# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| SPARTAN COMPOSITES, LLC, d/b/a FODS, and SPARTAN MAT, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>SIGNATURE SYSTEMS GROUP, LLC,<br><br>*Defendant*. | §<br>§<br>§<br>§<br>§  Civil Action No. 4:24-cv-609<br>§  Judge Mazzant<br>§<br>§<br>§<br>§<br>§ |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Signature Systems Group, LLC's Partial Motion to Dismiss and for Sanctions Based on Plaintiffs' Pre-Suit Misconduct (Dkt. #120). Having considered the Motion and the relevant pleadings, the Court finds that the Motion should be **DENIED**.

## BACKGROUND

Before the Court lies a hidden-camera discovery dispute between multiple business entities associated with the construction industry. Any fair assessment of the facts of this case must be founded upon a clear examination of the relevant parties. Defendant alleges that it first began selling "composite mat[s,]" or portable floor terrain sections designed to remove mud, dirt, and other debris from, in 2007 (Dkt. #20 at p. 12; Dkt. #60 at ¶ 7). Five years after Defendant entered the business, Plaintiff Spartan Mat, LLC ("Spartan Mat") was founded and began developing its own composite mats. Plaintiff Spartan Composites, LLC ("Spartan Composites"), was founded sometime later (Dkt. #20 at p. 15; Dkt. #60 at ¶ 22). In early 2014, FODS, LLC ("FODS"), then a business entity separate and apart from Plaintiffs, began work on a unique reusable "trackout control mat" that would clean tires by deforming them (Dkt. #1 at ¶ 12).

FODS ultimately piqued Defendant's interest, and on August 13, 2018, Defendant executed a confidentiality agreement with FODS that gave Defendant access to certain confidential information to support a potential buyout (Dkt. #1 at ¶¶ 17–18; Dkt. #20 at p. 15; Dkt. #60 at ¶ 17). Despite "many months of review and discussion," Defendant and FODS did not reach an agreement (Dkt. #1 at ¶ 19). Around that time, Defendant turned its attention to Plaintiffs and brought suit against them on matters related to trade dress and patent infringement (Dkt. #20 at p. 15; Dkt. #60 at ¶¶ 23–25). By December 2019, the parties signed a settlement agreement wherein they promised not to "manufacture, market, advertise, or sell any [m]at which is designed to be interlockable/interoperable with [the other parties' mats] for a period of seven (7) years from the Effective Date" (Dkt. #1 at ¶ 42; Dkt. #20 at p. 15). Following the execution of the settlement agreement, Plaintiffs partnered with FODS and began manufacturing the unique trackout mat that FODS had designed (Dkt. #20 at p. 16; Dkt. #60 at ¶ 27).

As Plaintiffs and FODS continued to work together, Defendant's interest in FODS was reignited, and Defendant and FODS executed yet another confidentiality agreement based on Defendant's expression that it was again considering acquiring FODS for itself (Dkt. #1 at ¶ 20). From May 2021 until the end of March 2022, Defendant requested and received a significant amount of confidential information from FODS (Dkt. #1 at ¶¶ 20–24).[1] As part of the negotiations, Defendant's head engineer was even permitted to inspect FODS's manufacturing and molding processes and to take photographs of the mat molds (Dkt. #1 at ¶ 24). Despite the collaborative

---

[1] Defendant requested and received "designs, specifications, ideas, and concepts, customer information . . . ." related to FODS (Dkt. #1 at ¶ 20). These included thousands of pages of confidential customer and business information, including "mat mold drawings" and detailed answers to manufacturing and assembly questions (Dkt. #1 at ¶¶ 21–22). Defendant also received "log-in access" to various key systems, which allegedly allowed Defendant to "monitor all business activity from production, sales, and quoting in real time and unmonitored by FODS personnel" (Dkt. #1 at ¶ 23).

examination process, further discussions were again suddenly terminated by Defendant in late March, 2022 (Dkt. #1 at ¶ 25).

On November 1, 2023, Defendant launched "DiamondTrack," a trackout prevention mat aimed at removing mud, dirt, and debris from vehicles exiting work sites (*See* Dkt. #1 at ¶ 26). Defendant's new model remained "both interlockable and interoperable with FODS's mats" such that "a customer of both may use the hardware that accompanies the FODS mat to connect the DimondTrack [sic] mat to the FODS mat" (Dkt. #1 at ¶¶ 26–27). Whether the connection between the two brands was the result of an act by Plaintiffs or Defendant remains a point of great contention (*see* Dkt. #16 at pp. 13–14; Dkt. #60 at ¶ 16).

In the year following the launch of Defendant's DiamondTrack product, Plaintiffs acquired FODS (Dkt. #20 at p. 16; Dkt. #60 at ¶¶26–27). Shortly thereafter, Plaintiffs' head of operations, Ryan Webster ("Webster"), with phone in hand and hidden camera in pocket, took to Defendant's manufacturing facility in Orlando, Florida (Dkt. #120 at p. 1). While there, he took pictures of Defendant's manufacturing machinery and secretly used a hidden camera (placed inside of a pen) to make a covert video recording of his conversations with employees (Dkt. #134-1 at p. 15; Dkt. #120 at p. 6). Traditional discovery would later reveal additional facts about Webster's mission, namely that the scheme was financed by Spartan Composites (which, by that time, had begun doing business as FODS), and that the plot was further shared with Nathan Barker ("Barker"), the corporate representative of FODS, and the co-founder of FODS, Bryce Clingerman ("Clingerman") (Dkt. #120 at p. 1; Dkt. #120-4 at p. 2; Dkt. #120-5 at pp. 18–20; Dkt. #75 at p. 1).

Just one week later, on July 3, 2024, Plaintiffs filed their Original Complaint in this court, bringing the following four causes of action against Defendant: (1) misappropriation of trade secrets

3

in violation of the Defend Trade Secrets Act, 18 U.S.C. ¶ 1836; (2) misappropriation of trade secrets in violation of the Texas Uniform Trade Secrets Act; (3) breach of contract; and (4) tortious interference with prospective business relations (Dkt. #1 at pp. 11–15). On August 29, 2024, Defendant filed its Answer and Counterclaim to Plaintiffs' Complaint, alleging that Plaintiffs breached their settlement agreement because they sold products "designed to be interlockable/interoperable" with Defendant's unique locking system, which Defendant claims has been used since 2007 (Dkt. #4 at p. 15).

On March 7, 2025, following months of discovery, Defendant filed its Amended Answer and Counterclaim to Plaintiffs' Complaint, adding a claim for interference with prospective business relationships (Dkt. #1 at pp. 20–21). On September 2, 2025, Defendant filed its Partial Motion to Dismiss and for Sanctions Based on Plaintiffs' Pre-Suit Misconduct, arguing that Webster's bad-faith conduct, considered in light of Plaintiffs' approval of it, warrants dismissal of all claims associated with the information it provided (Dkt. #120). On September 17, 2025, Plaintiffs filed their Response to Defendant's Motion to Dismiss and For Sanctions, arguing that sanctions are neither factually nor legally justified in this case (Dkt. #127). Six days later, on September 23, 2025, Defendant filed its Reply, again asking this Court to strike "Plaintiffs' trade secret allegations pertaining to FODS's mold and molding process, which are rooted in plaintiffs' abusive pre-suit conduct" (Dkt. #134 at p. 1). Finally, on September 24, 2025, Plaintiffs filed their Sur-Reply, repeating their earlier stance and emphasizing the hesitancy at which courts apply dismissal sanctions (Dkt. #145). The Motion is now ripe for adjudication.

## LEGAL STANDARD

The United States Supreme Court has held that, in certain circumstances, federal courts have inherent powers to sanction. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). This power "includes the ability to punish conduct before the court as well as actions beyond the court's confines, regardless of whether that conduct interfered with courtroom proceedings." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1088 (9th Cir. 2021). However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. Further, "[t]he threshold for the use of inherent power sanctions is high." *Matta v. May*, 118 F.3d 410, 416 (5th Cir. 1997) Indeed, the court's inherent sanction powers may be exercised "only if essential to preserve the authority of the court and the sanction chosen must employ the least possible power adequate to the end proposed. If there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first." *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996). "In short, the inherent power springs from the well of necessity, and sparingly so." *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1407 (5th Cir. 1993).

The Fifth Circuit has "confined sanctions under the district court's inherent power to instances of bad faith or willful abuse of the judicial process." *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990). Bad faith is "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose of moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will." *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999) (citation modified). Such bad faith "is judged by 'necessarily

5

stringent' standards." *Pressey*, 898 F.2d at 1021 (citing *Batson v. Neal Spelce Associates, Inc.*, 805 F.2d 546, 550 (5th Cir. 1986)).

A district court must evaluate whether "bad faith or willful abuse of the judicial process" exists under a "clear and convincing" evidentiary standard. *In re Moore*, 739 F.3d 724, 730 (5th Cir. 2014). Put another way, "[t]o support a finding of bad faith, the evidence must be so direct and weighty as to leave the factfinder with a firm belief in the truth of the facts of the case." *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001) (citing *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992)).

Engaging in self-help to circumvent the discovery process in bad faith is among the range of conduct for which a district court may assess sanctions using its inherent powers. *See, e.g.*, *Rousseau*, 985 F.3d at 1085, 1091 (analyzing a district court's use of its inherent powers to sanction a party based on the unauthorized pre-suit testing of evidence); *Lahr v. Fulbright & Jaworski, L.L.P.*, 1996 WL 34393321, *2 (N.D. Tex. 1996) ("The court may exercise its inherent authority to exclude 'proprietary' documents obtained unfairly and outside the context of formal discovery.").

## ANALYSIS

Defendant asks this Court to use its inherent power to sanction Plaintiffs by striking and dismissing two trade secret claims relating to the information obtained through Webster's trip to Defendant's Florida manufacturing facility (Dkt. #120 at p. 5; Dkt. #134, p. 7). Defendant has repeatedly made it clear that, in its opinion, nothing less than dismissal of these claims will do (Dkt. #120 at p. 12). Because the Court is unpersuaded that Plaintiffs' actions warrant the "draconian remedy of dismissal," and Plaintiffs have not requested lesser sanctions, the Court declines to invoke its inherent power in this case. *Marshall v. Segona*, 621 F.2d 763, 767 (5th Cir. 1980); *MultiPlan, Inc. v. Holland*, 937 F.3d 487, 501 (5th Cir. 2019) (quoting *Chambers*, 501 U.S. at

6

43 and *Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010)) (citation modified) ("[I]nherent powers—those implied powers that are necessary for a court to manage its affairs—should only be used 'to achieve the orderly and expeditious disposition of cases,' and when they are 'essential to preserve the authority of the court.'"). While the Court seeks to properly discourage business entities from engaging in interstate activity that invokes thoughts of corporate espionage and scenes from "Mission Impossible," Defendant is nonetheless correct in its assertion that "[t]he ultimate issue of whether Plaintiffs' actions should be prosecuted under Florida law is not before the Court" (Dkt. #134 at p. 6). In that context, Defendant is free and encouraged to seek out justice, where legally permissible, for any alleged violations of Florida law elsewhere as it so chooses. To the extent that Defendant requests that the Court use its limited inherent power to strike Plaintiffs' claims for bad faith abuse of the judicial system, however, the request is denied.

I.      **Dismissal Sanctions are not Warranted**

There is insufficient ground to conclude that Plaintiffs' pre-litigation actions constitute bad faith abuse of the judicial process such that dismissal sanctions are appropriate. Further, the Court declines to use its inherent power to dismiss claims associated with every bad faith act taken prior to litigation. While the Court finds that Plaintiffs acted in bad faith in ordering, supporting, funding, and ultimately benefitting from Webster's Florida mission, it cannot find the same support for the notion that Plaintiffs' bad faith has resulted in any abuse of the judicial process fairly punishable by dismissal sanctions. Because Defendant has not adequately explained why Plaintiffs' conduct has so negatively impacted or abused the present litigation as to invoke the inherent power of the Court to "manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases," the

Court sees no reason to resort to the harsh application of dismissal sanctions. *Link v. Wabash R. Co.*, 370 U.S. 626, 631 (1962).

### A. Clear and Convincing Evidence of Bad Faith

From the face of the record, Plaintiffs' involvement in Webster's mission to Florida constitutes a bad faith act. As noted above, bad faith "implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will." *Miller v. Dunn*, 774 F. Supp. 3d 806, 818 (N.D. Tex. 2024). Here, Webster admitted in deposition that he knowingly and intentionally entered Defendant's manufacturing facility without permission and repeatedly lied to Defendant's employees about meeting with a fictional individual to remain in the facility (*See* Dkt. #134-1 at pp. 10–14). He further agreed that he "came up with an excuse for being in [Defendant's] manufacturing facility because [he] knew [he was not] supposed to be there . . . ." (Dkt. #134-1 at p. 14). As noted above, he secretly recorded the event with a pen camera and openly took photos of Defendant's heavy machinery (Dkt. #134-1 at p. 15). Webster's actions, taken together, satisfy even the "necessarily stringent" bad faith standard. *Batson*, 805 F.2d at 550 (5th Cir. 1986); *See, e.g.*, *Site 2020 Inc. v. Superior Traffic Services, LLC*, No. CV 21-63-M-DLC-KLD, 2023 WL 4060099, at *10 (D. Mont. Mar. 27, 2023), (finding that a party acted in bad faith where, during the course of litigation, it ordered its employee to don a disguise and infiltrate the property of another party to gain insight into confidential discovery matters), *report and recommendation adopted*, No. CV 21-63-M-DLC, 2023 WL 4248715 (D. Mont. June 29, 2023).

But the bad faith in this case is hardly limited to Webster in his individual capacity. The evidence is uncontroverted that: (a) Barker and Clingerman knew about and agreed that Webster should undertake the Florida mission; (b) Clingerman bought Webster a hidden pen camera and

knew that he would use it at Defendant's facility; (c) Plaintiffs (FODS) paid for Webster's plane ticket to Florida; (d) Plaintiffs (FODS) reimbursed Webster for his hotel expenses; (e) Plaintiffs (FODS) paid for Webster's rental car; and (f) Barker personally thanked Webster for completing the job (*See* Dkt. #134-1 at pp. 8–9, 12, 14–18). From the facts listed above, the Court finds by clear and convincing evidence that Plaintiffs displayed bad faith in intentionally supporting, encouraging, and ultimately benefitting from Webster's unexpected excursion into Defendant's property.

As a result of their bad faith actions, Plaintiffs inarguably had access to information prior to the lawsuit that they otherwise could not have been privy to.[2] Plaintiffs ask that the Court excuse their actions as mere "poor judgment . . . ." in "acting to protect its trade secrets" (Dkt. #127 at p. 5). The Court understands Plaintiffs' impulse to defend their business, especially after having reason to believe that Defendant had inappropriately handled sensitive information. But while Plaintiffs may indeed have been acting to protect their trade secrets, a right thing must be done in a right way.[3] Plaintiffs' actions portray much more than "bad judgment" or negligence—they portray a story of intentional undercover deceit directly associated with Plaintiffs' trade secret claims. Indeed, it is bad faith, not bad judgment, that leads a business to intentionally and secretly send its employee, armed with a hidden camera and verbal fabrications that betray a dishonest purpose, into the private manufacturing facilitates of its competitors.

---

[2] Plaintiffs admit as much in deposition, stating that they "learned" and "found out" about the specific manufacturing process Defendant was employing as a result of the trip (Dkt. #120-7 at pp. 11–12).

[3] The Court has reason to doubt Plaintiffs' argument that protection of trade interests was the sole purpose of Webster's mission. Clingerman states in his deposition that protecting Plaintiffs' trade secrets constituted only "*part* of the reason why we wanted to go down and see [Defendant's manufacturing process]" (Dkt. #95-1 at p. 32).

9

### B. Plaintiffs' Bad Faith Acts do not Warrant Dismissal of a Cause of Action

The Court is not free to wantonly issue dismissal sanctions in response to every single bad faith act taken by a party prior to litigation. Instead, the Fifth Circuit has noted that, "[t]o the extent that inherent power is seen as a product of necessity, *it contains its own limits*. It is . . . an implied power *squeezed from the need to make the court function*." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990) (emphasis added), *aff'd sub nom. Chambers*, 501 U.S. 32. In this context, sanctions brought about by the court's inherent powers must be deemed "necessary to protect the efficient and orderly administration of justice [or] . . . necessary to command respect for the court's orders, judgments, procedures, and authority." *In re Stone*, 986 F.2d 898, 902 (5th Cir. 1993). Ultimately, whether a bad faith act warrants dismissal sanctions is a matter of equitable discretion. *In re Thomas*, 250 F.3d 744 (5th Cir. 2001) (citing *Warren v. Rsrv. Fund, Inc.*, 728 F.2d 741, 748 (5th Cir.1984)) ("[W]e have consistently held that even where a district court finds bad faith, it may exercise its equitable discretion and refrain from imposing sanctions."). Because the Court finds dismissal sanctions unnecessary to cure the negative impact created by Plaintiffs' bad faith act, it declines to issue dismissal sanctions on any of Plaintiffs' trade secret claims.

First, Webster's Florida mission has had a minimal impact on the present litigation. Defendant argues that dismissal sanctions are warranted because Plaintiffs engaged in "self-help discovery" to such an egregious degree that "Plaintiffs' trade secret claims . . . are tainted to their very root . . . ."(Dkt. #130 at p. 4). However, Defendant has not raised sufficient facts to support the use of such an "extreme" measure. *Marshall*, 621 F.2d at 767 (citation modified) ("We have upheld the use of the draconian remedy of dismissal in suitably extreme circumstances."). Instead, the facts presented hardly suggest that Webster's trip and Plaintiffs' actions were taken in a litigious context, much less in a conscious attempt to thwart the Federal Rules of Civil Procedure or

otherwise undermine the integrity of the judicial system. At best, Defendant points to Clingerman's belief that the information collected by Webster "*in part* form[ed] the basis of [his] decision to file a complaint against [Defendant]" (Dkt. #120-8 at p. 9). However, Defendant overlooks the fact that the tangible results of Webster's trip were not attached to or otherwise presented to the Court in the Original Complaint itself. Further, Clingerman testified that he had not discussed the matter with his attorneys prior to carrying out the plan (Dkt. #120-8 at p. 10), and Webster testified that he had not discussed the idea of a lawsuit with either Barker or Clingerman prior to visiting the facility (Dkt. #127-1 at p. 4). At all times before the Court, Plaintiffs have not acted with a "dishonest purpose" or to cause "harassment" or "delay" through Webster's bad faith mission. *See Miller*, 774 F. Supp. 3d at 818–19. They have neither attempted to conceal nor spoliate any evidence relating to Webster's mission and have instead been open and forthcoming in all discovery proceedings. As a result, the Court finds no evidence of any "extraordinary circumstance" beyond an isolated and foolish pre-suit act that could justify a dismissal sanction. *Marshall*, 621 F.2d at 767.

Defendant repeatedly likens Plaintiffs' actions to those described in *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1317 (D. Utah 2016) (Dkt #130 at p. 9; Dkt. #134 at p. 7). In *Xyngular*, a district court imposed dismissal sanctions on a counterclaim-plaintiff for his bad faith actions taken prior to litigation. *Id.* at 1328. There, the plaintiff and his counsel "sought to gain an unfair advantage in [his] lawsuit" and requested and reviewed hundreds of relevant and irrelevant documents for over one year prior to filing suit against the defendant. *Id.* at 1318, 1324. After "attach[ing] some of the documents to his pleadings and application for a temporary restraining order," plaintiff ultimately disclosed his collection of documents, insisting that he had only sought

11

them to "blow the whistle," despite continuing to collect them "after he stopped meeting with any investigative agencies." *Id*. at 1324. The facts of *Xyngular* are readily distinguishable from the facts of this case. Here, Plaintiffs' bad faith acts are not clearly of consequence in the present litigation. Unlike the plaintiff in *Xyngular*, who relied upon specific documents and other information to gain an unfair advantage both prior to and throughout litigation, the Plaintiffs in this case merely "confirm[ed] . . . what we understood and what we had been stating and what we had been expressing to . . . counsel" (Dkt. #120-7 at p. 10). *Id*. at 1328. Importantly, Plaintiffs' pre-suit actions have not uncovered any information that could be used to provide them with an advantage in litigation. Instead, they produced photographs and a video containing information that Plaintiffs almost certainly would have obtained had they sought them through proper discovery channels (*See* Dkt. #120-7 at p. 10). Given the plain and uncontested testimony offered by Plaintiffs, their lack of clear use or reference to the relevant photos or video, and the absence of any obvious advantage in litigation, there is little beyond pure speculation to connect Webster's bad faith mission to the notion that Plaintiffs conspired to abuse the judicial process or gain an unfair advantage in the current proceeding in a manner similar to the plaintiff in *Xyngular*.

  While the court in *Xyngular* held that dismissal sanctions were justified because "[plaintiff] cannot unlearn the information in the documents, and the [defendant] would be forced to defend plaintiff's claims despite his unfair advantage," Defendant goes so far as to argue that it is actually *advantaged* by Plaintiffs' bad faith conduct (*See* Dkt. #120-7 at p. 10; *see* Dkt. #94; Dkt. #95 at pp. 10–12). *Id*. at 1326. Because Plaintiffs took it upon themselves to allegedly "protect [their] trade secrets" prior to litigation, Defendant argues that it has gained considerable evidence to support two of its affirmative defenses (*See* Dkt #127 at p. 5; *see* Dkt. #94; Dkt. #95 at pp. 10–12). It is likely

12

for this very reason that Defendant has strongly opposed any attempt by Plaintiffs to exclude the photos or video that Webster took at Defendant's manufacturing facility (Dkt. #94; Dkt. #95 at pp. 10–12). In fact, Defendant continues to reject Plaintiffs' proposed voluntary agreement to not use Webster's photos and videos at trial (*See* Dkt. #127 at p. 10). In light of Defendant's continued utilization of Webster's mission and its consequences, the Court finds that no unfair advantage was gained by Plaintiff that necessitates the particularly harsh use of dismissal sanctions.[4] Rather, the mission itself ironically appears to operate as its own self-contained deterrent.

Finally, the Court turns to Defendant's request that it dismiss Plaintiffs' claims to prevent setting a negative precedent: namely, encouraging future parties to take improper actions in anticipation of litigation. In short, the Court finds that the circumstances of this case do not demand dismissal as a cure to any hypothetical threat of negative precedent. Assuming, *inter alia*, that Plaintiffs acted in anticipation of litigation when Webster planned and executed his bad faith expedition to Florida, Plaintiffs are not the first to take rash and inappropriate action prior to filing a complaint. When district courts deal with such conduct, they are naturally hesitant to resort to dismissal sanctions absent any aggravating factors or tangible harm to the parties' ability to litigate.[5]

---

[4] To the extent that Defendant relies upon *Staton Techiya, LLC v. Samsung Elecs. Co., Ltd.*, 742 F. Supp. 3d 602, 666 (E.D. Tex. 2024), *appeal dismissed*, No. 2024-1917, 2024 WL 5181582 (Fed. Cir. Dec. 20, 2024) to argue that dismissal is warranted under the circumstances presented, the Court notes that dismissal in that case was predicated upon the following: (1) it was "impossible to know the full extent of the improperly obtained evidence's use[;]" (2) the defendants engaged in numerous attempts to cover their abuse of the Federal Rules of Civil Procedure; and (3) the defendants stole privileged and confidential information both before and during litigation. *Id.* at 666, 660, 658. None of those factors are before the Court, and the Court declines to dismiss Plaintiff's claims.

[5] *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Hill*, No. 4:15-CV-166-DMB-JMV, 2018 WL 3370557, at *4 (N.D. Miss. July 10, 2018) (issuing a dismissal sanction against a party for bad faith pre-litigation conduct "based on [her] continued violations of Court orders, as well as her refusal to pay court-ordered sanctions . . . ."); *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 571 (S.D.N.Y. 2008) (issuing a sanction excluding evidence except for impeachment purposes in response to plaintiff's unlawful access and use of defendant's confidential emails in drafting a complaint); *Muslow v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. CV 19-11793, 2020 WL 4471160, at *5 (E.D. La. Aug. 4, 2020) (issuing a sanction excluding evidence obtained and improperly utilized prior to litigation).

This Court shares the same hesitancy to dismiss claims under its inherent power. This hesitancy is especially strong here, as Webster's pre-suit mission did not "taint" Plaintiffs' claims "to their very root" (Dkt. #130 at p. 4). No evidence connects the bad faith act to intentional subversion of the trial process, and the trip has not provided Plaintiffs with a unique or tangible benefit in litigation. Instead, its very existence has seemingly exposed Plaintiffs to the potential of litigation and two affirmative defenses. Because the Court finds the use of dismissal sanctions to be unnecessary to preserve the integrity and authority of the judicial process or to adequately deter future improper conduct, it declines to use its inherent power to dismiss any of Plaintiffs' trade secret claims.

### C. Monetary Sanctions in Lieu of Exclusionary Sanctions

As noted above, dismissal sanctions are not taken lightly. The Fifth Circuit has held that, in general, "[s]anctions under a court's inherent power to punish abusive litigation practices are permissible but should be used as a *last resort* . . . ." *Sample v. Miles*, 239 F. App'x 14, 20 n.14 (5th Cir. 2007) (emphasis added). Defendant argues that dismissal of Plaintiffs' claims is justifiable because, among other reasons, it "leaves Plaintiffs with the *majority* of their claims pending" (Dkt. 134 at p. 7). However, the sanction chosen by this Court under its inherent power "must employ the least possible power adequate to the end proposed[,]" and here, "a lesser sanction than dismissal is available." *Nat. Gas Pipeline*, 86 F.3d at 467; *Popejoy v. United Apartment Grp., Inc.*, No. 5:24-CV-00843-OLG-RBF, 2025 WL 826533, at *2 (W.D. Tex. Jan. 28, 2025), *report and recommendation adopted*, No. SA-24-CV-00843-OLG, 2025 WL 824143 (W.D. Tex. Mar. 12, 2025). Rather than dismiss two of Plaintiffs' trade secret claims associated with Websters trip, the Court is instead willing to consider satisfying the demands of justice with an alternative, lesser, and well-tailored remedy to accompany Defendant's use of Plaintiffs' bad faith actions: monetary sanctions.

The Court finds it necessary here to repeat that Defendant adamantly rejects and refuses the proposition that Webster's photos and video should be excluded from trial (Dkt. 94; Dkt. 95 at pp. 10–12). Because Defendant continues to argue that it benefits from the tangible evidence created by Plaintiffs' bad faith conduct, the Court finds that the exclusion of such evidence would unjustly benefit Plaintiffs, who have repeatedly requested that the evidence be excluded (Dkt. 94 pp. 4–6; *see* Dkt. 127 at p. 10). Having exhausted alternative remedies, the Court finds that a monetary sanction, together with the benefits that Defendant continues to derive from Plaintiffs' bad faith actions, may be appropriate to serve the ends of justice as a clear response to Plaintiffs' embrace of "self-help discovery" to protect its trade secrets.

Though the Court notes that it is willing to consider the imposition of monetary sanctions in this case, it cannot go so far as to order them. When a district court imposes sanctions under its inherent power, "it must comply with the mandates of due process," which requires "fair notice and an opportunity for a hearing on the record." *CEATS, Inc. v. TicketNetwork, Inc.*, 71 F.4th 314, 323 (5th Cir. 2023). Here, Defendant has not requested any form of monetary sanctions and have not properly placed Plaintiffs on notice that they might face monetary sanctions. To impose monetary sanctions on Plaintiffs in this order risks erroneously providing Plaintiffs with notice "that they *might* face [monetary] sanctions at the same time that they learned that they *would* face [monetary] sanctions." *Id.* As a result, the Court declines to use its inherent power to issue either dismissal, exclusionary, or monetary sanctions at this time. Having found dismissal sanctions unnecessary to preserve the authority or efficiency of the judicial system, the Court sees fit to deny Defendant's present motion.

## CONCLUSION

It is therefore **ORDERED** that Defendant Signature Systems Group, LLC's Partial Motion to Dismiss and for Sanctions Based on Plaintiffs' Pre-Suit Misconduct (Dkt. #120) is hereby **DENIED**.

**IT IS SO ORDERED.**

SIGNED this 20th day of October, 2025.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE