UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

SPARTAN COMPOSITES, LLC, ET AL | DOCKET 4:24-CV-609
|
| NOVEMBER 17, 2025
VS. |
| 9:19 A.M.
|
SIGNATURE SYSTEMS GROUP, LLC | SHERMAN, TEXAS

------------------------------------------------------------

VOLUME 1 OF 4, PAGES 1 THROUGH 214

REPORTER'S TRANSCRIPT OF JURY SELECTION AND TRIAL
**REDACTED TRANSCRIPT**

BEFORE CHIEF JUDGE AMOS L. MAZZANT, III,
UNITED STATES DISTRICT JUDGE, AND A JURY

------------------------------------------------------------

APPEARANCES:

FOR THE PLAINTIFFS:    CHRISTOPHER JOHN SCHWEGMANN
                       JESSICA COX
                       KRISTOPHER M. RUIZ
                       LYNN, PINKER, COX & HURST, LLP
                       2100 ROSS AVENUE, SUITE 2700
                       DALLAS, TX 75201


COURT REPORTER:        CHRISTINA L. BICKHAM, CRR, RDR
                       FEDERAL OFFICIAL REPORTER
                       101 EAST PECAN
                       SHERMAN, TX 75090

PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

FOR THE DEFENDANT:        ROBERT H. RECKERS
                          DAVID WYNNE MOREHAN
                          SHOOK, HARDY & BACON, LLP - HOUSTON
                          600 TRAVIS STREET, SUITE 3400
                          HOUSTON, TX 77002

                          BASIL TRENT WEBB
                          EVAN JAMES WEIDNER
                          SHOOK, HARDY & BACON, LLP - MO
                          2555 GRAND BOULEVARD
                          KANSAS CITY, MO 64108

                          BRENNA L. KINGYON
                          SHOOK, HARDY & BACON, LLP - KS
                          3612 WEST 48TH STREET
                          ROELAND PARK, KS 62205

                          KIMBERLY CANDACE PRIEST-JOHNSON
                          SHOOK, HARDY & BACON LLP - DALLAS
                          100 CRESCENT COURT, SUITE 700
                          DALLAS, TX 75201

INDEX

|                                              | PAGE |
| -------------------------------------------- | ---- |
| COURT WELCOMES PROSPECTIVE JURORS             | 14   |
| *VOIR DIRE* BY MR. SCHWEGMANN                 | 40   |
| *VOIR DIRE* BY MR. RECKERS                    | 84   |
| JURY SWORN                                    | 128  |
| PRELIMINARY INSTRUCTIONS TO THE JURY          | 129  |
| SEALED PORTION NUMBER 1                       | 145  |
| BRIAN SCHENK:                                 |      |
|     DIRECT EXAMINATION OF BY MS. COX | 148 |
|     CROSS-EXAMINATION BY MR. WEIDNER | 174 |
| SEALED PORTION NUMBER 2                       | 194  |
|     REDIRECT EXAMINATION BY MS. COX | 194 |
|     QUESTIONS FROM THE JURY | 200 |
| BRYCE CLINGERMAN:                             |      |
|     DIRECT EXAMINATION BY MR. SCHWEGMANN | 201 |
| COURT REPORTER'S CERTIFICATION                | 214  |

INDEX OF EXHIBITS

|                          | PAGE |
|--------------------------|------|
| Plaintiffs' Exhibit 93   | 165  |
| Plaintiffs' Exhibit 45   | 210  |
| Plaintiffs' Exhibit 45   | 210  |
| Defendant's Exhibit 48   | 152  |
| Defendant's Exhibit 243  | 177  |
| Defendant's Exhibit 16   | 186  |
| Defendant's Exhibit 16   | 192  |

(In chambers, all parties present, prospective jurors not present.)

THE COURT: Okay. So it's my understanding there were issues with slides for opening statements. I don't know which side or both.

MS. COX: We had an issue with the last couple of slides on defendant's opening PowerPoint.

THE COURT: Okay.

MR. RECKERS: Yeah. So let me just show your Honor the slides we're pulling up now. So the issue here is the breach of contract claim. So the parties have these sort of mirror-image breach of contract claims. There is a mutual provision in the Settlement Agreement that says neither side can make interlockable mats with the other side.

Our argument is that we don't breach there, we don't breach the contract ourselves, and for all the reasons that they say that we're breaching, they are the ones to actually breach. And that's sort of it. It's a mirror-image claim.

They sell -- so these are mats. They have holes in the corners of them. And we basically say that there is a connection system that --

THE COURT: Do you have the slides to show me?

MR. RECKERS: Yeah, I'm going to show you the

slides.

THE COURT: Is it the last --

MS. COX: It's the last three.

And, your Honor, while he's pulling it up, I can describe what the issue we have with these slides is.

So their counterclaim as pleaded has to do with the interlockability of the FODS mat and the DuraDeck mat, not the interlockability of the FODS mat and the DiamondTrack mat, so these are not mirror-image claims.

And they've pleaded consistently. In their original answer, in their original counterclaims, their amended counterclaims, their expert report, their corporate rep deposition, and their expert deposition, they confirmed consistently that the theory of their counterclaim breach was the interlockability of the FODS mat and DuraDeck.

Now they're trying to change it to say that their claim is actually about the FODS mat and the DiamondTrack, two completely different products.

MR. RECKERS: Well, they're not completely different in the sense that, as we put in our pleading, that the DuraDeck and the DiamondTrack have the exact same connection system.

So what we did was we pulled forward our connection system -- so it's basically holes plus these pieces of -- these plates of hardware that have these

little pegs in them.

I'll show you in our pleading where we point out that they are the same. So when we say "DuraDeck" in our answer, basically, we point out that it's the same for both.

And the point for us is that we haven't changed anything. We've been making this type of connection system and putting the holes in these same places in our mats since long before the FODS was even on the market.

MS. COX: And, your Honor, this isn't about the hardware; it's about the mats that they are alleging interlock.

I spoke with Ms. Kingyon, who is counsel for defendant, last night, and I asked over email whether or not they were planning on alleging now that the FODS mat and the DiamondTrack mat being interlockable was the theory for breach, the defendant's counterclaim. Ms. Kingyon confirmed in writing and over the phone that, yes, they are now changing it based on discovery, despite the fact that, as pleaded, their claim is the interlockability of the FODS mat and the DuraDeck mat.

The DuraDeck mat and the DiamondTrack mat are not the same mat. It has nothing to do with the hardware.

MR. RECKERS: So I'll show you just -- this is our affirmative claim. These are our counterclaims --

THE COURT:  Well, what does the pretrial order say?  Tell me what --

MS. COX:  The pretrial order was the first time that there was a written place where defense counsel stated that they were alleging interlockability of FODS and DiamondTrack.  We did lodge an objection.  That's footnoted in the pretrial order.

MR. RECKERS:  And they have been on notice of that.  It is in the pretrial order.

And also I'll point out this is -- this is our breach of contract claim, our counterclaim, and we have the DuraDeck connection.  We point out that it's the same connection with DiamondTrack.  And then we -- this is paragraph 41 of our Docket Number 20.

Then we go and we say that they are breaching this provision of the Settlement Agreement, which is what's in those slides, on the basis of 2024 when Spartan acquired FODS.  So it's hardware; the DiamondTrack plus DuraDeck, it's the same; and then their breach based on 2024.

THE COURT:  So --

MS. COX:  And if you look at paragraph 42, it specifically states "the interlockability of FODS and DuraDeck," not DiamondTrack, and it has nothing to do with the interlockable hardware.

MR. RECKERS:  Again, if you look at paragraph 41,

it's both the hardware and the combination of DuraDeck and DiamondTrack.

MS. COX: Your Honor, nowhere in paragraph 41 will you find it written that they are alleging that the FODS mat is interlockable with DiamondTrack.

MR. RECKERS: Right. I mean, that's their argument.

THE COURT: Okay. And so what is --

MR. RECKERS: So the slides -- so we breached -- so the first slide is just -- sets up the Settlement Agreement, and then this is the provision that's mentioned in our pleading to say that they breached.

MS. COX: The dispute over the slides is the photos of the mats that are on there as well as the defense counsel said over email they were planning on changing the theory of breach to now argue that FODS is interlockable with DiamondTrack.

That's our problem with these slides. That's not DuraDeck as alleged in those photos. That's the DiamondTrack, which is not the claim that they have pleaded.

MR. RECKERS: And so just -- I'm showing this slide, which I -- so this is the DuraLink connection system, which is the old connection system, that we mention on paragraph 41.

MS. COX: And we've specifically objected to Slide Numbers 38 through 40, which is the last three. So I think that's a little bit earlier than what we've objected to.

MR. RECKERS: Okay. All right. So this just shows that we use the same connection system between the two.

And then this is the one, I think, that you're objecting to.

MS. COX: 38 through 40 has the exact same photo in all of them.

MR. RECKERS: Okay. So this is a photo from their expert's report to show that their hardware -- again their hardware is what's referenced.

And then we show that -- the provision that we pled that they breached next to their hardware. And then we argue -- and this is really, I think, the gist of it -- that the DuraLink -- that we don't sell anything that connects the two, that they sell something that does connect and that their selling of the thing that connects is the breach.

THE COURT: Okay. What else?

MS. COX: It's the photos of the mat that are the problem, as well as what they are going to argue before the jury is that they planned -- what they told us over email -- which I'm happy to provide the Court a copy of our

email.  They confirmed over email that they plan on telling the jury that defendant's theory of breach is that the FODS mat and the DiamondTrack mat is interlockable.  That's what they are showing in the last slides.

That's not their theory, not as pleaded.  And the first time that they raised that was in the joint pretrial order.  Again, for the first year of this case, they have alleged that their theory was the DuraDeck and the FODS being interlockable.

THE COURT:  And so where is that when you look at paragraph 41 or 42?

MR. RECKERS:  Yeah.  What we're pointing out here is that DuraDeck and DiamondTrack are the same.  So they have the same hole location.  And so if you can interlock with DuraDeck, that means that you can interlock with DiamondTrack.  It's the exact same connection system, which is the focus of the breach allegation.  The connection systems are the same.  We've maintained them the same.

So if that's a breach of the contract as they affirmatively claim, then our counterclaim shows that it's not our system that breached.  We haven't done anything different.  It's that they came up with a new, essentially, longer connection system that -- not only is it their theory that these things are in violation, it's their connection system which is what accomplishes the breach,

accomplishes the interconnectability.

THE COURT: Okay.

MS. COX: Again, your Honor, that is not what they have pleaded nor is it what they have pursued for the first year of this case.

THE COURT: Okay. Well, I'm going to look at the pretrial order, and then I'll give you an answer before -- you know, by the time jury selection is done.

Anything else?

MR. RECKERS: Well, and I'll tell you just sort of a preview, Judge. If you were to go the other way on this, we would simply change our slides to basically make it the mirror image and to say the word "not" in breach of the parallel provision because we're not the ones that sell the -- we're not the ones that sell the connectible connection system. I don't know if I'm going to -- yeah, because I want to have a Plan B for that, as you would expect.

THE COURT: Okay.

MS. COX: And, Judge, the last thing I'll say is I think this is a bigger issue of we need to know what defendants are going to say their counterclaim is at trial because we've been operating under the assumption that their counterclaim is as pleaded, which is that the FODS mat interlocks with DuraDeck.

Now, the night before trial, they are changing it. So this goes way beyond the opening PowerPoint. It comes up in opening, of course. But we need to know what they are going to be arguing so that we can put on a defense.

THE COURT: No, I understand. But you are objecting to it, so --

MS. COX: Yes.

THE COURT: Right now, it's still in the case until I decide differently.

MS. COX: Understood.

THE COURT: But I'll get you an answer, you know, by the time we get done with jury selection.

What else, everyone? Anything else from the defense?

MR. RECKERS: Not from us, no.

THE COURT: Anything else?

MS. COX: Nothing else.

THE COURT: Okay. Well, hopefully, we'll get started early. Otherwise, we'll start at 10:00.

Also, just for a scheduling issue, tomorrow I'm visiting with Allen High School students, and we do this every year. We're probably going to take a lunch break tomorrow not until 1:00. So I'll do it over my lunch hour, meet with the students.

So I'll tell the jury when -- at the end of the

day today, whoever gets selected, about that, but I just wanted you -- for your case, planning purposes, we won't break until 1:00 for lunch.

MS. COX:  Got it.  Thank you.

THE COURT:  Okay.  Well, very good.  Then we'll send for y'all as soon as we're ready.  Thank you.

(Recess, 9:29 a.m. to 9:46 a.m.)

(Open court, all parties present, prospective jurors present.)

THE COURT:  Good morning.  Please be seated.

We are here in Case 4:24-CV-609, Spartan Composites, LLC, doing business as FODS and Spartan Mat, LLC versus Signature Systems Group, LLC.

For the plaintiffs, are you ready to proceed?

MR. SCHWEGMANN:  We are, your Honor.

THE COURT:  Okay.  And for defendant, are you ready to proceed?

MR. RECKERS:  Ready, your Honor.

THE COURT:  Good morning, everyone.  I want to welcome you to jury service here in the Eastern District of Texas, Sherman Division.

My name is Amos Mazzant.  I'm the district judge in residence here, and I do just want to welcome you to jury service and thank you for being here today.

I just want to tell you a little about myself.

I'm a United States District Judge here in the Eastern District of Texas. I have lived here in Sherman since 1990. I have been on the bench in this Court since 2014, although I've been a judge in other positions since 2004.

I have a confession to make. I wasn't born here, but I got here as quick as I could. So that's what every non-Texan says who came here.

My kids were born here. My grandkids were born here, so...

And then I came to Texas to go to Baylor Law School. I paid for my own education, so -- I went to university of Pittsburgh undergrad. My wife and I are from a small, small town outside Pittsburgh. And then Baylor gave me a full academic scholarship, which is what brought me to Texas, and then I never left.

I mentioned I'm married. I have two grown children. My older daughter is an Aggie, so I'm an Aggie dad. And they are doing really well, so -- my other two schools, Baylor and Pitt, are not doing great, so -- but right now A&M is doing nicely, so I root for them. So sorry if there are any UT fans here. I know there's a rivalry there.

But anyhow, so my older daughter isn't using her degree. She's actually a flight attendant with American and been doing that for over four years and loves it.

She was considering going to law school and came to me and apologized and said, "Dad, I really want to go fly the world," so she is doing that. She has a serious boyfriend who's a pilot as well. So -- it's a transient lifestyle, but they both seem to like that.

My younger daughter is a graduate of Tarleton University and -- at Stephenville. And she's not using her degree. She's an assistant manager at an event center. And then she's married and I have two granddaughters, too, one who's ten months old, who I got to play with yesterday, and they live right outside of Sherman. So...

And then my wife is a retired schoolteacher. She taught at Howe ISD, kindergarten, and then she taught in Sherman ISD until she retired.

Okay. So I tell you all these things about myself because I think it is only fair that before we start asking you questions, you learn a little bit about me. So that's part of that process.

Has anybody been in this building before?

Okay. We've got one here.

Okay. So it's a very historic building. It was built for a total cost of $144,000 and it is the oldest courthouse being used in all of the Fifth Circuit, which is all of Louisiana, Mississippi, and Texas. And there have only been four judges in residence in this building since

it opened in 1907.

There's not a portrait -- the first judge in residence was David Bryant, and his picture was downstairs. He never did a portrait. And he served the Eastern District from 1890 to 1910.

The next -- second judge in residence was David Bryant's son, Randolph Bryant. Now, that's his portrait in the back of the courtroom. And he served the Eastern District as a District Judge from 1931 to 1951. At that time, there was just one judge, and then we expanded to two judges. We now have eight District Judges for the whole district.

But Judge Bryant moved the headquarters from Sherman, which was the headquarters of the Eastern District, to Tyler where it currently is at.

And then Judge Brown is the third judge in residence, and his -- that's his portrait to my left, your right. He was a judge here from 1985 until he passed away in 2012. In 2013, we got the building renamed the Paul Brown Courthouse by an act of Congress.

Judge Brown was my mentor until he passed away. He gave me my first job out of law school when I graduated from Baylor Law School.

And then I became the fourth judge in residence on December 19th of 2014.

The other portrait up here is Judge Ron Clark, who is a former Chief Judge of our district and is from Sherman. I actually was in private practice as a young associate with him. He has taken his kind of retirement for a federal judge on what we call senior status.

He asked me to put his portrait here because he was from Sherman and was a state rep here for years, and his practice was primarily here. But his position when he became a District Judge was in Beaumont, Texas, so he had to move there. So he is no longer in Beaumont, and that's why his portrait is here.

The craziness is, as a District Judge, after you serve ten years, you get to have a portrait. And actually I've ordered mine. The artist is busy, so it will be about a year before I sit for that, which is crazy that I've been on the bench in this position that long.

Okay. So let me move on.

Now, there were some changes to the building. Of course, the entrance to the building when I first became the district judge here, the marshals asked me to move it back to the original entrance. You used to enter on Travis Street and now you move -- you enter in the original entrance, which is on Pecan Street, which is our mailing address.

Anyways, I just wanted to give you a sense of this

historical building because it's a building that I love.

I do hope you will enjoy federal jury service. It is very important to how we function in society. And so I know some of you are probably thinking there's other places I'd rather be than be here on this Monday morning, and I understand.

But if you'll just indulge me a minute, when we look at our history of our -- of the United States, it goes all the way back -- I mean, I'm not going to go this far back, but you can go all the way back to Magna Carta and King John. But if you bring it up to more -- to our country, you could look at the Declaration of Independence, the issue of trial by jury was something very important to our Founding Fathers and they included it in the Constitution.

And when they ratified the Constitution, we added the ten amendments to the Constitution, which we call the Bill of Rights. And the Seventh Amendment guarantees your right to a jury trial in civil cases. The Sixth Amendment is the right to trial by jury in criminal cases.

So for over 200 years, we've had a constitutionally guaranteed right to settle civil disputes by trial by jury.

So being here today, ladies and gentlemen, in a very real way you're doing your part as good citizens to

preserve, protect, and defend the Constitution of the United States, including the right to a trial by jury.

I always say jury service is one of the highest forms of public service that any American can serve, the highest being our men and women who serve in the armed forces.

Each of you, as a prospective juror, is being asked to exercise a fundamental right of American citizenship, to participate in the fair and just administration of Government under the law.

A retired federal judge and the retired Dean of the UNT Law School, Judge Royal Furgeson, wrote -- he wrote this forward on a book about jury trials, and I always liked this quote. It says, "The jury Trial is a critical component of our Democratic society, and its use in civil cases is unique to the United States. It is truly an example of our participatory democracy in action, ensuring our nation's promise of liberty and justice for all. Indeed, in America we do justice with juries."

And I do a whole jury speech that I call "Doing Justice with Juries." It's 30 minutes. I'm not going to give it to you. But -- so that's why I really like that quote, and that's why I named my speech what I did.

And -- but we are in a unique situation in the world of how we settle disputes, and today there is a real

dispute among these parties. And so the jury selected for this case is going to be asked to decide those factual disputes.

What I always say, our system of justice as we know it and practice it would not exist without men and women serving as our jurors in our -- in these cases.

Now, one thing, too, is the Sherman Division is the busiest division in the Eastern District. And I always say -- I'm now the Chief Judge, too, of the district, so I have administrative duties in the district in addition to my case duties.

But we have -- a normal judge has a 430-weighted caseload. Mine is about 1,900. And that's just half the docket.

My district judge colleague in the Plano court, a federal courthouse, also has a 1,900-weighted caseload.

So as Chief Judge, I've taken steps to give a third of our docket or -- yeah, I think 34 percent -- to the other judges in the district, future filings, but we still have a really current backlog of cases.

And this is an aside, but just today I received the first-filed case and then there was another case that was the same subject matter, different parties but the same subject matter so they are related. And our typical practice is we transfer the case to the judge who got the

first filed.  But being nice -- and I'm hoping that my colleague would take both cases even though I got the first filed -- I sent him an email saying, you know, I'll do whatever you want to do.  I know our tradition is you would transfer it to me, but if you want both cases, I'll give them to you.

He said yes because he said he was already working on the motion that he had pending in his case, which was just filed like two weeks ago.  If you saw my motion list and how many motions we have pending, something filed two weeks ago, it will be many, many months before I get to it.

Anyways, all of that is to say I'm just saying how busy we are, and this is -- I keep track of my statistics for jury trials.  This is my 146th jury trial since I've been a federal judge, which is a lot of jury trials.  So I love this whole process.

But I couldn't do this without an amazing team, so the whole preface of why how busy I am is we are a team here in this courthouse.

So you've already met my amazing courtroom deputy. Keary Conrad, who will be the face interacting with the jury.  She's been with me a long time and does an amazing job.

I have an amazing court reporter, Chris Bickham over there, taking the record down.  And so she also does a

great job. Although she is taking a transcript down for the jury selected, there will not be transcripts available for your use. But she has to take everything down.

And then we have two amazing court security officers. We have Bill Hayth, who is a long-time court security officer. And then we have Bart Pollock, who is there, and this is his first trial, I think. He's newer, but it's his first trial.

And then Greyson Addicott is my lawyer that's helping me out.

Go ahead and stand, Grayson.

So he is a recent graduate from Baylor who just joined me in September.

So that's how we get all of this accomplished.

And so what I'm going to do now is -- I could summarize the case, but I give each side five minutes just to tell you about the facts of the case and then I'll continue with my part of the process.

And the plaintiff, they always have the burden, so they go first. I'll let them say -- if you want to go ahead and spend five minutes to say whatever you want to say about the facts.

MR. SCHWEGMANN: Thank you, your Honor. May I proceed?

THE COURT: Yes.

MR. SCHWEGMANN: Good morning, ladies and gentlemen. I'm glad to see you here.

My name is Chris Schwegmann. I'm a lawyer. I represent the plaintiff in the case. I represent two companies, one called Spartan and one called FODS, F-O-D-S. Stands for foreign object debris system.

And my clients, they make mats, these large construction mats that are used at the entrance of a busy construction site.

If any of you have been into a construction zone or construction site, it often gets muddy, it gets dirty. And one of the things that FODS created was a giant mat. It's 12 feet long and 7 feet wide that sits right at the entrance.

So when those trucks go in, and more importantly when they exit with all that mud on their tires, these mats knock that mud off so it doesn't get into the streets, it doesn't get into the water systems, it doesn't shoot those little pebbles that break your windshields. And that's -- that's the purpose.

And what's interesting is for years and years and years, no one had thought to create a reusable composite plastic mat that could sit at the entrance of a construction site. For years, people put gravel or put rocks there.

And my client, Mr. Clingerman, who's sitting with us today, he was working full time in construction and he had an idea. He said, "What if we can create something we can reuse that would sit at the entrance that would help take this debris off our roads?"

So while working full time, he invested his own money and spent literally hours and hours in his own garage making prototypes, coming up with designs, doing testing, and he ultimately designed what we refer to as the FODS trackout mat. It tracks the -- keeps -- tracks that dirt right off the tires.

So he started his own company and he came up with a unique way to manufacture it. He came up with certain trade secrets that were integral to the creation of this mat.

Now, it's a small company, but it did very well very fast. Started selling these mats to construction companies -- to distributors who sold to construction companies, and they grew year after year after year. Some bumps in the road, yes, but grew year after year, but still a small company.

And in 2018, you'll hear, for those of you who sit on the jury, that a bigger company, Signature Systems, who was making mats but not trackout mats -- no one else was doing this -- said, "Hey, we want to purchase you. We want

to buy your company."

The parties signed a nondisclosure agreement, a Confidentiality Agreement that permitted us to share with Signature customer lists, our sales data, the folks we sell it to. But more importantly, we showed them how to make it. We gave our trade secrets to Signature during that due diligence process.

Now, 2020 rolled around, and everybody knows what happened in 2020. COVID hit. Construction was in disarray. No one knew what the world would look like.

They didn't close the deal in 2020. They parted as friends and went on their separate ways.

We continued to sell our FODS mats to distributors, and they sold the other kinds of mats that they made, but they didn't have a trackout mat.

In 2021, Signature comes back to FODS and says, "Let's restart these discussions."

So we said, "Yes." We signed a nondisclosure agreement.

The nondisclosure agreement says whatever information we give to Signature, Signature can't use for its own benefit.

And, again, we gave our customer lists. We gave our sales data. We talked about our pricing. We told them who we sell to and why and how we get those sales.

We gave them the designs of our mats. We even let their engineers inspect the molds, take pictures, make measurements.

You'll hear that deal didn't close either. And if you sit on the jury, you'll hear some of the reasons why.

Again, we thought we'd part as friends. In fact, afterward we said, "Hey, remember all that information we gave you during this due diligence process? Remember the designs? Remember the customer lists?" We said, "Sorry the deal didn't work out, but destroy all that information we gave you." They weren't allowed to use it under the nondisclosure agreement. And we said, "Destroy the data. Destroy the documents."

They didn't destroy it.

THE COURT: Okay. Your five minutes are up.

MR. SCHWEGMANN: You'll hear more about that when we're allowed to show you the opening and as we go.

Thank you for your time.

THE COURT: And both sides will have a regular -- a more normal opening statement to let everything out.

Okay. Would defense like to take their five minutes?

MR. RECKERS: Yes, your Honor.

Good morning. Nice to be with you. We're excited to be trying the case before at least some of you.

My name is Rob Reckers. I represent the defendant in this case, Signature Systems.

As you just heard, Signature is a company in the mat manufacturing business. They make these big industrial mats.

And I'll introduce my team later on this morning, but I want to introduce you first to someone important who's with us. That's Mr. Jeff Condino. He's the president of Signature Systems. He started there on the operations side. He's worked his way up.

Mr. Condino is going to be here all week with me because this is an extremely important case to Signature. He's going to tell you, along with some other employees of Signature, the facts of this case that are going to be very different than what you hear from plaintiffs' side, because here are those facts.

Signature has been in the mat manufacturing business since 2007. They are the innovators in this space. They pioneered the same type of process for making mats of all different shapes and sizes.

They have a patent from 2012, years before FODS was on the market, on how to make mats like this. These are big pieces of molded plastic. They're fairly simple products. And Signature has a facility that's been making mats for a long time.

Our defenses are going to focus on two issues, two main points that we're going to make to you throughout this trial.

Number one, the mat at issue here, this big trackout mat that knocks mud off the tires, that was made by Signature's technology, Signature's experience. Signature has been able to make mats like this long before they talked to the FODS folks. They did not use any stolen technology from the FODS folks. Signature already had their own factory, already had the machines to make these big mats.

Number two, and it's related, Signature didn't take any secrets from the FODS folks. We'll walk through each of the things that they say are secret and we'll show they were already in the public domain. They were either information that FODS had already put out in the market. They sell these mats publicly. They're not a secret.

The mats themselves, they're made up of an old process called compression molding. Big pieces of plastic made on machines that are commercially available that Signature already owned.

So at the end of the day, there's no secrets in this case, no secrets were stolen, and there's no damages.

I expect you'll hear some mud thrown at my clients, but that's okay because none of it's going to

stick.

At the end of the trial, we're going to ask just one simple thing, that you decide the case on the evidence and the facts because from our perspective there's only really one just outcome based on those -- that evidence and those facts and that's going to be a verdict for Signature.

So, again, look forward to trying this case before at least some of you.  Thank you for your service.

THE COURT:  Okay.  Thank you, Mr. Reckers.

So we're starting a process called *voir dire*. It's a French term meaning to speak the truth.  This process enables the parties and the Court to determine which of you would be the best prospective juror for this particular case.

This allows the parties to ask you questions.  The process works better if everyone participates.  We want to hear what you have to say, and it's important for how we decide which of you will be the best ones for this jury.

The one thing to keep in mind is -- when you get asked questions today is just to give full, complete, truthful answers to any question.

Remember, ladies and gentlemen, there are no wrong answers to any question.  We're just trying to figure which of you would be the best juror for this case.  And all we want is full, complete, and truthful answers.

The example I always use is, to put it in my -- like where would I not be the best juror?  And I'll tell you right now.

So as I mentioned, I grew up in a small town north of Pittsburgh, so I'm a Steelers fan.

Any Steeler Nation here?

No.  Okay.

No Cleveland Browns or -- fans here?

Okay, good.  I guess you're all Cowboys fans?

Okay.  A few.

Well, I'm not sure what teams y'all are rooting for, then.  Okay.

So anyways, my Steelers actually played well yesterday, so I'm happy about that.

But I know that if this was a case involving the Pittsburgh Steelers, I know about myself that I'm not rational when it comes to the Steelers.  So if it was a case about the Steelers, I wouldn't be a good juror.

And that's an extreme example, but it's a true example.  I wouldn't be good with that.

Now, the Cowboys are headquartered in the Sherman Division, in Frisco, at The Star.  So I've had three Cowboys-related cases, so I have never held it against the Cowboys.  And I root for them unless they play the Steelers, which only happens like every five years.  So,

you know, I get the -- I've had those Cowboys cases.

So the purpose of the questioning is simply to ensure the jury chosen in this case will be fair and impartial to both sides, be able to listen to the evidence and have an open mind.

Jurors must be as free as humanly possible from any bias, prejudice, or sympathy as to the law or the facts of the case. All you need to bring to serve as a juror is your impartiality, along with your own good judgment and common sense.

Now, the questions today are not made to invade your privacy. We're just trying to see which of you would be the best juror for this case. If something is asked you don't want to be shared among the whole group, then please just, you know, let us know and we'll bring you up separately later in the process.

I will tell you the attorneys have a seating chart that has your number, your name, your city you're from, your occupation, if you have one. If you have a spouse, it also has the spouse's occupation as well.

Now, when they start asking you questions and you have answers, I would ask -- I've asked the attorneys to use your numbers. It's a public record. I just don't want your names in the public record.

And if they do use your names, because they're

used to that, you know, I'll strike your name from the record to protect your identity, so don't worry about that. But I just want you to know why they're not using your names. It's because I have instructed them to do so.

Now, as we start the process, if you have any -- a response to a question, raise your hand. Wait for one of our fine security officers to bring you the mic. You would stand --

I'll pick on you, 21. You're right up front. You'd stand. Hold the number up so everyone can write it down.

You would stand. You would say, "Juror Number 21," and then answer the question. Okay?

And if you are silent to any question, we're going to assume the answer is "no."

One thing as the judge that's presiding over this case, I want to manage your expectations.

So our normal day is 9:00 to 5:00. This case will take all week is what I anticipate. I've put them on the clock.

So once we start the trial after jury selection, every second that you're in the box counts to one side or the other, which guarantees the case will be in the hands of the jury by Friday. It may happen sooner. You know, sometimes cases go quicker, but I just wanted you to know

that.

And, again, we normally just go 9:00 to 5:00. There will be some adjustments in that, you know, throughout the week that could happen.

So the question is: Since it's going to take all week, does that present a significant problem for anybody to serve on the jury?

Had to grab a pen to make note of this.

Okay. So Juror Number 4.

PROSPECTIVE JUROR: I'm Number 4.

So the reason why I'm raising my number up is twofold. So I do sales as a professional. It's commission based. This is a very busy time of year for us, so most of my earnings are made during this time to the end of the year.

In addition to that, I'm a small business owner that -- a company that just started six months ago, which is heavily dependent upon me.

THE COURT: Okay. I'll take these up at the end of the process, I mean, so -- okay. Thank you.

Okay. The next one is Juror Number 8.

PROSPECTIVE JUROR: I'm Number 8.

And I work nights, so I've been up for -- since 5:00 p.m. yesterday and, I mean, it's going to take me a little bit to adjust to days.

THE COURT: So if you got selected for the jury, you could serve this week and -- I mean, I assume you're not going to be working and --

PROSPECTIVE JUROR: No. I won't be working, but -- I mean, I'm going to try to stay awake, I guess --

THE COURT: We'll try to keep you -- these are good attorneys. I'm sure they'll keep you engaged here.

PROSPECTIVE JUROR: I might fall asleep.

THE COURT: Well, the CSO may tap you on the shoulder if you fall asleep, and I understand, but thank you.

Okay. Number 13.

PROSPECTIVE JUROR: Hi. Juror 13. I just have a client meeting in Dallas from 10:00 to 2:00.

THE COURT: What day?

PROSPECTIVE JUROR: Wednesday.

THE COURT: Okay. Thank you.

All the way to the back, 17.

PROSPECTIVE JUROR: Hi, your Honor. I'm Juror Number 17.

First of all, I would be happy to serve as a juror if selected, but the timing right now is really tough because we have our 94-year-old grandfather who is living with us and he's fallen three times this week. And so my husband works full-time and my kids are all in school and

so --

THE COURT: So you're the major caregiver?

PROSPECTIVE JUROR: Yeah. So I don't know how being on -- it would be the first time no one's home for that period of time, for five days.

THE COURT: I understand. Thank you.

Okay. Over here, Juror Number 23.

PROSPECTIVE JUROR: Hi. Juror Number 23.

My only concern right now is that I'm an accountant and I own my own firm. I'm the only member of that firm. And so I'm just concerned about being here all week, for missing filing deadlines and reporting deadlines for sales tax and month-end reporting if I'm not able to communicate and get information from my client during the business day.

THE COURT: Okay. Thank you.

Okay. 27.

PROSPECTIVE JUROR: I'm Juror 27.

I'm an athletic coordinator and I have two games this week, and I am also driving the bus to those games.

THE COURT: Wait. So let me -- what do you do again? I'm sorry.

PROSPECTIVE JUROR: Athletic coordinator.

THE COURT: Oh, okay. And then you're the bus driver, too?

PROSPECTIVE JUROR:  Yes.  We have two --

THE COURT:  What school?

PROSPECTIVE JUROR:  Fowler Middle School.

THE COURT:  Thank you.

The next one is 32.

PROSPECTIVE JUROR:  Hi.  I'm Juror 32.

I'm recovering from the flu last week and so I was -- I'm a schoolteacher as well.  So I've been out of school last week and so it would probably be really difficult to also be out of school this week.

THE COURT:  Where do you teach?

PROSPECTIVE JUROR:  Down in Frisco as well.

THE COURT:  Okay.  Thank you.

Okay.  Is that everybody?

Again, I'll take these up at the end of the process.  So you're stuck here today, at least, and then we'll address that.

And then, again, I try to always manage your expectations.  Each side has been given an hour to ask questions, so it may push into the lunch hour as we try to get the jury selected.  I always try to get the jury selected.

We're going to seat eight of you.  And then I usually want to get the jury selected so everyone else can leave, and then we'll take a lunch break and everything

with the jury that's selected.

Also, you know, traditionally I would call it the splash zone is over here. I do something a little different because I increase the number of strikes that each side has. So in my last couple of jury trials we got to the last two jurors over here. So it just depends on how the process plays out.

Before I turn it over to the attorneys, I'm going to go ahead and ask each side to introduce everybody at their table. And the reason that I'm going to ask you after they do that if you know anybody. So we're just seeing if you know any of the attorneys or the parties.

So I'll ask plaintiff to go first.

MR. SCHWEGMANN: Again, good morning. My name is Chris Schwegmann.

With me at our table is my colleague, Jessica Cox.

MS. COX: Good morning.

MR. SCHWEGMANN: And Chris Ruiz.

MR. RUIZ: Good morning.

MR. SCHWEGMANN: And I mentioned him earlier. This is Bryce Clingerman.

And this is Brian Schenk.

And with me here is maybe the most important person on our team, Scott Smoot.

THE COURT: Thank you.

Does anybody know anybody on the plaintiff side?

Okay. And then for the defense? Mr. Reckers, if you'll introduce your team.

Oh, your mic, yes.

If I don't remind you, my court reporter will.

MR. RECKERS: All right. So I have Mr. Condino, as I mentioned before.

Then also with me is Mr. Trent Webb, Ms. Jill Schmid, and Evan Weidner.

THE COURT: Do you want to introduce everybody else?

MR. RECKERS: Yeah. Let me introduce -- we have Kimberly Johnson, David Morehan.

And then also with us is Brenna Kingyon, Sue Rilley, and Deborah Ripkowski.

THE COURT: Thank you.

Does anybody know anybody on the defense side?

Okay. Very well.

And then, again, each side is going to have an hour to ask questions. And then the way this process will play out is when we're done with the questioning, I'll meet with the attorneys about the various hardships everyone mentioned; and that will require everyone to probably go into the hallway between upstairs and downstairs.

We may have to call some of you back, too, to ask

some follow-up questions.

And then ultimately when we're done, we'll get the jury seated. But, you know, some of that process takes some time, so bear with us. And then we'll get the jury seated and then, you know, everyone else will be able to leave and then the jury selected, you know, will continue.

Couple bonuses. My only hobby is baking. So for the jury selected, you'll get something this week. I'll bake you something homemade. So just one little plus, especially this time of year.

And then the other thing is I allow the jury to ask questions of witnesses. I'll explain that process when the jury is selected. Not many judges do that, so I allow that process.

So we're going to turn it over to the plaintiffs to go ahead and ask their questions, and we want to hear what you have to say. Thank you.

MR. SCHWEGMANN: Thank you again. I know what a hassle it is to drive here, find parking, come sit in these pews for what's going to seem like hours while we ask these questions.

I thank you and I echo what Judge Mazzant said about this right and that it's enshrined in the United States Constitution. And in some ways it's the most sacred thing, other than voting or serving in the armed services,

that we can do to exercise our rights.

So thank you. I'm going to thank you now and I'm going to thank you often throughout this case as you listen to the stories that these respective folks have to tell.

Like Judge Mazzant, I feel like it's important, if I'm going to ask you personal questions, I should tell you something about me.

I'm 51. I grew up in Texas. I grew up in a little town outside of San Antonio, Texas. I live in Dallas now with my wife, who is also a lawyer. She's a law professor at SMU.

I've got three kids. I have a 15-year-old girl, Scarlet. She's got -- just recently got her learner's permit. And it's funny. As I was coming to court today I was thinking to myself, I don't know what's more nerve-racking, standing in front of all of you people who I just met or being the passenger in the car as she drives to school every morning.

I have a 14-year-old son. He just turned 14 today. Today is his birthday. I called him this morning to wish him happy birthday and I got the typical response you get from a 14-year-old boy, which is, "Thanks, Dad." Wasn't much else.

And, finally, I have a 10-year-old girl. Her name is Hattie. She's probably more excited about Max's

birthday than he is because he likes cherry pie and so everyone tonight at dinner is going to have cherry pie, except for me, who is staying at the Marriott making sure that we're finishing this trial on time so that we can get you guys out in time for Thanksgiving.

As Judge Mazzant said, we're trying to find people who don't have any particular bias one way or the other. So know when I ask my questions I'm really just interested to know more about your background to see if we can learn more about you to see if any of those biases might exist.

So I, unfortunately, Judge, am a Cowboys fan, growing up in Texas. It's difficult to be a fan these days. I'm not looking forward to this evening's game.

So all of my questions are designed really to get at what is your background, what is your experience, and whether it's a right fit.

I guess first let me ask, has -- does anyone work or have worked in construction? And just by a show of hands, if you could just raise the card high so that we can see you.

Anybody work in construction?

Number 15 -- let's start with 15. Where did you work? Tell us a little bit about that experience.

PROSPECTIVE JUROR: Good morning. Juror Number 15.

I actually worked in the residential home-building space for a home builder in the local area. They have a huge market presence, of course, so -- that's my background.

MR. SCHWEGMANN: With who?

PROSPECTIVE JUROR: Highland Homes specifically.

MR. SCHWEGMANN: Okay. What kind of work did you do?

PROSPECTIVE JUROR: I was actually on the HR side, but primary focus was bringing in superintendent and construction managers to oversee all phases of construction.

MR. SCHWEGMANN: Okay. Any experience with trackout mats like you heard about today?

PROSPECTIVE JUROR: I was out in the field from time to time obviously to poach candidates to bring onboard. Not something I'm most proud of. But ultimately it was -- that was really the only experience and exposure that I had in watching all phases of construction.

MR. SCHWEGMANN: Okay. Thank you, then. They don't have your name, so they don't know who is poaching the clients. So...

PROSPECTIVE JUROR: Good deal.

MR. SCHWEGMANN: Number 9.

PROSPECTIVE JUROR: I'm Juror Number 9.

My uncle owned a construction company in Rhode Island, so I was responsible for assisting him, driving the dump trucks in and out of construction sites and things like that, so...

MR. SCHWEGMANN:  So you've seen this trackout issue first-hand?

PROSPECTIVE JUROR:  I couldn't tell you.  I think it was -- most of the times it was rocks.  I don't think I've ever seen a mat on the way out.

MR. SCHWEGMANN:  And how long were you doing that kind of work?

PROSPECTIVE JUROR:  I did it every summer for about six years.

MR. SCHWEGMANN:  All right.  Thank you, sir.

PROSPECTIVE JUROR:  Sure.

MR. SCHWEGMANN:  Appreciate the response.

Anybody on this side of the room?  Anybody work in construction?

All right.  Next, how about this:  How many of you either work in engineering or have an engineering degree? Anyone on this side of the room?

Number 3.

PROSPECTIVE JUROR:  I'm Juror Number 3.

I'm mechanical engineer working on the automotive air-conditioning compressor for almost 29 years.

MR. SCHWEGMANN: Okay. And you have a degree in engineering?

PROSPECTIVE JUROR: Yes, I do.

MR. SCHWEGMANN: In mechanical engineering?

PROSPECTIVE JUROR: Yes.

MR. SCHWEGMANN: All right. Thank you, sir. I appreciate the response.

Anyone on this side, an engineering degree or works in engineering?

What about on this side of the room?

Number 21.

PROSPECTIVE JUROR: Hi. I'm Juror 21.

I have an engineering degree, but not using it, so...

MR. SCHWEGMANN: Okay. What kind of -- what field of engineering?

PROSPECTIVE JUROR: Electrical.

MR. SCHWEGMANN: And what do you do now?

PROSPECTIVE JUROR: I am unemployed. Last job, everyone got sacked, so yeah.

MR. SCHWEGMANN: Oh, sorry to hear that. Thank you for being here.

Anyone else that has an engineering background?

All right. Does anyone on either side of the room -- has anybody worked in manufacturing, maybe worked

with plastics or compressed materials, built molds? Anybody over here?

What about over here?

Okay. Oh, I'm sorry, Number 8.

PROSPECTIVE JUROR: Hi. I'm Juror Number 8.

And I work in manufacturing.

MR. SCHWEGMANN: What kind of manufacturing is it?

PROSPECTIVE JUROR: We make aerospace parts, so plastic, aluminum. It depends on the material that is requested.

MR. SCHWEGMANN: Do you guys use molds to make plastic parts?

PROSPECTIVE JUROR: I don't think so. I think it's just, like, we machine the plastics.

MR. SCHWEGMANN: Okay. How long have you been doing that?

PROSPECTIVE JUROR: Thirteen years.

MR. SCHWEGMANN: All right. Thank you. Thank you for continuing to stay awake through this process, too. I appreciate that.

Number 18.

PROSPECTIVE JUROR: Hi. I'm Juror 18.

So I work for a large dairy co-op, so I work in supply chain. So some experience I have is with the blow molds. So we use resin to blow jugs.

So that's my experience with --

MR. SCHWEGMANN:  And do you do that work yourself?

PROSPECTIVE JUROR:  No.  No.  I'm in finance, but I work in supply chain finance, so I know the full operation of how it works and --

MR. SCHWEGMANN:  And have you spent some time on the floor and seen how these --

PROSPECTIVE JUROR:  Yes.

MR. SCHWEGMANN:  -- these jugs are blown?

PROSPECTIVE JUROR:  Yes.  Because I've been to many plants around the nation, so yeah.

MR. SCHWEGMANN:  Have you ever operated any of that machinery?

PROSPECTIVE JUROR:  No.

MR. SCHWEGMANN:  Ever design any of the molds or anything like that?

PROSPECTIVE JUROR:  Unfortunately not.

THE COURT:  Okay.  Thank you, sir.  I appreciate that.

Number 35.

PROSPECTIVE JUROR:  Number 35.

I work for an insurance company and one of my target companies is advanced manufacturing.  That's my sweet spot.

MR. SCHWEGMANN:  Okay.  What does advanced

manufacturing do? What do they make?

PROSPECTIVE JUROR: It could be anything. It could be the car industry. It could be forging.

I mean, it's basically any kind of industry.

MR. SCHWEGMANN: Okay. And do you do any of that work yourself?

PROSPECTIVE JUROR: No. I underwrite for them, insurance, risk control, claims.

MR. SCHWEGMANN: Okay. Thank you.

Have you ever spent time on the factory floor and seen how the process of some of these things are made?

PROSPECTIVE JUROR: Yes, during risk control. That's what we do. We make any suggestions.

MR. SCHWEGMANN: Okay. What kind of things have you seen being made at advanced manufacturing?

PROSPECTIVE JUROR: I mean, a lot. There's a lot. We -- cages. You can -- we have -- I mean, there's just so many. I mean, it's commercial, and so it's all over Arkansas, Dallas. There's -- it's just a lot.

MR. SCHWEGMANN: Okay. Thank you. Thank you for the response.

You heard me talk earlier when I had my five minutes about an acquisition or an acquisition attempt. Has anyone worked for a business that either acquired another company or has been acquired, there's been a merger

of some sort?

I -- let's start -- well, I guess I'll go in order. Number 4.

PROSPECTIVE JUROR: Yeah. So I've worked for --

THE COURT SECURITY OFFICER: Wait for the mic.

MR. SCHWEGMANN: Sorry. They can't -- the room is so big it's hard to hear.

PROSPECTIVE JUROR: Yeah. So I've worked for different software companies in the past, and in the past five years there's been a number of acquisitions. So that's my experience.

MR. SCHWEGMANN: And what was your connection or involvement in any of those acquisitions?

PROSPECTIVE JUROR: Just enterprise account executive. So I was just an employee of one company, and then we would acquire another company. And then oftentimes I would learn that solution or product and we would focus on cross-selling that to our customers.

MR. SCHWEGMANN: Okay. Were you involved pre-acquisition at all, exchange of information to see if the parties wanted to do an acquisition?

PROSPECTIVE JUROR: No. Certainly not. So I wasn't involved on the back end or anything like that.

MR. SCHWEGMANN: Okay. Thank you, sir.

Who else had their -- let's see. I promised I'd

go in order. Let's say Number 8.

PROSPECTIVE JUROR: I'm Number 8.

The company I work for was previously like a mom and pop shop, and then they got bought out by a larger company. I still work there.

MR. SCHWEGMANN: Okay. And were you involved at all in the sharing of information to determine whether the acquisition should proceed?

PROSPECTIVE JUROR: No. I was just one of the machinists, but yeah.

MR. SCHWEGMANN: All right. Thank you, sir.

Number 9.

PROSPECTIVE JUROR: I worked for a small start-up software company that was acquired by a larger software company. I was not involved with any of the whether or not they should merge, but I was responsible for making sure that our systems matched theirs during the integration periods.

MR. SCHWEGMANN: Okay. So after the acquisition, you kind of helped integrate the two companies?

PROSPECTIVE JUROR: Exactly.

MR. SCHWEGMANN: Okay. Do you recall whether, in your particular instance, there was a nondisclosure agreement?

PROSPECTIVE JUROR: There was a nondisclosure, and

I was covered.

MR. SCHWEGMANN: Okay. Thank you, sir.

Anyone else -- Number 13.

PROSPECTIVE JUROR: Hi. Juror 13.

I worked for a company that has bought a smaller company, and then they also sold part of one of our brands that we carry.

MR. SCHWEGMANN: And what was your involvement?

PROSPECTIVE JUROR: I wasn't really involved with it at all, just had coworkers that were part of it.

MR. SCHWEGMANN: Okay. Was there sharing of information?

PROSPECTIVE JUROR: Yes, there was.

MR. SCHWEGMANN: And were you involved in that?

PROSPECTIVE JUROR: No.

MR. SCHWEGMANN: All right. Thank you, ma'am.

Number 14.

PROSPECTIVE JUROR: Hi. Good morning. I'm Juror Number 14.

My brother has a software company. He's an engineer and he bought a small company and I helped with the finance part of it. I did sign a nondisclosure, but I was not part of the decision-making.

MR. SCHWEGMANN: And did you look at that nondisclosure before you signed it?

PROSPECTIVE JUROR:  Of course.  I -- yes.

MR. SCHWEGMANN:  Did you take it seriously?

PROSPECTIVE JUROR:  Yes.

MR. SCHWEGMANN:  Was there anything about that that you think might make you -- more difficult for you to serve as a jury -- a juror?

PROSPECTIVE JUROR:  No.

MR. SCHWEGMANN:  Okay.  Thank you.

What about Number 18?

PROSPECTIVE JUROR:  Yes.  I've been on both sides. The company I was with was acquired by a larger company, and also we -- since I've been with the new company, we've acquired two or three different businesses since then.  So I've seen both sides.

I wasn't involved on the NDA side of things, but some of my colleagues were, so I'm familiar with that process.

MR. SCHWEGMANN:  Okay.  And did you -- when you were involved in that several times, were you part of the sharing of information with each side?

PROSPECTIVE JUROR:  No.  No.

MR. SCHWEGMANN:  Thank you, sir.

Let's see.  28.

PROSPECTIVE JUROR:  I was in-house counsel, so I dealt with a lot of mergers and acquisitions doing that.

And then in my private practice doing NDAs.

MR. SCHWEGMANN: So you know a lot about NDAs?

PROSPECTIVE JUROR: Yes.

MR. SCHWEGMANN: All right. Thank you, sir. Appreciate it.

Number 30.

PROSPECTIVE JUROR: Juror 30.

I've been with a company that has bought other companies, not involved in the decision-making, but in the technology integration piece of it.

MR. SCHWEGMANN: Okay. Were you involved in the sharing of information between the companies?

PROSPECTIVE JUROR: Yes.

MR. SCHWEGMANN: And tell us what that experience was like.

PROSPECTIVE JUROR: There was a form to sign to be read into it. And then privileged information shared between both parties.

MR. SCHWEGMANN: Okay. Was the idea that you're sharing this information for the purposes of the acquisition, but would use it for no other purpose?

PROSPECTIVE JUROR: It was all for integration actions during the acquisition and then post-acquisition.

MR. SCHWEGMANN: Thank you, sir.

Number 34, way in the corner.

PROSPECTIVE JUROR: Good morning. I'm Juror Number 34.

So I was involved in an acquisition of a rival company that we had -- our company went from private to public so we can go green, and so we were up for sale.

And so I was part of -- I was in purchasing, so I was -- the company that purchased us, we all had same departments. So it was just a matter of integrating and laying -- I should say lay off departments that were doubled. But it took them over three years --

MR. RUIZ: Wow.

PROSPECTIVE JUROR: -- because the company that I worked for was so large.

MR. SCHWEGMANN: What kind of company was it?

PROSPECTIVE JUROR: It was environmental. So we did recycling and waste cleanup.

MR. SCHWEGMANN: Okay. And were you involved pre-acquisition at all?

PROSPECTIVE JUROR: No.

MR. SCHWEGMANN: Okay. Thank you. Appreciate it.

One of the things you're going to hear about, for those of who you are lucky enough to be selected, is that some of the folks on my side -- Mr. Clingerman, for example, he doesn't have a college degree. He is not a formally trained engineer. He spent hours and hours in his

garage working on designs and doing research and coming up with the design that FODS ultimately used.

On the other side, I suspect you're going to hear that Signature has a team of engineers with degrees, have credentials. And, you know, there is nothing wrong with either path and I don't mean to suggest that, but I would love to know your reaction, how you honestly feel about that kind of difference, folks who might not have a college degree and folks who do and have trained technical expertise. I'm curious to know if you think that's good, bad, or neutral.

Anyone in the room feel that if someone doesn't have a college degree, that there is no way they could have come up with an idea or a design that's valuable? Anybody over here feel that way?

Anybody on this side of the room feel that if you don't have an engineering degree, if you don't have a technical background, that just through hard work you can't come up with something that's protectable, that's useful?

And if you do feel that way, don't be shy. This is the time to say. This is the time to uncover those kinds of biases one way or the other.

Let me ask it another way. Just by a show of hands, by showing your card, how many of you think that having an engineering degree or a college degree makes that

person more credible than someone who doesn't? Anybody feel that way?

You're facing the wrong way. Number 23. Thank you. Would you mind telling us your perspective about that?

PROSPECTIVE JUROR: Sure. From the perspective of I'm a licensed CPA. So if you're going down a path where you require licensure and certification and things like that, the background training and the education is invaluable, similar to like a doctor or a veterinarian or something like that.

MR. SCHWEGMANN: So -- thank you for sharing that perspective.

Does anybody share that same perspective?

And I'm sorry, sir, would you mind -- would you mind handing it back to 23?

So having that perspective, do you feel that knowing that Mr. Clingerman doesn't have that degree, doesn't have that background and perhaps some folks on the other side do -- in your mind, does that put us a little bit behind, a step behind?

PROSPECTIVE JUROR: No. It doesn't put you a step behind in my opinion.

MR. SCHWEGMANN: You're willing to listen to the evidence and hear the evidence and follow the Judge's

instruction?

PROSPECTIVE JUROR: Yes.

MR. SCHWEGMANN: Thank you.

I saw Number 4.

PROSPECTIVE JUROR: For me, it just depends on context. You know, like, I am biased when it comes to entrepreneurship and small businesses, in that sense. I just admire people who sacrifice to put in that good work to come up with an idea.

But on the other hand, in certain circumstances, you know, people have -- people who do have engineering degrees and whatnot, you know, they have those for a reason.

So it just depends on the context.

MR. SCHWEGMANN: All right. Thank you, sir. I appreciate that.

Does anybody share that perspective?

How many of you on this side of the room believe that someone can become an expert through years of hard work and research and putting in the time? How many feel that way?

All right. Thank you.

And on this side of the room, how many feel that someone can become an expert through years of hard work?

Thank you. There are so many, I'm not going to go

through each one with respect to that one.

Is there anyone in the room who just can't commit to having an unbiased opinion, judging witnesses on what they say, what they saw, what they did under the circumstances?  Can everybody commit to that?

What about over here?

Now, I asked some questions about nondisclosure agreements and I asked those questions in the context of an acquisition.  But I'm curious, has anyone here ever signed, in any context, a nondisclosure or a confidentiality agreement?

Okay.  And I'm going to kind of go through these quickly, but Number 2.

PROSPECTIVE JUROR:  I'm Number 2.

And I do HIPAA, because I'm a physician, with every patient.

MR. SCHWEGMANN:  Okay.  What kind of physician are you?

PROSPECTIVE JUROR:  I'm a child psychiatrist.

MR. SCHWEGMANN:  How long have you been doing that?

PROSPECTIVE JUROR:  Ten years.

MR. SCHWEGMANN:  Okay.  Thank you.  That's hard work.

Number 4.

PROSPECTIVE JUROR: I've been involved in NDAs as it relates to doing deep discovery in negotiations in more of a sales context. So a client or a prospect would have us sign an NDA so that way they would share sensitive information as part of, like, a discovery to determine if our solution could be a fit or not.

MR. SCHWEGMANN: Okay. Thank you, sir.

Number 8.

PROSPECTIVE JUROR: I'm Number 8.

As a machinist, pretty much all of our parts that are in the aerospace field are -- we can't talk about them or we can't share with other companies or anything like that.

MR. SCHWEGMANN: So in your business -- do you machine parts for different companies? Or just for --

PROSPECTIVE JUROR: Well, it depends. Like Boeing or the other airplane companies that exist, or fighter jets for the military. So a lot of that stuff is -- you can't talk about that.

And for other companies that I've worked for, pretty much whatever ideas we come up with, it's the company's because you're on the clock with them. So whatever ideas you suggest it's pretty much theirs.

MR. SCHWEGMANN: So is it fair to say in your world where you're machining parts for Boeing, I mean, you

don't treat these as just a piece of paper, do you?

PROSPECTIVE JUROR:  I mean, yeah, you're not supposed to talk about them.  Like, I can't go to another company and share how we machine them.

MR. SCHWEGMANN:  Okay.  Thank you.

Number 9.

PROSPECTIVE JUROR:  I recently had to sign an NDA for current litigation that's pending against a company that I work for in the software engineering field.

MR. SCHWEGMANN:  Okay.  And have you signed in any other context?

PROSPECTIVE JUROR:  With a former company, but it was all in the context of software engineering and sharing of engineering practices.

MR. SCHWEGMANN:  Okay.  Thank you, sir.

Let's see.  Number 14.

PROSPECTIVE JUROR:  I've signed the confidentiality agreements and NDAs, so --

MR. SCHWEGMANN:  What kind of context did you --

PROSPECTIVE JUROR:  I worked for two finance companies in different times, and both do require you to sign a confidentiality agreement.

MR. SCHWEGMANN:  What kind of information is exchanged when you've been involved in those situations?

PROSPECTIVE JUROR:  People, private information.

MR. SCHWEGMANN: Okay. All right. Thank you, ma'am. Appreciate it.

Number 15.

PROSPECTIVE JUROR: Yes. I was involved in NDAs when it came to employment specifically. Obviously, in the industry --

MR. SCHWEGMANN: Oh, you work in HR.

PROSPECTIVE JUROR: That's correct, yes, sir.

MR. SCHWEGMANN: So people are sharing their personal details.

PROSPECTIVE JUROR: You got it.

And then being on the talent acquisition side, of course, having the pipeline of specific candidates in the industry sort of thing, it was a nondisclosure agreement that we had to sign off for. So...

MR. SCHWEGMANN: Thank you, sir.

PROSPECTIVE JUROR: Of course.

MR. SCHWEGMANN: And Number 18.

PROSPECTIVE JUROR: So I worked for a defense contractor formerly, and I don't know if this falls under NDAs, but I had to get a top secret clearance.

MR. SCHWEGMANN: I think it probably does.

PROSPECTIVE JUROR: So, yeah, I had to work -- so I worked with them for -- this was in the finance realm, but worked at that company over five years.

MR. SCHWEGMANN:  So I take it that's something that you took seriously.

PROSPECTIVE JUROR:  Oh, for sure.

MR. SCHWEGMANN:  You don't treat it as just a piece of paper, do you?

PROSPECTIVE JUROR:  Right.

MR. SCHWEGMANN:  All right.  Thank you.

How about this side?

Oh, wow.  There's lots of folks.  It's more common than -- let's see.  Number 19.  We haven't heard from you.

PROSPECTIVE JUROR:  Yeah.  I'm Juror Number 19.

I did an NDA when I worked for FedEx Custom Critical.  We had a military contract.

And then currently I work for NFM in their financing.

MR. SCHWEGMANN:  Say that one more time.

PROSPECTIVE JUROR:  Nebraska Furniture Mart.

MR. SCHWEGMANN:  Oh, yeah.  Okay.

PROSPECTIVE JUROR:  I do their financing collections and repossessions, so I have a lot of information that I handle for that, and I'm under contract to not say anything.  That's kind of Social Security numbers and those kinds of things.

MR. SCHWEGMANN:  Very private information.  Thank you.

Let's see.  Number 22, someone else we haven't heard from.

PROSPECTIVE JUROR:  Yeah.  Juror 22.

I'm actually bringing suit against somebody, so, obviously, like, my lawyer tells me, you know, I --

MR. SCHWEGMANN:  Sure.  Attorney-client privilege --

PROSPECTIVE JUROR:  Yes.

MR. SCHWEGMANN:  -- with him or her.

PROSPECTIVE JUROR:  Yes.

MR. SCHWEGMANN:  If you don't mind me asking, what kind of litigation are you involved in?

Would you prefer to talk about it --

PROSPECTIVE JUROR:  Yeah.

MR. SCHWEGMANN.  -- privately?

PROSPECTIVE JUROR:  Yeah.

MR. SCHWEGMANN:  I'm happy to do that.

Number 23.

PROSPECTIVE JUROR:  Hi.  Number 23.

All of my clients, we have confidentiality agreements.  Obviously I have tax and finance information.

And then anytime we're investigating maybe the purchase of software to use, we have signed NDAs not to discuss what we're going to see as we evaluate different software.

MR. SCHWEGMANN: Sure. Thank you.

26.

PROSPECTIVE JUROR: Juror Number 26.

It was just a lawsuit, and so I had to sign an NDA.

MR. SCHWEGMANN: Okay. I'll talk about that separately in a bit if that's all right.

PROSPECTIVE JUROR: Okay.

MR. SCHWEGMANN: Thank you.

28, I think I know your experience. I think we can hand it over to 27.

PROSPECTIVE JUROR: Juror 27.

I'm not sure if this falls under it, but as an educator, you have to be confidential. You cannot provide identifying information about students.

I also worked in a hospital before, so I couldn't violate HIPAA as well.

MR. SCHWEGMANN: Okay. Like our physician friend, Number 2.

Anyone else over here?

If the Court -- if the Court instructs you that confidentiality agreements, nondisclosure agreements are binding contracts that have legal effect, does anybody have a view of a nondisclosure agreement that you just couldn't follow that instruction? Does that give anybody any

heartburn or concern?

All right. I see no hands.

This case, I told you, is going to involve customer lists, and it's going to involve some price -- you know, some pricing information, some business information that my client shared with Signature during these acquisition attempts.

Have any of you had to manage that kind of information, customer lists, pricing, things like that? Just a show of hands.

And while your hands are up, is there any of you that just instinctively feel that that kind of information is not confidential?

What about over here? How many of you manage customer lists or pricing, things like that?

And leave your hand up if you think, just before you've heard any evidence, that that stuff, that's just not confidential.

Does anybody -- especially those of you who have been involved in acquisition attempts. A handful of you mentioned that you've kind of been through this process once or twice.

I'm looking at you, Number 9.

Does anybody think that information exchanged under a nondisclosure agreement in the context of this kind

of acquisition, does anybody think that that's just industry practice to use that kind of information?

Anybody think that that's okay because that's just what companies do?

Let me ask a similar question. You'll hear that FODS has a website and that it has a data sheet about the trackout mat, its dimensions, what it looks like, how much weight you can put on it before it crushes.

Does anybody think that if a product can be bought off the shelf, does anybody think that it's always fair for a competitor to copy it?

Number 9. I knew I was looking at you for a reason, so --

PROSPECTIVE JUROR: I feel like if it's generally available and the specs are online -- sorry. Juror Number 9 -- and the specs are available and there are pictures of it and there's no patent on it, then I feel like anybody has -- should have the right to it if they have the means to produce it.

MR. SCHWEGMANN: Okay. Thank you for that.

Does anybody feel the same way?

Okay. Okay. All right. There's a handful of -- I'll -- let me explore that with a different question. Thank you.

Because you mentioned -- you mentioned -- I'm

going to skip ahead. I'm glad.

You mentioned the idea of a patent. And how many of you have -- and I understand there's -- you haven't heard the Court's instructions about what's a patent and what's a trade secret yet. But just having not heard the evidence or having not heard the instructions, does anybody think there's a difference between a patent and a trade secret? Does anybody know that difference?

What about over here? Anybody -- except for Number 28, does anybody know the difference between a patent and a trade secret?

Okay. What's your view about that?

PROSPECTIVE JUROR: 21 here again.

A patent is -- you register it with the U.S. Government so that, like, you can monetize it legally. And if someone copies that design and they check it against the patent, then it's patent infringement and they can't do that.

MR. SCHWEGMANN: Okay.

PROSPECTIVE JUROR: And a trade secret is -- you don't patent it, but it's not revealed to -- anything. But if someone else discovers the formula on their own, it's not protected by law, so they can use it.

MR. SCHWEGMANN: Okay. Thank you, 21.

Has anybody had any involvement in patents in any

way over here?

And, 9, what's been your involvement?

PROSPECTIVE JUROR:  Juror Number 9.

I've been involved with three patents so far, all on the software engineering side with different tools that we've developed for exploring different ways of doing engineering.

MR. SCHWEGMANN:  Okay.  And what was your involvement?  Was it as an inventor?

PROSPECTIVE JUROR:  I was part of the invention team, yes, on one of them.

And then two of them, I was part of the testing team for the invention.

MR. SCHWEGMANN:  Okay.  And has anyone -- thank you.

Has anyone else been involved in any way, either as an inventor or -- Number 13.

PROSPECTIVE JUROR:  Hi.  Juror 13.

I work for a company that had a patent.

MR. SCHWEGMANN:  I'm sorry?

PROSPECTIVE JUROR:  I worked for a company that had a patent.

MR. SCHWEGMANN:  Were you one of the inventors?

PROSPECTIVE JUROR:  No.  I wish I was, yeah.

MR. SCHWEGMANN:  Were you involved in writing the

patent or helping come up with its claims?

PROSPECTIVE JUROR: No. It was -- it's been years in the making there.

MR. SCHWEGMANN: What kind of patent was it?

PROSPECTIVE JUROR: It's an apparel company. So they have a patent on the way the denim was made.

MR. SCHWEGMANN: Thank you.

Anybody over here ever been involved in any way in a patent, either an inventor, writing it, that sort of thing?

Okay. You have. I'm sorry. Number 3, I didn't see you the first time.

PROSPECTIVE JUROR: I'm Juror Number 3.

As a mechanical engineer, we tried to invent a new technology, so...

We were told to invent something every year, so...

MR. SCHWEGMANN: That's a lot of pressure. Every year?

PROSPECTIVE JUROR: Every year. It was.

And about ten years ago when I got a new job in here and then we need invent something, avoid competitor's patent, and we did it.

MR. SCHWEGMANN: So you had to design around somebody else's patent?

PROSPECTIVE JUROR: Uh-huh. (Moving head up and

down.)

MR. SCHWEGMANN:  And you were able to do that?

PROSPECTIVE JUROR:  Yes.

MR. SCHWEGMANN:  What kind of product or method?

PROSPECTIVE JUROR:  A compress engineer, and then it was forging material.  And they had a patent how to make it, but we couldn't use it, so we made a different way to use it.

MR. SCHWEGMANN:  Okay.  Thank you for sharing that experience.

Anybody else?  Did anything they say trigger a memory that you want to share that might be relevant?

So we all have a basic -- I think many of us anyway have a basic understanding of what a patent is, but who here thinks that if someone has a patent for something, that always means it's a complete blueprint for how to manufacture a product?

Does anybody think that if you have a patent that's related to something or to a product, that it means it's a complete blueprint for how to make it?

Does anyone think that if a particular design of a product or a particular functionality of a product is patented, that all of the important information about how to manufacture it is included in the patent?

PROSPECTIVE JUROR:  Could you repeat that

question?

MR. SCHWEGMANN:  Well, let me ask it another way.

Does anyone feel that once a company has a patent about a particular feature of a product, that -- like a particular way to manufacture it or a particular design feature -- many of you might not know, but the Apple iPhone has something like 400 or 500 patents all about different features and functionality.  There's not just one patent on the Apple iPhone.

And so I guess what I'm trying to figure out -- and I know we don't share the same patent background experience, but does anyone just sort of instinctively feel that if a company has a patent on one part of the product, that that means that that patent protects all aspects of the product?

Let me go back to -- I kind of went on this patent tangent.  Thank you, Number 9.

But I want to go back to maybe something that's just a bit more personal, and I'm hoping you'll share with me your experience.

Has anyone ever felt -- maybe in school or in your workplace or in other aspects of your life, has anyone ever felt that someone stole your idea, took your idea?  Has anybody ever felt that or experienced that?

Anybody want to share what that experience was?

Anyone over here?

Anyone ever felt that someone took that idea, maybe you were working on a group project at school back in fifth grade -- and I won't say her name -- took my idea. Anybody have that experience?

Anybody in the workplace?  Somebody kind of took credit for one of your ideas?  Anybody want to share an experience about what that was like?

Number 14, I kind of saw you nod over there.

PROSPECTIVE JUROR:  So part of working -- oh, Juror Number 14.

Part of working for who I work is that when we sign the contract every -- any of our ideas are owned by them.  So sometimes whenever I create different processes, they all fall under my boss, not myself.  So there's no credit to me *per se*, but it's part of my contract as well, so...

MR. SCHWEGMANN:  Okay.  And has it happened more than once?

PROSPECTIVE JUROR:  Too many times, yeah.

MR. SCHWEGMANN:  Anybody else have that experience?

What about the opposite?  What about the converse of that?

Has anyone ever been accused of taking someone's

idea and taking credit for it?  Anybody been accused of that before?

Ah, Number 14.  You too.

PROSPECTIVE JUROR:  Yes.  But this was back in school.

Hi.  Juror Number 14 again.

When I was in high school, I had a lot of attendance mishaps because I had a health issue, and my teachers always thought that it was very weird that I always had As and hundreds and I was there three weeks and whatnot.  And I was even accused of buying essays, but I never did.

But, yeah, it has happened.

MR. SCHWEGMANN:  You know, obviously in this case my clients allege that Signature used some ideas that it shouldn't have.  Anything about that experience, would it prejudice you one way or the other, or could you listen to the evidence and judge fairly?

PROSPECTIVE JUROR:  I believe I can judge fairly since I've been in both sides of the spectrum.

MR. SCHWEGMANN:  Right.  All right.  Thank you, ma'am.

Number 23.

PROSPECTIVE JUROR:  Hi.  23 again.

So prior to opening my own accounting firm, I was

an accounting professor.  So there are several cases that I've actually brought against students for plagiarism where we have had to take them in front of a disciplinary committee for, you know, stealing another student's work or duplicating something they found on the Internet, things that were not their own original work when they were required to submit their own work.

MR. SCHWEGMANN:  Can you imagine doing that in this day with AI?

PROSPECTIVE JUROR:  It's very difficult, yes. It's very difficult.

MR. SCHWEGMANN:  Thank you for sharing that experience.

Okay.  So for the next set of questions, I'm just going to ask for a show of hands.  I'm not going to make you stand up and tell me all of your experience.

But who here -- by a show of hands, who here on this side of the room has ever been sued or sued someone else?

Okay.  And what about over here?  Who's been a party to a lawsuit, been sued or sued someone else?

Okay.  And 28 is raising his hand, but I understand why.

Now, for the folks over here who have been sued or sued someone else, did you have a positive or negative

experience with the legal system?

So if you'll put your hands back up, let me just ask it a different way.

Is there anything about that experience that you had, either being sued or suing someone -- anything about that experience that, you know, it just left such a bad taste in your mouth, you don't think you could be a fair juror for this case?

I noticed some hesitation.

What about over here?  Who's been sued or has sued someone else?  Just so I can remember who put their cards up.

And I think, 22, you're right in the middle of it. It is --

I'll ask 32, is there anything about that experience that just left such a bad taste in your mouth, you're not sure you could be a good juror?

PROSPECTIVE JUROR:  No.

MR. SCHWEGMANN:  And I'm sorry you're getting over the flu.  I had it myself last week.  I think I infected my whole team, but I think we're over it.

Has anyone on this side of the room ever served on a jury before?

And was there anything about that experience that made -- that left a bad taste, you just wouldn't want to do

it again?

And for the two that raised your hand, were either of you the foreperson of that jury?

Okay. And on this side of the room, who served on a jury before?

Wow, lots. And leave your card up if anything about that prior jury service just left a really bad taste in your mouth and you think it would prejudice you today.

35.

PROSPECTIVE JUROR: Oh, no.

MR. SCHWEGMANN: Oh, no. Okay.

PROSPECTIVE JUROR: I just wasn't fast enough.

MR. SCHWEGMANN: And is -- for the folks that served on the jury here, has any of them been a foreperson?

Now, a couple more questions about some different things. This is a civil case. It's not a criminal case.

We've all seen *Law and Order*. We've all watched those TV shows. And you probably know from movies and TV that the standard, how you decide a case in a criminal case is -- I bet we could all say it at the same time -- it's beyond a reasonable doubt.

And that's how -- when you're taking somebody's liberty away and putting them in prison, the way our system is set up, the prosecutor has to prove beyond all reasonable doubt that that person is guilty.

This is not a criminal case. This is a civil case. And the standard of review in a civil case is -- you're going to hear it from the Judge -- it's a preponderance of the evidence.

So if beyond all reasonable doubt is 100 percent or something close to it, in a civil case it means more likely than not. More likely than not. 51 percent.

Sometimes folks will show you a scale and if it's just slightly tilted in one side's favor, under the standard the Court will give you, the plaintiff wins. Or if it's tilted in the other side's favor, 49/51, the defendant wins.

And that's something that they don't talk about on TV or in movies much.

The Judge is going to instruct you about this. But does anyone here believe that in a business dispute like this, the standard should be something different, something higher, something higher than 51 percent?

Does anybody think that the plaintiff, my clients, have to prove their case by something more than 51 percent?

Does anybody think that if Judge Mazzant tells you that the standard is preponderance of the evidence, is there anybody that's going to want more, that's going to feel like, "I just need to see more before I can find in favor of one party or the other"?

Is there anybody who thinks they won't be able to follow the Judge's instructions? And it's okay, but now is the time to say it.

Does anybody have a problem with any of that?

Now, I want to ask a few of you a handful of questions.

Juror Number 20, you've managed to remain silent this entire time. Good for you.

PROSPECTIVE JUROR: Number 20.

MR. SCHWEGMANN: Can you tell us what you do for a living?

PROSPECTIVE JUROR: I'm a pediatric occupational therapist.

MR. SCHWEGMANN: How long have you done that?

PROSPECTIVE JUROR: Almost 27 years.

MR. SCHWEGMANN: And what sort of -- can you give us what sort of work generally do you do in that role?

PROSPECTIVE JUROR: Most of my clients are on the autism spectrum. I work in an outpatient facility, so I have regular clients every week.

MR. SCHWEGMANN: Anything you've heard me talk about today give you any concern about whether you might be the right juror or the wrong juror for this type of case?

PROSPECTIVE JUROR: No. I don't know a lot about the topic.

MR. SCHWEGMANN: You haven't spent a lot of time with trackout mats?

PROSPECTIVE JUROR: No. Zero.

MR. SCHWEGMANN: All right. Thank you.

Let's see. Number 24.

PROSPECTIVE JUROR: 24.

MR. SCHWEGMANN: Good to meet you. We haven't heard much from you either.

Would you mind just telling us a little bit about what you do for work?

PROSPECTIVE JUROR: I'm a sales associate. I'm store lead essentially.

MR. SCHWEGMANN: Okay. And what kind of sales?

PROSPECTIVE JUROR: Retail mostly. I mostly work these days in the morning on truck.

MR. SCHWEGMANN: Okay. Anything I've said in my almost one hour that gives you any concern about being a good juror for this kind of case?

PROSPECTIVE JUROR: No. I just don't know much about any of this.

MR. SCHWEGMANN: Okay. Thank you for your time.

Let's see. Number 7.

I think you probably are guessing by now who I'm calling on.

Number 7, would you mind telling us what you do?

PROSPECTIVE JUROR:  Sure.  I'm Number 7 and I'm a graphic designer.

MR. SCHWEGMANN:  What kind of work do you do in the context of a graphic designer?

PROSPECTIVE JUROR:  I'm a senior designer.  So I actually -- well, I ideate, create the design, and then I execute on the design.

And I do everything from, like, small papers to large-scale signage and events.

MR. SCHWEGMANN:  Okay.  Any particular industry that you work on for these kinds of designs?

PROSPECTIVE JUROR:  Right now I work for a company called Synchrony, and they are, like, the financer of credit cards.  So, like, your Rooms-to-Go credit card is a Synchrony card or whatever.  And I work in their internal agency.

MR. SCHWEGMANN:  How long have you been doing that kind of work?

PROSPECTIVE JUROR:  15 years.

MR. SCHWEGMANN:  Great.  Thank you.  I appreciate that.

Anything you've heard me say today that gives you pause about whether you might be a good or bad juror?

PROSPECTIVE JUROR:  No.  I don't know very much about it either, so no.

MR. SCHWEGMANN: Okay. Thank you.

PROSPECTIVE JUROR: Thank you.

MR. SCHWEGMANN: Okay. I'm going to ask you to be brave. Anyone on this side of the room that hasn't spoken yet, would you please raise your card.

Number 6 -- oh, man, I thought I did a good job at this.

Let's talk to Number 1 first, please.

PROSPECTIVE JUROR: Hello. I'm Number 1.

MR. SCHWEGMANN: Hi. What do you do for work?

PROSPECTIVE JUROR: I'm a unit secretary at a hospital right now.

MR. SCHWEGMANN: Which hospital?

PROSPECTIVE JUROR: It's Texas Health Presbyterian in Plano.

MR. SCHWEGMANN: What does a unit secretary do?

PROSPECTIVE JUROR: I deal with all the paperwork with discharges, admissions. And then I also go into patients' rooms to do all of the discharge updating.

MR. SCHWEGMANN: Oh, with that walkable --

PROSPECTIVE JUROR: Sometimes, not always, but yes.

MR. SCHWEGMANN: All right. Thank you. I appreciate that.

PROSPECTIVE JUROR: Oh, of course.

MR. SCHWEGMANN:  Do you feel you've heard anything that might make you better or worse for this kind of case?

PROSPECTIVE JUROR:  No.  I don't really know anything about it, so...

MR. SCHWEGMANN:  Okay.  Thank you.

Number 6.

PROSPECTIVE JUROR:  Juror Number 6.

MR. SCHWEGMANN:  And remind us what you do for work.

PROSPECTIVE JUROR:  Municipal human resources.

MR. SCHWEGMANN:  Okay.  And is there anything you heard me talk about today that gives you any concern about being a good juror for this case?

PROSPECTIVE JUROR:  I deal in preponderance of the evidence every day, so...

MR. SCHWEGMANN:  Yes, you do.  Thank you.

Now, just a show of hands for the folks who haven't spoke, but let's start with Number 5.

PROSPECTIVE JUROR:  Hi.  I'm Juror Number 5.

MR. SCHWEGMANN:  And what is it that you do for work?

PROSPECTIVE JUROR:  I work for a day care.  I teach one-and-a-half to two-year-olds.

MR. SCHWEGMANN:  Okay.  And how long have you been doing that?

PROSPECTIVE JUROR:  Fourteen years.

MR. SCHWEGMANN:  That sounds like tough work.

PROSPECTIVE JUROR:  It's -- but it's --

MR. SCHWEGMANN:  I've had a number of one- or two-year-olds myself.

PROSPECTIVE JUROR:  No, it's good.  I enjoy it.  If I didn't enjoy it, I wouldn't have done it this long.

MR. SCHWEGMANN:  Anything I've said that gives you concern about being able to sit on this jury?

PROSPECTIVE JUROR:  I don't understand any of this.  I don't know.  Sorry.

MR. SCHWEGMANN:  Thank you.

PROSPECTIVE JUROR:  Okay.  Thank you.

MR. SCHWEGMANN:  I'm kind of running out of time.  I thought I used it wisely, but we'll see.

Just raise your hand if I haven't spoken to you.

Is there anything -- keep your hand up if there is anything you heard me talk about, whether in my five-minute opening or any of these questions I've asked, is there anything that just -- there is something in the back of your mind that says, "You know what?  I might be a Steelers fan, I might be a Cowboys fan, and I'm not ready to judge this kind of case"?

Anybody feel that way?

Okay.  Number 10, were you --

PROSPECTIVE JUROR:  No, no.  I just --

MR. SCHWEGMANN:  You were just slow to put the hand down.  I see it.

What about this side of the room?  If I haven't spoken to you, would you put your hand up.

And keep your hand up, please, if there is anything I said that gives you any concern that you'd be -- you could serve on this jury.

Are you -- 25, do you have a concern?  Oh, no. You're just also slow to put the hand down.

Thank you.

I'm just about out of time, and I promised you I would thank you at the beginning.  And let me thank you at the end.  I really appreciate your patience.

I appreciate your attention, your willingness to put your hand up and talk in front of all these people. Thank you.  It matters so much to us, as it does to the defense counsel.

I'm going to sit down, and my colleague on the other side gets to ask you some questions.  Thank you. Thank you.  Thank you.

THE COURT:  Thank you.

If defense would like to ask their questions.

MR. RECKERS:  All right.  I don't need the glasses anymore.

Well, thanks for all the information you've already provided. I'm sitting here taking notes, crossing out questions, so I probably won't need my whole hour.

As the Judge did, as Mr. Schwegmann did, let me just before I ask you questions tell you a little bit about myself.

I grew up in a town in southern Ohio, a small town outside of Cincinnati. Like the Judge, I came down here to go to school and haven't -- lived here for about 25 years. So I got here as soon as I could, as they say.

I'm married. My 19th anniversary is tomorrow, so I've already sent a card and flowers. I will have to get her dinner when I get back.

We live in the Houston area. My wife is from Houston. We have a boy and a girl. They're both in high school.

Daughter's on the dance team. My son is in yearbook. We're really busy, especially this time of year with the football playoffs.

So I told you about my client, but let me sort of pick up and ask some questions to you. Again, I'm going to try not to repeat the questions from -- that Mr. Schwegmann asked you.

But let me just ask, does anyone have any particular experience with the parties in this case?

As I said, my client is from the Dallas area. They're from Flower Mound.  The other side has some operations here as well.

Is anyone familiar with any of the parties in this case?

Okay.  And by the way, I sometimes have heard this asked, and sometimes it happens.  Does anyone on the panel -- do any of y'all know each other?

Okay.  Let me ask a little bit about the legal system and your experience with the legal system.

Does anyone have any kind of education or experience in law?

Number 28, Number 2.

What's your experience?

PROSPECTIVE JUROR:  I work with the JDC for the Dallas County, Juvenile Detention Center.

MR. RECKERS:  How long have you been doing that?

PROSPECTIVE JUROR:  Ten years.

MR. RECKERS:  Number 4.

PROSPECTIVE JUROR:  Number 4.

I'm not sure if this counts, but my wife is an attorney and she's always, you know, venting to me about stuff and whatever, you know, so -- yeah, I -- so, anyway, that's just my experience.  I'm not sure if it means -- or it matters.

MR. RECKERS: Yeah, well, my family can relate, I'm sure.

What kind of law does she practice?

PROSPECTIVE JUROR: Well, she started off doing marriage and family law. And then now she just does kind of what you guys do, in a sense, not on the litigation side, but just contracts for different businesses and whatnot. So she has conversations, does the consult, and then kind of helps on the contract side of the house.

MR. RECKERS: Number 6.

PROSPECTIVE JUROR: Twenty-five years' experience with employment law, so --

MR. RECKERS: Great.

Number 14.

PROSPECTIVE JUROR: Number 14.

I create legal documents for a financial institution.

MR. RECKERS: How long have you been doing that?

PROSPECTIVE JUROR: Two years on December 12th.

MR. RECKERS: What kind of institution?

PROSPECTIVE JUROR: A financial institution. I'm in the auto finance department.

MR. RECKERS: Great. Thank you so much.

All right. Anyone on this side -- again, 28, I think I know your background.

Anyone else have any experience/training working in the legal industry?

All right.  So let me ask just sort of your general perceptions of lawsuits.  Some people say that they would probably never file a lawsuit, that there's just too much hassle involved, that the legal system is one way or the other.

Other folks say if they thought they were harmed that they would file a lawsuit basically with the drop of a hat.  Basically, it would be very -- they wouldn't hesitate to file a lawsuit if they thought one was warranted.

How many of you are in that later group, wouldn't hesitate to file a lawsuit if you thought that that suit might have merit, if you thought that you had a legal claim?

Okay.  And, again, I don't want to ask too personal questions, so if you want to -- you want to talk to us later, you know, just let me know.

So, 22, are you in that group?

PROSPECTIVE JUROR:  22.

Yeah, because I'm in the middle of one.  So we can discuss what I am bringing.

MR. RECKERS:  Yeah.  And just in general, I'm sort of asking -- and, again, we'll move past that.  I'm asking sort of your general impressions of law and your thinking

of sort of when someone should come to court.

So, again, show of hands who wouldn't hesitate to file a lawsuit if they thought they were wronged.

Let's talk to Number 8. Can you tell me your perspective?

PROSPECTIVE JUROR: I mean, if somebody does you dirty, I would -- and if I could afford a lawyer or someone was willing to work for me, I mean, I would sue them.

MR. RECKERS: Absolutely. Great. Thank you.

Who else? Let me get the other cards.

32, I'll get your perspective on this question.

PROSPECTIVE JUROR: My background is that I have filed a small claim against someone and it took a lot of work on my part. And so I feel like if you're going to go to do all that work, man, you're doing it because you believe in yourself and you believe in your case.

MR. RECKERS: What kind of suit was that? Just at a general level.

PROSPECTIVE JUROR: Okay. This is kind of strange, but in my first couple of years of teaching, I knew a student from church and that student needed a cell phone. Her mother was an illegal. I put her on my cell phone policy.

And she did not follow the contract where I said she had to be passing all of her classes, and so I cut off

that cell phone policy, and then they never paid me back for it. So I took them to small claims court.

MR. RECKERS: Is there anything about that experience that you think might impact your ability to weigh the evidence and hear this case?

PROSPECTIVE JUROR: I mean, they found in my favor, so I was happy with the outcome.

MR. RECKERS: Great. Thank you so much.

Anyone else?

4, what's your perspective on this?

Number 4, please. Thank you.

PROSPECTIVE JUROR: Well, I believe in the legal system, so I think if somebody -- if there's damages or somebody was impacted, I think it warrants legal action.

And maybe I'm just a little bit biased because my wife is an attorney and I hear a lot of different instances of stuff from her experience. But, you know, I think considering the circumstances, that, you know, I'd be willing to engage in the legal system if there's merit and if it makes sense.

MR. RECKERS: Thank you for that.

And Number 9.

PROSPECTIVE JUROR: I used to feel that the legal system would have my back, but I recently also went through the small claims court process in Fort Worth and it's

awful. So now, even if I had a case, I probably wouldn't bring it because it's too much work on my part, too much time spent in the court system, and then there's no resolution given. I now have to go back to court to garnish his wages if I ever want to see it.

So, no, I have no faith.

MR. RECKERS: Okay. Well, let me ask sort of a -- let me sort of follow up from that and ask somewhat of a related question.

Some people think that if a case gets this far, gets to a trial and to a courtroom like this, that that case must have some merit, that there must be something to the plaintiffs' claim.

Other people think that even though you get this far, that maybe there's nothing there. And that's still up to, you know, people like you to decide.

How many of you come in here thinking that just because we're in this courtroom, just because we've gotten to trial, that there must be something to the plaintiffs' case? Does anyone think that?

All right. Let's talk through some of this.

Number 13, please.

PROSPECTIVE JUROR: Hi. Juror 13.

Yeah, I just kind of -- what they were saying is that if you're going to put the time and effort into it,

then I would think that there's some merit behind it or that there's a belief behind what you're fighting for.

MR. RECKERS: Let me see everyone's -- let's start on this side, everyone who feels that way.

Okay. So Number 4, we've already heard from you.

Number 6, I think --

Number 7, can I hear your perspective on this?

PROSPECTIVE JUROR: Sure. So it sounds like there are a lot of cases waiting to be heard, and I feel like if you're here, you waited a long time for it and -- yeah.

MR. RECKERS: All these cases move at different speeds. That's certainly true.

All right. So who else? Let me make sure I talk to new people here.

15, please.

PROSPECTIVE JUROR: Yeah, Juror Number 15.

For me, it's really about at the end of the day protecting ideas, innovation, and that sort of thing.

So from that perspective, I think it's extremely one that's obviously presented in court because of that reason, so...

MR. RECKERS: Anything you've heard so far, you think that you might not be a balanced juror for this case?

PROSPECTIVE JUROR: No, not at all. I think at the end of the day it's about ethical integrity and fair

practices, so...

MR. RECKERS:  Thank you for that.

I think Number 17, can I get your perspective on this, please?

PROSPECTIVE JUROR:  Hi there.  Juror Number 17.

I think the process is just a long process.  I've been in lawsuits where -- it's just a long -- it's a long process, and they've done everything we could to be able to avoid getting to this level.  And so thankfully we were able to, like, solve things through mediation and stuff.  But we're currently in a lawsuit for my -- for grandpa -- my grandfather, who's living with us.

It's a long process, and I think both sides are trying to avoid getting to this level.  And so -- yeah.  So if it gets to this level, then there's got to be some merit to it.

MR. RECKERS:  Who else feels that way?  Did I get everyone on this side?

All right.  This side, who else has some perspective on this side?

So come up to Number 19, please, and we'll work around.

PROSPECTIVE JUROR:  Juror 19.

I agree with just the amount of time you have to take.  I had to go to court for a guardianship for my

child, and it is a very long process.

You have to really have a lot of dedication to what you want and filling out a ton of paperwork, hiring attorneys.  It's a lot of commitment to what you're going for.

So I believe that -- you know, that it's worth it in some sort of way to the other person.

MR. RECKERS:  All right.  Thank you for that perspective.

Again, so the question of who feels that because we're here, that the plaintiffs' claim must have some merit?

24, I think.  Can I hear your perspective on that, please?

PROSPECTIVE JUROR:  24.

I feel like I know a little of the legal system, but I know it's a lot of work, a lot of paperwork, a lot of money.  If you keep fighting for this long, there has to be at least a little bit something there.

MR. RECKERS:  Well, thank you for -- and thanks to all of you for sharing.  You definitely have shared a lot.  And so let me try to get to a couple more questions.

Some people -- again, this is to the legal process just in general.  Some people, when they see a large jury verdict on the news, they think that there is something

wrong with the large awards and they are skeptical.  Other people generally think that large awards are justified.  When a corporation is sued, there is probably a justified large award.

How many of you think when you see a large award against a corporation, how many of you are generally okay with that, that you generally think that the large judgments against corporations are okay?  Does anyone feel that way?

Okay.  So let's go on this side.  We'll start with 21.

PROSPECTIVE JUROR:  Yeah, 21 here.

It depends on what the thing is, but if it's like -- if it caused a lot of damages, or at least like potential damages, then sure, the compensation is worth it because it is compensation, after all.

MR. RECKERS:  Thank you so much.

Who else feels that way about large jury awards?

Number 20, I don't think we've heard from you yet.

PROSPECTIVE JUROR:  Yeah, Number 20.

I think it depends on the case.  I think it depends on how traumatic it is for the plaintiffs and I think it's probably decided appropriately.

MR. RECKERS:  Thank you so much.

Number 22.

PROSPECTIVE JUROR:  22.

So we're hoping mine doesn't get to the jury.  But I'm going to take you for all you're worth, yeah.

MR. RECKERS:  Excellent.

All right.  Who else to here -- 23, what's your perspective?

PROSPECTIVE JUROR:  So similar perspective.

Juror 23.

Just, yeah, if it's justified, then I don't have a problem with a large award.

MR. RECKERS:  Anybody else on this side that I didn't talk to?

All right.  On this side, who has the same perspective about open to large awards?

Number 4.

PROSPECTIVE JUROR:  I don't have anything to add to what's already been said.  I'm just echoing other comments.

MR. RECKERS:  Anyone else here want to share their thoughts on this?

Okay.  Has anyone here been involved in product development, either proprietary technology or trade secrets, anything like that?

Number 8, can you tell us about that experience?

PROSPECTIVE JUROR:  I used to work for a 3-D

printer company, and I developed the feature models that they were going to -- so I designed them.  I machined them and I tested them.

MR. RECKERS:  What kind of products just in general?

PROSPECTIVE JUROR:  We 3-D printed molds for, like, Invisalign, so the dentists would be able to do the Invisalign at the office instead of having to send it out or anything like that.

MR. RECKERS:  Okay.  Thank you.

Anyone else been involved in product development?

Number 9.

PROSPECTIVE JUROR:  Juror Number 9.

Yep.  So I was involved with a patent probably about ten years ago.  It was an API inspection tool.

Our patent was successfully approved, so it was -- we received the patent, so it was proprietary technology.

MR. RECKERS:  Thank you.

Anyone else been involved?

Number 3, I think let's hear about your experience.

PROSPECTIVE JUROR:  Yeah.  Juror Number 3.

I'm a mechanical engineer, so I was -- I have been developing automotive air conditioning compressor for years.  So whenever we need to develop new one, we need to

search other competitors' patent.  So that's how I did.
Yeah.

MR. RECKERS:  Anybody that I've missed on this side?

How about over here?  Anyone involved in development of proprietary technology or trade secrets?

Similar question.  Has anyone here had an idea for a product, a new product, and taken steps to commercialize that product?  Has anyone had that experience?

PROSPECTIVE JUROR:  Same.

MR. RECKERS:  Same experience.  Thank you, sir, Number 3.  Thank you.

Anyone else?

Okay.  Does anyone here have any education, training, job-related experience specifically directed to contracts, to writing and potentially enforcing and interpreting contracts?

Number 14, would you tell me about that experience, please?

PROSPECTIVE JUROR:  Juror Number 14.

Like I said, I worked for a financial institution that -- and I'm in the -- I create the contracts and some other legal documents that can go to court.  If they do, I will have to present in court that I signed them or created them.

MR. RECKERS:  Have you ever had to do that.

PROSPECTIVE JUROR:  No, thankfully.

MR. RECKERS:  How much of the -- how much time do you spend as far as a percentage of your professional experience working with the contracts like that?

PROSPECTIVE JUROR:  Oh, the contracts?  Forever. You have to check every single thing that involves the person, the vehicle in question, and us, the financial institution.  So it's not straightforward; it's case-to-case basis.

MR. RECKERS:  Thank you so much.

Anyone on this side, again, experience, work, job related for contracts, interpreting/writing?

Number 25.

PROSPECTIVE JUROR:  Juror 25.

Yes, in real estate, doing contracts and writing contracts.

And then also I owned a learning center.  So I wrote up personnel policies and had contracts along with the children's parents.  And I was in early education with a private school, K through 4, so...

MR. RECKERS:  Thank you so much.

You know, Mr. Schwegmann asked you about patents and I -- and so I obviously am not going to reask that same question.  But let me ask about another form -- another

couple forms of intellectual property to see what experience y'all may have.

The first one is copyrights.

Does anyone have experience with copyrights, either getting their own copyright, putting out materials that they registered with the U.S. Government for that type of protection?  So anyone ever work with a copyright?

Number 23.

PROSPECTIVE JUROR:  I have several textbooks that I've coauthored, and all of those books have a copyright on them where nobody can take that material.

MR. RECKERS:  Thank you very much.

Anyone else for copyrights?

So let me ask about another form of intellectual property called trademarks.  Has anyone registered for a trademark or had any kind of disputes pertaining to trademarks?  Anyone?

Mr. Schwegmann asked about nondisclosure agreements and a whole bunch of paddles went up, and so let me ask just really specifically.  For the folks that had any experience with nondisclosure agreements, did any of you have any disputes, say with your employer or another party, about sort of what should have been disclosed as it pertains to the nondisclosure obligations?

Has anyone ever, you know, in addition to having

nondisclosure agreements, ever had any kind of disputes that might be -- that might, you know, inform your experiences or biases in this particular case?

Okay. Excellent.

Obviously you've heard a little bit about the facts of the case and I mean just a little bit. But, you know, it won't surprise you to hear from our perspective, from Signature's perspective, they've been falsely accused of doing something wrong.

Does anyone think that it's a problem for the defendant here to stand up and defend themselves?

Does anyone take issues with the fact that if you are accused of doing something wrong, that you have the right to defend yourself?

Now, one of the things you're going to hear about in this case is that my client, at least for some of the events, were a much larger company than FODS, than the plaintiffs.

Just knowing that, just knowing that fact, that it's a bigger company than what at the time was a smaller company, does anyone feel that that gives the smaller company a potential to start ahead just a little bit?

Because what we're trying to do, ladies and gentlemen, is to find a group of jurors where both sides are going to start at the same spot; right? If you think

of this trial like a race, you know, we want the starting line to be equal. And some people -- and it's natural and I'm not saying anything is wrong with it -- have a natural bias for smaller companies.

Does someone here -- does anyone here have that sort of bias and think that the smaller company is going to end up just a little bit ahead if we think of that starting line?

Number 4.

PROSPECTIVE JUROR: I mean, at the end of the day, you know, there has to be merit and there has to be evidence. But I know it takes a lot of hard work to start a business, especially when you're starting it from scratch.

So, I mean, if I'm being honest, yeah, there is a little bit of a bias towards somebody who has gone through -- I mean, not to say that the other party hasn't gone through some kind of grit like that, but, I mean, just being honest, there is some bias there.

MR. RECKERS: Yeah. That's why we asked the question. So I thank you for your honesty and for that opinion.

Anyone else share that view?

Number 13.

PROSPECTIVE JUROR: Juror 13.

Yeah, I agree with what he just said.  And I have a lot of family and friends who have small businesses, so I understand what that goes through.

MR. RECKERS:  Thank you.  I understand that.

Number 11, what's your perspective?  I don't think I've talked to you yet.

PROSPECTIVE JUROR:  I would also agree.  Smaller businesses usually, you know, are hard working, I guess, so I have -- my father also worked in small businesses in San Antonio.  So I would say he had long hours, 7:00 to 7:00, compared to a -- larger corporations are like 9:00 to 5:00 and they have more -- you know, more incentives.  They have more benefits, as well.  So I would also be, like, more biased to smaller businesses as well.

MR. RECKERS:  Thank you so much for sharing that.

Anyone else on this side that I didn't call on?

All right.  How about this side?

All right.  Starting in the back, 32, please.

PROSPECTIVE JUROR:  I guess I do have a personal bias against that.  I -- I would think the person owning the smaller business, when they're having to front a lot of that money themselves, I would think they're not going to do it unless they really felt justified.

MR. RECKERS:  Anyone else on this side that feels that way?

All right.  25.

PROSPECTIVE JUROR:  Number 25.

Yes, I pretty much echo what everyone else has said.  Owning a small business personally, I do believe there's a lot of hard sweat and tears and everything that goes into that.

So I'm not saying that a larger company doesn't do that, but I feel the same, that if they're bringing them -- I feel like there may be a reason.  And that's just the honest truth, the way I feel.

MR. RECKERS:  Thank you so much for sharing.  That's absolutely why we do this.

24, anything to say on this?

PROSPECTIVE JUROR:  24.

I just think a smaller company, they have a lot more to lose.  I try to support small businesses, but I will look at the evidence, for the most part, but I have, like, a small smidge of a bias.

MR. RECKERS:  Thank you so much.

19, did you have anything to say on this?

PROSPECTIVE JUROR:  Juror 19.

Pretty much what everybody else said.  The bigger business has more resources as well.  You know, there's that lawyer going over your contracts before you're signing everything.  I feel like that gives a bigger business more

advantage.

MR. RECKERS: Thank you so much.

Let me ask a similar question, and that is -- you might have heard the phrase "all is fair when it comes to business." Some folks will have a real negative reaction to that and some people may think that's fine.

Raise your hand if you think too many of the companies today act unethically, especially larger companies. How many of you have that sense that bigger companies have a tendency to be unethical?

19. So sort of the same reason we just talked about, 19?

PROSPECTIVE JUROR: Yes.

MR. RECKERS: Anyone else sort of share that view?

Number 15. Number 13.

Anyone else?

12, are you -- thank you. So 12, let's talk. I don't think we've talked yet.

PROSPECTIVE JUROR: I'm Juror Number 12.

MR. RECKERS: Okay. Please go ahead.

PROSPECTIVE JUROR: Go ahead.

MR. RECKERS: Oh, I was just asking you to share your perspective on this question of companies maybe acting too unethically in general.

PROSPECTIVE JUROR: I -- bigger companies tend to

be more ruder to their customers and everything, and small business owners are nicer.

MR. RECKERS:  Thank you for that perspective.

Let's talk about smaller businesses.

How many of you have started your own business?

Number 4, I think we've talked about that already.

12, what business did you start, ma'am?

PROSPECTIVE JUROR:  Me and my husband own a lawn service.

MR. RECKERS:  How long have you owned the service?

PROSPECTIVE JUROR:  Ten years.

MR. RECKERS:  That's a lot of hard work.

PROSPECTIVE JUROR:  Yes.

MR. RECKERS:  Anyone else here start their own business or have a family business?

Number 13.

PROSPECTIVE JUROR:  Juror 13.

Yeah, my husband started a food truck business.

MR. RECKERS:  Excellent.  What kind of food?

PROSPECTIVE JUROR:  Barbecue.

MR. RECKERS:  There you go.  Excellent.

MR. SCHWEGMANN:  Yeah.

MR. RECKERS:  Who else?

17.  What kind of business?

PROSPECTIVE JUROR:  Juror 17.

My husband and I started one of the first food trucks in Dallas several years ago.

MR. RECKERS: What kind of food for y'all?

PROSPECTIVE JUROR: It was mainly tacos and burritos.

MR. RECKERS: Okay.

PROSPECTIVE JUROR: But we had major success in it, and then it went nationwide. And then he got connected to a Dallas restaurant tour. And then things went side -- I don't really -- I know we talked about, like, the nondisclosures and stuff. I didn't personally have experience in it because it was my husband dealing with all of that.

But there was some stuff that went sideways with that. And so we -- you know, it ended up becoming like a 51/50 (sic) thing, and so we no longer had control in it.

MR. RECKERS: Excellent. Thank you so much.

Number 11, can you tell me about your small business?

PROSPECTIVE JUROR: Juror 11.

So not me specifically, but my uncle has a lot of restaurant businesses in Houston, like Pakistani Indian restaurants.

And a lot of my friends also start, like, more of a clothing brand companies, so I help -- you know, if they

need, like, a model or something, I help them out here and there.  So a little bit of bias.

MR. RECKERS:  Excellent.  Excellent.

So, yeah, let me just ask that in general.  And I'll come to this side next, but just this side of the room.

For those of you that have experience with a small business, owning your business or a family business, how many of you think that that experience might give some sort of bias or weighing, you know, letting the other side -- the plaintiff again, as I said, who started off as a smaller business, some head start in this case?

Does anyone feel like they might have that bias coming into the case such that they might not be the best juror for this?

Number 4, okay.

Sorry.  Flip it around.  11.

PROSPECTIVE JUROR:  (Speaking inaudibly.)

PROSPECTIVE JUROR:  I didn't understand the question.

MR. RECKERS:  Yeah, yeah.  So what I'm asking really is just your experience, as being in your case a small business, does that give the plaintiff a head start in your mind, that you might have some bias for them because they -- you know, you'll hear from them that they

started off as a smaller business and were small?

Okay. 17 and then 11.

Sorry. You turned the -- there. 11. I thought it was. Great. Thank you so much.

Okay. Anyone else?

Okay. So same question for this side. Who's had a small business experience, either owning your business -- okay. So 19. Could you tell us about the business?

PROSPECTIVE JUROR: Juror 19.

We had a trucking business, DHD Enterprises, LLC, and the big corporation kind of screwed us over, to be honest, so I am a little bit biased, but yeah.

MR. RECKERS: Can you elaborate sort of what -- what did they do to screw you over?

Again, I'm not looking for too many details, but just sort of want to get a sense.

PROSPECTIVE JUROR: We didn't take all the loads they wanted us to take. We had unfavorable places we didn't want to go, so they just kind of stopped hauling our truck into places.

MR. RECKERS: Thank you for that.

Okay. Who else had -- Number 23.

PROSPECTIVE JUROR: Yes. I have an accounting practice that I own, but I don't see any difference or any bias there.

MR. RECKERS:  Thank you so much.

25.

PROSPECTIVE JUROR:  25.

I started a day care and then owned and directed a private school as well, as I stated earlier, and did that for about 30 years, so...

MR. RECKERS:  Thank you so much.

PROSPECTIVE JUROR:  As far as bias, I don't know necessarily that I would be more biased to a small company. It would just have to be the evidence that was proven.  But I do believe there's a lot of hard work in a small business.

MR. RECKERS:  Absolutely.  I don't think anybody would argue with that.

So you think that if you hear the evidence, you could still weigh the evidence in this case?

Thank you.

26.

PROSPECTIVE JUROR:  I had a private practice in speech and language communication disorders.

MR. RECKERS:  Is there anyone else, small business?

27, please.  I don't think we've spoken.

PROSPECTIVE JUROR:  I used to own a cookie business, so I baked cookies from scratch.  But I don't

think that would -- I don't have any bias.

MR. RECKERS:  Thank you so much.

Just let me ask this in general to this side of the room:  Any of these experiences, owning a small business or having a family business, that thinks that might -- you might have a bias or let -- give a head start to the plaintiffs in this case?

Great.

All right.  How many of you would consider yourselves to be a leader?

Okay.  Number 4, Number 6, 9, 14, 16.  Let's talk to 16.

Juror 16, I don't think I've talked to you yet.

PROSPECTIVE JUROR:  Hi.  I'm Juror 16.

MR. RECKERS:  So could you tell me about your leadership or why you consider yourself to be a leader?

PROSPECTIVE JUROR:  Every job that I've ever had, I've started off at the bottom and worked my way up to supervisor, manager.  So it's more of a I'm a leader, not a follower.

MR. RECKERS:  Thank you for that.

So what kind of job do you have now?

PROSPECTIVE JUROR:  Right now, I work in the school system, child nutrition.

MR. RECKERS:  Okay.  Great.  Thank you.

PROSPECTIVE JUROR: You're welcome.

MR. RECKERS: All right. So let me make sure I get all the numbers in the back.

So who else considers themselves a leader here on this side?

I'll read off all the numbers. So 13, 18.

Juror Number 18, I don't think we've spoken much. Can you tell me about why you consider yourself to be a leader?

PROSPECTIVE JUROR: Yeah. Currently, like this juror mentioned, just through the years of work. I work in a dairy co-op. So over close to 15 years. So just over that time just, you know, promotions and things of that nature.

So I have a team between here and Kansas City that I lead and so -- yeah, just -- and then outside of that, I'm a leader in volunteer work that I do as well. So...

MR. RECKERS: Thank you very much.

PROSPECTIVE JUROR: Sure.

MR. RECKERS: How about this side? How many of you consider yourselves to be leaders?

Okay. 31, could we hear about your leadership experience?

PROSPECTIVE JUROR: Juror 31.

So work based, I'm a nurse. I've been a nurse for

15 years.  I'm a charge nurse and then a preceptor for new nurses on the unit as well.

MR. RECKERS:  Thank you.

32, I think.  Did you have your paddle up?

PROSPECTIVE JUROR:  I'm in charge of, like, identifying gifted students in my campus.

MR. RECKERS:  Okay.  Who else -- just to make sure I get all the paddles?

27, 26, 23.

Let me ask just sort of a similar question, and I'll do some more follow-ups.

How many of you had a leadership position in an organization?  So outside of, you know, maybe your work, a charity or the PTA or the church, any kind of group like that, how many of you had a leadership position?

Okay.  So let me ask 23 about your leadership position.

PROSPECTIVE JUROR:  President of various PTAs and booster clubs as my kids have grown up.  And I'm on the board of directors for the CPA society.

MR. RECKERS:  What was --

PROSPECTIVE JUROR:  The Texas CPA society.

MR. RECKERS:  Thank you very much.

Who else from this side has been in leadership positions?

26.

PROSPECTIVE JUROR:  I'm from the women's ministry at my church.  And then booster clubs, quarterback clubs.

MR. RECKERS:  And 25, please.

PROSPECTIVE JUROR:  I lead a women's ministry in my church as well, along with I was vice-president over Hopkins County child care advocate program.  And so just --

MR. RECKERS:  Thank you so much.

29, I think had your paddle up?

PROSPECTIVE JUROR:  Juror Number 29.

I was -- I'm a retired kindergarten teacher, so I've been a mentor teacher.  I've been on leadership teams choosing new teachers.

I've also been on early childhood -- the State of Mississippi and Alabama Early Childhood Association president for about three, four years.

MR. RECKERS:  All right.  On this side, any leadership positions?

Number 4, please.

PROSPECTIVE JUROR:  I've just served in different leadership capacities in men's groups at church over the years.

MR. RECKERS:  Number 6.

PROSPECTIVE JUROR:  Juror Number 6.

Youth baseball coach for eight years, staff parish

relations committee with my church, and HOA board.

MR. RECKERS: We'll go back to 9 right behind you and then to 14, please.

PROSPECTIVE JUROR: Juror Number 9.

I was president of the homeowners association for four years.

MR. RECKERS: And go back to --

PROSPECTIVE JUROR: Juror Number 14.

I've been the president of morale committees and president also of foreign exchange students when I was in college, and also a mentor at my job.

MR. RECKERS: And I think right behind you as well, 16.

PROSPECTIVE JUROR: Juror Number 16.

It would be involved -- very muchly involved in the children's youth groups when my children were growing up, so it would be that.

MR. RECKERS: And I think working around to Number 18, please.

PROSPECTIVE JUROR: Juror 18.

Youth basketball coach, as well as I also work at outreach -- one of the leaders at an outreach group in McKinney.

MR. RECKERS: Thank you.

All right. So I think that's almost all my

questions.  Just let me wrap up real fast.

One of the things, the way our system works, is that the plaintiffs get to go first.  They get to put on their evidence.  Obviously we have a lot to say about it, but we're going to have limited opportunities at least for the next couple days for those of you who are seated on the jury.

Does anyone here, do you think you would have a problem waiting to hear all the evidence, waiting until my side gets to put on their evidence before making their decision in this case?  Do you think that would be a problem for any of you?

Number 8, let me hear your perspective on that.

PROSPECTIVE JUROR:  I'm Juror Number 8.

And just to be honest with you, just from the -- their side, since they went first, I mean, they are like 80/20 already on you guys from what I guess.

MR. RECKERS:  That's why we do this.

All right.  Does anyone else have that perspective that because they've already gone first a little bit and they're going to get a couple days to go first, is anyone else going to have that same perspective, that they think it would be hard for them to wait, say, until the end of the trial to make their decision about sort of who might be in the right or the wrong in this case?

Does anyone else have that perspective?

There's nothing wrong with if your do. We just want to -- and I appreciate hearing about that now.

Okay. So as I wrap up, is there anything that I've brought up or Mr. Schwegmann brought up, or even the Court, that makes you think that maybe you wouldn't be a good, impartial, fair juror in this case?

Any personal bias that would make either one side or the other, either of us, maybe start this case with a little bit of a head start just based on some personal -- you know, we can talk with the Judge about it, but does anyone have -- go into this thinking that maybe one side is ahead just from where we are now? Anyone have that -- anyone have that feeling just sitting here in the pews right now?

Okay. Number 11. Tell me about that.

PROSPECTIVE JUROR: Juror 11.

Like I mentioned before, kind of like the small business bias, the underdog story kind of bias as well. So I don't know, I just try to always root for the underdog so -- that's just how I am. So that's maybe a little bit bias there again.

MR. RECKERS: I understand. Absolutely.

Anyone else?

Anyone else, again, have anything that we haven't

talked about yet, think that there is a bias that they might have to make them not really the best juror, that they are a fan?  Like the judge said, a Steelers fan wouldn't be a good person for a case with the Steelers.

Okay.  All right.  Well, as others have, as Mr. Schwegmann has, I thank you really for your service and your attention.  Obviously, you know, there will be several of you picked.

I'm excited about trying that case in front of those who are picked.

For everyone else, thank you so much for participating in this process and for their jury service.  Thanks very much.

THE COURT:  Okay.  Thank you.

So at this time I'm going to dismiss everyone to the hallway.  You can spread out through here and downstairs, except for -- one thing I just want to tell you is you don't know a lot about the case, but I don't want you talking about the case.  I don't even want you talking about this jury selection process.  Talk about sports, the weather, upcoming Thanksgiving, whatever, but nothing about this case.

And then what I would ask, Juror Number 22 to stand back so we can follow up on things.  But otherwise, I'm going to excuse y'all.

Again, this is going to take some time to get the jury -- you know, to get all -- the process is I have to go talk to the attorneys first.  Then they have a time to visit among themselves, and then we'll try to get this done as quick as possible.

I know it's the lunch hour.  But we'll get the jury seated and then we'll break for lunch for the jury selected.

Thank you again for your participation.

If Juror 22 will approach the podium.

Everyone else, I will excuse you at this time.

(Prospective jurors exit the courtroom; Prospective Juror 22 remains.)

THE COURT:  You can approach the podium, ma'am.

Everyone can be seated.

Juror 22, I know you indicated you had some litigation.  Can you share a little more about that?

PROSPECTIVE JUROR:  Yeah.  So it's an IVF case.  The media -- I'm going to cry.  Sorry.

THE COURT:  Oh, I'm so sorry.

PROSPECTIVE JUROR:  No, it's okay.

So against, you know -- so basically the media culture that was used and the petri dish for the embryos was tainted and there was a recall on it; but it was already mine and people all over the country, their eggs

and embryos were destroyed.

THE COURT: Okay. I am so sorry. And so you're in litigation over that?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. And I guess the general question is: How will that impact you if you served on this jury?

PROSPECTIVE JUROR: I mean, I don't think it would. I just think every situation is different. I just know with mine...

THE COURT: Okay. Let me just see if any of the attorneys have questions on that issue.

MR. SCHWEGMANN: None for plaintiff, your Honor.

MR. RECKERS: No, your Honor.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR: Okay. Thank you.

(Prospective Juror 22 exits the courtroom.)

THE COURT: Okay. Any strikes for cause from plaintiffs?

MR. SCHWEGMANN: Your Honor, could we just have a few seconds to confer?

THE COURT: Okay.

MR. SCHWEGMANN: No, your Honor.

THE COURT: Strikes for cause from defense? We'll just do it one at a time.

MR. RECKERS:  Juror Number 8, your Honor.

THE COURT:  Let me see if they are going to object to that.  He also worked nights and asked not to serve because of that.

MR. SCHWEGMANN:  Your Honor, I'm tempted, but no objection.

THE COURT:  Okay.  I'll strike Juror Number 8.

Next?

MR. RECKERS:  Number 11 indicated bias at the end, small business.

THE COURT:  Response?

MR. SCHWEGMANN:  Your Honor, we don't believe he should be for cause.  He didn't say he would be unfair.  He just said -- in other words, counsel didn't ask the predicate question sufficient to strike the person for cause.

THE COURT:  Personally, I just think he doesn't want to serve on a jury.

MR. SCHWEGMANN:  That was my impression as well.

THE COURT:  So that's my impression.

Well, let's bring Number 11 back in.  Let me just follow up.

MR. RECKERS:  19, your Honor, gave a bias to smaller companies.  I think we're pretty clear about that.

MR. SCHWEGMANN:  Same issue, your Honor.  I don't

believe Counsel asked questions sufficient to disqualify for cause.

I mean, she said honestly, I think, as did 15, other people on the panel, that they may start biased toward a small business, but he didn't ask whether that bias would cause them to ignore the Court's instructions or otherwise be unfair.

THE COURT: Right. I agree with that.

You know, I'm going to deny 11 and 19. Of course, you're going to have plenty of strikes.

So what's next?

But, I mean, they are correct. I don't know if you had asked the follow-up questions, whether they would have said one way or the other.

What's next?

MR. RECKERS: One second to confer, if you --

THE COURT: Well, I mean, I have 11 coming back in, so let me just go ahead and...

(Prospective Juror 11 enters the courtroom.)

THE COURT: If you'll approach the podium.

I know you indicated that you have some underdog bias. I guess the question is: Can you set that aside and decide it based on the Court's instructions, both on the law -- the jury decides the facts and -- or are you going to already lean towards the plaintiff irrespective of what

the evidence is?

PROSPECTIVE JUROR: I think just, like, personal, like, history, I guess, with my family and, you know, kind of like the bigger corporations, I think I would side more towards the plaintiff, just personal experience.

THE COURT: Okay. Any follow-up?

MR. SCHWEGMANN: Yes.

Me again.

THE COURT: Is your mic on?

MR. SCHWEGMANN: It is.

THE COURT: Okay. Go ahead.

MR. SCHWEGMANN: If the Court instructs you to treat both big companies and small companies the same, would you have the ability to follow the Court's instructions in that regard?

PROSPECTIVE JUROR: I will try my best, but I don't know. But the way I am, I just feel like I go off based off emotion more, just like my personality. But I'll try my best, but I can't give an answer that is in concrete, yeah.

MR. SCHWEGMANN: All right. Thank you, sir.

THE COURT: Thank you, sir.

MR. RECKERS: No questions.

THE COURT: Yeah. You can go back into the hallway. Thank you.

(Prospective Juror 11 exits the courtroom.)

THE COURT: Okay. I am going to strike 11.

And, of course, I denied 19.

What's next?

MR. RECKERS: The only other one is 4, your Honor.

THE COURT: Number 4 -- well, let me just say that's also -- 4 has a hardship issue.

MR. SCHWEGMANN: No objection, your Honor.

THE COURT: So I'll strike 4.

Any others?

MR. RECKERS: No, your Honor. Thank you.

THE COURT: Okay. Let's just talk about the other people that explained hardships.

13, if we let them on the jury, I'd have to break the trial, which isn't conducive to our timing. Any objection to me releasing 13?

MR. SCHWEGMANN: No objection, your Honor.

MR. RECKERS: No, your Honor.

THE COURT: Okay. So I'll strike 13.

The next one is 17. She's the caregiver for the 94-year-old grandfather. Any objection to me releasing on hardship, not any other reason but --

MR. SCHWEGMANN: No.

THE COURT: If you'll say it louder. You're very soft-spoken.

MR. RECKERS: No, your Honor.

THE COURT: Okay. I'll strike 17.

The next one -- the next one, I don't -- it's 23. It's just she's an accountant by herself. That usually is not sufficient for the Court to do that one, but I'll leave it to the attorneys. If you want me -- if you want to agree to strike her, but I'm not asking you to strike her.

MR. SCHWEGMANN: So if I understand the Court correctly, if he and I agree --

THE COURT: If you agree to strike her, I will based on the hardship, but it's not a hardship. Everyone, it impacts their work to some degree.

MR. SCHWEGMANN: Sure.

THE COURT: So I -- it's not a blanket rule for the Court.

MR. SCHWEGMANN: Your Honor, we're willing to excuse her for hardship if Signature is.

THE COURT: I'm not -- again, I'm not asking. Just if you both agree, I'll strike her. If not, I'm not --

MR. RECKERS: We would prefer to leave her on.

THE COURT: Okay. That's fine.

And then 27. So Number 27 is the bus driver for some athletic events this week. Any reason -- or any objection to me excusing 27?

MR. RECKERS:  We'd be fine excusing her.

MR. SCHWEGMANN:  Your Honor, we prefer to leave her.

THE COURT:  Okay.  Well, but here's the only situation is -- let me bring her in to see if there's --

(Off-the-record discussion between the Court and courtroom deputy clerk.)

THE COURT:  Okay.  So here's the situation, is my understanding from my staff is she can get coverage for one of the days.  For the other day, she can't, so we would have to adjourn the trial.

I will honor her excuse.  So if she makes the panel, that impacts, you know, our schedule here.  So...

MR. SCHWEGMANN:  We don't want to impact the schedule.  And what I -- thank you for that additional information.

THE COURT:  No, I just want -- when someone actually tells me their hardship and I don't excuse them, I do honor their request.  So...

MR. SCHWEGMANN:  I understand.  I think with that additional information you provided, we'll be happy to excuse her as well.

I had previously thought, as it is with my kids' school, that there is usually coverage for these various different days --

THE COURT:  Well, that's why I asked.  My staff knew that one of the days she does have coverage, one day she does not.

MR. SCHWEGMANN:  And in that instance, your Honor, we're fine.

THE COURT:  Okay.  So the defendants have already agreed to that, so I'll strike 27.

And there is one more.  And, again, this one is -- I'm not asking to strike 32.  I mean, it's just a hardship because she's already been off a week for the flu, and I think she's a teacher.

So even though my wife is a retired teacher, I am not going to ask her to be struck.  So -- but if both sides want to agree to strike her, that's up to y'all.  Again, I'm not asking you to.

MR. RECKERS:  We'd be fine excusing her.

MR. SCHWEGMANN:  Well, your Honor, I think we prefer that she remain.

THE COURT:  No, that's fine.  Again, I wasn't -- I wasn't asking.

Okay.  So the ones that I have struck for either cause or hardship are 4, 8, 11, 13, 17, and 27.

Okay.  So each side will get ten strikes.

And for the purposes of the record, I'm striking 35.  They're outside -- I have an odd number of jurors.

So your strike zone is -- I'll seat an eight-person jury, the first eight not struck. But each side will have ten strikes through Juror 34.

And then how much time do y'all need? Can you do this in, like, 15 or so minutes?

Well, here's -- what about -- I assume you're going to go to your respective rooms; right?

Can you turn your list in by 12:30?

MR. SCHWEGMANN: Yes, your Honor.

MR. RECKERS: Yes.

THE COURT: Okay. Go ahead and go, and then we'll let the jury come back in here. And thank y'all.

(Recess, 12:13 p.m. to 12:40 p.m.)

(Open court, all parties present, prospective jurors present.)

THE COURT: Please be seated.

If your number is called, if you'll come forward and our court security officers will get you seated in -- on the -- in the jury box.

THE COURTROOM DEPUTY CLERK: Number 1, Number 2, Number 6, Number 16, Number 18, Number 20, Number 26, Number 29.

THE COURT: Okay. If you eight will stand, raise your right hand, and take your oath.

(The oath is administered to the jury.)

THE COURT: You may be seated.

For everyone else, I am sorry you did not make the jury, but thank you for your participation.

If you want a work excuse, they're available at the security desk when you leave. But you're excused at this time.

Thank you.

(Remaining prospective jurors exit the courtroom.)

THE COURT: Please be seated.

Ladies and gentlemen, I'm going to go ahead and do my preliminary instructions and then we'll break for lunch, so just all the general instructions about the trial and everything.

Members of the jury, you have now been sworn as the jury to try this case. As the Judge, I will decide all questions of law and procedure. As the jury, you are the judges of the facts.

At the end of the trial, I will instruct you on the rules of law that you must apply to the facts as you find them. The evidence from which you will find the facts will consist of the testimony of witnesses, documents, and other items received into the record as exhibits, and any facts that the lawyers agree or to -- agree to or stipulate to or that the Court may instruct you to so find. But certain things are not evidence and must not be considered

by you.  I will go over that list now.

First, statements, arguments, and the questions by the lawyers are not evidence.

Second, objections to questions are not evidence. Lawyers are obligated to their clients to object when they believe evidence being offered is improper under the rules of evidence.  You should not be influenced by the objection or by the Court's ruling on the objection.

If the objection is sustained, you must ignore the question.  If the objection is overruled, you must treat the answer like any other.  If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction as well.

Third, testimony the Court has excluded or told you to disregard is not evidence and must not be considered by you.

And, fourth, anything you have seen, heard, or read outside of the courtroom is not evidence and must be disregarded.  You are to decide the case solely on the evidence presented to you here in the courtroom.

Now, there are two kinds of evidence, direct and circumstantial.

Direct evidence is direct proof of a fact, such as the testimony of an eyewitness.

Circumstantial evidence is proof of facts from

which you may infer or conclude that other facts exist.

I will give you further instructions on these, as well as other matters at the end of the case, but keep in mind you may consider both kinds of evidence.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness' testimony to accept or reject. I will give you some guidelines for determining the credibility of witnesses at the end of the case.

You may take notes during the trial. Do not allow your note-taking to distract you from listening to the testimony. Your notes are an aid to your memory. If your memory should later be different from your notes, you should rely on your memory.

Do not be unduly influenced by the notes of other jurors. A juror's notes are not entitled to any greater weight than each juror's recollection of the testimony.

Now, until the trial is over, do not discuss this case with anyone and do not permit anyone to discuss this case in your presence. This includes your spouse, children, relatives, friends, coworkers, and people with whom you might commute to court each day.

During your jury service, you must not communicate any information about this case by any means, by conversation, or with any tools of technology.

For example, do not talk face-to-face or use any electronic device or media, including, but not limited to, a telephone, a cell or smartphone, camera, recording device, BlackBerry, personal digital assistant, computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog, or website, such as Facebook, MySpace, YouTube, Snapchat, Instagram, Twitter, or TikTok, or any other way to communicate to anyone any information about this case until I accept your verdict or excuse you as a juror.

Do not even discuss this case with the other jurors until the case -- until the end of the case when you retire to deliberate. It is unfair to discuss this case before all the evidence is in because you may become an advocate for one side or the other.

The parties, the witnesses, the attorneys, and the persons associated with this case are not allowed to communicate with you. And you may not speak with anyone in or around the courthouse other than your fellow jurors or court personnel.

Do not make any independent investigation of this case. You must rely solely on what you see and hear in the courtroom when reaching your verdict.

Do not try to learn anything from this case from any other source. In particular, you may not use any

electronic device or media, such as your telephone, cell phone, smartphone, or computer to research any issue touching on this case.

Do not go online or read any newspaper account of this trial or listen to any radio or television newscast about it.

Do not visit or view anyplace discussed in this case, and do not use Internet programs or other devices to search for or view anyplace discussed in the testimony.

In sum, you may not research any information about this case, the law, or the people involved, including the parties, the witnesses, the lawyers, or even me, the Judge, until you've been excused as a juror at the end of the case.

Now, there are some issues of law or procedure that I must decide that the attorneys and I must discuss. These issues are not part of what you must decide, and they are not properly discussed in your presence.

To avoid having you leave the courtroom and to save time, I may discuss these issues with the attorneys at the bench, out of your hearing.

When I with confer with the attorneys at the bench, please do not listen to what we're discussing. If the discussions require more time, I may have you leave the courtroom until the lawyers and I resolve the issues. I

will try to keep these interruptions as few and brief as possible, but understand that it's part of every trial.

Now, normally during the trial of a case only the lawyers or the parties ask questions of the witnesses. In this case, as I mentioned during *voir dire*, I'm going to do something different. I'm going to permit you, the jurors, to also ask questions of the witnesses, and it is my hope this will be helpful to you.

So I want to explain how it will work. After the attorneys are through questioning each live witness, each of you will have the opportunity of submitting written questions for that witness. I will be giving you some blank question forms for your use.

If during a particular witness' testimony you believe there is something important that you would like to ask that witness, you may write your question on the form after entering the name of the witness.

After the attorneys have completed their questioning of the witness I will ask each juror to pass their form to the court security officer. You should pass a form even if it is blank. By doing this, the identity of the juror asking a question will not be readily apparent to us. There is no need to put your name on the form.

The Court will then have the attorneys approach the bench to consider your questions for the witness.

During this bench conference, the Court will review the questions with the attorneys. The Court will then decide whether it believes the question is appropriate. Please do not be offended if I do not ask your question or if I rephrase it in some way.

The Court will then ask the witness the questions it believes are appropriate, and the witness will answer the questions for the jury. After the witness answers all of the jurors' questions, the Court will allow the attorneys, if they desire, to ask any follow-up questions.

It is my hope that allowing you to ask questions will help you be more engaged in the proceedings and get the information you need to reach a just verdict.

My one concern about this procedure is that it not become too time-consuming. Please don't feel compelled to ask a question if you don't feel it is necessary. At the same time, you should not be afraid to ask a question if you believe it will help you better understand a witness' testimony.

Your questions should be limited strictly to the witness' testimony and you should not ask questions that are unrelated to the specific testimony of that witness. The Court will decide whether your question is appropriate and whether it should be asked. You should not draw any adverse inference against any party should the Court

decline to ask a question or rephrase a question that you have submitted.

Before I get into the issues of this case, I want to talk about the burden of proof required. In deciding some issues in this case, you must decide whether certain facts have been proven by a preponderance of the evidence. A preponderance of the evidence means that the fact that is to be proven is more likely true than not.

Let me give you an example. Take the evidence and imagine that it is equally balanced on a scale so that both sides of the scale are even. Now take a feather and add it to one side of the scale so that the scale tips ever so slightly in that direction. That is a preponderance of the evidence.

There will also be an issue where you might be instructed to use a higher standard and decide whether a fact has been proven by clear and convincing evidence. Clear and convincing evidence is evidence that produces, in your mind, a firm belief or conviction as to the truth of the matter sought to be established.

Proving a claim or defense by clear and convincing evidence, stated another way, means that it is highly probable that the facts are as the party contends.

And I will tell you when I do my final instructions, each of you will have a copy of that to take

back with you in the jury room and to follow along at the end of the case.

Now, plaintiffs, Spartan Composites, LLC, D/B/A FODS and Spartan Mat, LLC, have sued defendant, Signature Systems Group, LLC.  Specifically, plaintiffs allege the following three causes of action:

One, misappropriation of trade secrets under the Defend Trade Secrets Act, 18 USC, Section 1836, which is also referred to as the DTSA; second, misappropriation of trade secrets under the Texas Uniform Trade Secrets Act, which is also referred to as TUTSA, or T-U-T-S-A; and three, breach of contract.

Defendant, on the other hand, brings one counterclaim against plaintiffs for breach of contract.

Claim 1, misappropriation of trade secrets under the Defend Trade Secrets Act.

To succeed on the merits of a misappropriation of trade secrets claim under the Defend Trade Secrets Act, plaintiffs must prove:  One, that a trade secret existed; two, the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and, three, defendant used the trade secret without authorization from plaintiffs.

Cause of Action 2, Misappropriation of Trade Secrets Under the Texas Uniform Trade Secrets Act.

Similarly, under the Texas Uniform Trade Secrets Act, it is nearly identical to the federal Defend Trade Secrets Act in many respects. Plaintiffs must prove the same three elements to succeed on the merits of their state claim:

One, that a trade secret existed; two, the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and, three, defendant used the trade secret without authorization from plaintiffs.

Cause of Action 3, Breach of Contract. To succeed on the merits of their breach of contract claim, plaintiffs must prove the following elements: One, the existence of a valid, enforceable contract; two, performance or tendered performance by the plaintiffs; three, breach of the contract by defendant; and, four, damages to plaintiffs as a result of defendant's breach.

Now, the defendant has a counterclaim for breach of contract. Defendant's breach of contract counterclaim is structurally identical to the breach of contract claim brought by the plaintiffs. As a result, to succeed on the merits of its breach of contract counterclaim, defendant must prove the following elements:

One, the existence of a valid, enforceable contract; two, performance or tendered performance by the defendant; three, breach of the contract by the plaintiffs;

and, four, damages to defendant as a result of the plaintiffs' breach.

The trial will now begin. Lawyers for each side will make what is called an opening statement. An opening statement is an overview of what each side expects the evidence to show in a case.

But remember, what the attorneys say is not evidence. Your decision should be based on the evidence in the case. What the attorneys say is intended to be a roadmap to help you understand the evidence as you hear it during the course of the trial.

After the opening statements from both sides, plaintiffs will then be presenting their evidence. After plaintiffs rest their case-in-chief, defendant will then begin presenting its evidence.

After defendant concludes presenting its evidence, plaintiffs will have the opportunity to present any rebuttal evidence, if they have. And then if plaintiffs present any evidence regarding defendant's counterclaim, defendants will have the opportunity to present any rebuttal evidence on that claim.

After the evidence has been presented, the attorneys will then make closing arguments. Remember, closing arguments are not evidence but rather the attorneys' interpretations of what the evidence has shown

or not shown.

I will give you some detailed instructions on the law to apply in deciding the case at the end of the case, and those will control.  And, again, you'll have a copy of those to take with you at the end when you go back to deliberate.

And then I will give you a list of questions you must -- you're going to have to answer.  This list of questions is called the verdict form.  Your answers to those questions will need to be unanimous, and those unanimous answers will constitute the verdict in this case.

After the closing arguments and my final instructions, you will then go to the jury room to deliberate to reach a verdict.

Keep an open mind during the entire trial.  Do not decide the case until you have heard all of the evidence, the closing arguments, and my final instructions.

Now, normally I would say it's time for opening statements, but I'm going to instead say it's time for lunch.  I'm sorry, and I appreciate your patience as we have gone long.  I don't know about you, but I'm hungry.

So we're going to go ahead and take a lunch break until 2:00, and we'll come back and hear opening statements.

What's going to happen is you're going to go out,

and they'll probably take you up to the jury room, and you'll get jury badges because you're now 1 through 8. Your other numbers aren't important anymore.  And you'll follow all these instructions when I go out.

Again, you know, you'll have your phones back. Just don't do any research on this case or anything.  Don't talk about the case.  But have a good lunch, and we'll come back and we'll hear opening statements.

Thank y'all.  Have a good lunch.

(The jury exits the courtroom, 12:56 p.m.)

THE COURT:  Please be seated.

Before we break for lunch, we discussed this morning the issue of the defendant's counterclaim and, of course, the pretrial order, paragraph 41 is the only one that discusses what that breach of counterclaim and for the breach of contract claim would be.  And, of course, the plaintiffs objected to it, and so that requires the Court to go back to Document 20, which is the amended answer and counterclaim.

In reading paragraph 42 -- 41 is general, but 42 indicates the breach is based upon the FODS trackout mat. So I think that's all the breach of contract claim that's what's in the pleadings, so I think the defendants are bound by that.

So I understand that you wanted to expand it, but

when I look at paragraph 42, it only deals with the issue of the FODS trackout mat. So anything else would be excluded based upon that.

I just wanted to give you advanced notice so you can adjust those slides to not include anything other than that.

MR. RECKERS: Right. And so, your Honor, I think what we would ask is to -- we will take out any reference to our affirmative claim, but we'd still like to argue that we don't breach there the parallel obligation --

THE COURT: Wait. Let me make sure I understand. You're dropping your breach of contract claim?

MR. RECKERS: I'm going to drop the slides.

THE COURT: Oh, okay. I was a little confused there.

MR. RECKERS: Yeah, I -- no, I will address that further, but, you know --

THE COURT: No --

MR. RECKERS: -- for purposes of my opening statement, I'd like to -- and we provided defense -- or plaintiffs' counsel the revised slides and want to sort of get a sense of what I'll be allowed to say about the -- our defense to their affirmative claim, which does implicate the FODS mat and the FODS hardware.

MS. COX: Your Honor, I don't -- we don't have an

issue with that so long as we see the slides first.

But just for clarification for the record, the issue with paragraph 42 was that it references the DuraDeck mat and not the DiamondTrack mat. So I just wanted to confirm that that was the Court's understanding as well is that defendants would be limited to the interlockability of FODS and DuraDeck in paragraph 42.

THE COURT: Well, 42 limits it to -- the issue is the FODS trackout mat and the Signature DuraDeck mat. That's what's in the paragraph.

MS. COX: Correct. Understood.

THE COURT: Yes, it's limited to that.

So just amend your slides. I think we're good.

Anything else from the plaintiffs, then?

MS. COX: Nothing further from the plaintiffs.

THE COURT: Anything else from defense?

MR. RECKERS: No, your Honor.

THE COURT: Okay. And then I guess we'll start back at 2:00.

Again, you can use the little music stand and move it over here, if you'd like, for opening statements. You're not bound to the podium or the little music stand, but if you want to use it, you're welcome to it. Okay? I just don't hold you -- I don't hold you to the podium.

I do remind you, I do hold you to the podium for

questioning witnesses.  You have arm's-length, you know, from that.

Okay.  Have a good lunch, and we'll see you back at 2:00.  Thank you.

(Recess, 1:00 p.m. to 2:03 p.m.)

(Open court, all parties present, jury present.)

THE COURT:  Please be seated.

Okay.  It is now time for opening statements.

If plaintiffs would like to make their opening statement?

MS. COX:  Your Honor, before we get started, we'd ask the Court to seal the courtroom for opening, other than the parties' witnesses and employees, which we're fine with staying in the courtroom.

THE COURT:  Okay.  So who do you want it sealed to?  I mean --

MS. COX:  Sorry?

THE COURT:  Who do you want to be excluded?

MS. COX:  Just for the record, for the courtroom to be sealed because we intend to go into the trade secrets during opening.

THE COURT:  Okay.  That's fine.

So for the audience, if there's anybody in the audience who is not subject to the protective order, they would need to leave at this time.

(Courtroom sealed.)

(This portion of the transcript is sealed and filed under separate cover as Sealed Portion Number 1.)

(Courtroom unsealed.)

(Recess, from 3:23 p.m. to 3:38 p.m.)

(Open court, all parties present, jury not present.)

MR. WEIDNER:  Yes, your Honor.  Signature just wanted a little clarification on the scope that the Court will allow examination on the Scout Mat.

Under the recent order that the Court just entered, Signature certainly does not intend to introduce Scout for any sort of offset --

THE COURT:  I'm having trouble hearing you, so...

MR. WEIDNER:  Is this better, your Honor?

THE COURT:  Just you're soft-spoken, so...

MR. WEIDNER:  Oh, I'll try to speak up a little bit more, your Honor.

THE COURT:  Thank you.

MR. WEIDNER:  Basically, Signature wishes to elicit testimony regarding the Scout Mat solely to the extent that it rebuts an element of plaintiffs' breach of contract claim with regard to the Settlement Agreement.  As we read into the preliminary jury instructions today, plaintiffs must prove that they themselves performed under

that contract as an element of their claim.  And so that's the reason that Signature wishes to elicit testimony regarding Scout Mat today.

MS. COX:  Your Honor, I do have a response.  It may take about two to three minutes -- and I don't see the jury lined up -- if that's okay.

THE COURT:  Is the jury here?

THE COURT SECURITY OFFICER:  No.

THE COURT:  No.  Go ahead.

MS. COX:  So the issue with --

THE COURT SECURITY OFFICER:  They're coming down.

THE COURT:  Okay.

MS. COX:  I'll talk fast-ish.

The first problem with this is that the Scout Mat is unrelated to both of the breach of contract claims that the jury is going to be here about -- hear about today.  So it's not only going to be confusing to them, but it's not relevant to the breaches that we're talking about and whether or not relevant aspects of the contract were performed there.

The other part of this, your Honor, is that if the Scout Mat and the DuraDeck mat are interlockable, both parties fail to perform, which means that both parties' breach of contract claims couldn't work.  Obviously that's not the case since we are both standing here today assuming

that we can bring breach of contract claims that are both valid.

There is a matter of law waiver issue to that argument.

MR. WEIDNER: Your Honor, Signature respectfully disagrees. The element of their claim requires that plaintiffs show that they performed under the contract, not that they performed with regard to any specific mat.

Not only that, there are inequal provisions under the contract that would have excused Signature from having to change anything about its DuraDeck mat, as I intend to show in my examination of Mr. Schenk today.

THE COURT: Okay. Well, we'll continue this.

But let's bring the jury in.

(The jury enters the courtroom, 3:41 p.m.)

THE COURT: Please be seated.

At this point the Court will conditionally admit all exhibits that are unobjected to or that I've overruled the objection.

And then does plaintiff want to call their first witness?

MS. COX: Plaintiffs call Brian Schenk.

THE COURT: Sir, if you'll raise your right hand to be sworn in.

(The oath is administered to the witness.)

THE COURT: Go ahead and proceed.

<u>DIRECT EXAMINATION OF BRIAN SCHENK</u>

<u>CALLED ON BEHALF OF THE PLAINTIFFS</u>

BY MS. COX:

Q. Good afternoon.

A. Hello.

Q. Would you please introduce yourself to the jury.

A. Yes.

My name is Brian Schenk. I'm the COO at Spartan Mat and Spartan Composites, and have been with the company since approximately December 31st, 2013.

Q. Where are you from, Mr. Schenk?

A. I live in Phoenix, Arizona.

Q. Is that where your office is located?

A. We have offices there, but also obviously our plant in Rockledge, Florida.

Q. You said that you are the COO of Spartan, right?

A. Yes.

Q. What are some of your responsibilities as COO?

A. Strategy. The leadership of the plant team in the Rockledge, Florida, plant reports to me and Justin directly, but to me initially.

And so just overseeing operations from a high-level strategy perspective, managing Jeff Juergens, who's the president of Spartan Composites, and Robert

Adair, who's the VP of operations.

I also interact with financial reporting.

Q. Now, when the Judge read out the case today, we heard him say that there were two Spartan companies listed as plaintiffs. Spartan Composites, doing business as FODS, and Spartan Mat.

Can you tell me what the difference of those two companies is?

A. Yeah. So Spartan Mat was born probably 13 years ago or so as a mat broker in mostly the wood mat space. The majority of the matting industry in the United States, North America, is wood mats. They are heavier duty to handle heavier loads from cranes and other track equipment.

And so Spartan Mat was really founded by Justin Thelin, our CEO, who was really a wood mat broker and trader and found himself in the matting industry on the wood mat side. So that's really the parent company history.

And then we came in to the composites seeing an opportunity to, you know, diversify our product and getting into the quickly growing composite space because composites last longer, they don't rot. And so an engineered product made sense to also go into.

Q. So just to clarify, Spartan Mat makes wood mats and Spartan Composites, they are a maker of plastic mats,

right?

A.   That's accurate.

Q.   And are you the chief operating officer of both Spartan companies?

A.   Yes.

Q.   How long have you worked for Spartan?

A.   About seven years or so, since basically early 2019, late 2018.

Q.   Are you familiar with Spartan's relationship with FODS?

A.   Yes.

Q.   What's their current relationship?

A.   Spartan Composites, which is a subsidiary of Spartan Mat, the parent company, we formed a relationship for many years since we acquired the plant in Florida in -- December 31st of 2018 and became the total manufacturer for the FODS product.  And ultimately through years of working with them and seeing opportunities, we acquired them in 2024.

Q.   Let's break that up a little bit.

Where is the manufacturing plant located?

A.   In Rockledge, Florida.

Q.   In what year did Spartan purchase the manufacturing plant?

A.   Again, we closed on the assets of D&D Manufacturing December 31st of 2018.

Q.  Since December 31 of 2018, has Spartan been manufacturing FODS?

A.  Yes.

Q.  Are there any other companies that had manufactured FODS?

A.  No.

Q.  So is it fair to say that Spartan is the exclusive manufacturer?

A.  Yes.

Q.  And I believe you mentioned this, but did you say that Spartan acquired FODS in 2024?

A.  Yes.

Q.  What's the status of FODS now as a part of Spartan?

A.  It's a significant segment of our business.  They have a significant sales team now as they have grown, as we've seen on the screen, and shown their growth over the years.

They continue to operate fairly independent and run their segment, but they roll into Spartan Composites' family.

Q.  So when we saw the party name earlier, it was Spartan Composites doing business as FODS.  Why did Spartan decide to keep the FODS name?

A.  Because it's built a significant brand in the market.  It was the pioneer and inventor of a composite trackout mat.

There hadn't been one to date until -- you know, until early this year that had been a competitor or when the DiamondTrack was, you know, introduced to the market.

So for us, it meant a significant brand opportunity for us to diversify our business.

Q. Let's shift gears a little bit. I want to talk to you about the types of plastic mats that Spartan makes.

Are you familiar with all the products that Spartan makes and sells?

A. Yes.

Q. So what are some of the products that Spartan makes?

A. So a couple of our flagship products is our larger mat. We call it System7 XT. It's a large 8-foot by 14-foot roughly 1100-pound panel mat that is intended to be an access road.

So, for example, when utility companies need to go and fix something -- run a power line or another project and it's an area that's really wet and preventing vehicles from sinking into the dirt and mud, this creates a base essentially to allow vehicles and pedestrians to access an area without disturbing the environment and also protecting vehicles and life.

Q. You mentioned System7. I think it would be helpful for the jury to see it.

MS. COX: Could we show Defense Exhibit 48.

And, your Honor, this has been preadmitted.

BY MS. COX:

Q. What are we looking at in this picture?

A. This is the System7 XT mat.

Q. How is this different from the FODS mat?

A. In a couple of ways. So it's a two-piece mat that we weld together, which means it's an engineered product for what we use it for, which is essentially, again, a road base, if you will. We call it an access mat.

These interconnect and interlock into more of a road versus site-specific like trackout.

Did you ask me how they're different?

Q. I did.

A. Okay.

Q. That was a good answer, but there was something there that you said that I want to point out.

You said that this is manufactured in two pieces, right?

A. Correct.

Q. //////////////////////////////////////////////////////////////////////////////

//. ///////////////////////////////////////////////////////////////////////////

//////////////////////////////////////////////////////////////////////////////

//////////////////////////////////////////////////////////////////////

///////////////////////////////////////////////////////////////////////////////



Q. Does Spartan consider how it strategically sells to certain types of customers and industry to be confidential and proprietary to Spartan?

A. Yes.

Q. After acquiring FODS in 2024, did Spartan take any measures to make sure that they kept FODS's confidential data confidential?

A. Can you repeat that one more time?

Q. Sure.

So after 2024, after Spartan already acquired FODS, what measures did Spartan take to make sure that FODS's trade secrets and other information remained confidential?

A. I mean, as a general business practice, our policies are to try and obviously hold trade secret information, client lists, those types of things, even pricing, as close to the vest as we can and only disclose those where they need to.

Just in general, we allowed FODS to operate their

business model as they had been and kept that intact.

Is that your question?

Q. Sure.

So let's go through some specifics.

Do you have an employment agreement with Spartan?

A. Yes.

Q. Are there any confidentiality provisions in your employment agreement?

A. Yes.

Q. Are you permitted to share trade secrets with a third party as an employee of Spartan?

A. No.

Q. Does that same policy apply to all of the employees of Spartan?

A. Yes.

Q. What about the employees of FODS since the acquisition?

A. Absolutely. Similarly, yes. We have tightened -- if anything, over the years, we've tightened those up more rigorously.

Q. Does Spartan have any kind of employee handbooks or other documents other than employment agreements that might contain confidentiality provisions?

A. Yes. We definitely have employment handbooks, employment manuals, yes.

Q. So putting the documents aside, let's talk about the

REDACTED -- 11/17/2025 Jury Selection and Vol 1, Pg 160

actual manufacturing facility.

Are you aware of the security measures that Spartan has at the manufacturing facility?

A. Yes.

Q. What are some of those measures?

A. We restrict the inside operations where the plant is located. We do allow visitors to come on-site. Usually, it's -- well, they're always required to sign in and be accompanied. And then, you know, usually those tours occur outside the exterior of the yard or in our offices. We have a conference room.

Q. So I want to make sure the jury has a visual picture of what we've talking about.

So we were discussing how System7 was manufactured earlier. Is the mold for System7 -- where is that located at the facility?

A. It's -- there's two molds for the System7 because it's a top and bottom, and it's currently situated under what we call the two Erie Press lines that we have.

Q. So if I drive up to the facility and I park my car and I get out, can I walk right into the manufacturing part where you can see the big machines?

A. No.

Q. Do I have to go through an office first?

A. Yes.

Q. And is that where the sign-in sheet is that you mentioned?

A. Yes.

Q. Are there any circumstances where you would allow someone to go look at the facility without signing an NDA?

A. No.

Q. And why exactly does Spartan not allow anyone to see the facility without an NDA?

A. Because we also claim our manufacturing process to be proprietary for us and trade secret.

Q. Is there anything specifically about the manufacturing process? Is it the big machines, or is it how those machines work and the molds that they have?

A. I mean, specifically, all of the above.

The mold process itself, as well as our times under press, the cure times, when they come out how the mats are handled; thereafter, if it's a System7, how they're welded. That, we call residency time. Under the weld, the temperatures that affect those things. All of that is proprietary.

Q. So suffice to say there are a lot of things in that facility that you need to make sure are protected, right?

A. Yes.

Q. Now, we've talked about post 2024, when Spartan acquired FODS.

Before 2024, when Spartan was manufacturing FODS, did Spartan have all of these same measures in place?

A. Yes.

Q. And did they do everything that they could to protect FODS's trade secrets?

A. Yes.

Q. So now that we've discussed Spartan's relationship with FODS, I want to talk about Spartan's relationship with Signature, the defendant.

Have Spartan and Signature ever been involved in a lawsuit before this one?

A. Yes.

Q. Can you very generally tell me what that lawsuit was about?

A. Yes. The outcome was what we've all heard today referred to by both counsel, which is the Settlement Agreement in 2019.

High level, the lawsuit was brought against Spartan for infringing trade dress as it relates to the way our mats look on the top of the mat. We talked about the skin of the mat has a tread pattern or a traction pattern molded into it. And so it was largely brought against us for those purposes.

Q. So let's back up just a little bit.

Before the lawsuit, did Spartan and Signature have

any kind of business relationship?

A. Minor and a short one. We were a tool manufacturer for their DuraDeck for a few months in early 2019.

Q. Can you tell me how that happened, how you came to be the manufacturer for Signature for a few months?

A. Inherited, if you will.

That process or that contract, if you will, preceded us. And with D&D there was a relationship where that 4-foot by 8-foot mat we call the DuraDeck was made by D&D.

And so we acquired that plant, we had the option to work with Signature for a time and also make those mats for them.

Q. Okay. So just to be clear, before 2018, Signature was being manufactured by D&D; is that right?

A. Yes.

Q. And then Spartan bought D&D's facility?

A. Yes.

Q. And after --

A. I think you meant before 2019. Sorry.

Q. Yes. I'm sorry. You're right. Before 2019.

And then after that, did you say that Spartan manufactured Signature for a few months?

A. Yes.

Q. Was there a specific product that Spartan manufactured

for Signature?

A. I'm only aware of one and that was the DuraDeck, which is that 4-foot by 8-foot mat.

Q. Are you familiar with how Spartan manufactured Signature at the facility in 2019?

A. Yes.

Q. Can you tell the jury about that?

A. It's a similar process -- well, the DuraDeck is essentially a half-inch flat panel. It doesn't have engineered ribbing, like I explained, with like a cellular core. It's just a flat half-inch, roughly, piece of plastic. And it's -- both sides have the tread pattern on them with the nameplate on -- you know, logo plate on both sides.

MS. COX: Your Honor, may I leave the podium for just a minute to go grab the physical mat?

THE COURT: Yes, go ahead.

MS. COX: Thank you.

BY MS. COX:

Q. All right. Mr. Schenk, can you see this mat that I'm holding up?

A. Yes.

Q. So we see this one has these pyramids on top, right?

A. Yes.

Q. So you said that the DuraDeck had -- let me rephrase

that question.

Does the DuraDeck have the same pattern on the front and the back side of the mold?

A. It does. It's basically a two-sided mat.

Q. So it's identical on both sides of the mold; is that fair?

A. Yes.

They may change out the traction, like tread pattern we talked about, but they are largely identical on both sides.

Q. So when we're looking at this mat, how would you be able to make this mat identical to make it the same way as DuraDeck?

A. You can't.

Q. Would that require it to have pyramids on both sides?

A. Yes.

It wouldn't be ideal.

Q. Let's go back to that Settlement Agreement.

MS. COX: If we could pull up Plaintiffs' Exhibit 93.

And, your Honor, this has been preadmitted.

THE COURT: That's fine.

BY MS. COX:

Q. Is this the Settlement Agreement that you were referring to earlier?

A.  Yes.

MS. COX:  If we could zoom in on the top part of that.

BY MS. COX:

Q.  What's the date of this Settlement Agreement?

A.  December 19th, 2019.

Q.  And can you tell me who the three parties are that are listed out there at the top?

A.  Signature Systems Group, LLC; Spartan Mat, LLC; Spartan Composites, LLC.

Q.  So other than FODS, the same companies that are in this room today?

A.  Yes.

MS. COX:  Now, if we could go to 93.001 and highlight the "Compromise of Claims" section.

Yes, that first Section 1 up at the top.

BY MS. COX:

Q.  Now, you told the jury a minute ago a little bit about the lawsuit that Signature brought.

By signing this Settlement Agreement, did Spartan admit that Signature's claims were valid?

A.  No.

MS. COX:  And if we could zoom back out from there.

*

BY MS. COX:

Q. Are you familiar with the breach of contract claim that we've brought in this case against Signature?

A. Yes.

MS. COX: Could we zoom in on Section 2.2, please.

BY MS. COX:

Q. Mr. Schenk, would you mind reading out this section for the jury.

A. "Signature will agree not to manufacture, market, advertise, or sell any Mat which is designed to be interlockable" and/or "interoperable with a Mat manufactured by Spartan for a period of seven years from the Effective Date."

Q. Okay. So let's break that down a little bit.

Do you see where it says "interlockable/interoperable"?

A. Yes.

Q. What do you understand "interoperable" to mean?

A. How a product operates or functions with another mat adjacent to it.

So I would understand it to mean interoperates, how the mats marry together and how they function together.

Q. So let's talk about their function first. We know that the FODS mat is a trackout mat, so what kind of mat would be interoperable with the FODS mat?

A.   None other that I know of until the DiamondTrack was introduced.

Q.   Why is it that you believe that the DiamondTrack is interoperable with the FODS trackout mat?

A.   Because they operate in the same purpose and are effectively the same length and width, and they can be interconnected as such.

Q.   When you say "same purpose," are these both trackout mats?

A.   Yes.

Q.   The next thing you mention is interlockability, and you described it as these two mats being able to marry together.

     Is that a fair understanding of what you thought interlockable meant in this agreement?

A.   Yes.

Q.   Now, at the end of this sentence it says, "for a period of seven years from the effective date."

     What was the effective date that we looked at earlier?

A.   December 19th, 2019.

Q.   So when would seven years from the effective date be?

A.   December 19th, 2026.

Q.   Is that next Christmas?

A.   Yes.

Q.   So has this condition expired yet?

A.   No.

Q.   Now, at the time that this was signed in 2019 -- you've already told us, but just as a refresher -- was Spartan manufacturing FODS?

A.   Yes.  We had a contract in place with FODS.

Q.   At the time that Spartan was manufacturing FODS and Signature, were you ever aware of Signature coming to the facility to pick up their own mats?

A.   I was aware that they were picking up their mats, yes. I don't know who, but I know that they were picking up their own mats for delivery.

Q.   Fair enough.

When you go to the facility to go pick up your mats, can you see the other finished products out in the yard?

A.   Yes, absolutely, and along the street side.

Q.   So if you were able to go visit the facility back in early 2019, would you see both Signature's DuraDeck and FODS's trackout mat had been manufactured there?

A.   Yes, if they were in the yard, and that's where we often kept the finished goods was in the outside yard.

Q.   Did Spartan continue to manufacture the FODS trackout mat immediately after this agreement was signed?

A.   I'm sorry.  One more time.

Q. Sure.

Did Spartan continue to manufacture the FODS trackout mat immediately after this agreement was signed?

A. Yes. We've never stopped making the FODS mat.

Q. So going back to Section 2.2 --

MS. COX: If we could zoom back in on that.

BY MS. COX:

Q. What was your understanding of what this Settlement Agreement prohibited Signature from doing regarding the FODS trackout mat?

A. Well, my understanding is that all mats that we manufactured would not be overlapped in our manufacturing.

Essentially, we wanted to stay out of each other's business, if you will, and so all mats that we manufactured would fall under this agreement.

Q. So specifically related to the FODS trackout mat, what did that mean that Signature couldn't do under this agreement?

A. Make a mat that would be interoperable or interlockable.

Q. And when we say "make," we mean manufacture, market, advertise, or sell. Is that what the agreement says?

A. Correct.

MS. COX: We can put that exhibit away.

*

BY MS. COX:

Q. Mr. Schenk, there is one last thing that I want to talk to you about because if I don't bring it up, the opposing counsel will.

At one point did Spartan consider making its own trackout mat?

A. We did.

Q. When was that?

A. Just before we closed on the plant in December of 2018, for about a month or two period, we considered making a FODS mat. We were concerned about potentially losing relationships, so we considered the competitive nature of should we start our own.

Q. What happened with that idea that Spartan had to make a FODS mat?

A. Well, it was shelved. It was -- the idea didn't last long.

Q. So it was just an idea. Was it ever carried out?

A. Never.

Q. Why not?

A. I've said this before, but, like, there was a lot of friction early on with FODS and Spartan trying to understand our roles as new owners of the plant, and we really just realized that they were our number one customer. We had no experience in the trackout space. We

never marketed a trackout mat significantly.

We had only tried brokering a few mats here and there without much success.  We didn't have much market knowledge, to be honest with you, and we knew it was going to have to take years for us to develop something and compete against them.

So we really realized that the best thing to do was just to align with them in a relationship and that they were our best customer.

Q.  And before we talk more about that idea, you said that it would have taken you years to come up with a product like this.

How long does it typically take Spartan to come out with a mat of its own, from the very ideation until you have the finalized manufactured product?

A.  Well, when it comes to making a good one, years.  We struggled for probably six years on our large mat.  You have to do a lot of testing, a lot of engineering values that are reviewed and assessed.  And you do test parts and those fail.

For us, it took us about six years to make the XT what it is today, with some earlier somewhat successes with our first large mat, but it's pretty significant.

And I think most people have experienced that. We've heard that about FODS as well.  It took them years to

develop and design that mat.

I know that -- I know that MegaDeck has had multiple versions. I think they're on their third version now for Signature's product.

It just takes years to really refine and make a better product.

Q. Has Spartan ever been able to come up with a mat and get it finalized in one year?

A. No.

Q. What about a year and a half?

A. I think, in fairness, the Scout Mat was our quickest to market because, again, it is a flat half-inch same-sided mat with just a tread pattern. It's not engineered.

But as far as anything that's engineered, in my opinion -- and I'm not a mold designer, but in my opinion, it's significant for time.

Q. And is the Scout Mat as big of a mat as the FODS mat?

A. No.

Q. Now, let's go back to this idea that Spartan had in 2018.

At the time that Spartan had that idea to make their own trackout mat, was Spartan under contract with FODS?

A. No.

You said in 2018?

Q.  Yes, in 2018.

A.  No.  No, we entered our contract with them about March of 2019.

Q.  Was Spartan trying to acquire FODS at that time?

A.  Oh, no.

Q.  Did Spartan base that idea on any trade secrets that belonged to FODS?

A.  No.

MS. COX:  Your Honor, a moment to confer?

THE COURT:  I'm sorry.  Yes, go ahead.

A.  Jess, can you ask me that last question one more time? I want to make sure I understand that last question.

BY MS. COX:

Q.  Sure.

So my last question was whether or not when Spartan first had the idea, Spartan got any trade secrets from FODS that it used to contemplate that idea further.

A.  Not to my knowledge.

Q.  Okay.

MS. COX:  Your Honor, we pass the witness.

THE COURT:  Cross-examination?

CROSS-EXAMINATION OF BRIAN SCHENK

BY MR. WEIDNER:

Q.  Good afternoon, Mr. Schenk.

We heard a bit about molding today, but you would

agree with me that there are two possible orientations for compression molding mats like these, right?

A.  Yes.

Q.  Either the male side is on top or the male side is on the bottom; isn't that right?

A.  That's correct.

You're referring to the trackout, sir?  Is that what you're referring to?

Q.  Yeah.

A.  Okay.

Q.  And you would also agree with me that Signature has been making composite mats for a long time, hasn't it?

A.  Yes.

Q.  And Signature has a lot of experience making composite mats, right?

A.  Yes.

Q.  Now, the FODS mat is made with compression molding, isn't it?

A.  Yes.  Correct.

Q.  Now, I'd like to talk about pricing for just a moment.

Spartan shares its pricing information with clients and customers, doesn't it?

A.  It does.

Q.  And FODS also shares its pricing information with customers and distributors, right?

A.   Yes.  By which manner, I -- you -- I would have had to defer to them in how they disclose it, but yes, there is obviously pricing shared to certain distributors.

Q.   And you would agree with me that whenever you send pricing information with -- to a distributor or a customer, they can share that information with whoever they want, can't they?

A.   Yes, they could share that.

     My only comment to that is that pricing is dynamic.  It depends on the uniqueness of the situation, the volume, and the location, cost of logistics and transportation.  So they're not all alike; they're unique.

Q.   But you would agree with me that when you share pricing with a customer, that customer can share that pricing with whoever they want?

A.   For that particular proposal, they could, yes.

Q.   And so if pricing was a trade secret, you wouldn't share it with anyone, would you?

A.   That's correct.

Q.   Now, Spartan and FODS don't require users or distributors of these mats to sign any kind of NDA, right?

A.   Not to my knowledge.

Q.   And neither company has ever required any vendor to agree not to reverse engineer one of these mats, have they?

A.   That's correct.

Q. Mr. Schenk, isn't it true that in this case FODS is accusing Signature of copying its yellow mat?

A. I think that's a broad definition. I think there's components to what FODS is claiming. But in general, yes.

Q. And FODS is also alleging that it has certain trade secrets pertaining to its yellow mat, right?

A. Correct.

Q. But copying a product isn't trade secret misappropriation, is it?

A. Not to my knowledge if it's public.

Q. And, in fact, Spartan's chief executive officer suggested copying FODS's design back in 2018, didn't he?

A. Yeah, he did. As we contemplated making a knockoff product -- excuse me -- making a mat, Justin had made those comments. But I will qualify that, if I may.

Justin is largely a sales representative of the company. As the CEO, he started the company, and he made those comments, yes. But after he allows the team to consult around him and make better decisions, we decided otherwise.

But, yes, that was a comment he had --

Q. Well, why don't we go ahead and take a look at that.

A. Okay.

Q. Will you please turn to DTX-243 in your binder, please. 243.

Do you recognize this exhibit, Mr. Schenk?

MS. COX: And, your Honor, just before we move forward, it's unclear whether or not this exhibit is admitted. So if it's not admitted yet, I'd just ask that it'd wait to be shown on the screen until it is admitted.

THE COURT: Was this one of the preadmitted exhibits?

MR. WEIDNER: I believe there are relevance objections to this, your Honor, but I think that the door has been opened.

THE COURT: Since there are objections, you can't put it on the screen first. You need to provide a hard copy and go through the steps.

MS. COX: And, your Honor, to be clear, we don't object to admitting it, but we just wanted to make sure that it was admitted first since it was not a preadmitted exhibit originally.

THE COURT: Well, since they're not opposed to -- but, again, make sure in the future before you put it up.

MR. WEIDNER: Absolutely, your Honor.

THE COURT: But if you want to offer it, I don't think they object.

MR. WEIDNER: Yes. I will offer Exhibit 243 into evidence, your Honor.

THE COURT: And my understanding, there's no

objection?

MS. COX: No objection from plaintiffs.

THE COURT: Defense 243 will be admitted.

BY MR. WEIDNER:

Q. Now, do you recognize this document, Mr. Schenk?

A. Yes.

Q. And this is an email from Justin Thelin to a group of people, including yourself; isn't that right?

A. Yes.

Q. And Justin Thelin is Spartan's CEO, correct?

A. Yes.

Q. So this email shows Spartan's chief executive officer saying that Spartan was going to make and launch its own trackout control mat, right?

A. At the time, he did.

Q. And he's the head of the company. He's the chief executive officer. What he says goes, right?

A. Not always, but I understand what you're saying. He did make the comment as the CEO's position. He was really the owner of the company. But to your point, no, it doesn't always go.

Q. And so -- but he is the CEO, and I believe you just said the owner of the company; isn't that right, Mr. Schenk?

A. Yes, that's correct.

Q. And he said, the owner of the company said that according to this, Spartan could just copy FODS's design, right?

A. He did say that at the time, yes.

Q. Now, you don't think that it would have been trade secret misappropriation if Spartan had made an exact copy of FODS, do you?

A. Well, I think if he made an exact copy of FODS, yes, it would have been. That's my opinion.

MR. WEIDNER: Dillon, can you pull up where it says "Should we literally just make the exact same mat..."

BY MR. WEIDNER:

Q. Can you see that on the screen, Mr. Schenk?

A. Yes.

Q. So this is what Mr. Thelin was pitching, making the exact same mat as FODS but in a different color, right?

A. Yes. The problem with this timeline is that Justin didn't fully understand who the manufacturer was of the mat.

We became the tool manufacturer of FODS. It was actually their mold that we tool manufactured for them as a service.

So there was a time when Justin thought we could just kind of go forward. But, again, he has advisors around him, and he moves pretty quick as a sales guy. And

we've had obviously further conversations about this, and we shelved it quickly after.

Q. But Mr. Thelin doesn't say that he doesn't know who's manufacturing this mat. He says, "Should we literally just make the exact same mat..." Right?

A. He did say that at the time, yes.

Q. And you don't think that making the exact same mat would be trade secret misappropriation, do you?

A. Actually, I don't know. But I think it would be.

Q. Well, Mr. Thelin, do you -- or, Mr. Schenk, do you remember having your deposition taken in this matter?

A. Yes.

Q. Do you remember swearing an oath to tell the truth, the whole truth, and nothing but the truth at that deposition?

A. Yes, sir.

Q. And you're under oath today, right?

A. Yes, sir.

Q. Well, would you please --

MR. WEIDNER: I'd like to hand the witness his deposition.

Permission to approach, your Honor.

THE COURT: Yes, go ahead.

MS. COX: Your Honor, before opposing counsel approaches, we'd like to know the page and line number so that we can see it before they continue.

THE COURT: Yes. If you'll provide that to them.

MR. WEIDNER: Yes, absolutely. Page 75, Lines 4 through 13, your Honor.

A. What page is it? I'm sorry.

MS. COX: And, your Honor, if we can just have one moment to pull that up.

THE COURT: Yes, go ahead.

A. What page is it, sir? I'm sorry.

BY MR. WEIDNER:

Q. 75.

A. Thank you.

MS. COX: Your Honor, at this point we object to hearsay as this would be an improper impeachment. I'm happy to approach and explain.

MR. WEIDNER: Your Honor, the witness testified --

MS. COX: And, your Honor, before we go into what his deposition says, I would just ask that we be able to approach as to not allow hearsay to get before the jury.

THE COURT: Okay. Counsel approach.

(The following proceedings were conducted at sidebar with all parties represented.)

MS. COX: Your Honor, the question that he was asking him --

THE COURT: You don't have to be so silent. There's white noise.

MS. COX:  Got it.

-- as to whether or not Mr. Schenk believes that it would have been misappropriation, that's not the question that he was asked at his deposition.  And also he answered no, which is consistent with the testimony that he has given here today.

MR. WEIDNER:  Your Honor, I asked Mr. Schenk today whether this would have been trade secret misappropriation and he said yes, I think it would be.

Here I asked him the same, whether that he thought it was his opinion that Mr. Thelin was misappropriating FODS's trade secrets and he said no.  That is the exact opposite answer that he gave at his deposition.

MS. COX:  And, your Honor, that's not what Mr. Schenk said on the stand, to my recollection, but perhaps we ask him again to clarify.

THE COURT:  If you want to ask the question again. It's not the same question here.

MR. WEIDNER:  Oh, yes.  I'm more than happy to ask the question again.

THE COURT:  So if you want to go ahead and just ask the original underlying question and see if we can get that back on track.

MS. COX:  Understood.

MR. WEIDNER:  Yes.  Absolutely.  Thank you, your

Honor.

(Sidebar conference concluded.)

THE COURT: If you'll reask the question again, please.

A. Okay.

BY MR. WEIDNER:

Q. Mr. Schenk, is it your opinion that Mr. Thelin was -- would have misappropriated FODS's trade secrets if he had made the exact same mat like he suggested doing here?

A. Well, when you use the term "exact," I'm assuming that he would have to have some kind of knowledge that was not available to us when I answered yes.

Q. And Mr. Thelin says "exact," doesn't he?

A. Yes.

Q. Do you remember being asked whether you thought Mr. Thelin was misappropriating FODS's trade secrets at your deposition?

A. I know -- yes and no. There were a lot of questions.

But if you're asking me if we could have made a copy, we could have intended to make a copy, yes. We could have tried, yes.

Q. And your testimony at your deposition was that Mr. Thelin was not doing anything wrong. He wasn't misappropriating FODS's trade secrets even though he wanted to make an exact copy of the FODS mat?

MS. COX: Objection, your Honor, as to misstatement of the deposition.

THE COURT: Well, overruled.

MR. WEIDNER: I'll rephrase the question, your Honor.

THE COURT: Go ahead.

BY MR. WEIDNER:

Q. When I asked you whether you thought this was misappropriating FODS's trade secrets, you said no; isn't that right?

A. You're talking about in my deposition time frame?

Q. Yes.

A. That's correct.

Q. Even though he wanted to make an exact copy of the FODS mat; isn't that right?

A. That's correct.

Q. But today you're saying that would have been trade secret misappropriation?

A. Well, I was thinking about the word "exact," which made me think about what that would require. And so I'm not necessarily amending my answer. I just understand the question differently. But...

Q. So you are changing your testimony?

A. I'm not trying to change my testimony.

So you're asking me if Justin Thelin said, "Let's

make an exact copy."

What I'm trying to say is that I don't think it would have been trade secret based on his comments or based upon his desire to steal secrets.

But when you ask me about exactness today, I thought of what that would require, which would be engineering plans.  So that's why I answered the way I did.

Q.  And to be clear, Mr. Thelin uses the words "the exact same mat"; isn't that right?

A.  Correct.

MR. WEIDNER:  We can go ahead and put that exhibit away.

BY MR. WEIDNER:

Q.  Mr. Schenk --

MR. WEIDNER:  Can we pull up Defendant's Exhibit 16, which should be preadmitted, your Honor.

BY MR. WEIDNER:

Q.  Now, Mr. Schenk, I believe you discussed this with your counsel a bit earlier, but this is the Settlement Agreement between Signature and Spartan, right?

A.  Yes, sir.

MR. WEIDNER:  Now, if we could highlight Section 2.1.3, please.

BY MR. WEIDNER:

Q.  Now, in this provision, Spartan agreed "not to

manufacture, market, advertise, or sell any Mat which is designed to be interlockable" or "interoperable with a Signature mat for seven years;" isn't that right?

A. That's correct.

MR. WEIDNER: And if we could bring up Section 3, please.

BY MR. WEIDNER:

Q. Now, under this contract Spartan also had 180 days to sell off all of the mats that would violate the section that we just looked at; isn't that right, Mr. Schenk?

A. Correct.

Q. So if we look at Sections 2.1.3 and Section 3 together, Spartan had 180 days to get rid of all of its mats that were interlockable or interoperable with a Signature mat, right?

A. Correct. But it says -- my understanding is the covenants, plural, as described in Section 2.1, which also include mats that had former tread patterns that allegedly violated Signature's claim against us.

Q. But Section 2.1.3 just says any mat "designed to be interlockable" or "interoperable with a Signature Mat," right?

A. Yes. Both parties received a covenant not to manufacture, make, or sell mats that are interlockable and/or interoperable.

Q.  But only Spartan had to get rid of all of its mats that were currently interlockable or interoperable, right?

A.  Well, that's my understanding as it relates to the mats that were formerly made that would have had trade dresses unacceptable to Signature.

Q.  Does Section 3 say trade dress which is unacceptable to Signature or "any covenants set forth in Section 2.1," Mr. Schenk?

A.  It says any covenants in 2.1.

MR. WEIDNER:  Your Honor, at this point I'd like to approach to resolve the previous evidentiary issue.

THE COURT:  Okay.  Let me have counsel approach.

(The following proceedings were conducted at sidebar with all parties represented.)

MR. WEIDNER:  Yes, your Honor, at this point I would like to elicit testimony regarding Spartan's failure to comply with the Settlement Agreement in connection with the Scout Mat.  Specifically, at his deposition Mr. Schenk admitted that the Scout Mat is interlockable and interoperable with Signature's DuraDeck mat, both at the time of the Settlement Agreement and today.  Spartan must prove that it complied with the Settlement Agreement in order to bring its breach of claim against Signature for that agreement.

MS. COX:  And, your Honor, again we allege the

same issues that we had earlier, that this is a waiver problem, but more than that, this is a constantly shifting claim. This was originally their counterclaim, which they dropped. And then it was a offset defense, which the Court did not allow. And now they are trying to get it in.

And it's irrelevant evidence to the mats that are actually going to be decided on by the jury. It's just going to confuse them.

THE COURT: But does that matter? I mean, Ms. Cox, the issue is the breach of the agreement and it includes everything.

THE COURT REPORTER: I'm sorry, Judge?

THE COURT: Oh. No. The issue here is is that -- I understand you wanted to limit the breach of contract claim just to a certain mat, but it's a breach of the entire agreement. I agree, they have no affirmative claims for that, but it seems to me that what the Court has excluded is, of course, coupled with their defenses that they argue in the MIL, and I agreed with them on that -- or against them on that.

But ultimately, isn't any breach of the agreement -- I mean, because that's the second element of your breach of contract claim.

MS. COX: It is.

THE COURT: So that's why it's relevant to that,

is it not?

MS. COX: Your Honor, our position would be that it's not a materially relevant claim and, not to mention, even if it is materially relevant, a breach in this context for a defense of the element can be -- it's a waiver problem. We were both doing it, and so neither of our claims would be valid if this is correct, which simply can't be the case. That's a matter of law problem.

MR. WEIDNER: If I may.

Your Honor, as I went through earlier, there was a selloff provision which only applied to Spartan. And so like Mr. Schenk simply just testified, Spartan had to sell off all of its mats and Signature was allowed to continue its regular course of conduct with regard to DuraDeck.

Signature selling DuraDeck was at no point a breach of this agreement, whereas Spartan not getting rid of its mat and then continuing was.

THE COURT: So here is my view is that I think it's relevant and you are welcome to -- you are welcome to provide me case law if you can prove that this is wrong because just looking at it, it seems to me that any breach that is an Element 2 you are claiming, there is no prior breach by you --

THE COURT REPORTER: I'm sorry?

THE COURT: I'm sorry, Chris.

MS. COX: We understand, your Honor.

THE COURT: You understand what I'm saying.

MS. COX: Yes.

THE COURT: So all I'm saying is, is that I'm going to allow them to proceed. You are welcome to provide me case law that says that's wrong, that you can't parse out -- because that's what they're doing, correct? They're parsing out --

MS. COX: Yes.

THE COURT: You're trying to limit it to just the mats that are in dispute versus they are trying to expand and say, well, it's a defense on any breach at any point in the contract, basically, against your contract claim.

It just seems -- it seems that their argument probably is the right answer on that.

And I understand that it has taken them multiple ways to get there. And they have lost most of those avenues, but I don't see a valid way to say no to this.

MS. COX: We understand.

THE COURT: Yeah, but what I'm telling you, though, is that you are welcome to provide case law because the Court can still correct it in the way you do the charge if you can find case law that says they can't do what they're doing.

MS. COX: Got it.

And just to clarify, it sounds like the motion *in limine* is still fully in place because --

THE REPORTER: I'm sorry?

THE COURT: I think the MILs are still in place.

MS. COX: Okay. Okay.

THE COURT: So --

MS. COX: That sounds good.

THE COURT: That hasn't changed, but -- so --

MS. COX: Yeah.

THE COURT: Okay?

MS. COX: Understood. Thank you.

MR. WEIDNER: Thank you, your Honor.

THE COURT: And it sounds like I'll have homework tonight, but I'll give you homework first.

(Sidebar conference concluded.)

THE COURT: Go ahead and proceed.

MR. WEIDNER: Can we pull up DTX-16 back on the screen.

BY MR. WEIDNER:

Q. Now, at the time of this Settlement Agreement, Spartan offered a Scout Mat that was interlockable and interoperable with Signature's DuraDeck mat, didn't it, Mr. Schenk?

A. Yes.

Q. And at the time of the Settlement Agreement, Scout was

a 4-foot by 8-foot ground protection mat, right?

A.   Yes.

Q.   And so under the Settlement Agreement, Spartan was supposed to sell off or destroy at least all of its Scout Mats in that 180-day period, and then going forward it was supposed to make sure that they weren't interlockable or interoperable with Signature's DuraDeck; isn't that true?

A.   That's true.

Q.   But to this day, Spartan still offers the Scout Mat, and that Scout Mat is still interlockable and interoperable with Signature's DuraDeck, isn't it?

A.   Yes.

Q.   And the Scout Mat is still a 4-foot by 8-foot ground protection mat, right, Mr. Schenk?

A.   Yes.

Q.   So Spartan is actively breaching this Settlement Agreement, right?

A.   Yes.

Q.   Now, Spartan purchased FODS in 2024, right?

A.   Yes.  February 1st.

Q.   And FODS initially wanted a pretty significant sum of money for that purchase, right?

A.   It was significant to all of us, yes.

Q.   Was it around $30 million, Mr. Schenk?

A.   I would say it was under that.

Q.  Was it in the mid 20s?

A.  I'd rather not disclose that because I do feel like that was confidential.

MS. COX:  Your Honor, if I may, if opposing counsel would like that information disclosed, we just ask that the courtroom be sealed momentarily so Mr. Schenk can disclose that information.

THE COURT:  Okay.  I will go ahead and seal the courtroom and the record.  As soon as we're finished with this, then we'll unseal.

(Courtroom sealed.)

(This portion of the transcript is sealed and filed under separate cover as Sealed Portion Number 2.)

(Courtroom unsealed.)

MR. WEIDNER:  No further questions, your Honor.

THE COURT:  Okay.  Additional questions?

REDIRECT EXAMINATION OF BRIAN SCHENK

BY MS. COX:

Q.  Mr. Schenk, there's a few topics I want to talk to you about that came up on cross-examination.

Now, the first one is early on, do you remember Mr. Weidner asking you about pricing data?

A.  Yes, it came up.

Q.  When Spartan shares its pricing data with a customer, does it share a big Excel spreadsheet of its historical

Q. pricing data?

A. No.

Q. What does it share?

A. It shares a quote for that particular customer for that particular product for that particular volume in that moment.

Q. Would Spartan ever share with a customer all of their historical pricing data that shows the sales price for the entirety of Spartan's customer base?

A. No. Spartan Composites would never want to do that.

Q. All right. The second topic I want to go over is when Spartan was contemplating making its own trackout mat.

Now, do you think that there is a difference between having a bad idea and actually going through with it?

A. Yes.

Q. So did Spartan actually make a copycat mat of the FODS?

A. No.

Q. Mr. Weidner at the very end was asking about the Settlement Agreement. What date was that Settlement Agreement signed?

A. Was it December 19th, 2019?

Q. And what do you recall about what Spartan had to do with the Scout Mat?

A. The Scout Mats that we had in inventory, my

understanding was is we had to terminate -- or destroy those or sell those off -- excuse me -- sell those off for a certain period that had the particular tread pattern on those.

Q. Did Spartan do that?

A. Yes.

Q. After the mats were sold off, did Spartan keep selling the old Scout Mat, or what happened?

A. We phased into a new mold, so it had a different tread pattern.

Q. So it was a different mat basic -- well, let me rephrase that.

Same mat, different pattern; is that fair?

A. That's correct.

Q. Do you remember about how long it took Spartan to come out with the new Scout Mat?

A. With that one, fairly quickly, probably between six and 12 months because it's just a matter of changing tread plates versus an entire cavity.

Q. So does mid to late spring 2020 sound about right?

A. Could be, yes.

Q. Now, you were asked on cross-examination about the Scout Mat interlocking with some of Signature's other mats. Do you know specifically what mat that would be referring to?

A.   The Scout Mat?

Q.   Yes.

A.   It would be the DuraDeck.

Q.   Are the DuraDeck and the Scout Mat interlockable with one another?

A.   Yes.

Q.   All right.  So we've talked about what Signature -- excuse me -- what Spartan did after the agreement was signed.  Let's talk about Signature.

     Did Signature keep manufacturing and selling the DuraDeck immediately after the Settlement Agreement was signed?

A.   Yes.

Q.   And during that time period, was that when Scout was taken off of the market?

A.   Repeat the question.  I'm sorry.

Q.   Sure.

     So when Signature kept selling the DuraDeck after the Settlement Agreement was signed, was that during the period when Spartan was trying to make a new design for the Scout Mat?

A.   Yes, I believe so.

Q.   So you saw in the Settlement Agreement the provision that Mr. Weidner read about Spartan's obligations not to make an interlockable mat.

A.   Interlockable and interoperable.

Q.   Thank you.  That's correct.

Did that same obligation also apply to Signature?

A.   Yes.

Q.   Does that mean that Signature was also in breach of the agreement for continuing to manufacture the DuraDeck?

A.   Yes.

Q.   And who would have breached first?

A.   (Pausing.)

Q.   Here, I'll clarify my question.

When we're talking about the DuraDeck and the Scout Mat, if Signature kept manufacturing the DuraDeck immediately after the agreement was signed but the Scout Mat didn't come back out for a few months later, who kept manufacturing their mat first?

A.   Signature would have.

Q.   Did Spartan try to hide the fact that it had designed a new Scout Mat with a different pattern?

A.   No.

Q.   And as we've said, that was in early 2020.  Since then, when is the first time that Signature ever complained about the Scout Mat?

A.   Not until this lawsuit recently.

Q.   And to clarify, did they complain about it before or after Spartan and FODS brought this lawsuit against them?

A.  After.

Q.  Did they ever file a lawsuit against you -- let me rephrase that.

Did they ever send a demand letter before this lawsuit related to the Scout Mat?

A.  Never.

Q.  So you never received any kind of complaint about it?

A.  There was no notice whatsoever.

MS. COX:  A moment to confer, your Honor?

THE COURT:  Yes.

MS. COX:  No further questions, your Honor.  We ask that Mr. Schenk be allowed to step down.

THE COURT:  Well --

MS. COX:  Oh, if there are --

THE COURT:  We'll see if they have additional questions, and then the jury might have questions so --

MS. COX:  Very true.  Understood.

THE COURT:  This is the first witness, so I -- do you have any additional questions?

MR. WEIDNER:  No further questions, your Honor.

THE COURT:  So, ladies and gentlemen, this is your first time.  Whether you have a question or not, just fold a piece of paper and pass it over to the court security officer.

It can be blank if you have no questions, but just

in case someone has questions, I try to preserve the identity of the person asking.

Let me have counsel approach.

And typically just the counsel that -- but you can all come up if you want to.

(Sidebar conference, off the record.)

THE COURT:  Just basically one, maybe two questions from this.  It's regarding the Settlement Agreement between Spartan and Signature.

If Signature's mat had no holes, would they have met the terms of the settlement, in your opinion?

THE WITNESS:  In my opinion?  If they had no holes, I still don't believe they would have met -- I still believe they would have been in breach because there is that interoperability.  You could still lay the mats together and they could still serve a purpose functionally.

THE COURT:  And what about if you apply that to Spartan?  Would that apply to your --

THE WITNESS:  It applies the same.

THE COURT:  Okay.  Any follow-up based on that jury question?

MS. COX:  No follow-up from plaintiffs, your Honor.

MR. WEIDNER:  Nothing from defense, your Honor.

THE COURT:  You may step down.

THE WITNESS: Thank you.

THE COURT: Okay. Well, I know we're coming up to 5:00, but we can start our next witness if you have that next witness ready.

MR. SCHWEGMANN: Let me learn how to put on the microphone, your Honor.

THE COURT: You'll learn by the time the trial is over.

Who is your next witness?

MR. SCHWEGMANN: Mr. Bryce Clingerman.

THE COURT: Sir, if you'll raise your right hand to be sworn in.

(The oath is administered to the witness.)

THE COURT: Go ahead and proceed.

MR. SCHWEGMANN: Thank you, your Honor.

DIRECT EXAMINATION OF BRYCE CLINGERMAN

CALLED ON BEHALF OF THE PLAINTIFFS

BY MR. SCHWEGMANN:

Q. Afternoon, Mr. Clingerman.

A. Morning -- or afternoon.

Q. Feels like -- it's a long day.

A. It's been long.

Q. For the record, tell us your name.

A. Sure. Yeah. My name is Bryce Clingerman.

Q. And where are you from?

A.   Yeah, been born and raised in the Denver, Colorado area.

Q.   Where are you employed?

A.   With FODS.

Q.   And what's your position?  What's your role at FODS?

A.   Sure.  My current position at FODS is president.

Q.   How long have you held that position?

A.   Ballpark, 2020 or so.

Q.   Now, before we get into the business of FODS, tell us, did you attend some college?

A.   Yes.

Q.   Where did you attend college?

A.   Yeah, I'd say a little bit at a now defunct Bible college called Northland Baptist Bible College for a couple years, and then Metropolitan --

          THE COURT:  Will you slow down a little bit?

          THE WITNESS:  Yeah.  Sorry.  Yes.

          THE REPORTER:  Northland Baptist Bible College...

A.   Yeah.  Northland Baptist Bible College for about two years.

          I also studied for several years at Metropolitan State College of Denver.

BY MR. SCHWEGMANN:

Q.   Have you ever testified in a court like this before?

A.   No.  First time.

Q. Okay. And one of the things that you'll hear often is both of us, we need to speak very slowly so --

A. Sure.

Q. -- she can write this down. Her fingers don't quite move as fast as we can speak.

Now, you told us about some of your college. Did you graduate, sir?

A. No.

Q. And would you tell the jury why you never obtained a degree?

A. Sure. Yeah. Just life came up. Just had some -- you know, some different opportunities in life and took those instead of graduating college.

Q. Okay. What kind of work were you doing as a young man?

A. Yes. So my dad owned a foundation company for new homes, you know, doing concrete work. So I did that my summers, weekends, spring break, et cetera. Just did -- you know, just in mostly construction space.

Q. And did you hold any particular positions in that construction space?

A. Sure. Yeah. With my dad, I was a foreman. So kind of just like a -- I guess a term for like a skilled laborer, set forms, you know, set rebar, et cetera, helped pour concrete.

I've been a superintendent, a project manager for

different, you know, companies.

Q.  Spend some time on construction sites?

A.  Yes, sir.

Q.  About how long were you working construction?

A.  Yeah, so -- I, yeah, started in 2016 -- I'm sorry -- or, I'm sorry, in 1996 with my dad doing foundations during high school.

And then, you know, I still -- actually still dabble in construction right now.

Q.  Now, I want to talk about FODS that we've heard so much about in a little bit more detail.

How did you first get into the business of what's now FODS?

A.  Yeah.  Sure.

So for a little bit I was a superintendent for a custom home builder in the Denver area.  And a fellow superintendent, Kevin Martinez -- you'll hear his name as well -- he is a cofounder of FODS, along with myself. Yeah, we worked for this custom home builder for a while.

I got laid off in '06 at the start of the downturn, and he got laid off in '08, you know, right in the thick of the housing downturn.

We always stayed in contact with each other.  I started doing fix-and-flips, my own, you know, kind of, you know, fix-and-flips for houses.  I got into tenant finish

for, you know, Starbucks, Kohl's, Whole Foods, different commercial customers of mine.

And then he was working for a general contractor in about 2010 and that was actually building out a training center for CDOT, the local DOT in Colorado, to where a contractor can properly learn how to do erosion of stormwater controls, you know, measures to -- you know, for CDOT jobsites.

So anyway, there was a little test rock construction exit there, and then there was also composite mat to show how a contractor could get over a sensitive or, you know, soft, you know, ground areas. And the idea was why don't you put rock on top of the mats and then the end user could lay them down pretty quick. You can reuse it, you know, bring it from job to job. Then it won't get squished down like the rock always does.

Q. Now, before we get too much in the business, FODS is an acronym, right?

A. Yes, sir.

Q. What does "FODS" stand for?

A. Yeah, so I'm a private pilot, and Kevin was a private pilot as well. So FOD stands for foreign object debris. It's a term in aviation that anything that's not -- that can cause damage to a -- you know, some aircraft or personnel on the ground.

So, yeah, it's just an aviation term.  So the traditional aviation, like a small rock, a pebble, a broken off zipper from a suitcase might be a FOD.  A bird strike to an aircraft could also be a FOD.

So anyway, it's just a catchy name for our company.

Q.  Okay.  And you mentioned Kevin Martinez.  Do you consider him one of the original cofounders of FODS?

A.  Yes.

Q.  And is he still involved today?

A.  No, he's not.

Q.  And what happened with Mr. Martinez?

A.  Yeah.  He passed away in 2023.

Q.  Okay.  Now, I want to go back to this -- well, let me ask a different question.

When did you and Kevin, Mr. Martinez, first have the idea to form a company about this -- around this debris problem related to construction sites?

A.  Yeah.  Sure.  That would have been in spring of 2010.

MR. SCHWEGMANN:  Okay.  And, Mr. Smoot, is there any chance you could pull up Ms. Cox's PowerPoint for her opening, Slide 3?

BY MR. SCHWEGMANN:

Q.  All right.  Mr. Clingerman, can you see the screen?

A.  Yes.

Q. And have you seen scenes like this during the time you were working construction?

A. Yes.

Q. And could you just describe for the jury, what's the problem with this photo? What's the issue here?

A. Yeah. So it may not be clear, but all that debris in the street, you can see like the muddied tire tracks driving down the street.

You can see the jobs on the left where a vehicle that's on a disturbed lane -- a disturbed land site, they say, where there is no grass or vegetation, there is mud, those tires pick up that mud, that dirt, the rocks, bring it out onto the streets and that's what you see here.

MR. SCHWEGMANN: Okay. And can we look at Slide 4 of this same presentation, please, Mr. Smoot.

BY MR. SCHWEGMANN:

Q. All right. And do you recognize what's shown on the screen?

A. Yes.

Q. And can you tell us -- tell the jury what's shown on the screen?

A. Yeah. So essentially this is your traditional trackout control that's been around for decades. I believe the EPA came out with a similar thing back in the '50s or '60s where, even back then, they were trying to figure out how

to clean tires of the mud.

So the idea was to take some rock -- different jurisdictions have different, you know, specs on what kind of rock and how long, how wide, how thick that rock might be. But, yeah, this is just a typical rock construction exit.

Q. And would you tell the jury what's wrong or what makes it difficult to just use rocks like this at the entrance of a construction site?

A. Sure.

So, you know, you can imagine large concrete trucks, dump trucks, even pickup trucks, you know, driving in. The rocks on the initial install, they are pretty lofty, and so those tires (*sic*) get into those tire lugs to, you know, really agitate them from the tires.

Once a lot of heavy trucks drive over there or even pickup trucks, it really just pushes those rocks down, and then at that point they are not effective and it's hard to clean them.

Q. All right. Now, Mr. Clingerman, in 2010, 2011, when you're sitting down with Mr. Martinez and you see this kind of problem, apart from rocks, were there other solutions on the market to deal with this trackout problem?

A. Yes, there was.

Q. And what were some of those other solutions?

A.  Yeah, so like the most common ones, people would take like a cattle guard of sorts, and the idea would be to use a series of rock along with the cattle guard or a shaker plate, where the idea of that shaker plate would be to, you know, kind of shake, which would clean off those tires and undercarriage.

The other way that's -- you know, that also was around is like basically a big car wash bay.  So as that heavy truck or the pickup truck or cars that are muddy, they would drive through this wash bay.  Then sprayers would clean off those tires.

Q.  So when you sat down with Kevin to solve this problem, solve this issue, what was the -- just generally what was the solution you guys came up with?

A.  Yeah, what we knew we wanted was something that could be, you know, easy to install, easy to use, that you could reuse it; and that whether it's one truck a day or hundreds of trucks a day, that those shapes would clean off those tires.

Q.  And what did you want to make this -- this solution to this problem, what did you want to make it out of?

A.  You know, at the start we were, you know, just thinking about anything.  But we quickly settled on plastic, you know, due to its strength properties.  You know, it's cheaper, you know, to produce.  It's, you know, fairly

lightweight.

Q.  All right.

MR. SCHWEGMANN:  May I see Plaintiffs' Exhibit 45.

Don't put it on the screen yet, Mr. Smoot.

BY MR. SCHWEGMANN:

Q.  Do you have a book of exhibits in front of you, sir?

A.  I don't.  I don't believe so.  I have some over here.

MR. SCHWEGMANN:  Your Honor, may I help --

THE COURT:  Yes.  Ms. Cox.

BY MR. SCHWEGMANN:

Q.  And can you open that book to what's called Plaintiffs' Exhibit 45?

A.  Okay.

Q.  And do you recognize that?

A.  Yes, I do.

Q.  Is that a photo of the FODS mat with a truck on it?

A.  Yes.

MR. SCHWEGMANN:  Your Honor, I move to exhibit -- admit Plaintiffs' Exhibit 45.

MR. WEBB:  No objection, your Honor.

THE COURT:  Okay.  45 will be admitted.

MR. SCHWEGMANN:  All right.  Mr. Smoot, could we publish it, please.

BY MR. SCHWEGMANN:

Q.  All right.  Can you tell us what we're looking at?

A.   Yeah.  So this would be like one of our earlier -- I guess it would be like a flyer brochure.  There's just -- yeah, just like a marketing piece.

Q.   Okay.  And this is the -- I take it the final version of what the FODS mat ended up looking like, right?

A.   Yes.  Yeah.  I believe this picture was taken from probably 2016-2017 time frame.

Q.   Okay.  So this is the final version.

Let me ask you:  Is this what you and Mr. Martinez originally came up with?

A.   No.

Q.   And what did -- just describe generally for the jury, what did some of those early prototypes look like that you and he developed?

A.   Yeah, just a bunch.  I mean, we definitely prototyped a lot of different, you know, shapes, you know, heights, sizes, spacing.  Yeah, from, like, rock shapes to cylinders.

You know, obviously, we settled on the pyramid shape.  We thought it was pretty strong and seemed to work pretty well.

But, yeah, just a lot of trial and error over the years.  And, yeah, final -- you know, just settled on this design.

Q.   Now, how long did it --

THE COURT:  We're going to go ahead and stop for the day.  It's 5:00, and I have a 5:15 hearing in another case.

So, ladies and gentlemen, we are finished with our first day.  Again, I'll thank you for your attentiveness today.

Again, we'll start tomorrow morning at 9:00, so just be up in the jury room before 9:00.

And, again, please don't discuss the case among yourself or anyone else.  Don't do any outside research.  Just tell your family and your work you're in a federal case in Sherman.  When it's all over, you can say anything you want to say.  But until then, you can't talk about it.

Have a safe drive home, and see you tomorrow morning.  Thank you.

(The jury exits the courtroom, 5:00 p.m.)

THE COURT:  Please be seated.

Anything further from the plaintiffs?

MR. SCHWEGMANN:  May I just confer with Mr. Reckers on one issue?

THE COURT:  Yes, go ahead.

MR. SCHWEGMANN:  Ten seconds.

Nothing further, your Honor, from the plaintiffs.

THE COURT:  Anything further from defense?

MR. RECKERS:  No, your Honor.

THE COURT: I did want to raise one issue just in transparency's sake.

We have been informed that one of the jurors, I think Juror Number 7, thought they might have recognized somebody from the video during opening statement and apprised the CSO and it got down to us.

I don't know anything else other than that, and I haven't done anything because I wanted to disclose it and see how the parties would like me to proceed.

MR. SCHWEGMANN: I'm sorry, your Honor. I just didn't hear you.

THE COURT: So apparently Juror Number 7 thought they may have recognized somebody in the video from opening statement, so -- we didn't -- we have not researched it in any way, so that's all I know.

MR. SCHWEGMANN: Your Honor, I'll confer with Mr. Reckers, but I can't imagine there's a problem, unless it's Mr. Fouad.

Did --

THE COURT: We're not even sure, I mean, whether or not they -- what they thought. It was just out of an abundance of caution they informed and --

MR. RECKERS: Could we ask the juror who they think it is and confirm from them that it is likely not?

THE COURT: So what I can do, if both sides agree,

I'll have my courtroom deputy just see who they think it is, and then we'll go from there.

MR. SCHWEGMANN: Okay. Thank you, your Honor.

THE COURT: And then just -- yeah, and we'll deal with it tomorrow, then.

Okay. Well, then I'll see y'all tomorrow.

I am going to ask you just to -- you'll have to clear out because my 5:15 is something that's -- I'll have to seal the courtroom.

So we'll see y'all tomorrow. Thank you.

(Proceedings adjourned, 5:03 p.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, NOVEMBER 17, 2025, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

/s/
CHRISTINA L. BICKHAM, CRR, RDR