UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

SPARTAN COMPOSITES, LLC, ET AL   | DOCKET 4:24-CV-609
                                 |
                                 | NOVEMBER 18, 2025
VS.                              |
                                 | 8:15 A.M.
                                 |
SIGNATURE SYSTEMS GROUP, LLC     | SHERMAN, TEXAS

-------------------------------------------------------------

VOLUME 2 OF 4, PAGES 1 THROUGH 244

REPORTER'S TRANSCRIPT OF JURY TRIAL
**REDACTED TRANSCRIPT**

BEFORE CHIEF JUDGE AMOS L. MAZZANT, III,
UNITED STATES DISTRICT JUDGE, AND A JURY

-------------------------------------------------------------


APPEARANCES:

FOR THE PLAINTIFFS:       CHRISTOPHER JOHN SCHWEGMANN
                          JESSICA COX
                          KRISTOPHER M. RUIZ
                          LYNN, PINKER, COX & HURST, LLP
                          2100 ROSS AVENUE, SUITE 2700
                          DALLAS, TX 75201


COURT REPORTER:           CHRISTINA L. BICKHAM, CRR, RDR
                          FEDERAL OFFICIAL REPORTER
                          101 EAST PECAN
                          SHERMAN, TX 75090




    PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

FOR THE DEFENDANT:          ROBERT H. RECKERS
                            DAVID WYNNE MOREHAN
                            SHOOK, HARDY & BACON, LLP - HOUSTON
                            600 TRAVIS STREET, SUITE 3400
                            HOUSTON, TX 77002

                            BASIL TRENT WEBB
                            EVAN JAMES WEIDNER
                            SHOOK, HARDY & BACON, LLP - MO
                            2555 GRAND BOULEVARD
                            KANSAS CITY, MO 64108

                            BRENNA L. KINGYON
                            SHOOK, HARDY & BACON, LLP - KS
                            3612 WEST 48TH STREET
                            ROELAND PARK, KS 62205

                            KIMBERLY CANDACE PRIEST-JOHNSON
                            SHOOK, HARDY & BACON LLP - DALLAS
                            100 CRESCENT COURT, SUITE 700
                            DALLAS, TX 75201

INDEX

                                              PAGE


BRYCE CLINGERMAN:
     CONTINUED DIRECT EXAM BY MR. SCHWEGMANN     10

SEALED PORTION NUMBER 3                          20

     CROSS-EXAMINATION BY MR. WEBB               20

SEALED PORTION NUMBER 4                          44

     RECROSS-EXAMINATION BY MR. WEBB             48
     QUESTIONS FROM THE JURY                     52
     FURTHER RECROSS-EXAMINATION BY MR. WEBB     54

NATHAN BARKER:
     DIRECT EXAMINATION BY MR. SCHWEGMANN        56
     CROSS-EXAMINATION BY MR. RECKERS           104
     QUESTIONS FROM THE JURY                    119
     REDIRECT EXAMINATION BY MR. SCHWEGMANN     120

CHRISTOPHER HEFNER:
     DIRECT EXAMINATION BY MS. COX              121
     CROSS-EXAMINATION BY MR. WEBB              154
     QUESTIONS FROM THE JURY                    161
     REDIRECT EXAMINATION BY MS. COX            163

WILLIAM S. HOWARD:
     DIRECT EXAMINATION BY MR. RUIZ             164

SEALED PORTION NUMBER 5                         171

     CROSS-EXAMINATION BY MR. RECKERS           186
     REDIRECT EXAMINATION BY MR. RUIZ           233
     RECROSS-EXAMINATION BY MR. RECKERS         236

COURT REPORTER'S CERTIFICATION                  244

INDEX OF EXHIBITS

PAGE

Plaintiffs' Exhibit 3                              11

Plaintiffs' Exhibit 7                              12

Plaintiffs' Exhibit 5                              13

Plaintiffs' Exhibit 133                            33

Plaintiffs' Exhibit 34                             47

Plaintiffs' Exhibit 76                             67

Plaintiffs' Exhibit 72                             68

Plaintiffs' Exhibit 72                             68

Plaintiffs' Exhibit 130                            75

Plaintiffs' Exhibit 167                            78

Plaintiffs' Exhibit 184                            89

Plaintiffs' Exhibit 298                            98

Plaintiffs' Exhibit 297                            100

Plaintiffs' Exhibit 297                            105

Plaintiffs' Exhibit 130                            108

Plaintiffs' Exhibit 153                            130

Plaintiffs' Exhibit 184                            134

Plaintiffs' Exhibit 338                            141

Plaintiffs' Exhibit 358                            141

Plaintiffs' Exhibit 64                             144

Plaintiffs' Exhibit 371                            146

Plaintiffs' Exhibit 93                             148

Plaintiffs' Exhibit 76                         159


Defendant's Exhibit 240                        22

Defendant's Exhibit 240                        23

Defendant's Exhibit 239                        29

Defendant's Exhibit 17                         33

Defendant's Exhibit 43                         37

Defendant's Exhibit 110                        43

Defendant's Exhibit 239                        45

Defendant's Exhibit 240                        45

Defendant's Exhibit 240                        49

Defendant's Exhibit 240                        172

Defendant's Exhibit 252                        174

Defendant's Exhibit 252                        202

Defendant's Exhibit 164                        207

Defendant's Exhibit 321                        231

Defendant's Exhibit 252                        234

(Open court, all parties present, jury not present.)

(REPORTER'S NOTE:  Material read into the record is transcribed verbatim and, therefore, may not reflect an exact quote from documents or exhibits.)

THE COURT:  Please be seated.

So I wanted to update you on Juror Number 7.  So Juror Number 7 and her husband are the founding pastors for a new church in Allen.  They have a financial campaign going on for a building program right now.  She met Michael Shivers for the first time on Sunday night through her husband, but had seen him around the church.

She did say that Mr. Shivers is the largest financial giver to the church and the biggest financial backer towards the building campaign and their church, and Mr. Shivers' support actually pays her husband's salary.

So it seems to me that because of that, we should excuse Juror Number 7.  I assume -- I don't speak for the defense, but I --

MR. RECKERS:  Sounds great.

THE COURT:  No, I know.  I assume --

MR. RECKERS:  I understand, your Honor.

THE COURT:  There is not really an argument not to do that.  And she called my -- we were going to investigate it this morning, but she actually called my courtroom

deputy last night because she was nervous about it, which I'm glad she was so forthright.

        This is a first.  I've never had this happen.  This is my 146th jury trial.  It's always funny how these things happen.

        MS. COX:  Your Honor, we agree that Juror Number 7 should be struck for cause -- or excused for cause.

        THE COURT:  Okay.  So we will go ahead and I'll have my courtroom deputy go and tell her she can go ahead and leave.  And, again, I'm not going to -- we won't say anything to the rest of the jury until this is over.  So...

        What else?  Anything else?

        I just wanted to get that taken care of so hopefully we can start on time.

        Any other issues?

        MR. SCHWEGMANN:  Just one issue, your Honor.

        I understand the Court's issued an order about time limits, and each side has ten hours.  I conferred with Mr. Reckers yesterday.  We fully anticipate by giving -- doing closings on Friday.

        He and I agree, I think -- and he'll correct me if I'm wrong -- that we also agree to the ten hours per side.  However, he and I would like the closing argument not to count toward that time.  And I think by -- we anticipate we'll finish the evidence on Thursday, and however much

time that takes, it takes, but that we each have the same time for closing on Friday morning.

And we'd ask the Court to amend the order accordingly, really just to say that those time limits don't apply to the closing argument.

THE COURT:  Well, so you're asking me to do something different than I've always done, so...

MR. RECKERS:  Well, Judge, the concept here is for us to just make sure we get the hour each for closing, but then also try to hit the ten hours.

And the most important thing from my perspective is that we get evidence closed on Thursday.

THE COURT:  Well, the way I have done the math is I don't think that's going to be a problem.  I think we'll be done on Thursday.  I mean, we'll get, like, six and a half hours a day in.

MR. SCHWEGMANN:  Maybe I can put it differently. Can we just -- perhaps an easier way to accommodate is just everybody gets 11 hours instead of 10 hours.  We just -- both sides want to ensure we have sufficient time for closing on Friday morning.

THE COURT:  Well, that's the whole purpose of a timed trial is to make you be more concise.  So I'm not going to amend it at this point.  You know, the way I've always done it, for good cause, I could extend time.  And

I've had to do that because -- Ms. Johnson, she probably doesn't -- I don't know if she remembers this, but her husband had a trial in front of me where they needed extra -- they used almost all of their time and they wouldn't have had any closing argument time left.  And I -- and, of course, I granted some additional time.

So it's not meant to -- it's just meant to make the lawyers be more concise.  And so I am not ready yet to change the order because we include opening and closing.  I excluded, of course, jury selection from that.  And then we'll just see how we go.  Okay?

So I'm not telling you -- I'm just telling you no for now.

MR. SCHWEGMANN:  I understand, your Honor.  Thank you.

We just wanted to alert the Court and just align that he and I both are very much aligned on getting the jury out of here on Friday so they don't have to come back on Monday, and we just wanted to make sure that we didn't have disputes going forward about...

THE COURT:  Right.  My calculation is that -- I mean, we still could on the time limits, you know -- you will definitely be done with evidence on Thursday, but you may even get to closing.  We'll just see, based on, you know -- I don't know how much time we used yesterday.

Okay.  Anything else?

MR. RECKERS:  Not from us, your Honor.

MR. SCHWEGMANN:  No, your Honor.

THE COURT:  Okay.  So we'll just -- we'll start back here in just a minute.  I'll have my courtroom deputy go ahead and excuse Juror 7.  And if everyone is here, we'll just start.

And I'll stay here on the bench for now.  So...

MR. SCHWEGMANN:  Your Honor, may I approach the podium just to kind of organize myself?

THE COURT:  Yeah, go ahead.

MR. SCHWEGMANN:  Thank you.

And may he take the witness stand?

THE COURT:  Yes, he can.

(Off the record, 8:57 a.m. to 9:00 a.m.)

(Open court, all parties present, jury present.)

THE COURT:  Please be seated.

Welcome back, ladies and gentlemen.

Sir, you understand you're still under oath?

THE WITNESS:  Yes.

THE COURT:  Go ahead and continue.

MR. SCHWEGMANN:  Thank you, your Honor.

CONTINUED DIRECT EXAMINATION OF BRYCE CLINGERMAN

BY MR. SCHWEGMANN:

Q.  Mr. Clingerman, before the evening break, we were

talking about some of the early work you did to design the FODS mat.

Do you recall generally that discussion?

A. Yes.

Q. I want to look at some of those early prototypes you developed. Would you -- I believe there is a binder on your table.

Would you look at Plaintiffs' Exhibit 3.

A. Yep.

Q. And do you recognize that? Can you tell us what it is?

A. Yes. Yes. So this is one of our first designs that we came up with where -- it's a series of cylinder-type shapes with different heights.

MR. SCHWEGMANN: Okay. Your Honor, I move to admit Plaintiffs' Exhibit 3.

MR. WEBB: No objections.

THE COURT: Okay. 3 will be admitted.

MR. SCHWEGMANN: Mr. Smoot, can we show the jury what we're looking at.

BY MR. SCHWEGMANN:

Q. Do you see that on the screen, sir?

A. Yes.

Q. Okay. And how was that early prototype different from the design that you ultimately produced?

A. Sure.

So instead of, like, having, you know, cylinders at different -- of varying heights, you know, what we came up with was a pyramid-type structure.

Q.  Okay.

MR. SCHWEGMANN:  And, Mr. Smoot, you can take that down.

BY MR. SCHWEGMANN:

Q.  And then back to the book, Mr. Clingerman.  Can you look at Plaintiffs' Exhibit Number 7?

A.  Yes.

Q.  Do you recognize that?

A.  Yes.

Q.  Is that another one of the designs you considered early on?

A.  Yes.

MR. SCHWEGMANN:  All right.  Your Honor, I'd move to admit Plaintiffs' Exhibit 7.

MR. WEBB:  No objection.

THE COURT:  Okay.  7 will be admitted.

MR. SCHWEGMANN:  Mr. Smoot, can we show that to the jury.

And could you make it just a little bit bigger.

BY MR. SCHWEGMANN:

Q.  And, Mr. Clingerman, what is the jury looking at in Plaintiffs' Exhibit 7?

A.  Sure.

So one of these first designs was -- what we came up with was a rock-type structure or shape to it which would kind of mirror the traditional rock construction exit.

Q.  Okay.  And that's different also from the design that FODS ultimately adopted?

A.  Yes.

MR. SCHWEGMANN:  All right.  We can take that down.

BY MR. SCHWEGMANN:

Q.  And just briefly, I want to look at just a handful of others.  In the book, can you look at Plaintiffs' Exhibit 5?

A.  Yes.  Got it.

Q.  What are you looking at?

A.  Yeah.  So what -- this is one of our -- more of a final design.  This shows our pyramid shapes on top of the top surface.

Q.  Okay.

MR. SCHWEGMANN:  And move to admit Plaintiffs' Exhibit 5.

MR. WEBB:  No objection.

MR. SCHWEGMANN:  All right.  Can we see --

THE COURT:  Give me a chance to admit it.

MR. SCHWEGMANN:  I'm sorry, your Honor.

THE COURT:  5 will be admitted.

MR. SCHWEGMANN:  Can we see Plaintiffs' Exhibit 5.

And can you make that a little bit bigger, sir.

BY MR. SCHWEGMANN:

Q.  And, Mr. Clingerman, can you tell me what the jury is looking at?

A.  Sure.

So this is almost what our final design looked like that we came up with, a series of pyramid shapes, structures, with some spacing.  We'd scattered them to efficiently clean tires better.

Q.  Now, we looked at some of these early prototypes.  Are those the only prototypes that you developed back in 2010, '11, '12, that period of time?

A.  No.

Q.  About how many different types of prototypes did you consider and think about during that early time period?

A.  You know, I don't know exact count, but it was a lot. I mean, it could have been upwards of about a hundred or so.

Q.  Okay.  And how long did it take you from the sort of initial thought to what we're looking at on Plaintiffs' Exhibit 5?

I mean, was it something that you did overnight?

A.  No.

Q.  And how long did it take?

A.  Yeah, when we came up with the idea in 2010, you know, about to 2014.  So about four or five years it took.

Q.  Now, Mr. Clingerman, during this design phase, did you consider a two-piece mat?

A.  Yes.

Q.  And what did you decide about whether you wanted a two-piece mat or a one-piece mat?

A.  Yeah.  One of our first thoughts with a two-piece mat, it could be super strong, but what we thought about was, you know, it would be more costly to make, produce, you know, more plastic.  It would potentially create a weak point, whether we had to mechanically fasten them together or weld them.

And we wanted to, you know, have something that's, you know, lighter, easier to install; cheaper to, you know, to produce as well.

Q.  Now, remind the jury.  What are the dimensions of the FODS trackout mat?

A.  Sure.

So in the direction -- we're 12-feet wide and then in the direction of travel we're 7-feet long.

Q.  Okay.  Now, during that period where you're designing this, this 2010, 2014, up till 2016 period, did you do

research on the market about what else is out there?

A.  Yes.

Q.  And was anyone during that time period making a one-piece mat of that size?

A.  No.

Q.  Now, we heard Signature say they've been making mats for a long time.

Was Signature making a mat of that size in one piece?

A.  No.

Q.  Now, once you had the design, is it fair to say you had to find somebody to manufacture it for FODS?

A.  Yes.

Q.  And was that easy to do?

A.  No.

Q.  And would you explain to the jury why it was difficult to find a manufacturer that could manufacture a mat of that size in a single piece?

A.  Sure.

So a lot of people out there will make a very small part, like a water bottle, plastic cap, plastic bottle, a cell phone case.  There's a million people that can make small parts.

But to do a large part of this size, this 12 feet by 7, 400-plus pounds, you know, there's just a few, you

know, people in the world that can make this type of mat.

Q.  Was it difficult to find a manufacturer that could create these pyramid-type structures?

A.  Yes.

Q.  And approximately how many manufacturers did you reach out to to see if they could help you with this kind of thing?

A.  Sure.  So my research -- I reached out to a fair amount of them.  If I thought they could make it, which is probably about give or take ten or so manufacturers, I reached out to them to see if they could, you know, produce a 12 feet by 7 type product, and got some feedback where most of those people couldn't even do that.

Q.  Now, when you spoke with these other manufacturers, you had to share the design with them, correct?

A.  Yes.

Q.  And what, if anything, did you do to make sure that those manufacturers didn't take your idea?

A.  Yeah.  For every conversation, before we talked about the actual details of the product, we had them sign a confidentiality or an NDA.

Q.  Okay.  And an NDA is a nondisclosure agreement?

A.  Correct.

Q.  Now, you ultimately found a manufacturer, correct?

A.  Yes.

Q.   And who was that?

A.   Yeah, at the time, it was LRM.

Q.   Okay.  And you had an NDA with them?

A.   Yes.

Q.   All right.  Now, could you overnight -- just once they had the design and once they had the manufacturer, could you overnight just start making this stuff?

A.   No.

Q.   And would you tell the jury why?

A.   It's a huge upfront capital expense.

Q.   And the capital expense was for what?

A.   The actual molds, you know, for marketing the actual inventory to produce the parts.

Q.   So where did you get the money?

A.   We, you know, obviously invested some of our own money, also time.  But, yeah, we had to reach out to friends and family for investment.

Q.   And about how much money did you have to raise to even get this off the ground?

A.   Yeah.  The goal at the time was raise about $3 million. We ended up with 725,000 or so.

Q.   Did you invest your own money?

A.   Yes.

Q.   Your own savings?

A.   Yes.

Q.  And about how much of your own money did you put into this?

A.  It was about 100,000.

Q.  And at that time, after you had given that hundred thousand, were you able just to quit your day job?

A.  No.

Q.  What were you doing at the time?

A.  I was still a general contractor working on, you know, some -- you know, some tenant finish, some remodeling projects.

Q.  All right.  Did you -- I'm sorry.  Did you finish your answer, sir?

A.  Yes.

Q.  All right.  Thank you.

          MR. SCHWEGMANN:  Your Honor, I need to -- at this point, I'm going to go into some of the details about the trade secrets.  I'd ask that the courtroom, for protective order purposes, be sealed.

          THE COURT:  Okay.  I'll go ahead and seal the courtroom.

          If there's anybody here not subject to the protective order, you need to leave at this time.

          MR. SCHWEGMANN:  I don't see anyone, your Honor.

          THE COURT:  Okay.  Just tell me when you're finished so that I can unseal the record.

MR. SCHWEGMANN:  Understood.  Thank you.

(Courtroom sealed.)

(This portion of the transcript is sealed and filed under separate cover as Sealed Portion Number 3.)

(Courtroom unsealed.)

MR. WEBB:  May it please the Court?

THE COURT:  Go ahead.

CROSS-EXAMINATION OF BRYCE CLINGERMAN

BY MR. WEBB:

Q.  Good morning, Mr. Clingerman.

A.  Good morning.

Q.  My name is Trent Webb.  We've never met before, but I do have a few questions for you.

A.  Sure.

Q.  You wouldn't consider yourself an expert in compression molding, would you?

A.  No.

Q.  You wouldn't consider yourself an expert in designing molds, right?

A.  No.

Q.  And you wouldn't consider yourself an expert in manufacturing systems, correct?

A.  Correct.

Q.  Now, outside the prototyping of your FODS mat, FODS has never manufactured one of your mats?

A.  Correct.

Q.  And the prototypes you created were not created using compression molding, right?

A.  Correct.

Q.  D&D handled the product manufacturing for FODS, correct?

A.  Yes, until Spartan bought them, but yes.

Q.  But certainly before Spartan, it was D&D?

A.  Yes.

Q.  And D&D had all the compression molding equipment you needed, right?

A.  Yes.

Q.  And then Linear manufactured the mold that FODS uses for its mat, correct?

A.  Correct.

Q.  You said FODS sent Linear a CAD drawing or CAD drawings of your mat, correct?

A.  Yes.

Q.  And CAD means computer-assisted drafting?

A.  Uh-huh.  Yes.

Q.  So they're basically detailed drawings of your product, correct?

A.  Correct.

Q.  Then they use their software to figure out how to make the mat, correct?

A.  Yes.

Q.  That includes the working out the orientation and the cooling lines and the plates and all the molding specifics, correct?

A.  Yes.

Q.  Now, you weren't the one who figured out how to actually design the mold to make these mats, correct?

A.  Correct.

Q.  And Linear, in fact, was the one who actually figured out how to actually design the molds, right?

A.  Yes.

Q.  And you handed the CAD drawings to them and said figure it out, more or less?

A.  Yes.

Q.  No one at FODS told Linear how to make a mat, correct?

A.  We did not tell Linear how to make their mold.

Q.  So they ended up figuring it out on their own, right?

A.  The mold construction, yes.

Q.  All right.

        MR. WEBB:  Can we pull up DTX-240.

        Hold on one second.  Is this admitted?  All right.

        May I approach the witness, your Honor?

        THE COURT:  Yes.

        MR. WEBB:  Oh, this isn't it.  Sorry.

                          *

BY MR. WEBB:

Q.  Mr. Clingerman, you recognize this document, correct?

A.  Yes.

Q.  It's a U.S. Patent Number 8,061,927, correct?

A.  Yes.

Q.  That's the patent on the FODS mat, right?

A.  Yes.

MR. WEBB:  At this time, I would offer into evidence Exhibit DTX-240.

MR. SCHWEGMANN:  No objection.

THE COURT:  Okay.  240 will be admitted.

BY MR. WEBB:

Q.  You had a fair amount of input in preparing the patent application that led to this document, right?

A.  Yes.

Q.  Did a tremendous amount of research, right?

A.  Yes.

Q.  That includes Internet research?

A.  Yes.

Q.  Library research?

A.  Yes.

Q.  Videos?

A.  Yes.

Q.  Looking at other patents?

A.  Yes.

Q.  Again, there's nothing wrong with looking at competitors' patents, is there?

A.  No.

Q.  And you looked to see what was on the market, correct?

A.  Correct.

Q.  And it's your testimony you did not find anything for Signature?

A.  Yeah.  At that time, correct, sir.

Q.  And you didn't find their patent?

A.  Correct.

MR. WEBB:  All right.  Let's look at Column 3, line 37 to 39.

BY MR. WEBB:

Q.  The column number is at the top of the columns, so go to Column 3 and down to 37 to 39.

Are you there?

A.  Yes, yeah.

Q.  Great.

That reads:  "The upstanding structures are selected from their group consisting of cylinders, pyramids, rock shapes, ribs, and combinations thereof."

Do you see that?

A.  Yes.

Q.  So you would agree with me that the patent discloses the use of pyramidal structures as the surface features,

correct?

A.   Along with those others, yes.  Correct.

Q.   All right.  Now let's go to Column 5, line 11 through 13.

     Are you there?

A.   Yes.

Q.   "With reference to Figs 2, 5, 8, 11, and 14 of the drawings, a single vehicle tracking mat is configured in a regular geometric shape, such as a rectangle," right?

A.   Yes.

Q.   And when the patent discusses this single vehicle tracking mat, that means the mat is in one piece, correct?

A.   It refers to a single vehicle tracking mat.

Q.   And that means that it's a one-piece mat?

A.   It doesn't say that.  It says "a single vehicle tracking mat."

     MR. WEBB:  All right.  Take this down, please.

BY MR. WEBB:

Q.   Mr. Clingerman, you were deposed in this case, right?

A.   Yes.

Q.   Your deposition was taken, correct?

A.   Correct.

Q.   And in your deposition you swore to tell the truth just like you did today?

A.   Yes.

Q.  And you were asked a series of questions about this patent, correct?

A.  Yes.

        MR. WEBB:  May I approach, your Honor?

        THE COURT:  Yes.

BY MR. WEBB:

Q.  Mr. Clingerman, this is a transcript, or paper copy --

A.  Sure.

Q.  -- of your deposition.

        I would like you to turn, please, to page 30 and go to line 15.

A.  Yes.  Got it.

        MR. WEBB:  Can you pull that up, Dillon.

BY MR. WEBB:

Q.  All right.  You were asked:  "Yeah.  Column 5, lines 11 to 13" --

        MR. SCHWEGMANN:  Your Honor, objection.  Improper impeachment.

        MR. WEBB:  He testified that it was not a one-piece based upon that discussion in the patent, and I am entitled to show that's not what he said in his deposition.

        MR. SCHWEGMANN:  May we approach?

        THE COURT:  Yes.

        (The following proceedings were conducted at sidebar with all parties represented.)

MR. SCHWEGMANN:  Your Honor, my understanding is he's got to ask the witness if he recalled how he testified and he can't show the deposition until he receives an inconsistent response.  You don't get just to start showing deposition pages to the jury.

MR. WEBB:  I'm happy to do that if you'd like.

THE COURT:  Well, that's the way you do it.

MR. WEBB:  Okay.

THE COURT:  Okay.

(Sidebar conference concluded.)

BY MR. WEBB:

Q.  Apologies, Mr. Clingerman.

Do you recall in your deposition when you were talk -- when you were questioned about those -- that paragraph?  Do you remember that?

A.  Yes.

Q.  And isn't it true that when you were asked, "Now, when it talks about a single vehicle tracking mat, that means that the mat is in one piece, right"?

Do you remember that question?

A.  Can you repeat the question?  There was a lot of commotion going on in the background behind you.

Q.  Sure.

"QUESTION:  Now, when it talks" -- when the patent.  When the patent -- "talks about a single vehicle

tracking mat, that means that the mat is in one piece, right?"

A.  I believe --

Q.  Do you recall that?

A.  I believe in deposition that that's what we were talking about, yes.

Q.  Correct.

And your answer was, "I believe" that -- "yeah, that's what that's saying," correct?

A.  That's what it says in the transcript.

Q.  Let's go on to Column 5, Line 20.

Are you there?

A.  Yes.

Q.  It says, "A mat width of 7 to 8 feet is suitable.  The length of a mat, 10, may be the greatest length that can be conveniently handled for installation.  A mat length of 12 to 15 feet is suitable."  Right?

A.  Yes.  That's what it says.

Q.  So that discloses the 12-foot length of the FODS mat, correct?

A.  The 12 to 15 feet, yes.

Q.  Okay.  Also in Column 5, at Line 58, it says there, sir, that "The end edges can carry means for mechanically interlocking two similar mats arranged end to end."

Did I read that correctly?

A.  Yes.

Q.  So that disclosure means that these mats can be mechanically interlocking, correct?

A.  Yes.

Q.  Okay.  So based upon what we've talked about this morning, in this patent it discloses a one-piece mat, pyramid structures, the length of the FODS mat, and interlocking structures.  Agree?

A.  It talks about a single mat and the pyramid structures and the interlocking features.

Q.  Okay.  All right.  You can put that down, sir.

        MR. WEBB:  Can we pull up DTX-239 -- actually, I don't think this has been admitted yet, so hold off on that.

BY MR. WEBB:

Q.  All right.  Do you have that document in front of you?

A.  Yes.

Q.  Tell the jury what you're looking at.

A.  Yeah.  So what this is is a marketing piece that we provide.  It's our Technical Data Sheet.

Q.  And it describes the FODS mat, right?

A.  Yes.

        MR. WEBB:  All right.  At this time I'd offer in evidence DTX-239.

        THE COURT:  I'm sorry.  What was the number?

MR. WEBB:  Sorry, your Honor.  DTX-239.

MR. SCHWEGMANN:  No objection, your Honor.

THE COURT:  Okay.  It will be admitted.

BY MR. WEBB:

Q.  All right.  Mr. Clingerman, this document, this Technical Data Sheet, is available online?

A.  Yes.

Q.  It's a document that you hand out to customers and prospective customers, correct?

A.  Yes.

Q.  And it identifies -- right there in the lower left-hand part of that box, it identifies the '927 FODS patent we just discussed.

A.  Yes.

Q.  All right.  So, again, I'm -- sorry.  I'll refer to that patent by the last three digits, '927.

A.  Sure.

Q.  Will that work for you?

A.  Yes, that's fine.

Q.  All right.  If you will take a minute and look at this document, sir, I don't see anything where it talks about your mat being protected by trade secret.

A.  Correct.

Q.  It lists the patent, but nothing about trade secrets, fair?

A.  Correct.

Q.  And to be clear, there are no allegations in this lawsuit that my client has infringed the '927 patent, correct?

A.  I believe so.

Q.  If you look at the first paragraph there, looks like the second sentence, "The top surface of the FODS mat contains rows of raised pyramids which are staggered in the direction of travel."

        Do you see that?

A.  Yes.

Q.  And then if you go down to the third paragraph -- sorry.  Bear with me.  I've got too many folders up here.

        All right.  So if you go down to the last sentence, it says, "The modular 12-foot wide, 7-foot long mats are designed to be used in series to form an exit lane."

        Do you see that?

A.  Yes.

Q.  And that's in this Technical Data Sheet?

A.  Yes.

Q.  It's available online?

A.  Still, yes.

Q.  All right.  And then below that, underneath the picture of the mat -- and just to be clear, that's a representation

of the FODS mat, right?

A.  Yes.

Q.  All right.  And below that, it says the size of the mat, correct?

A.  Correct.

Q.  Including the thickness at 3-3/4 inch?

A.  Yes.

Q.  The height of the pyramid, 2-7/8 inch?

A.  Yes.

Q.  And the weight of the pad, 420 pounds?

A.  Yes.

Q.  You would agree that this document also discloses the pyramidal shape, mat size, and mat structure for the FODS mat, right?

A.  Yes.

Q.  I mean, that's the idea.  You're handing this out to people who might want to buy it.  They need to see the details for that, right?

A.  Yes.

Q.  Again, this is publicly available, right?

A.  Still, yes.

Q.  All right.  So once FODS sells a mat to a customer, they don't monitor how it's being used, do they?

A.  No.

Q.  And these mats yet are placed alongside roads, correct?

A.   Yes.

Q.   Someone with a tape measure could walk out there and measure, right?

A.   Absolutely.

Q.   It's public, right?

A.   Yes.

Q.   I would like now to turn to the nondisclosure agreement you mentioned earlier.

        MR. WEBB:  I have DTX-17, but your exhibit number was --

        MR. SCHWEGMANN:  Which one?  The first or the second?

        MR. WEBB:  The second one.

        MR. SCHWEGMANN:  What number is it, for us?

        MR. WEBB:  I mean, I can admit it as a different exhibit, but that would be a duplicate.

        RUIZ:  It's 133, I think.

        MR. WEBB:  133?  All right.  Thanks, Kris.

        Could you pull up Exhibit 133, Dillon.

BY MR. WEBB:

Q.   Sir, you talked about this on direct with Mr. Schwegmann, but this agreement was executed May 24, 2021, right?

A.   Yes.  That's the date.

Q.   Now, the idea for using a nondisclosure agreement came

from Signature, not FODS; isn't that true?

A.   The document came from Signature.   That's their letterhead.   But the agreement -- or the idea was both parties.

Q.   All right.   So this is a Signature document?

A.   Yes.

Q.   And the fact of the matter is this is a mutual nondisclosure agreement, correct?

A.   Yes.   It says "Mutual Confidentiality Agreement."

Q.   In other words, this agreement contemplated that each side would provide the other side confidential information, correct?

A.   Correct.

Q.   And as part of this exchange, Signature provided confidential information to FODS, correct?

A.   Yes.

Q.   And under the terms of the agreement, just because someone marks it confidential doesn't make it confidential in fact, correct?

A.   In certain cases, yes.

Q.   All right.   So, for example, if they put "confidential" on something that's not confidential, it doesn't apply under this agreement, correct?

A.   I believe that's probably true.

        MR. WEBB:   All right.   Could we go to page 2,

paragraph 6.

BY MR. WEBB:

Q.  Okay.  So this is a paragraph that excludes information that's not really confidential, even if a party says it is, correct?

A.  Yes, in Letter (a), I believe that's what it says, yes.

Q.  All right.  Let's read it together.

"The obligations of confidentiality and non-use in Sections 1 and 2 shall not apply to any information that:

"(a) is publicly known at the time of disclosure of the Receiving Party;

"becomes public knowledge without breach of this Agreement by the Receiving Party;

"is known to the Receiving Party at the time of the disclosure and not subject to any restriction;

"(d) is lawfully obtained without restriction from a third party not affiliated with" either "Party"; and then, finally,

"(e) ...independently developed by the Receiving Party by employees of the Receiving Party who have not had access to the Confidential information."

Correct?

A.  Yes.  That's what it reads.

Q.  And you signed this agreement on behalf of FODS, correct?

A.  I believe so.

Q.  Now, during opening statements, counsel for FODS spoke at length about information provided by FODS to Signature and what it did with it after the deal fell through in March of 2022.

Do you remember that?

A.  Yes.

Q.  I think the words "theft" and "steal" were used a few times.

Do you remember that as well?

A.  I'm not sure of the exact words, but probably similar, yes.

Q.  Now, again, Signature provided confidential information to FODS as a part of this negotiation, correct?

A.  Yes.

Q.  Some of this information included customer and sales information from Signature to FODS?

A.  Correct.

Q.  So that information was very sensitive, correct?

A.  Yeah.  The confidential information, yes.

Q.  Okay.  Let's go back to this document, and let's look at paragraph 2.

It says there that the "...Receiving Party" -- in other words, the side that gets the other side's confidential information -- "shall not use or disclose, for

its own or a third party's benefit," correct?

A.   That's what it says, yes.

Q.   So if FODS received some confidential information from Signature in these negotiations, it could not use that information for itself or third parties, right?

A.   That's what that says, yes.

Q.   All right.  Now, if you'll -- the negotiations on this second potential transaction fell apart in March of 2022, correct?

A.   Yes.

Q.   You just testified about that a few minutes ago.

        Apologies.  All right.  I'm going to hand to you what's been marked as DTX-43.

        MR. SCHWEGMANN:  Your Honor, I believe we're going to have to approach on this one.  This addresses an issue previously discussed with the Court.

        THE COURT:  Okay.  Counsel, approach.

        (The following proceedings were conducted at sidebar with all parties represented.)

        MR. SCHWEGMANN:  Your Honor, this document he's handed the witness falls squarely within the scope of Motion in Limine Number 4, which prohibits from -- or at least approaching the bench before talking about evidence that -- well, I'll leave it at that.  This falls within the scope of Motion in limine Number 4.

THE COURT:  Remind me what that is, though.

MR. SCHWEGMANN:  Motion in Limine Number 4, we had this discussion about whether Signature could argue that FODS breached the nondisclosure agreement by retaining confidential information post closing.

Ms. Cox argued that there's no allegation of prior material breach.  Unlike the contract issues, this is not an element of a claim for trade secret misappropriation.  This is just a distraction, and I think that's why the Court ultimately granted that motion in limine.

MR. WEBB:  Yeah, granted with a caveat.

The caveat is -- this -- you dropped a footnote, your Honor.

It says this motion is granted only to the extent that the Defendant uses such evidence, argument, or discussion of the Scout Mat to expressly support a breach of contract as an affirmative defense.

MR. SCHWEGMANN:  But this has nothing to do with the Scout Mat.

MR. WEBB:  I don't think this is the right order.

MR. SCHWEGMANN:  I don't think this is either.

I think what he has shown the witness is an email that tends to show that, at least in one instance, FODS kept some information and didn't destroy it in accordance with the contract, but that's not an element of the trade

secret claim.

MR. WEBB:  Sorry.  I grabbed the wrong order, your Honor.  Sorry.

You dropped a footnote in granting that motion that said we can, however, introduce it to rebut a claim that we violated our NDA, breach.

MR. SCHWEGMANN:  I don't think that's right, your Honor.  I mean, we're not talking -- we don't even have a claim for violation -- we don't even have a claim for violation of the NDA.

We have a claim for trade secret misappropriation, one of which is we need to show they kept and used the information, right?  The fact that they didn't destroy it, I need to point out in my case-in-chief to show that they had access to it.

But all they're trying to say is, look, they kept something, too.  The problem with that, your Honor, is they don't have a prior material breach claim.  They don't even have an element of the trade secret misappropriation for which this is relevant.

MR. WEBB:  That's not the issue.

The issue, Judge, is that you -- we argued that they're claiming exemplary damages.  They're claiming this conduct was egregious and wanton and malicious.  That's all relative to what they did as well.

This is something that both parties did, both parties understood they could do.  And in your order, which we're going to try to find, you said we could use this if they opened the door.

And in their opening statement, the nondisclosure agreement says that --

THE COURT:  Be sure you speak over here.

MR. WEBB:  I'm sorry.

THE COURT:  Go ahead.

MR. WEBB:  For example, during opening statement, Ms. Cox said they didn't just keep FODS's confidential data, they used it.

And this is from the slide deck on Signature's.  They made the plan.  And you'll see on there that he is getting FODS's financial data from 2018, 2020, and 2021.

And he'll admit to you that the only reason he has that data is because he got it from FODS during the acquisition.

They have opened the door with respect to our alleged breach of this contract, and under the footnote there, they have opened the door.

MR. SCHWEGMANN:  I mean, your Honor, the door is opened because we've alleged a claim for trade secret misappropriation.  We need to show use of the information that was kept.

MR. WEBB:  But the --

MR. SCHWEGMANN:  They have nothing that's relevant.

So what the order says is essentially they're using the information just for trade secrets.  They have not made the allegation to violate the motion in limine because the motion in limine says it's granted to the extent the plaintiffs do not attempt to use defendant's alleged failure to destroy -- (audio distortion).

THE COURT REPORTER:  I'm sorry, Judge, but I can't hear you.

THE COURT:  I'm sorry.

The footnote says to the extent the plaintiffs do not attempt to use defendant's alleged failure -- (audio distortion) --

THE COURT REPORTER:  I'm sorry, Judge.

THE COURT:  Oh, okay.  Anyways, the footnote to motion in limine, they haven't done that.  So they're not asserting a breach of the Confidentiality Agreement because of the retention of their documents.

MR. WEBB:  In their opening statement, your Honor, counsel said, "'We said sorry the deal didn't work out, but destroy all that information we gave you.'  They weren't allowed to use it under the nondisclosure agreement.  And we said, 'Destroy the data.  Destroy the documents.'

"They didn't destroy it."

MR. SCHWEGMANN:  But the nondisclosure agreement is part of the misappropriation claim.  It's the way they accessed it.  It relates only to that claim.  We don't have a claim for breach of the NDA.

MR. WEBB:  But it's a backdoor claim of the breach because that's how they're arguing that we violated the --

THE COURT:  I'm going to sustain the objection.

MR. WEBB:  Okay.  Thank you.

(Sidebar conference concluded.)

BY MR. WEBB:

Q.  All right.  When you were in negotiations with Spartan under which Spartan would eventually purchase FODS, there was a presentation made by a number of FODS's employees to Spartan.

Do you remember that?

A.  I believe so.  I'd have to see some documents, sir.

Q.  I'm sorry?

A.  Yes.  I'd have to see some documents to provide more color.

Q.  Okay.  And there was a PowerPoint created for use during that meeting, correct?

A.  I believe so, yes.

Q.  And you were -- you had a role in creating that document, correct?

A.  Yes.

MR. WEBB:  Your Honor, may I approach?

THE COURT:  Yes.

BY MR. WEBB:

Q.  Mr. Clingerman, I'm handing you what's marked as DTX-110.

All right.  Can you identify this as the PowerPoint presentation you used in that meeting?

A.  It looks to be, yes.

MR. WEBB:  And let's pull up DTX-110.

THE COURT:  Is this one -- was it already conditionally admitted?  Do you know?

MR. WEBB:  It's not objected to.

MR. SCHWEGMANN:  No objection, your Honor.

THE COURT: Okay.  Then Defense 110 will be admitted.

MR. WEBB:  At this time, your Honor, I move to admission of DTX-110.

THE COURT:  I've already admitted it so --

BY MR. WEBB:

Q.  Mr. Clingerman, this is that presentation we talked about earlier, correct?

A.  Yes.

Q.  And the date of this is November 30, 2023, correct?

A.  Yes.

Q.  Now, this presentation was an overview of the FODS business, correct?

MR. SCHWEGMANN:  I'm so sorry to interrupt, but I believe for this document we need to invoke the protective order.

MR. WEBB:  Fair enough.

THE COURT:  Oh, I'm sorry.  Yes, we'll seal the courtroom again.  Anybody that is not subject to the protective order will need to leave.

I don't think we have any of that now, so go ahead and proceed.  Just tell me when you're finished.

MR. WEBB:  All right.

(Courtroom sealed.)

(This portion of the transcript is sealed and filed under separate cover as Sealed Portion Number 4.)

(Courtroom unsealed.)

BY MR. SCHWEGMANN:

Q.  So the third bullet point talks about actively soliciting FODS's customers.

Who was doing the solicitation?

A.  Signature.

Q.  Now, before that time, was Signature ever actively soliciting FODS's customers?

A.  No.

Q.  It was only during this time that they started to do

that?

A.   Correct.

Q.   And how did they know who your customers were?

A.   They'd saw all of our information and still had it.

Q.   All right.  Just two brief topics.

MR. SCHWEGMANN:  Mr. Smoot, may I please see DTX-239.

BY MR. SCHWEGMANN:

Q.   This is that Technical Data Sheet that Mr. Webb asked you about?

A.   Yes, sir.

Q.   And it has the dimensions.

Have you ever said that the dimensions of the trackout mat is a secret?

A.   No.

Q.   And does anything in this Technical Data Sheet explain to someone how to make the mat?

A.   No.

Q.   Does anything in this sheet talk about /////////////// //////////////////////////////////////////////////////// ////. /////.

MR. SCHWEGMANN:  And if we could look at DTX-240.

BY MR. SCHWEGMANN:

Q.   This is that FODS patent that Mr. Webb showed you, right?

A.  Correct.

Q.  And similarly -- and we're not going to go through this line by line.  But you've seen it before, right?

A.  Yes.

Q.  Is there anything in this patent that talks about how to make the mat?

A.  No.

Q.  Is there anything in this patent about ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨

Q.  This patent just covers the product itself, fair?

A.  Yes.

Q.  Okay.  Last topic.  He asked you some questions about this company.

        Do you recall that?

A.  Yes.

Q.  And I think was trying to suggest that you didn't have the know-how or the capability to put together this mold, right?

A.  Yes.

Q.  Now, you had an agreement with Linear, fair?

A.  Yes.

Q.  And did you enter into -- and I'm going to show it to you.  But did you enter into that agreement before you asked linear to do any work at all?

A.  Yes.

Q.  And is it fair to say Linear was working for you?

A.  Yes.

Q.  And you -- did you provide the designs to Linear so that it could do the tooling?

A.  Correct.

        MR. SCHWEGMANN:  All right.  Now can we just look at -- I know the number.  It's PX-34.

        Any objection to PX-34?  It's this Linear agreement.

        MR. WEBB:  No, that's fine.

        No objection, your Honor.

        THE COURT:  Okay.  So Plaintiffs' Exhibit 34 will be admitted.

        MR. SCHWEGMANN:  And can we just bring up and can you just highlight the first page so we can see what it looks like.  And can we see the top heading.

BY MR. SCHWEGMANN:

Q.  And what is this document, sir?

A.  It was the Manufacturing Services and Supply Agreement.

        MR. SCHWEGMANN:  And could we go to paragraph 6 of this agreement.

BY MR. SCHWEGMANN:

Q.  And this is the agreement between Linear and FODS, the company he was asking you about?

A.  I'm not -- are you able to highlight that?

MR. SCHWEGMANN:  Okay.  Could we go back to the first page.

A.  All right.

MR. SCHWEGMANN:  And increase the size of the first paragraph.

A.  Yeah, it's between D&D and FODS.

BY MR. SCHWEGMANN:

Q.  Okay.  And with respect to D&D --

MR. SCHWEGMANN:  Could we go to page 005 and let me see paragraph 6, please, Mr. Smoot.

And -- okay.  Let me take that down because I've got the wrong document up.

BY MR. SCHWEGMANN:

Q.  Is it fair to say that when you were working with Linear, you had an agreement that any improvements to your design were the property of FODS?

A.  That's correct.

Q.  Okay.  Thank you.  I appreciate your patience with me.

MR. SCHWEGMANN:  Pass the witness.

THE COURT:  Anything additional?

MR. WEBB:  Just a few, your Honor.

RECROSS-EXAMINATION OF BRYCE CLINGERMAN

BY MR. WEBB:

Q.  I promise we're almost done.

A.  That's all right.

MR. WEBB:  Dillon, can you pull up 240 again.

BY MR. WEBB:

Q.  Again, this is the patent, the '297 (*sic*) patent we talked about earlier, correct?

A.  Yes.

Q.  And on the left-hand side under vehicle tracking mat (*sic*) it lists the inventor for this patent, correct?

A.  Correct.

MR. SCHWEGMANN:  Your Honor, outside the scope.

THE COURT:  Well --

MR. SCHWEGMANN:  He's raising issues that are outside the scope of my redirect.

MR. WEBB:  Redirect covers this patent.

MR. SCHWEGMANN:  It didn't cover this -- these issues with respect to it.

MR. WEBB:  The document's in evidence.

THE COURT:  Well, it is outside the scope, but I'll give you some leeway.

Go ahead.

MR. WEBB:  All right.

BY MR. WEBB:

Q.  The inventor listed is Kevin Martin -- Martinez?  I'm sorry.

A.  That's correct.

Q.  And that's one of your partners, one of the cofounders of FODS?

A.  Yes.

Q.  And your name is not listed as an inventor, is it?

A.  No, it's not.

Q.  All right.  So earlier on direct you talked about how you saw a Signature prototype, right?

A.  Uh-huh.

Q.  It was like under the -- a trailer or something.

        Do you remember that?

A.  Yes.

Q.  ////////////////////////////////////////////////////////////////////////////////////
//////////////////////////////////////////////////////////.
///. /////////////////////////////////////////////////////////////////////////////////
///. //////////////////////////////////////////////////////.

        MR. WEBB:  All right.  Let's pull back up the PowerPoint for the Signature meeting.

        I would like to go to the challenges page about Signature.

BY MR. WEBB:

Q.  All right.  So this is the page we talked about earlier.

A.  Uh-huh.

Q.  Now, at the top of the page, there is a quote.  "War does not determine who is right - only who is left."

Correct?

A.   That's what it says.

Q.   At this time, you were concerned about FODS being a challenge -- I'm sorry --

A.   Signature?

Q.   -- Signature being a challenge.

A.   Yes.

Q.   Because they were making a trackout mat, correct?

A.   Uh-huh.

Q.   And you were presenting to Spartan, who would ultimately purchase your company.

A.   Correct.

Q.   All right.  So it's fair to interpret that quote, isn't it, as saying when you go to war, being right doesn't matter, it's only if you remain standing, correct?

A.   Yeah, that's what that quote says.

Q.   Yeah.  And the purpose of this quote in this presentation on the page addressing FODS's challenges was to tell your future acquiring company that this lawsuit's not about right or wrong, just about who is remaining on the market, correct?

        MR. SCHWEGMANN:  Objection, your Honor. Mischaracterizes the document.

        THE COURT:  Overruled.

                         *

BY MR. WEBB:

Q.  Can you answer my question, sir?

A.  Yeah.  Okay.  Sorry.  Would you ask it again?

Q.  Sure.

A fair interpretation of that quote in this context is that if we're going to litigate, being right or wrong doesn't matter, just if we're the only company left?

A.  I don't take that from this document.  That's just a quote that was on the page.

Q.  Thank you.

MR. WEBB:  No further questions, your Honor.

THE COURT:  Okay.  Anything else?

MR. SCHWEGMANN:  No.  Thank you, your Honor.

THE COURT:  Okay.  So, ladies and gentlemen, whether you have a question or not, please fold a piece of paper and pass it over to the court security officer.

Let me have counsel approach.

(Sidebar conference, off the record.)

THE COURT:  Okay.  We have a few questions from the jury.

And I will preface this.  Only say if you know the answer.

THE WITNESS:  Sure.

THE COURT:  I don't want you to speculate about anything.

////////////////////////////////////////////////////////////////////////// ////////////////////////////////////////////

////////////////////////////////////////////////////////////////////////.

///////////////////////////////////////////////////////////////////////////.

////////////////////////////////////////////////////////////////////////////.

//////////////////////////////////////////////.

///////////////////////////////////////////////////////////////////.

//////////////////////////////////////////////////////////////.

/////////////////////////////////////////////////////////.

////////////////////////////////////////////////////////////////////////////.

//////////.

THE COURT:  Then who approached who first for the second acquisition?

THE WITNESS:  It was a conversation that where -- where Signature approached FODS.

THE COURT:  And can you clarify the business relationship between FODS and Signature regarding the DuraDeck mat?

THE WITNESS:  Yes.  I'll try.  Another person might be a better answer to that, coming up.

But I believe we started buying parts -- or some -- the DuraDeck were 4-foot by 8-foot mats -- I'm going to butcher the timeline, but we had been purchasing probably since, I believe, 2018, maybe 2019 time frame.

THE COURT:  Okay.  And then is the LRM Linear?

THE WITNESS:  No.  So LRM was one of the manufacturers I reached out to initially who at the time was licensing D&D's technology to produce parts.

When we got to actually producing the parts, the owner of D&D took over that -- the manufacturing.  LRM did not exist at that time -- or by then.  And just the transitioning went to D&D.

THE COURT:  Okay.  Any follow-up?

MR. SCHWEGMANN:  No, your Honor.

MR. WEBB:  Your Honor, just a question for clarification.

FURTHER RECROSS-EXAMINATION OF BRYCE CLINGERMAN

BY MR. WEBB:

Q.  When you were asked by the Judge here about who approached whom first --

A.  Uh-huh.

Q.  -- for the second round of negotiations, was it FODS or was it Signature, I didn't quite understand your answer. Can you clarify that for me?

A.  Sure.

So it was Signature approaching FODS.

Q.  I'm sorry?

A.  Signature approaching FODS.

Q.  Signature was the party who first approached FODS in that second round of negotiations?  It wasn't the other way

around?

A.  Can you repeat that?

Q.  Yeah.

So it was FODS or Signature that reached out first, not the other way around?

A.  Yes, I believe so.

Q.  All right.  Just to make sure that's clear.

MR. WEBB:  Thank you.

THE COURT:  Okay.  You may step down.

I think what we'll do is we'll go ahead and take our morning break now.  I know we're going until 1:00 today, so I wanted to try to get close to 11:00 before we took the break.

But, again, ladies and gentlemen, please don't discuss the case among yourself or anyone else.

We'll take 15 minutes, and we'll come back and continue.  Thank you.

(The jury exits the courtroom, 10:50 a.m.)

THE COURT:  Okay.  We'll see you back in 15.

(Recess, 10:50 a.m. to 11:06 a.m.)

(Open court, all parties present, jury present.)

THE COURT:  Okay.  Please be seated.

Your next witness?

MR. SCHWEGMANN:  Your Honor, the plaintiffs call Nate Barker.

THE COURT:  Sir, if you'll raise your right hand to be sworn in.

(The oath is administered to the witness.)

THE COURT:  Go ahead and proceed.

MR. SCHWEGMANN:  Thank you, your Honor.

DIRECT EXAMINATION OF NATHAN BARKER

CALLED ON BEHALF OF THE PLAINTIFFS

BY MR. SCHWEGMANN:

Q.  Good morning, sir.

A.  Good morning.

Q.  Tell us your name.

A.  Nathan Barker.

Q.  And where are you from?

A.  Colorado.

Q.  Are you employed?

A.  Yes, sir.

Q.  Where?

A.  I work at FODS in the division of Spartan Composites.

Q.  And what's your role at FODS?

A.  I'm director of business development.

Q.  Now, we -- just before you heard from Mr. Clingerman, did you know Mr. Clingerman before you joined FODS?

A.  Yes, sir.

Q.  How so?

A.  We are -- he's my childhood best friend from when I was

eight years old.

Q.  And what was your involvement in sort of the creation of FODS?

A.  Well, like I said, we've been lifelong friends.  When Bryce and his partners were developing the product, we were roommates at the time and was just around it, assisted in some of the kind of market research, development, testing that they did in the field.

Q.  All right.  Now, we're going to talk about some of that in a little more detail in a second.

But here, where we sit today, can you give the jury a sense of what your day-to-day responsibilities are?

A.  So right now I oversee sales, marketing, and operations.

Q.  And I want to jump right to some of the issues in the case.

And did you have some involvement with what we've referred to as this first acquisition attempt by Signature of FODS?

A.  Yes, sir.  I was involved with and participated in all of it.

Q.  And what was your involvement as it related to that first acquisition attempt back in -- what year?

A.  Yeah, so we began talking with them, with Signature, back in 2018, I continued through 2019, was involved in all

of the meetings, discussions, negotiations.

Q.  And what were the reasons, from your perspective, that FODS was interested in doing a deal with Signature?

A.  Well, at that time we were very new with the product. We had just brought it out.  We had had good success, but we were still kind of the little guy.  We had just really come to market and were starting to get some traction.

And they were, you know, a really big player in that mat market and their president at the time really expressed, "Hey, we see the potential here and we'd like to help you really grow out this product."

Q.  Now, you said Signature was a really big player in the mat market.

Did it have a trackout mat at that time?

A.  No, sir.

Q.  And when you got involved this first time around in these discussions, did Signature express to you why it was interested in acquiring what you described as a new player, small company?

A.  Yeah.  Well, one, they were very complimentary of the growth and kind of the marketing where we had positioned ourselves in the industry and the success we were having.

But then, two, they had explained that they were kind of shifting their business model a little bit.  They had been more in the event space.  They kind of made a big

deal, they showed us when we visited their facility, they had always provided the red carpet for the Oscars, and they were getting out of that type of event space and focusing more on plastic mats; and this was a large plastic mat they felt that they're offering.

Q.  All right.  Now, we looked at the nondisclosure agreement that Signature and FODS signed before the parties exchanged information that first time around.

You're familiar with that agreement, fair?

A.  Yes, sir.

Q.  And did you exchange any information with Signature until that agreement was in place?

A.  No, sir.

Q.  All right.  Now, we talked with Mr. Clingerman about some of the design documents and molds and things like that.  But is it fair to say that FODS also exchanged other what I'll call maybe nontechnical types of information?

A.  Yes.

Q.  And can you give the jury a sense of what Signature requested, just as a general matter, and what we provided after that NDA was signed?

A.  Yeah.  They asked for a lot of information about our company, how it was ran, who our customers were, who our target customers were, what the regulatory environment looked like, what we were doing to educate and influence

the regulatory environment.  They wanted to know what our costing looked like, our sales model and pricing looked like.

They wanted to kind of know how the entire company ran.

Q.  Okay.  I'm going to talk about some of those components in a little bit more detail, but did -- at any time during that process did you hold anything back?

A.  No.

Q.  Anything they asked for you gave them?

A.  Correct.

Q.  Now, at that time how was the customer data -- how was FODS's customer data kept?  How was it stored?

A.  Yeah.  So at that time we used a -- we had a QuickBooks -- suite of QuickBooks that we used to store all of our customer information, our sales information, all the purchase orders we received, as well as all the costing and purchasing we did on our side.

Q.  So did you have some involvement in maintaining that information?

A.  Yes.  At that time it was primarily Bryce and I were really the only people that entered information into those systems.

Q.  All right.  And did that information include every single sale ever made by FODS?

A.  It included all the sales we made and also quotes for maybe sales and opportunities that we ended up not winning and we lost.

Q.  Okay.  And during the opening statement, Mr. Reckers -- he made it sound like someone could go on the Internet and just figure out who our customers are.

First, is that true?

A.  You could see who some of our customers are.  You could not see who all of our customers are.

Q.  The information -- I want you to focus on the information in the QuickBooks and that list of information that you talked to us about.

Can you find all of that on the Internet?

A.  No, not at all.

Q.  Like give some examples of some things that's in the QuickBooks that Signature accessed that's not public.

A.  Yeah.  So, I mean, a lot of these companies that we were working with are big multinational, you know, billion-dollar companies; and so you have to have the right purchasing agent, the right regional and sales manager who's covering that product, really oversees that product within their sales force.  So all of those points of contact.

And then we had a whole pricing structure that we used with each customer.

None of that was public.  That was all stored within our system.

Q.



Q.  Now, did Signature ask you questions about how you implemented this kind of model in the 2018-2019-2020 time period?

A.  They did.  Early on in the discussion, I think there was some skepticism of it because it was very different than what they had done.

But rather quickly, as they got more information and saw how it worked and we educated them on the marketplace, they came to sign off, agree that that was the best model for our product.

MR. SCHWEGMANN:  Okay.  And, Mr. Smoot, could we

please see Plaintiffs' Exhibit 76, which has been

conditionally preadmitted.

BY MR. SCHWEGMANN:

Q.  And, first, Mr. Barker, can you tell us, what's the date of this email?

A.  Apologize.  Clean some dust off that screen.

The date of the email is August 26, 2019.

Q.  And this is during the period of that first acquisition?

A.  Yes, sir.

MR. SCHWEGMANN:  And can we, Mr. Smoot, please look at paragraph 1.

And could we just expand that.

BY MR. SCHWEGMANN:

Q.  By the way, when Signature's asking these questions about the sales model, were you answering this sort of generally, or were you constantly providing them very specific detailed information to back up what you're saying?

A.  As the transaction progressed, they ended up sending up an accountant who just worked from our conference room for two or three weeks and then went back to their home office and had a whole list of questions based on what she reviewed.

So this was very detailed questions that -- based

on the information we provided.

Q.  And what was Signature asking for in paragraph 1 of this email?

A.  In this case, they wanted us to confirm the breakdown of our sales volume based on breaking it out by distributor versus end user.

Q.  And did you provide that information?

A.  We did.

        MR. SCHWEGMANN:  Okay.  Let's look at Plaintiffs' Exhibit 72 -- but you'll have to take it off the screen. I'm sorry, Mr. Smoot.

BY MR. SCHWEGMANN:

Q.  There should be a book in front of you, sir.  Will you look at the piece of paper behind the Tab 72?

A.  Yes, sir.

Q.  And can you just tell us what you're looking at generally?

A.  It's an email that I sent to Bryce Clingerman on August 2nd of 2019.

        MR. SCHWEGMANN:  Okay.  Move to admit Plaintiffs' Exhibit 72.

        MR. RECKERS:  No objection.

        THE COURT:  72 will be admitted.

        MR. SCHWEGMANN:  Now we can put it on the screen, sir.  Thank you.

And could we just expand and scroll down a bit, the numbered paragraphs.

Now, before you do that, I'm sorry.  I jumped the gun.

BY MR. SCHWEGMANN:

Q.  What's the date of this email, sir?

A.  August 2nd of 2019.

Q.  Okay.  And the first paragraph says -- the first sentence says, "Thanks for meeting with Pradeep and I yesterday."

Remind us who Pradeep is.

A.  Pradeep was the president of Signature at the time.

Q.  Okay.  And so he came to meet with you guys in person about what?

A.  About the acquisition.

Q.  Okay.  And what is being asked of FODS in the numbered paragraphs at the top of that page?

A.  They have detailed financial information that they're asking about.

Q.  Okay.  And in paragraph 2, it talks about discounts, discounts given.  Does that relate to the pricing information we talked about earlier?

A.  Correct.

Q.  Are those negotiated discounts, is that something that's public knowledge?

A.  No, sir.

Q.  Did they also ask for, for example, in paragraph 3, 2018 financials?

A.  Yes, they did.

Q.  And did they ask about shipping?

A.  They did.

Q.  And are the shipping charges for our products that might affect how profitable they are, is that something that's public knowledge?

A.  No.  We have negotiated freight minimums where if they order a certain -- in a certain volume amount, we cover the freight on our end.

Q.  Okay.  And then paragraph 4 refers to the 2018 financials.  And paragraph 5 is the 2017 financials.

Does FODS share its financials with the public?

A.  No, sir.

Q.  Would you have shared any of this information about pricing, discounts, rebates, customers if you had -- if you didn't have a nondisclosure in place?

A.  No.

Q.  Now, if you'll look at -- just under that set of numbered paragraphs, it says, "refer to my attached file. Trying to calculate the average sales price and the average purchase price of the mats for each of the years."

A.  Correct.

Q.   What are they asking for there?

A.   They're wanting a breakdown of what came out to be the average sales price per mat on an annual basis.

Q.   Is that something that someone can calculate just by looking at Google?

A.   No.

Q.   Why not?

A.   They don't know the sales volume.  They don't know the discounts, the rebates.  They don't know the costs, the shipping that we're covering.  They don't know what the sales price is or the volume that we sell.

Q.   Why does FODS close -- well, why would any company want to closely guard this type of information from a competitor?

A.   It protects the company from a competitor stealing that business model, stealing those customers, stealing all of that information and using it against you.

Q.   All right.

          MR. SCHWEGMANN:   Now, Mr. Smoot, you can take that down.

BY MR. SCHWEGMANN:

Q.   Mr. Barker, I don't have time to show you here today all the emails from Signature to FODS asking for information.

          Were those the only two requests?

A.  No, sir.

Q.  Can you estimate or give the jury some sense of how much volume-wise of financial information, customer data, and other types of materials they were requesting during this 2018 to 2020 time period?

A.  They were asking for everything we had to the point where rather than waiting for emails, they had an accountant just sitting directly in our conference room that we met with multiple times a day.

Q.  All right.  I want to go forward in time to the second time there was a discussion about an acquisition.

First, just generally, when did those second discussions start?

A.  Roughly May of '22.

Q.  Okay.  May of '21?

A.  '21.  I apologize.  You're correct.

Q.  And there seems to be some dispute about this.  I'm hoping, Mr. Barker, you can clear it up.

Who initiated the discussions concerning that second acquisition?

A.  Signature did.  After the --

Q.  Tell us the story.

A.  Well, after the first negotiation ended -- it was called off right as COVID started and both companies had a lot to deal with, but we remained very friendly.

FODS was actually a customer of Signature. We had decided to also start offering a 4 by 8 mat as just an extra kind of accessory product for our customers. We were already shipping to those distributors giving them the option to buy those 4 by 8 mats.

And due to our friendly relationship with Signature, they were our supplier for those, during that initial negotiation we had worked with them to generate a custom logo of ours that they put on their mats when they produced those.

And so we had rolled out that offering to our customers and began to have issues with Signature not fulfilling the POs we had sent over.

At the beginning of that year, they had approached us about a new tiered -- volume tiered pricing model where we were actually going to pay more for the first mats we bought.

But over the course of the year, as we bought more, we'd get bigger rebates, and that would end up being -- if we hit the volume we had, that would reduce the cost.

Q. Let me break that up a second, Mr. Barker.

What -- just so we're clear, what Signature mat was FODS buying at that time?

A. We were buying the DuraDeck.

Q.  Is the DuraDeck different from the DiamondTrack?

A.  Very.

Q.  And what were the reasons that FODS was buying DuraDeck from Signature?

A.  We were offering it to our customers because we thought it was a nice add-on.  And we had a great relationship with Signature at the time.  We had stayed friendly ever since the original negotiations.  And they had -- you know, so we chose them as our vendor.

Q.  And what was the problem you were having with respect to Signature's ability to supply you with DuraDeck?

A.  After -- at the beginning of the year, after we had signed the new volume pricing agreement, they had began not -- or having issues fulfilling the POs we were sending in.

Q.  Okay.  As a result of that issue, the DuraDeck issue, what happened next?

A.  Well, one, it would be impossible for us to hit the volume numbers.  And so what I did was I reached out to their current president, Jeff Condino.  I had met him at the -- during the first acquisition.

At the time, he was, I believe, head of operations.  But between that first acquisition and May of '21, he had been promoted to president, and so I reached out.

We have a business relationship, the two companies. It makes sense to reengage on a personal level and see about setting a meeting so we could discuss the issues we were having with the supply of DuraDeck.

Q. All right. Mr. Barker, let me show you Plaintiffs' Exhibit 130, which has been conditionally admitted.

You told the jury that you had reached out to Jeff to congratulate him. Will you tell us what Exhibit 130 is?

A. What I'm looking at now is his response to my initial email --

MR. SCHWEGMANN: Can we look at the initial email, Mr. Smoot? It's a little further down.

A. So this is the initial email that I sent in the spring of 2021 reaching out requesting -- congratulating him on the promotion and requesting a meeting.

BY MR. SCHWEGMANN:

Q. Okay. And how did Mr. Condino respond?

A. It was a friendly response. It said be happy to have us in Dallas. He would like to introduce us to their new head of sales, as well as head of marketing, and mentioned that there has been some changing in resin pricing and wanted to know how that was affecting our production.

Q. Now, you reach out to him to congratulate him. You're talking about the DuraDeck mats.

How do you start talking about a second

acquisition?

A.  Myself, Bryce, and Chris Hefner, we traveled to Dallas, to their corporate office and during the course of that meeting, talked through kind of the supply issues that we were having with the DuraDeck mat.  And then over the course of that meeting kind of -- that they had raised the discussion about, you know, we were at once in talks and we would still be interested.  Would you guys still be open to an acquisition?

Q.  And so what happened next?

A.  We indicated that we likely would be.  We had another partner, Kevin Martinez, that we needed to speak with about it.  And then received a follow-up email from Mr. Condino.

Q.  And at some point after that initial discussion, did the parties execute a second nondisclosure agreement?

A.  Correct.  Mr. Condino indicated that they were quite interested in another acquisition and proposed that him and their chief financial officer come to Colorado for a meeting.

Prior to that meeting, he sent us a new nondisclosure agreement to sign.

Q.  Okay.  And after the execution of the nondisclosure agreement, did you begin to share information again?

A.  We did.

Q.  Okay.  Now, did you share the same kinds of information

that you shared before?

A.  Yes, and more.

Q.  Okay.  And tell us about the "and more."

So you had previously given information up to about that 2020 time period.  What were they asking for this time around?

A.  This time around, they mentioned you guys are better at sales than accounting.  Rather than having to go back and forth and having list the things that you need to provide to us, why don't you just give us direct access to your QuickBooks accounts and let --

Q.  Let me stop you there.

So during the earlier acquisition talks, how did you provide the information?

A.  They would send a list of requests.  We would generate those reports or documents and either email them over or they had created what -- it's called a data room.  Really, it's a link that you just upload things to that both parties can see.

Q.  And how did Signature want to do things differently this time?

A.  We had a data room, but then also they said, "Let's just allow us to generate our own reports.  We're accountants."  I believe Mr. Condino has a degree in accounting.

And said, "We're going to be much better at this than you are.  It will save us time and be more efficient."

Q.  So what does "direct access" mean in this context? Like mechanically they just logged right onto your system?

A.  We generated a user ID and password that they could use so they could access the system.

Q.  And did they, in fact, do that?

A.  They did.

Q.  Now, I also heard -- did Signature request any other routine updates after these second acquisition talks began?

A.  As the talks moved forward and almost moved to a place where it was presumptive that the deal was going to close, sometime in September of that year, Mr. Condino suggested -- we first had a all hands, in-person meeting where he brought his whole team to Colorado and then said, "From here, let's start having weekly status meetings where you'll get on and give us an update on changes in the marketplace, sales, you know, progress, and opportunities."

Q.  And we'll talk about that in a bit more detail in a second.

Let me -- would you look in your notebook at Plaintiffs' Exhibit 167, please.

I'm sorry you have to juggle so many notebooks.

A.  Yes, sir.

Q.  Do you recognize the document behind Tab 167?

A.   Yes, I do.

Q.   Can you tell us just generally what it is?

A.   It is a invitation to a videoconference that was sent out by a company named RSM.

Q.   Can you look at page 3 of that document, the attachment?

A.   Yes, sir.

Q.   And tell us what that is?

A.   This was part of the presentation which RSM was going to be presenting and reviewing with us on the call.

Q.   Okay.  The jury may not have heard the name RSM.

          Can you tell us who -- who is, who was RSM?

A.   I'm not extremely familiar with them as a company.  My understanding, they are a financial services company that specialized in these types of acquisitions.  They were hired by Signature Systems to review all of our financial information and provide analysis.

Q.   And RSM also had access to your systems on Signature's behalf?

A.   Signature provided them the access we provided to Signature.

          MR. SCHWEGMANN:  Okay.  Move to admit Plaintiffs' 167.

          MR. RECKERS:  No objection, your Honor.

          THE COURT:  Okay.  167 will be admitted.

MR. SCHWEGMANN:  All right.  Mr. Smoot, could we see -- let's start on page 3 of that document.

BY MR. SCHWEGMANN:

Q.  Mr. Barker, is this the first page of a document that was attached to that email?

A.  Yes, it is.

Q.  And tell us generally, what is this PowerPoint presentation?

A.  It's an agenda of their analysis of the financial review they have done and a discussion point for areas where they want more information or clarification.

MR. SCHWEGMANN:  Okay.  And, Mr. Smoot, could we please go to -- let's see, it's page 10.

BY MR. SCHWEGMANN:

Q.  All right, sir.  Can you see that, what's on page 10?

A.  Yes, sir.

Q.  I'd like to first focus on the chart to the left that says "Net Sales By Customer."

Do you see that?

A.  I do.

Q.  Now, you previously told us that you provided customer lists, right?

A.  Correct.

Q.  In addition to the customer lists, did you provide more information about each of those customers?

A.  We did.

Q.  And is some of that information reflected here in this chart that was put together by the company Signature hired to analyze your financials?

A.  Yes.







Q. Was that something that happened by going to Google and looking for a list of distributors?

A.  No, sir.

Q.  How did that -- how did you acquire that kind of detailed information?

A.  It was years of cold calls, contacts, relationships, trade shows.  Hundreds and hundreds of nights on the road traveling with their sales team making those sales calls.

Q.  All right.  And did you share the result of those hundreds of hours on the road, all those cold calls, did you share all of it with Signature?

A.  Yes, we did.

Q.  Now, you mentioned trade shows, and that's something we heard a little bit about yesterday, too.

        What was -- just generally speaking, what was the strategy FODS had with respect to trade shows?

A.  We focused primarily on the end users, the contractors. We generated demand with them, and we did a lot of trade shows, both large and small.

Q.  How many trade shows would you say you've attended over the last few years?

A.  Too many.  A few hundred.

Q.  Did you keep lists of which trade shows you attended and others at FODS?

A.  We did.

Q.  And through trial and error, did you figure out which trade shows were worth going to versus which ones maybe

weren't?

A.   Yes, sir.

Q.   And was that something that you could put together overnight?

A.   No.

Q.   And did Signature ask any questions about your analysis of the best trade shows versus the maybe not so great ones?

A.   We did talk about that at length.

Q.   What did they ask about?

A.   They wanted to know which trade shows we went to, but then also why; and even shared some of the ones they were going to and, in a candid moment, admitted they were going to a lot of the wrong trade shows.

Q.   Now, during that first acquisition period and even during the second acquisition period, based on your own experience at these shows, did you encounter Signature much?

A.   We had never, to my knowledge, encountered them at a trade show before.

Q.   Was there really any overlap at those shows between you and Signature?

A.   No.

Q.   Now, during these discussions, did you come to have some understanding about the customers Signature sold to during that first acquisition period?

A.  I did.

Q.  And did you have conversations with a Mr. Shivers about that?

A.  Yes, sir.

Q.  Remind us who Mr. Shivers is.

A.  I believe his title is VP of sales and marketing for Signature Systems.  He's the head of sales that Mr. Condino indicated he wanted to introduce us to.

Q.  He's the sales guy at Signature, right?

A.  Right.

Q.  And did you have the opportunity to sit and compare your customer list with Signature's customer list?

A.  That did take place, yes.

Q.  And tell the jury how much overlap, if any, there was between our customer list at FODS and Signature's customer list.

A.  There was nearly none.

Q.  All right.  Let's fast-forward a bit.  I'm still talking about the acquisition -- the second acquisition.

Did you share information about the growth plans that FODS developed?

A.  We did.

Q.  And when I say "growth plans," like what does that include?

A.  Well, from our time in the field and interacting with

contractors, we learn about maybe construction industries that are increasing and growing, maybe regional areas that are seeing increased growth, other areas where our product is sorely needed, where there's challenges for customers that we can solve.

Q.  Did you share how much you had in inventory?

A.  We did.

Q.  Did you share with them how much you anticipated to manufacture in the coming months?

A.  We did.

Q.  Is that information that you consider confidential?

A.  Absolutely.

Q.  Is that something you would normally share with a competitor?

A.  No.

Q.  Is that something you can find on the Internet?

A.  No, sir.

Q.  All right.  And let's look at -- well, look in your book, please, sir, at Plaintiffs' Exhibit 184.

A.  Yes, sir.

Q.  And can you tell us generally what that is?

A.  This is an email from Mr. Shivers to myself, Mr. Clingerman, Mr. Hefner, and Mr. Martinez on January 4th of 2022.

Q.  So January 4th of 2022, that's during the first or

second acquisition?

A.   This is about six months into the second acquisition.

MR. SCHWEGMANN:  Okay.  And move to admit Plaintiffs' Exhibit 184.

MR. RECKERS:  No objection, your Honor.

THE COURT:  Okay.  184 will be admitted.

MR. SCHWEGMANN:  All right.  May we please see that.

BY MR. SCHWEGMANN:

Q.   All right.  And just like before, Mr. Barker, I don't have time to show you every email request made by Signature and every response, but would you look at Plaintiffs' Exhibit 184 and tell us for each bullet point what is it that Signature -- that Mr. Shivers, the sales guy at Signature, is asking you for?

A.   So he was setting up a meeting for that week.  And in preparation for that meeting, he wanted to review our overall go-to-market strategy with our product, our lead generation, our pay-per-click, which is our online advertising strategy that we developed with an outside third party, our historical spend on the marketing side, trade shows, and what our --

Q.   Hold on.  Let me stop with the first bullet point, the go-to-market strategy and the current marketing plan.

I mean, do you typically share your marketing plan

Q.  with a competitor?

A.  No, sir.

Q.  And do you -- can you find a company's internal marketing plan on the Internet?

A.  No, sir.

Q.  Let's look at trade shows.  We talked about that.

Were they continuing -- was Signature continuing to ask for trade show information in January of 2022?

A.  They were.

Q.  Okay.  And they were not only asking what's the strategy with the trade shows.  What else were they asking, in addition to how many shows?

A.  They wanted to know how many people, booth size, setup, what shows, and why we picked those shows.

Q.  Okay.  And then even though we were through this first acquisition talks, and even though we're six months into the second set of talks, were they asking for more information about the distributor sales model?

A.  They were.

Q.  And the next bullet point, market and industry trends. What were they looking for there?

A.  They kind of wanted to know how the market looked today, but really what we saw was changing about the market.

Q.  Do you guys typically share your own internal market

analysis with competitors?

A.  No, sir.

Q.  Do you publish it on the Internet?

A.  No.

Q.  It talks about market and industry targets.

What are they looking for under that bullet point?

A.  The current markets, but more so the new targets that we had identified to go after.

Q.  And is that something -- the people that you're going to target in the future, is that something that you typically share with your competitors?

A.  No, sir.

Q.  Is that something you can find on the Internet?

A.  No.

Q.  What about the -- you know, I want to stop on this pricing model because here we are in January of 2022 after months and months and months of discussion.  What are they asking for now with respect to the pricing model?

A.  They wanted more information on the structure of our pricing model.  They wanted to know if we had tiered pricing like they have.  And what our margin targets were.

Q.  Well, Mr. Barker, if these mats are like a package of Oreos, why are they asking you for this information?

A.  This is all the information you can't see when you look at price on the shelf.

MR. SCHWEGMANN:  All right.  We can take that down.

BY MR. SCHWEGMANN:

Q.  Mr. Barker, we know from Mr. Clingerman's testimony and others that the second set of acquisition talks resulted in failure.  Yes?

A.  Yes, sir.

Q.  And were you -- what was the date that we can agree that the parties walked away from this second transaction?

A.  I believe it was March 24th of 2022.

Q.  And how many weeks -- well, who walked away?  Was it FODS that walked away, or was it Signature that walked away?

A.  It was Signature.

Q.  And how soon after -- we heard some testimony about this inspection that took place in this Proper facility of the FODS mold.

You're aware that happened, right?

A.  I was.

Q.  How soon after that in-person inspection where they're taking photos and taking measurements did Signature walk away from the deal?

A.  Two weeks.

Q.  Okay.  And only after that January email we saw where they're asking for information about trade shows and

pricing models and structures and all that, right?

A.  Correct.

Q.  I mean, when Signature walked away from the deal, were you surprised?

A.  I think we were all stunned.  I had an employment contract that I had reviewed with their HR.  I had employment contracts for all of my employees.  I think they had already requested wire instructions.  To us, it was a done deal.

Q.  And at the end of these talks, I mean, was it -- did FODS try to renegotiate the price?

A.  No.

Q.  Did FODS try to ask for any other concessions with respect to the deal?

A.  No.

Q.  What are the reasons that Signature gave for walking away from this deal that the parties had negotiated and were ready to sign?

A.  It came down to our supplier agreement with Spartan.

Q.  Okay.  Now, I want to ask about that supplier agreement with Spartan.

        Go backwards a few months.  So deal fails in March.

        Did you -- well, let me ask first, is it fair to say that from 2019, years before this March '22 failure of

the transaction, Signature knew about the Spartan manufacturing agreement, right?

A.  Absolutely.

Q.  And how did Signature know about that Spartan manufacturing agreement?

A.  At the time the first acquisition started, Spartan -- or that facility was producing mats for both us and for Signature.  So we both knew the party very well.

They reviewed the first supplier agreement during the first acquisition, and then it was one of the very first documents that we provided during the second acquisition.

Q.  Okay.  So now let's go back to this October-November time period of 2021.  So we're, you know, months before Signature walks away.

What requests did Signature make of FODS about the Spartan manufacturing agreement?

A.  Their attorney -- I believe his name was Matt -- wanted some changes to the way the termination language was written, and so they asked us to go renegotiate that supplier agreement with Spartan to change the termination agreement language to language they preferred.

Q.  Okay.  And what are the reasons that Signature told you to go back to your manufacturer at Spartan and ask for a different termination provision?

A.   They wanted to have an explicit exact number of days notice that would be needed to be given for the contract to be terminated, and they wanted to be clear that the contract was assignable.

Q.   Now, what risks did you appreciate about how -- having to go to Spartan, your only manufacturer, and asking for that kind of thing?

A.   Well, twofold, threefold.

     One, we were kind of out of the blue asking them to renegotiate this agreement before it was due.

     Two, there was never explicit termination language in there.  And naturally, Spartan said, well, if you have the right to terminate, then that gives us the right to terminate as well.  And they had never before had the right to terminate the agreement.

Q.   Now, at Signature's request, did you, in fact, go to Spartan and ask for a new termination provision?

A.   We did.

Q.   And how did Spartan respond?

A.   It was over a course of a number of meetings.  They were surprised by the request.  They questioned us on it, about it, but eventually they did agree to the requested changes.

Q.   What would have happened to the FODS business if Spartan had reacted differently and had terminated that

agreement at that time?

A.  We would have been left without a supplier.  We would not have had the ability to produce product to sell to our customers.

And the only other facility that we know of in the world that could make it would have been Signature.

Q.  And were you willing to take that risk?

A.  Begrudgingly.

Q.  And what are the reasons you were willing to kind of reopen negotiations and take that risk?

A.  I think we viewed it as kind of being team players.  We were soon going to be part of the same team.  This is what they felt was the best language to have in there that would protect the new joint company once the deal closed.

Q.  And despite having done what Signature asked you to do, to renegotiate a deal with Spartan, to put yourself at risk, Signature still walked the deal?

A.  Yeah.  At the very end is when they started demanding that instead of it being assigned and they terminate, that we had to terminate first and then trust fall that they would still close the deal.

Q.  Okay.  Now I want to go forward in time a bit.

When is the first time you learned that defendant had made, I guess, what we now know as DiamondTrack?

A.  I believe it was April or May of 2023.

Q.  All right.  Would you look at your book and please find Plaintiffs' Exhibit 298.

       And I'm interested in the photo that's attached to the document.

A.  298.  Yes, sir.

Q.  Can you tell us just generally what it is?

A.  That is a photo of the knockoff FODS mat.

Q.  Okay.  And how did you --

       MR. SCHWEGMANN:  Well, move to admit Plaintiffs' Exhibit 298.

       MR. RECKERS:  No objection.

       MR. SCHWEGMANN:  All right.

       THE COURT:  It will be admitted.

BY MR. SCHWEGMANN:

Q.  All right, sir.  Can you tell us what you're looking at?

A.  So this is a photo of a knockoff FODS mat in Signature's yard.

Q.  And who sent you this photo?

A.  I believe it originally came from a customer.

Q.  So a customer sent you this.

       What was your reaction when you saw this?

A.  I was angry.

Q.  And why were you angry?

A.  At this point, it had been roughly a year since the

transaction had fallen apart, and I felt they had used us to get all of our information and now were going to try and screw us and take the company.

Q.  And what did you do in response to having seen this photo sent to you by someone else?

A.  I first tried to gather a little bit more information, make sure I had all the facts around it, where it was, where -- and so on.  And then I called Mr. Condino.

Q.  Okay.  Did you -- well, let me ask this first:  Why did you call Mr. Condino?

A.  Over the course of that previous transaction, I felt we had developed a relationship and I just wanted to ask him point-blank if -- what he was doing.

Q.  What was the question that you wanted to ask him point-blank after you had seen that photo?

A.  Well, it was a photo of a knockoff mat of ours in his yard, and I wanted to know if they were intending to use our information to make this mat or if there was some other explanation.

Q.  Did you make that call?

A.  I did.

Q.  And did you record that telephone call?

A.  I did.

        MR. SCHWEGMANN:  Your Honor --

                              *

BY MR. SCHWEGMANN:

Q.  Well, let me ask this first:  Have you listened to that recording since it was made?

A.  At some point, I did.

Q.  And do you recognize the voices on the call?

A.  Yes, I do.

Q.  And whose voices are they?

A.  Myself and Mr. Condino.

MR. SCHWEGMANN:  Your Honor, we have a snippet of the telephone call we'd like to play.  It's Plaintiffs' Exhibit 297.

MR. RECKERS:  Your Honor, we'd ask that the entire telephone call be played if it's -- if any portions are going to be played, under 106.

MR. SCHWEGMANN:  Your Honor, my response is we're only interested in one portion of that call.  If on re- -- if on cross he wants to play the rest of it, I think that should eat his time, not mine.

MR. RECKERS:  I don't even know which portion they want to play, your Honor.

THE COURT:  Well, again, because of the time limits that the Court has imposed, you are welcome to play the rest of it or portions of it in your cross.

MR. RECKERS:  Thank you.

THE COURT:  Go ahead.

MR. SCHWEGMANN:  All right.  Mr. Smoot, I'd like to key up Plaintiffs' Exhibit 297.1.

BY MR. SCHWEGMANN:

Q.  And before we play -- before we play it, Mr. Barker, I think first we're going to hear your question and then Mr. Condino's response.

Is that right, based on your review of this?

A.  From memory, yes.

MR. SCHWEGMANN:  Okay.  So let's play it.  Make sure it's loud so we can hear it.

(Audio presentation to the jury.)

MR. SCHWEGMANN:  Your Honor, move to admit Plaintiffs' 297.

MR. RECKERS:  No objection beyond what we've previously said.

THE COURT:  Okay.  Well, I'll admit the whole document.  And if you want to play portions, you can play whatever portions you like, but -- okay.  It will be admitted.

MR. SCHWEGMANN:  Thank you.

BY MR. SCHWEGMANN:

Q.  Did you, after speaking with -- well, let me ask you first:  Did you share this photo on the screen with Mr. Condino before you called him to ask about it?

A.  No.  I shared it after.

Q.  And what impression did you have about Mr. Condino's response when you asked him about this gray mat that a customer had sent a photo of to you?

A.  I did not believe that this mat could have been made and stored in his yard without his knowledge.

Q.  And when you asked him on the telephone call about this gray mat, he responded, "Nope and that, uh, we would, um, no, I mean, you know" --

Did you get the sense that he was caught off guard by this question?

A.  I think he was surprised that we were aware of it.

Q.  And when he continues to talk, he mentions he doesn't have a tool.  What do you take that to mean?

A.  I believe he was justifying the original lie by hanging his hat on the fact that they had not yet received delivery of a mold.

Q.  And did you get the impression that he was admitting or denying that this gray mat came from him?

A.  He was denying that he had any knowledge of it, which implies that it did not come from them.

Q.  Well, was he forthright about you (*sic*) and said, "Look, we're developing this mat, and what you saw was the gray mat on the yard"?

A.  He did share that we had -- we had exposed him to the valuable -- the value of the market.  And something else he

shared was something he never shared with us before, which was that they had been working on designs between the two acquisitions the entire time.

During the second acquisition, they never disclosed that they had been working on designs after the first acquisition.  That was news that I learned on that call.

Q.  All right.  Now, you weren't in the courtroom for this testimony, but Mr. Webb asked some questions to Mr. Clingerman about this whole issue involving Ryan Webster.

You're familiar with that issue, right?

A.  I am.

Q.  And was this call -- one of the suggestions made by Mr. Webb is that, well, no one from FODS had ever called Mr. Condino to just ask him.

Did you call Mr. Condino to just ask him?

A.  I did.

Q.  And what response did he give you when you made an attempt to call him and ask what's going on?

A.  I did not find him to be truthful.

Q.  Now, just very briefly, sir, we spent a lot of time talking about these distributors and talking about pricing, and I just want to make sure I check the box.

Is it fair to say that FODS has nondisclosure

agreements with its distributors that cover pricing?

A.  Yes, we do.

Q.  All right.  Thank you.

MR. SCHWEGMANN:  Pass the witness.

THE COURT:  Cross-examination?

CROSS-EXAMINATION OF NATHAN BARKER

BY MR. RECKERS:

Q.  Mr. Barker, did you tell Mr. Condino that you were recording that telephone call with him?

A.  No, sir.

Q.  And during that call, he told you that Signature was looking to get into the trackout mat space, didn't he?

A.  He said hypothetically the answer might be yes, they might get into it.

Q.  It was a little more than hypothetical.  He said they were interested in that space and they had been working on designs since 2020, right?

A.  He said, "If you were to ask me do I think we'll get a tool, I think the answer would be yes."

Q.  Yeah.  So you knew they were getting into that space, or at least planning at that point, right?

A.  He said they might.

Q.  Okay.

MR. RECKERS:  Well, at this time, your Honor, I'd like to play the entire -- it's about 20 minutes --

Plaintiffs' Exhibit 298.

THE COURT:  That's fine.  Go ahead.

MR. RECKERS:  I'm sorry.  297.

THE COURT:  Yes, 297.  Yes, go ahead.

(Audio presentation to the jury.)

BY MR. RECKERS:

Q.  Mr. Barker, do you commonly record conversations of people without their permission?

A.  I would not refer to it as common.

Q.  And then you take those conversations, you save them, and you give them to your lawyers for cases like this?

A.  Could you repeat the question?

Q.  You save those conversations and then give them to your lawyers for cases like this?

A.  This case is unique in my life, so that did transpire in this case.

Q.  You told Mr. Condino on the call a couple times things along of the lines of "I appreciate the honesty and the forthrightness."

Did you hear that?

A.  I did.

Q.  You told the jury today that you think he deceived you, right?

A.  He was.

Q.  Well, let's talk about that.

Well, what he told you on the call when you referenced a mat or a -- say, a prototype that was -- was it behind a trailer or a Dumpster or something in the yard?

A.  Yes.

Q.  He said that Signature didn't have a tool to make something like that.

You understand that a tool in this context is a mold, right?

A.  Correct.

Q.  And Signature, in fact, didn't have a mold to make any kind of trackout mat at that time, right?

MR. SCHWEGMANN:  Objection, foundation.

THE COURT:  Overruled.

Go ahead, if you can answer.

A.  I do not know the answer to that.

BY MR. RECKERS:

Q.  What Mr. Condino did tell you was that Signature was looking to get into and was planning to get into the trackout mat business in the near term, right?

A.  He said they were likely going to do it.

Q.  Yeah.  Well, in the near term as well?

A.  Correct.

Q.  And maybe even that year, right?

A.  That year or the next year.

Q.  Right.

He told you they'd been working on designs for a trackout mat since 2019, right?

A.  He did.

Q.  Okay.  He told you that it was going to be a different design and not the pyramidal design on the FODS product, correct?

A.  He stated that.

Q.  All right.  Well, it's true, we know, that their current design, the DiamondTrack design, has a different pyramid structure -- or a different diamond structure, correct?

A.  It does have a different pyramid structure.

Q.  All right.  Well, they're diamonds, right?

A.  In this case, I believe he took a pyramid and rotated it 45 degrees and called that a diamond.

Q.  Okay.  Well, we'll look at the shapes later.

A.  Okay.

Q.  He told you that it was going to be likely an orange color, right?

A.  He did state that.

Q.  He told you that they were going to use their existing machines to make it.

        Did you hear that?

A.  Correct.

Q.  He told you that they were going to be focused on their

existing accounts as far as their sales.

Did you hear that?

A.  He did state that.

Q.  Okay.  He said to you that there was space in the market for another trackout mat, right?

A.  He did state that.

Q.  And it's true.  You'll agree that there's a lot of opportunity in this market, as far as the market share that's between the rocks and the plastic, that the addressable market for both products, you guys have only scratched the surface.  Fair?

A.  That's your analysis, yes.

Q.  Now, let me address something else that you talked about on your direct examination.

MR. RECKERS:  If we could put up Plaintiffs' Exhibit 130, please.

BY MR. RECKERS:

Q.  Now, there was some discussion that you had with your counsel about who started the second acquisition discussions.

Do you recall that?

A.  Yes, sir.

Q.  In 130 -- the email at 130 was one of the emails that you talked about on that topic with counsel, right?

A.  Yes, sir.

Q.  If we go to the second page of 130, the first -- what we see on this page, you write, "With all of the changes at both companies in the market, we would love to get together to discuss future plans and ideas on how we can working together to create more growth for SSG."

Do you see that?

A.  I do.

Q.  So you reached out to Mr. Condino to discuss future plans and ideas, right?

A.  The growth of our DuraDeck relationship.

Q.  Well, it doesn't say that, does it?

A.  That's part of the same email, sir.

Q.  Well, it says -- you wrote "create more growth for SSG."

That's Signature Systems Group, right?

A.  That is the only revenue that we generated for Signature Systems was the DuraDeck.

Q.  Right.  But this is talking about future plans, not past plans, right?

A.  And we wanted to sell more.

Q.  Well, ultimately you wanted to be acquired by a company that could manufacture mats, right?

A.  I don't know that that is the case.

Q.  Okay.  Well, ultimately that's what you discussed with them going forward and what you later discussed and what

happened with Spartan, correct?

A.  In the meeting in Grapevine at their office, they raised the idea of rekindling the purchase discussion.

Q.  Right.

        So Mr. Condino responds -- if we go to the first email.  He says let me know when you're in Dallas, right?

A.  Correct.

Q.  And shortly thereafter you and some of your partners at FODS went to Dallas, right?

A.  Yes, sir.

Q.  Called up Mr. Condino and said can we come stop by and visit y'all, right?

A.  Correct.

Q.  And that was the genesis of the second acquisition or merger discussions, right?

A.  That was the genesis of the meeting.  During that meeting is when they raised the acquisition discussion.

Q.  You emailed Mr. Condino suggesting future growth discussions, right?

A.  I did send an email that stated that.

Q.  Yes.

        And then you went to Dallas to talk to him about it, right?

A.  Correct.

Q.  ////////////////////////////////////////////////////////////////

Q. Now, you talked with counsel a little bit about the pricing and your allegation that it's a secret, what you sell these things for.

You know, though, however, how much the DiamondTrack is sold to distributors for, right?

A. I do not.

Q. Well, you've seen pricing through your own competitive intelligence of the DiamondTrack as low as 1,300 to $1,400, right?

A. I have seen an instance of that.

Q. Okay. You've learned that pricing through your own

competitive discussions in the industry, right?

A.  Are you telling me that is their entirety of their pricing or that's one instance?

Q.  You know an instance --

A.  I do.

Q.  Right?

A.  Yes, sir.

Q.  So you generally know what the thing is being sold for in the market, given that you're in this market, right?

A.  I know what we sell it for, and I know an instance of what they have sold it for or offered it at.

Q.  It wouldn't surprise you that Signature also knows generally what you sell your mats for, right?

A.  They know exactly what we sell it at.

Q.  Well, they knew -- they knew in 2021, right?

A.  Sorry.  They knew in 2021 and 2022.

Q.  Right.  And obviously it's years later -- and by the way, your pricing changes, right?

A.  We have had price adjustments.

Q.  Right.

Q.  Now, you understand that -- well, so we talked about

the pricing.  So as we talked about, your understanding is that Signature offers its mat between 13- to $1,400 per distributor, right?

A.  Again, that's one instance.  If you would like to provide me any pricing information, I'm happy to review it, but I just know that one instance.

Q.  Well, I asked you that at your deposition.  That's what you told me, right?

A.  In that instance, when a customer forwarded that pricing, I'm aware of that.

Q.  When that customer forwarded that pricing, were they in violation of a nondisclosure agreement?

A.  With Signature?

        MR. SCHWEGMANN:  Objection, your Honor.  Foundation.  Calls for a legal conclusion.

        THE COURT:  Sustained.

BY MR. RECKERS:

Q.  Do you have any of Signature's confidential information regarding the current pricing --

        MR. SCHWEGMANN:  Objection, your Honor.  We just dealt with this at the bench trial -- at the bench conference earlier.

        THE COURT:  Sustained.

BY MR. RECKERS:

Q.  Tell me again how you know why -- tell me how you know

Signature's pricing, please.

A.   There was an instance where a customer contacted me and stated they had been sent a price from Signature.

Q.   How common is that, for you to learn your competitor's pricing, say, through a customer or some other industry contact that you have?

A.   I would say it's not really that common.  I mean, this is the only knockoff mat out there.

Q.   But it happened for the one mat that you're in competition to, right?

A.   It was a unique, surprising instance.

Q.   Well, did you call Signature and say, "Hey, we got your confidential pricing"?

A.   I did not.

Q.   Did you tell the customer, "We're not supposed to have this.  Please don't send us this competitive information anymore"?

A.   I had no information that it was confidential.  How would I know that?

Q.   You just told us that you think all of this information is highly confidential.

A.   I don't know what their practices are.  I know our practices.

Q.   Would it surprise you to know that customers did the same thing as to your mats to Signature?

A.   It would not.

Q.   [REDACTED]

Q.   And customers, of course, between the two, all things being equal, are going to prefer lower prices, right? Agree with me on that?

A.   I think that's too broad a statement for me.

Q.   Let me ask another question.

Customers also want a product that's going to perform well for its purpose, in this case knocking mud off tires, right?

A.   That's one of the functions, yes, sir.

Q.   And one of the things for these mats -- some of the things that -- the characteristics that, you know, impacts the effectiveness of knocking mud off tires is the shape of the diamonds or the pyramids on the surface of the mat, right?

A.   Correct.

Q.   And, obviously, we talked about that between FODS and Signature, there's a different shape of the items on the

surface of the mat, right?

A.  Both myself and multiple customers that have contacted us dispute that it is different.  They describe it as a pyramid.

Q.  Well, you understand that the DiamondTrack has fewer pyramids?

A.  It does have fewer pyramids.

Q.  Right.  Than FODS, right?

A.  It has fewer pyramids on that mat than FODS does.

Q.  Right.

And those pyramids, to use your terminology, have been rotated 45 degrees, right?

A.  I am estimating the amount they have been rotated, but yes.

Q.  Right.  So we have different shapes in different orientations, fair?

A.  I think we're both calling them pyramids, and they're just rotated.

Q.  And I'm trying to follow your testimony, sir.

And you understand that Signature contends that their combination of features on the surface of the mat is better at knocking the mud off the tires, right?

A.  I saw that in your opening.

Q.  Well, we talked about it at my deposition as well -- at your deposition as well, right?

A.  I apologize.  You may have to refresh my memory.  I'm certain we did.  I just -- it doesn't -- I don't recall.

Q.  Well, let me ask -- let me ask another question and that is, again, when I asked you about this at your deposition, whether you knew, whether FODS knew which of the mats did a better job at knocking mud off tires, you said you didn't know the answer to that either, correct?

MR. SCHWEGMANN:  Objection, your Honor.  The question is vague.  It's also improper impeachment again.

THE COURT:  Well, I'll overrule it if you can answer it.

A.  Yeah.  I still do not know the answer to that.

MR. RECKERS:  All right.  No further questions, your Honor.

THE COURT:  Additional questions?

MR. SCHWEGMANN:  May I confer for just one second?

THE COURT:  Yes.

MR. SCHWEGMANN:  No, your Honor.

THE COURT:  Okay.  So, sir, let me check.  I let the jury ask questions.  Let me see if they have any questions for you.

Whether you have a question or not, please fold a piece of paper and pass it over to the court security officer.

Let me have counsel approach.

(Sidebar conference, off the record.)

THE COURT:  I just have a couple questions from the jury.

Did you ever feel like Signature was asking for too much?  Did it ever raise a red flag to you?

THE WITNESS:  As we entered kind of after the new year, we started to really have some concerns about the amount of information they were asking for and kind of the lack of progress with the transaction.

And through our deal counsel, the law firm that was negotiating it, we really pressed, and that's where we wanted assurance the deal was going to take place.

They provided a deck that outlined the financing they had already lined up.  They provided those employment contracts for both us as individuals but then, more importantly for us, our team because we have all these employees that are aware of this transaction.

That long into it, you can't hide that you have people coming in and doing due diligence, and so we were very concerned that they received what we viewed as fair and good contracts.  And so working with Signature, we received all that information.

So, yes, there was kind of some red flags that started to go off, but we always on, call it, the business side talking with people at Signature, they reassured us,

"This is just how negotiations go.  The lawyers will figure it all out and this is going to close."

THE COURT:  And then was FODS made aware of RSM's involvement or potential involvement prior to the meeting invite to review the net sales data?

THE WITNESS:  Yes.  They alerted us that there was going to be a third-party organization to do what they called a quality of earnings and to review all of the data.  So we were aware of it prior to being invited to that meeting.

THE COURT:  Any follow-up?

MR. SCHWEGMANN:  Just one follow-up.

REDIRECT EXAMINATION OF NATHAN BARKER

BY MR. SCHWEGMANN:

Q.  Was it your understanding that the information provided to RSM was covered by the nondisclosure agreement that you had with Signature?

A.  100 percent.

MR. SCHWEGMANN:  Thank you.

MR. RECKERS:  Nothing from the defense.

THE COURT:  Can this witness be fully excused?

MR. SCHWEGMANN:  From plaintiffs' perspective, the answer is yes.

MR. RECKERS:  Yes, your Honor.

THE COURT:  Okay.  So you are free to leave.  You

can stay in the courtroom, too, if you like.  That's up to you.

THE WITNESS:  Thank you.

THE COURT:  You are excused as a witness.

THE WITNESS:  Thank you, sir.

THE COURT:  I know we were going to stop at 1:00 because these Allen and Melissa students, but we have about ten minutes.  So if you have your next witness, we'll start.

MR. SCHWEGMANN:  Your Honor, we believe he's downstairs, so it's going to...

THE COURT:  That's fine.  At least we can get the intro part probably done.

What is the name of your next witness?

MS. COX:  Christopher Hefner.

THE COURT:  If you'll raise your right hand, sir, to be sworn in.

(The oath is administered to the witness.)

THE COURT:  Go ahead and proceed.

DIRECT EXAMINATION OF CHRISTOPHER HEFNER

CALLED ON BEHALF OF THE PLAINTIFFS

BY MS. COX:

Q.  Good morning, or almost afternoon now.  Would you please introduce yourself to the jury.

A.  My name is Chris Hefner.

Q.   Where are you from, Mr. Hefner?

A.   I live in Denver, Colorado.

Q.   What do you do for work?

A.   I work for a company call M-R Group.

Q.   And what kind of company is M-R Group?

A.   M-R Group is a consulting company that works with manufacturers to help grow their sales division.

Q.   So do they provide sales services to different companies?

A.   Yep, sales and marketing.

Q.   Did you form M-R Group?

A.   My wife actually did.

Q.   When did that happen?

A.   2017.

Q.   And how did that M-R Group come to be?

A.   We -- I had a long history, as did my wife, in the sales world.  I worked for General Electric working with large construction companies for 20 years, which is crazy to think about.

        But, you know, we kind of said, "Why don't we bet on ourselves?  We know all these guys.  Let's kind of turn the paradigm a little bit and go out and leverage our relationships and help companies that want to go meet these guys on a scale, do it that way."

Q.   So we're close to the lunch hour, so I'm just going

to --

A. Yeah.

Q. -- cut to the chase a little bit.

Does M-R Group work with FODS?

A. Yes.

Q. How so?

A. When we first started, we worked with several companies, FODS being one of them.  And now FODS has been such a tiger-by-the-tail rocket ship that it's our exclusive customer that we work with.

Q. So FODS is the only company that you work with --

A. Yes.

Q. -- is that fair?

A. Yes.

Q. How did you end up working with FODS?

A. I was -- before we started M-R Group, I followed a divisional CEO from GE to a new company that was working with distributors, construction supply distributors.  And I was sitting in this little branch in Iowa, and apparently days before or the week before, Bryce -- unbeknownst to me, not knowing any of this -- had -- was driving through with his trailer with a mat, you know, trying to drum up sales.

And there was a brochure sitting on this little credenza, or little desk, and I just said, "Hey, what is that?  That's unique.  That's -- I've never seen that

before."

And somebody said, "Oh, they just dropped it off."

Looked at it and understood what it was, kind of read about it.  And I'm like, "Wow, I think we could do something with this."

Q.  Now, you said you've been working construction for about 20 years, right?

A.  Yeah.  Not construction, with construction.

Q.  With construction.

A.  Very big difference, yeah.

Q.  So when you picked up that pamphlet and you saw the FODS mat on it, had you ever seen anything like that before?

A.  No, not at all.

Q.  In your 20 years of working with construction?

A.  Not at all.

Q.  Mr. Hefner, do you have any kind of educational background in sales?

A.  I have an education background.

Q.  What's your education background?

A.  I have a dual degree from Syracuse University in marketing management and entrepreneurship in emerging enterprises, and a minor in leadership communication.

Q.  So the work that you do with FODS now, can you tell me what you are responsible for on a day-to-day basis?

A.   Yeah.  Basically, my focus -- although we all kind of do a little bit of everything in a small business, a typical small business -- is basically to do -- to handle the big guys, the big strategic guys; and then also think about where the business needs to be in three years, right, go out there and kind of pioneer what's the new stuff we need to be looking at.

Q.   And you might have said it already, but how long have you worked with FODS?

A.   Since 2019.

Q.   Now, I know you haven't been in here, but the jury has heard a lot about the acquisition attempts between Signature and FODS.

Since you joined in 2019, were you familiar with the acquisitions?

A.   Yes.  I had heard, you know, about the first acquisition, though I wasn't involved.  But I was intimately involved in the second.

Q.   What do you mean by "intimately involved"?

A.   Well, I mean, there was basically four of us.  One of the partners had passed away, so it was basically the four of us that kind of, you know, would band together to do anything, right, go do whatever needed to be done.

But certainly when you have this big company trying to acquire you, you know, we're at -- all the phone

calls, we're a four-man team where kind of one goes, we all go kind of thing.  So intimately involved.  We were all there.

Q.  So in the second acquisition attempt, were you at all of the meetings?

A.  Yes.

Q.  Were you on all of the emails?

A.  Yes.

Q.  Are you familiar with all of the information that FODS exchanged with Signature?

A.  Very much so.

Q.  So I want to talk about some of the conversations that you personally had during the acquisition.

Do you remember any of those conversations?

A.  Yes.

Q.  What sorts of things would you talk about with Signature?

A.  You know, it was very exhaustive.  You know, typically an acquisition is very financial, in, you know, here's how much money you brought in, here's how much money you kept.  You multiply it by -- the argument is how many times you're going to keep -- how many times that -- the multiple.  Very simple.

This was very exhaustive of how do you do this, who do you talk to, right?  It was a -- it was an all -- it

was a very, very invasive, at the time positively invasive, of how do we integrate.  But it was how do you go do what you do?  Who specifically do you talk to?  What makes them tick, if you will?

When you go to a buyer at this kind of customer, what do they want to hear?  When you go to this type of customer, who do you talk to, right?  What's the title or what's the department you're looking for, and what are the -- you know, the critical things that they want to hear?

Which we were glad to share at the time, but really it was, you know -- in retrospect, it was something very different.

Q.  And I'll come back to why you were glad to share it in a minute.  But you said you worked for GE before, General Electric?

A.  Yes.

Q.  Is that a big company?

A.  That is a very big company.  And this was quite a different experience, but great the same.

Q.  Did you work in a sales role when you were working with General Electric?

A.  Yes.

Q.  Were you responsible for these same sort of things that you were discussing, how to find customers, how to keep

them, things like that?

A.  Yes.

Q.  When you were at General Electric, did you share that information with any third parties?

A.  No.  That was, you know, the secret sauce of GE, of how we did that, and that was very much kept in.

But the paradigm typically -- the paradigm is GE is always kind of the biggest guy in the room.  We were the little guy, you know, talking to the big guy in the room.

Q.  So let's go back to FODS talking to Signature.

You said that at the time you were glad to share that information.  Why?

A.  Because our understanding and assurances were two things.

Number one, this was being done in good faith and the deal was going to get done.  There were strategic reasons to get the deal done.

And, number two, that we were wrapped in this warm, comfy blanket of Confidentiality Agreements, nondisclosure agreements that were very detailed around we will not use these things to benefit ourselves, you know, or prosper ourselves if this deal were to fall apart in any way.

Q.  Would you have ever shared this information without the NDA in place?

A.   Absolutely not.

THE COURT:  Ms. Cox, we're going to go ahead and end right now to take our lunch break.

Again, ladies and gentlemen, please don't discuss the case among yourself or anyone else, and don't do any outside research.

We'll take an hour and come back at 2:00.  Have a good lunch.

(The jury exits the courtroom, 1:00 p.m.)

THE COURT:  Okay.  Anything further from the plaintiffs?

MS. COX:  Nothing from plaintiffs, your Honor.

THE COURT:  Anything from defense?

MR. RECKERS:  No, your Honor.

THE COURT:  And you can leave all of your materials.  I have the students here.  I'll visit back there with them.  So -- there's too much to move.

And then y'all are dismissed for lunch.  Thank you.

(Recess, 1:01 p.m. to 1:59 p.m.)

(Open court, all parties present, jury present.)

THE COURT:  Please be seated.

Ladies and gentlemen, I hope you had a nice lunch.

Go ahead and continue.

                              *

BY MS. COX:

Q.  Mr. Hefner, you can go ahead and take a seat for me.

A.  Sorry.

Q.  And do you see a binder in front of you that includes Plaintiffs' Exhibit 153?

A.  I've got a 183 -- did you say 183?

MS. COX:  153.

A.  I've got a 183 and a 105.

BY MS. COX:

Q.  So it should be within the one that says 183.

A.  Okay.

Q.  106 to 183.

Can you turn to Tab 153 for me?

A.  Sorry.  Swimming in --

Q.  You got it?

A.  Swimming in binders up here.  Sorry.

153?

Q.  Yep.

A.  Okay.  Go ahead.

Q.  Do you recognize this email?

A.  Yes.

Q.  Are you one of the recipients of this email?

A.  Yes.

Q.  Is this a true and correct copy of this email?

A.  Yes, ma'am.

MS. COX:  Your Honor, plaintiffs offer Plaintiffs' Exhibit 153.

MR. WEBB:  No objection.

THE COURT:  153 will be admitted.

MS. COX:  Mr. Smoot, could we show Exhibit 153.

And if we could go down to the second email, dated September 21st.

Third email.  Sorry.  One more down, the one on the bottom.

BY MS. COX:

Q.  Do you remember this email from Mr. Condino?

A.  Yes.

Q.  Can you tell the jury what this email is about?

A.  Basically, we had many meetings where we'd go to Dallas.  Sometimes the Signature guys would come to Denver.

And this was an email about the Signature guys coming up to Denver, seeing if we wanted to have dinner maybe, and getting together for another round of discussions.

Q.  What specifically did Mr. Condino want to discuss?

A.  He -- this was -- this was about the future structure of how our two businesses would merge together and what that would look like.

MS. COX:  So let's go up to the very top email, please, Mr. Smoot.

BY MS. COX:

Q.  What did Mr. Barker send to Jeff Condino in this email?

A.  Basically, the answer to one of the questions that was what is the remaining year, the last couple of weeks of the year, what are the trade shows that you're going to be at for the rest of the year.

Q.  And the jury has heard a little bit about the trade show information that was exchanged during the acquisition.

Do you know whether or not FODS ever provided Signature with a list of the trade shows that FODS attended?

A.  List and pretty detailed discussion around the list.

Q.  What sorts of discussions did you have?

A.  What trade shows -- there's, God only knows, thousands, tens of thousands of trade shows happen every year.  And, you know, the discussion was what trade shows do you go to? What trade shows have you gone to that aren't good?

Because a lot of times -- it's kind of like a restaurant, right?  You might hear good things, but until you go and have bad chicken, you know, you realize it's not a good fit for you and you just don't go again.

So there's just kind of positive experience and then, you know, bad experience, but they all shape how -- what you know to be a little smarter every time.

Q.  How many trade shows are there?

A.   Like a billion.

Q.   So how do you find out the right one to go to to sell your product?

A.   You talk to other manufacturers.  You talk to customers, you know, that you're trying to sell to, both the distribution customers and the end users of, hey, what trade shows do you go to?

Unfortunately, they're predominately in Las Vegas. And it's great if you like Las Vegas, but if you don't, it's not fun.

Q.   Did you tell Signature about your strategy at the trade shows, like how you set up, how you marketed the product, who you approached?

A.   Yeah.  We had a lot of -- we had discussion around how many people, you know, how to engage the people that are there, you know, what we found to be very effective strategies of customers, how to find them.

Because it's like standing in a mall, right, and people are walking by.  You've kind of got to be like half carnival barker and half -- you know, have something to kind of grab their attention.

Q.   Now, when you share this information with Signature, what, if anything, could Signature do with that information in the future that could affect FODS's business?

A.   Well, I mean, again, we're giving information to a --

you know, under the comfort and protection of -- legal protection supposedly.  But we're giving them basically pieces of our secret -- the recipes of our secret sauce of how we've -- through grit and through trial and error and a hell of a lot of work, you know, how we became successful to that point.

Q.  And just to clarify, one of the points of going to a trade show is to find customers, right?

A.  Correct.

Q.  Did you ever figure out what the best trade shows were to go to to find customers for the FODS trackout mat?

A.  We have our list, but it's -- you know, it's an evolving -- it's a constant evolving list.

There's -- the trade show business is constantly evolving.  There's new ones that pop up, so you've got to investigate those, so on and so forth.  So it's evolving.

Q.  And that list that you're talking about, is that what you gave to Signature during the acquisition?

A.  Yes.

MS. COX:  If we could show Plaintiffs' Exhibit 184, which has already been admitted.

And if we could zoom in on the bullet points in the middle.

BY MS. COX:

Q.  Now, the jury has already heard a little bit about this

email, but do you remember receiving it during the second

acquisition?

A.   Yes.

Q.   Who sent this email?

     And we can zoom back out if that's helpful.

A.   Oh, Michael Shivers, the vice-president of sales.

     MS. COX:   Now if we could zoom back in on the

middle.

A.   Sorry.  I just want to be -- make sure we do that

right.

BY MS. COX:

Q.   What was Mr. Shivers asking for?

A.   This was an agenda for a coming meeting that really

kind of dove into just specifically kind of a commercial or

sales deep dive conversation.

Q.   Now, did you have just one meeting with Mr. Shivers

during the acquisition negotiations?

A.   No.  He was present a few times.

Q.   Did you have weekly meetings?

A.   Yeah.  We had a weekly -- I think we called it a

huddle.  I can't remember what day it was, but it was on

the calendar kind of in perpetuity during the whole

acquisition.

Q.   What would be discussed at these weekly meetings?

A.   It was all about, you know, how are sales going, what

are the -- what are the big -- you know, where are your numbers at kind of is where it always starts.

Discussions around, you know, we're building up inventory because we had to jump this gap of, you know, Spartan shuts down, Signature starts.  So inventory was a big deal, so we had to ramp up inventory where we had an inventory, trying to kind of Evel Knievel that gap so we could still service customers in the meantime.

And, you know, what are your big quotes out there?  You know, anything new and exciting kind of come up?  All sorts of things.  Basically every time just a big business review.

Q.  So the second acquisition lasted from April 2021 until about March 2022, right?

A.  Correct.

Q.  So in addition to these formal meetings like the one in this email, you were also having weekly updates about FODS's sales; is that fair?

A.  Correct.

Q.  And you would share that with Signature every single week?

A.  Correct.

Q.  The first bullet point in Mr. Shivers' email says, "Overall Marketing 'Go to market strategy.'"

What do you recall discussing with Mr. Shivers

about this?

A.  You know, the go-to-market strategy is kind of a broad term of, again, how do you do what you do?  What have you found that's been successful?  You know, things that are near and dear to our heart, kind of how we do it, not -- you may see a public-facing website or something like that, but there is a lot of strategy behind that.

And that's kind of our go-to-market of, you know, how do we do what we do, what kinds of customers are we looking for, where are we at now, where do we want to be.

Q.  ////////////////////////////////////////////////////////////////// ////////////////////////////////////////////////. ///. ////////////////////////////////////////////////////////// //////////////////////////////////////////////////////////// ////////////////////////////////////////////////////// ////////////////////////////////////////////////////////////////. ///////////////////////////////////////////////////////////////////. ////////////////////////////////////////////////////////////////// /////////////////////.

////////////////////////////////////////////////////////////// ///////////////////////////////////////////////////////////// ////////////////////////////////////////////////////////// ///. ////////////////////////////////////////////////////////////////// ///////////////////////////////////////////////////////////.

//////////////////////////////////////////////////////////////////////

Q.  And are these relationships that FODS has spent years building?

A.  Yes.

Q.  What about the fourth bullet point that says "Industry Targets"?

How was FODS's industry targets different from Signature's?

A.  So our understanding -- you know, what was explained to us is really Signature has, you know, the main two products basically.  It's kind of like a little mat and a big mat. And basically it keeps people and vehicles from -- you know, you build them into kind of a yellow brick road, if you will, and it keeps people or vehicles out of mud and through areas.

It's a very -- very niche product in the transmission and distribution world, basically building high-wire, high-voltage lines through prairies and forests and stuff like that.  So you've got to build a road, a 20-mile road, right, for crews to be able to work on.

Our product is very different in that every -- I like easy.  I like simple things.  Every project, whether it's a city park, a high-rise urban building, you know, or anything has to have a construction entrance, so everything is an opportunity for us.

And so you are kind of -- they are very hyper-

focused over here and we do everything.  So it was a lot of discussion of a world they just didn't dabble into to help them understand that.

Q.  So is it fair to say that in addition to you having different customers, at least in 2022, these two companies had completely different industries that they were selling to?

A.  Yes.

Q.  Mr. Hefner, how could Signature use this information against FODS in the marketplace?

A.  Well, I mean, if you don't have to go through that learning curve, the trial and the error -- trial and the error, the blood sweat and tears, the failure, all that stuff to learn it on your own, it's easy.  It's like being in a foot race with a jet pack, right?  It's just -- it's not on par.  It's not the same.

Q.  Do you think it's fair competition if your competitor already knows what customers you're going to target?

A.  I think that is a very unfair advantage.

Q.  How so?

A.  Well, again, you spend a ton of time -- for every one customer you find that says yes or, you know, gets it or wants to do it for whatever reason, utilize a product, there might be five or ten that said, "You're an idiot," or "We don't like it," or whatever it is.

So there is a lot of work to go into that success. And to refine it down and just hand somebody just the bar of gold and not the mountain that you had to grind through to get the bar of gold, that's a very different path, and it's -- I would say that's not fair competition whatsoever.

Q.  Does this hinder FODS's ability to compete fairly in the marketplace?

A.  I mean, it puts us at a giant disadvantage, yeah.

Q.  When did the defendant release the DiamondTrack?

A.  In late '23 or early '24.

Q.  November 2023 sound right?

A.  Yeah.

MS. COX:  And if we could show Plaintiffs' Exhibit 338, which has been conditionally preadmitted.

Any way we could rotate that to the right?

BY MS. COX:

Q.  Well, you might have to tilt your head a little bit. But what are we looking at in this photo?

A.  A trade show booth of Signature's featuring predominantly the DiamondTrack mat.

Q.  Well, and specifically the jury has heard that the DiamondTrack is orange.  What color is this one?

A.  This one is gray.

MS. COX:  Could we show Plaintiffs' Exhibit 358, which has also been conditionally preadmitted.

BY MS. COX:

Q. What do we see in this photo?

A. Another trade show prominently featuring the DiamondTrack.

MS. COX: Thank you, Mr. Smoot.

BY MS. COX:

Q. Mr. Hefner, after the defendant released the DiamondTrack, did you notice anything about the trade shows that the defendant was going to?

A. Yeah. They started going to our trade shows where they hadn't been before.

Q. And when you mean (*sic*) before, do you mean before the acquisition?

A. Before the acquisition and all the conversations around where to -- where we go.

Q. Did this ever -- let me rephrase that.

Do you go to any of these trade shows?

A. Yes.

Q. Did you ever experience any impact on FODS's ability to market at these trade shows due to the DiamondTrack also being present?

A. Yes. I mean, there was a lot of conversations -- you know, we have a product that didn't exist, right? This isn't a new kind of tire, you know, with a better tread or anything like that.

This was a novel, new product that a lot of people -- nobody had seen before, right?  So that was a great advantage.  It's a very shiny object, if you will, of people walking around who have been doing construction for 20 years, 10 years, 50 years, whatever it might be.

And so you got a lot of those, "Wow, what a great idea."  We get a lot of, "Why didn't I think of that" conversations.

And then once DiamondTrack shows up at these same shows, you had a lot of conversations with customers going, "Hey, you know, I talked to your cousin company over there, you know, with your orange mat."

And I'm like -- at first I was like, "What are you talking about," because it was just so kind of foreign and, you know, I'm not -- whatever is happening over there is happening over there.

But you have a lot of customers now that you have to have this conversation of, "That's a different -- that's a competitor mat.  You know, here's why ours is somewhat different."

And they go, "Huh, looks just like a FODS mat."

So it's very confusing to the customer.

Q.  So you had customers at trade shows see the DiamondTrack and then come up to you and say, "Huh, that looks just like the FODS mat"?

A.  Yes.

Q.  Let's switch gears.  I want to talk about the interlockability aspect of FODS.

MS. COX:  Mr. Smoot, if we could show Plaintiffs' 64, which has been conditionally preadmitted.

BY MS. COX:

Q.  Do you recognize this?

A.  Yes.

MS. COX:  Could we zoom in on the bottom part of this document.

BY MS. COX:

Q.  Can you explain to the jury what they are looking at here.

A.  So basically these are what we call mat layout options.

The good thing about FODS is, again, very simple, you have a 12-by-7 foot rectangle.  And every jobsite is a little bit different.  The traffic patterns are different. Size vehicles are different.

So essentially what you're doing is you're playing Tetris with the same shape, you know, to build an overall different shape that fits that project.  And these are kind of the main classical ones that we've developed that are the most frequently used, the most common used.

Q.  Now, how do you physically interlock two mats?

A.  So there's hardware holes precut in the -- at the

factory in the corners basically, and we have what's called a hardware kit that's a kit of stuff that we make that mechanically locks together -- each kit locks together four mats.

And basically there is a dry fit.  Each bracket is the middle of two mats where they meet, kind of goes on both sides of it to lock them so it's not waffling those vehicles.  The weight transfers from one mat to the other.

And then on the edges, we have straps.  They're just steel straps.  One strap kind of -- you kind of sandwich the mat, one on top, one on the bottom, and a bolt goes up and nuts lock down the bolt.

MS. COX:  And, your Honor, if I may, for demonstrative purposes, we have the hardware that Mr. Hefner was referring to.  May I hand it to him so he can explain how it works?

THE COURT:  Yes.

MS. COX:  Can you help me out?

I have a box of tools over there.  Trying to figure out which one you needed.

BY MS. COX:

Q.  Can you tell the jury what you are holding?

A.  So this is an example of the strap that I was saying.  There's -- the kit has multiple of these.

This will go kind of hole to hole in the mat.  And

then the bolt goes up, sandwich one on top, one on the bottom, then the nut will come down and lock the edges, basically.

So it's one mechanically locked together big mat instead of four mats.

Q.  So does this go in between the long sides or does it go on the corner of the short sides?

A.  Now we're going to confuse everybody.

Basically where -- so the mat is laid out like this, 12 feet wide.

The next mat would be here.  It goes, you know, side -- corner to corner right there, wherever they meet.

Q.  And I'll help us out.

MS. COX:  If we could show Plaintiffs' 371, which has been conditionally preadmitted.

Can you zoom in where that -- yes.  Right there.

BY MS. COX:

Q.  Is this the same piece of hardware that you're holding?

A.  Yes.

MS. COX:  And if we could zoom back out, please.

BY MS. COX:

Q.  What are we looking at in this photo?

A.  We are looking at a DiamondTrack and a FODS mat being interlocked together.

Q.  Did you take this photo?

A.   I did not take it, but I was stage left there.

Q.   So you've seen these two mats interlock?

A.   Yes.

Q.   And just to clarify, the hardware that you're holding in your hand, what company makes that?

A.   FODS.

Q.   Is that hardware that is made specially for FODS?

A.   Yes.  We had to design it.

Q.   Has FODS ever used a different hardware to interlock the FODS mats?

A.   No.

Q.   Has FODS ever sold a different hardware to interlock the FODS mats?

A.   No.

Q.   Even after being acquired by Spartan, has FODS sold a different hardware?

A.   No.

Q.   Has FODS ever changed the hole locations that are on the mats?

A.   Yes.  I think it was about '21, we had some feedback of the holes were -- where they originally were designed and made for years were a little bit closer to the edge, and that's obviously a stress point.  You know, it's very durable plastic, but it's still plastic.  And some guys use tractors to move these things, so they're not exactly

gentle with them.

And so we had some feedback that the corners were tearing out where the bolt was coming through, so we moved it inset just a little bit to give it a little bit more strength and rigidity there.

MS. COX:  Mr. Smoot, could we show Plaintiffs' Exhibit 93, which has been admitted.

Could we go to the second page, please, and zoom in on 2.1.3 -- I'm sorry -- 2.2.

BY MS. COX:

Q.  Mr. Hefner, I know you haven't been in here with us during the whole trial, but the jury have heard a lot about the Settlement Agreement and specifically the phrase "designed to be interlockable."

When you were negotiating with Signature during the second acquisition, did you ever share with them design files for the FODS mat?

A.  Yes.

Q.  Do you remember what the hole locations were on the design file that you shared with the defendant?

A.  The original.

When we moved the hole, we never bothered to update the 3-D rendering of our original drawing because we already had the mold made.  We use those to make the mold.

So no.  I mean, it's in the original spot.

Q.  Are you familiar with the hardware that Signature sells for interlocking the DiamondTrack?

A.  Yes.

Q.  Do you know whether or not that would be able to be used to interlock the FODS and the DiamondTrack?

A.  It would make -- it would be possible.  There was reference in the opening that only our -- only our hardware can lock together FODS and DiamondTrack, but that's only the case after we moved the hole.

We have thousands and thousands and thousands of mats that were made in the original -- with the original hole location that in that configuration Signature's hardware works perfectly on it.

Q.  So I just want to make sure I understand you correctly.

Are you saying that Signature's mat was designed to be interlockable with the design that you shared with them during the acquisition?

A.  Yes.

Q.  There is one last thing I want to discuss, Mr. Hefner.

Now, the jury heard Mr. Clingerman talk about how this has impacted the business and the family of all of his employees.

Do you have any personal knowledge of this?

A.  Of him being affected or the impact --

Q.  I'm sorry.

A.   -- of families?  Or both?

Q.   I'll rephrase the question.

Of how the DiamondTrack has affected FODS as a business?

A.   Yeah.  You know, FODS has been an amazing -- it's a great product, but what it -- what the more nucleus or what it really is is a great group of people that have a passion to build something, something that hasn't been done before, you know, press through that headwind, if you will, of trying to get it done, push that rock up the mountain, in an amazing family.

You know, everybody -- this isn't an office where everybody comes in and goes to their little office and their cube and nobody talks and goes out.  I mean, it's a family.  Those families are one big family.

And it -- the stress and the -- you know, the whiplash of going from the excitement with the toil -- you know, tempered with the toil of having to make this happen and grow this thing from nothing, pivot to we now have this -- despite our best efforts, despite our best protection, despite having -- no offense -- lawyers upon lawyers to try and protect us going through all of this, we now have this astroid coming towards our family to annihilate it, and that is unfair.

And I hate that it happened to them.  It is our

job to try and protect them.

Q.   Is that the reason why FODS brought this lawsuit?

A.   To protect our work, the livelihoods of everybody that's got us there, and then to defend right and wrong, yes.

Q.   As well as FODS's intellectual property?

A.   Yes.

Q.   Now, you said you've been with FODS since 2019; is that accurate?

A.   Yes.

Q.   Are you familiar with the distributor sales price that FODS provides to its distributors?

A.   Yes.

Q.

Q.   And that's because of the DiamondTrack being on the market and affecting your sales price?

A.   And the -- yes.  Yes.

MS. COX:  A moment to confer?

THE COURT:  Yes.

MS. COX:  We pass the witness.

THE COURT:  Cross-examination?

MR. WEBB:  May it please the Court?

CROSS-EXAMINATION OF CHRISTOPHER HEFNER

BY MR. WEBB:

Q.   Good afternoon, Mr. Hefner.

A.   Good afternoon.

Q.   My name is Trent Webb.  I'm one of Signature's lawyers, and I just have a few questions for you today.

First of all, you have had basically a career in sales, right?

A.   Correct.

Q.   And when you're selling a product against a product that is better and less expensive, you're probably going to lose some business, right?

A.   I think that is an oversimplification of what is occurring here.  How did the product get better?  How did the product get there?

Q.   But true, though.  If you're competing against a better

product at a lower price, chances are you're going to lose some business?

A. If it was that simple, yes.

I think that's like saying I'm going to beat you in a foot race, but I get to shoot you in the leg first.

Q. Yes. And a lower price ultimately benefits the consumer, correct?

A. You could look at it that way.

Q. You talked about the diligence that Signature and FODS went through in connection with the second organization --

A. The due diligence --

Q. -- second acquisition?

A. The due diligence, you said?

Q. Correct.

A. Yes.

Q. And that's very standard in any sort of transaction, correct?

A. Correct.

Q. The parties exchange information because they need to understand the business of the party they're about to become united with, correct?

A. Correct. Though there was a very low exchange rate. It was -- for every one bit of information we gave -- or we got from them, there was probably 5,000 things that we told them.

Q.  And Signature was going to purchase FODS, not the other way around?

A.  Correct.

Q.  And it's fair to say that if you're buying a company, you want to be doubly sure that everything is legit, accurate, correct?  Right?

A.  I would agree with that provided that the -- what you're referring to is financials.  The majority of what we discussed were commercial how-to discussions.  The finances are pretty easy, and we turned over the Quicken at their request.  They had direct access to our books.

So the financial questions were pretty limited because -- they could ask us, "What are your sales this month?"  They could ask us that, but we were asked to provide them direct access into our live software.  And being forthright, we had nothing to hide.  So they would run their own reports.

Q.  But it's true, isn't it, that Signature had to take a loan in order to buy FODS, right?

A.  I think you're saying that as a "poor me" situation, but the reality is they were owned at the time by private equity, and private equity lives on loans and lives on future loan capital.

Q.  Interesting you mentioned private equity, because it's true, isn't it, that Spartan is not an independent company

either, right?

A.  Correct.

Q.  As a matter of fact, you've heard of Exchange Income Corporation before, right?

A.  I have indeed.

Q.  That's EIC, right?

A.  Yes, sir.

Q.  That's a Canadian multinational company, isn't it?

A.  Yes.

Q.  Revenues in excess of $2 billion a year?

A.  Correct.

Q.  And they purchased Spartan, correct?

A.  Correct.

Q.  And Spartan, in turn, previously purchased FODS, right?

A.  Correct.

Q.  So Signature had to take out a loan in order to finance the deal to acquire FODS, right?

You knew that?

A.  We were told that.

Q.  Correct.

A.  I don't think that's -- I don't think that generates differently a strategy on how to address a deal or not.

Q.  Well, the bank might have thought differently, correct, because the bank is loaning Signature money?

MS. COX:  Objection, your Honor, as to

speculation.

THE COURT:  Well, overruled if you can answer.

A.  I'm sorry.  Can you ask the question again?

BY MR. WEBB:

Q.  Well, if the loan is shelling out $25 million to buy a company, they want to be very sure you're not buying a pig in a poke.  They want to know the company is legit, right?

A.  I would think if you were getting a loan or if you were reaching into your own pocket and writing a check, you would want to know that.

Q.  Now, you said that the due diligence process was exhaustive and invasive, correct?

A.  Okay.

Q.  And that Signature was looking for tons of information, right?

A.  Yes.

Q.  Now, you weren't at the company back at the first acquisition negotiation, were you?

A.  I think I just missed it.

Q.  Just missed it.

And you understand that the year before those acquisition discussions took place, FODS had to fire its CFO, right?

A.  I wasn't there.

MR. WEBB:  Can we pull up previously admitted 76.

THE COURT:  Which exhibit?

MR. WEBB:  Plaintiffs' 76.

BY MR. WEBB:

Q.  You know who Bryce Clingerman is, correct?

A.  Very well, yes.

Q.  And you have no reason to doubt the accuracy of an email that he wrote?

A.  Okay.

Q.  Second paragraph says, "An additional note to keep in mind.  We had to terminate our CFO in May of 2018.  Once we looked at the books, we realized that many items weren't properly accounted for, done correctly, inventories kept accurate, et cetera.  June '18 on should be a lot more clear and done correctly.  Not to be vague in some of the answers below, but that is a big reason."

Do you see that?

A.  I do.

Q.  Now, if you were going to do a deal with a company and you have two separate negotiations, the first negotiations involved information that was wrong from the company you want to purchase, fair to say you'd be pretty careful for the next one, right?

A.  I don't think this is saying that it was done wrong.  I think it was lapsed.

And you're talking -- now you're talking about an

acquisition that happened two and a half years later.  That

has -- that is a thousand years in the CPA world.  It's

been cleaned up.  It's well behind us.

Q.  Once bitten, twice shy, correct?

A.  Yeah, but I don't think this had anything to do with

the reason that the first acquisition fell through.

Q.  So is it your testimony today that on the technical

side, the drawings that FODS had were consistent with the

molds and other equipment used to make those mats?

A.  I am not an engineer.  I don't -- I can look at a

drawing and see that it looks like a FODS mat.  I don't

technically -- I wouldn't say I was technically astute to

make that kind of statement.

Q.  Because, again, if you're taking out a loan to buy a

company that you've already seen has inaccurate records,

you would want to triple check to make sure this time

around they are up-and-up, right?

A.  I think every time you want to make sure the finances

are, but I don't think that's anything what we're talking

about here.

Q.  All right.  So I want to wrap this up.

Trade shows are shows, right?

A.  The trade shows are -- they are conventions.

Q.  Yeah.

A.  Yeah.

Q.  People display their products in hopes that they will find some buyers, right?

A.  Correct.

Q.  And that is public, right?

A.  Oh, yeah.

MR. WEBB:  No further questions.

THE COURT:  Anything additional?

MS. COX:  No further questions from plaintiffs, your Honor.

THE COURT:  Okay.  So I let the jury ask questions.  Let me see if they have questions and then we'll get you on your way.

Whether you have a question or not, please fold a piece of paper and pass it over to the court security officer.

Let me have counsel approach.

(Sidebar conference, off the record.)

THE COURT:  I just have a couple questions from the jury.

And so what were sales like before DiamondTrack for FODS?

THE WITNESS:  What were the --

THE COURT:  What were the sales like before DiamondTrack for FODS?

THE WITNESS:  Like in a dollar amount or just

like --

THE COURT:  They just generally asked for sales figures.

THE WITNESS:  Yeah.  So I guess I'll answer it two ways.  One, I don't know the specific numbers, so, sorry.  But we had year-over-year growth.

You know, this was a great -- this was the great American story of, you know, Bryce starting off in his garage liquidating his life.  Could have gone horribly wrong.  Could be working in Home Depot saying, would have, should have, could have.

But he put everything on the line.  Everybody lowered their shoulder into it.  After that, you know, got it done.

We had a ton of growth.  It was year-over-year, you know, I'm going to say 20 to 30 percent, you know, from zero, right, so it seems like a lot.  But, you know, it was growing, growing, growing, and it was a matter of just how do we -- how do we scale this thing, how do we always stay in front of it, service the customers that we find and go find new customers.

So it was a great, very active commercial and sales pursuit.

THE COURT:  And then is --

THE WITNESS:  Hopefully that somewhat answers the

question.

THE COURT:  Thank you.

Is the new design for the FODS mat interlockable with the DiamondTrack mat?

THE WITNESS:  Yes.  As we saw, that picture, they are interlockable directly.

THE COURT:  Okay.  Any follow-up?

MS. COX:  Just one, your Honor.

REDIRECT EXAMINATION OF CHRISTOPHER HEFNER

BY MS. COX:

Q.  When was that photo taken that we were looking at?

A.  (Pausing.)

Q.  Just a general year is fine.

A.  Yeah, general, 2024.

MS. COX:  Nothing further.

THE COURT:  Any follow-up?

MR. WEBB:  Nothing, your Honor.

THE COURT:  Okay.  Can this witness be fully excused?

MS. COX:  Yes, from us.

MR. WEBB:  Yes.

THE COURT:  Okay.  Sir, you are free to leave. You can stay in the courtroom if you like, but...

THE WITNESS:  Thank you very much.

THE COURT:  You are excused as a witness.

What's next for the plaintiff?

MR. RUIZ:  Yes, your Honor.  Plaintiff calls Dr. William Howard to the stand.

THE COURT:  Sir, if you'll raise your right hand and be sworn in.

(The oath is administered to the witness.)

THE COURT:  Go ahead and proceed.

MR. RUIZ:  Thank you.

DIRECT EXAMINATION OF WILLIAM S. HOWARD

CALLED ON BEHALF OF THE PLAINTIFFS

BY MR. RUIZ:

Q.  Good afternoon.  Could you please state your name for the members of the jury.

A.  William Howard.

Q.  Now, on a general level, what do you do for a living?

A.  On a general level, I'm an engineer.  I work with companies to help them design and develop their equipment. My specialty is really designing and, even more, the development of equipment.

Q.  What degrees do you have to hold that position?

A.  So I have a lot of degrees.  I have a bachelor's of mechanical engineering.  I have a bachelor's of electrical engineering.  I have an MBA.  I have a master's in mechanical engineering.  And I have a PhD in mechanical engineering.

Q.   Now, Dr. Howard, are you an employee of any of the parties in this case -- Spartan, FODS, or Signature?

A.   I am not.  I have no relationship with any of them.

Q.   And why are you here today?

A.   So I was asked by FODS to come in and to look and to see if there were trade secrets that they had.  And if there were trade secrets that they had, were those trade secrets used improperly by Signature.

Q.   All right.  Well, before we get to those opinions, I first want to talk about your background a little bit.

So just generally, have you ever practiced as an engineer?

A.   Oh, I've practiced engineering since I started, and I do to this day.

Q.   What areas did you focus on?

A.   I've really worked with mechanisms in machinery and equipment the whole time.  That's where I started when I was first in GE.  That's what I continue to do to this today.

Q.   You mentioned that you worked at GE.  What company is that?

A.   So that's General Electric.

And when I got out of college in '86, I worked in their mechanisms department for Space Station and mechanisms for the Space Station.

Q.  Have you ever worked at a company called Kliklok Corporation?

A.  Yes.  So after I finished my PhD -- which was after GE, I went back to school and finished my PhD -- I went to work for a machinery company called Kliklok, and Kliklok is a large company, does lots of machines.

        I started off as engineering manager and quickly became R&D director.

        And at -- as the R&D director, my specialty or my role there was to develop a new product.  So I would develop the new machines, the new equipment, to modify the existing machines, to improve the machines, things like that, to try to improve the different types of equipment.

Q.  Well, Dr. Howard, in total, about approximately how many machines have you worked with that you personally either designed or developed?

A.  Do you mean at Kliklok or through my whole career?

Q.  Just general.  Your general history.

A.  So in my whole clear, I've done hundreds and hundreds of machines worth hundreds of millions of dollars.  Lots and lots.

Q.  Earlier you told us that you are now a consultant in the field.  What does it -- what does that look like?

A.  So in 2002, I hung out a shingle.  I mean, one of the things you can do as a person with skills or doctorates is

you can go and you consult with companies.

And so since 2002, I have been working with a lot of different companies to -- they'll call me up because they are designing new equipment, they're designing new machines, they are trying to do a product, they want to improve a manufacturing line, something along those lines, and they will hire me to help them improve their equipment, improve their machines.

Q.  Can you give us an example of some companies that you worked with?

A.  Well, some of them are large companies.  I mean, I have worked with Frito-Lay.  I've worked with Nike.

But of the 75, 80 companies I've worked with over the last 25 years, the majority of them are relatively small.  You probably wouldn't have heard of any of them.

The same way I'm guessing you've never heard of FODS or never heard of Signature.  They're generally more smaller size companies.

Q.  Dr. Howard, do you have any certifications or licenses in the field of engineering?

A.  Yes.

I am a licensed professional engineer.  I'm licensed in three states.  I'm licensed in the State of Georgia, in the State of Alabama, and in the State of New Jersey.

Q.  Now, Dr. Howard I want to talk now about patents.  The jury has heard a little bit about this today.

Just do you own any patents?

A.  I do.

Q.  And --

A.  Well, I have six patents, six U.S. patents, a couple more international patents.

Q.  What areas do those patents cover generally?

A.  They are all going to be related to new machines that I've designed.  So all of those are in the area of machine design or new machinery.

Q.  And have you reviewed other patents before?

A.  Yes.  I mean, what I do is the development of equipment.

And it's not unusual when you're developing new equipment to look into patents to see what is out there to make sure that your equipment doesn't infringe on somebody else's patent.  So that's a fairly normal part of development.

Q.  And, Dr. Howard, have you ever served as an expert witness before in court?

A.  Oh, yes.

Q.  And what areas do you -- did you typically cover in those?

A.  Well, the expert witness work that I do is always going

to be related to machinery and equipment because that is my area.  I help companies design equipment.

And so when I serve as an expert -- and I do that, you know, a fair bit.  About half of my work is in that area.  It's always going to be related to new equipment that is being designed or developed.

Q.  So talking more to the specific case at hand today, have you ever worked with compression molds in your career?

A.  Oh, absolutely.

Q.  Can you briefly describe your background there?

A.  So when I went to work for Kliklok, we were doing a development project for a new machine.  It was a weigher.  And we had a part on there that was big, fairly large, and fairly expensive to manufacture.

And so we made all of our own parts.  And I had Kliklok bring in a compression machine and worked with the machine design molds and ended up replacing that one part with something that was much easier and much more cost-effective and worked really well.

And with that success, on all of the future machines at Kliklok, we tried to include more compression molding into our machines.  And myself or my team, we would design the molds and the parts for that compression mold for the parts that we were going to put on our machining equipment.

Q.   What about plastic composite mats?  Have you ever worked with those before your time here today?

A.   I have, yes.

Q.   And -- sorry.

A.   So one example was -- I'm not sure the exact year, but 2007, 2008, something in that time period, I was hired by Apache Mills, and Apache Mills makes -- they're more of a residential mat, but they make compression-molded plastic mats.  And I worked with them for the better part of a year.

Q.   Have you ever worked specifically with a company that has some relation to Spartan and Signature?

A.   So I've never worked with Spartan or Signature, but -- and they're not in Court, obviously, but there's a third company that is the sort of third player in the sphere, not in trackout mats.  But when you talk about roadway mats or when you talk about ground protection mats, they're a very big player in that, and the name of that company is Newpark.

And in 2019, Newpark hired me to help them with their manufacturing of their roadway mats, and specifically the manufacturing processes around it.

They had a patent that was expiring in a couple of years and they were wanting to go through and increase the efficiency of their manufacturing process to increase the

throughput, the productivity, and they hired me to assist them with that work.

Q.  Thank you for that, Dr. Howard.

MR. RUIZ:  Your Honor, at this time, we would ask for the courtroom to be sealed.

THE COURT:  Okay.  We'll go ahead and seal the courtroom and the record.

Unless everyone is subject to the protective order.  If you're not, you need to leave.  I don't think there's anybody there that's not.

MR. RUIZ:  I don't see anybody, your Honor.

THE COURT:  So just let us know when you're finished.

MR. RUIZ:  Yes, your Honor.

(Courtroom sealed.)

(This portion of the transcript is sealed and filed under separate cover as Sealed Portion Number 5.)

(Courtroom unsealed.)

MR. RUIZ:  And if we could take that down, please.

BY MR. RUIZ:

Q.  Dr. Howard, I want to talk about the patents in this case.

Now, did you review any patents that were relevant for your analysis here?

A.  I did, yes.

Q.  Now, in your opinion, did any of them cover either the manufacturing process or the mold that we just discussed?

A.  In my opinion, they did not.

Q.  All right.  Let's walk through that here.

MR. RUIZ:  If we could pull up what's already been admitted as DX-240, please.

BY MR. RUIZ:

Q.  Dr. Howard, what is this patent -- what is the title of this patent?

A.  The title of this patent is "Vehicle Tracking Pad."

Q.  So does this patent talk about a mat or the mold?

A.  This is related to the mat itself.

Q.  Does anywhere in this patent disclose the mold that we just discussed?

A.  Nowhere in this patent does it disclose any of the, say, 20 features that we went through.  Nowhere.

Q.  What about the manufacturing process?  Is there anything about the manufacturing process that would be disclosed in this patent?

A.  No.  There's nothing.

Q.  Now, you were here when Mr. Clingerman testified this morning, right?

A.  I was.

Q.  Did you hear opposing counsel ask him about the fact that the word "pyramid" is in there?

A.   I did.

Q.   Does this patent disclose the size of those pyramids?

A.   It does not.

Q.   Does it disclose how to make those pyramids?

A.   It does not.

Q.   ///////////////////////////////////////////////////////////////////////////////////////////////////////////////////////

///////////////////////////.

///. ////////////////.

Q.   And opposing counsel also talked a lot about that phrase "single vehicle tracking mat."

       Do you remember that?

A.   I do.

Q.   Does that phrase tell us whether the mat is manufactured as a single piece or if it needs to be mechanically fastened or welded together?

A.   So I read the patent.  And when I read the patent, when it said "single vehicle," I thought it meant a single vehicle because it's -- they're 7 inches (*sic*) wide.  That's wide enough for one vehicle to go over it.

       So I believe that that was referring to a single vehicle, not the fact that the part is made from a single piece.

Q.   Right.

       If we could now take a look at -- actually, Dr. Howard, do you have the defendant's exhibits up there?

MR. RUIZ:  Your Honor, permission to approach?

THE COURT:  Yes, go ahead.

MR. RUIZ:  Sorry.  If we could have 252.

BY MR. RUIZ:

Q.  Dr. Howard, what is DX-252 generally?

A.  DX-252 is the patent.  I believe I saw at least a figure from this in the openings.  It's a patent that is Signature's patent from -- it was dated in 2019.  That's when it was issued.

Q.  And did you review that patent in preparation for your case -- your trial testimony here today?

A.  Yes.  It's -- this is one of the patents that I reviewed.

Q.  And does it appear to be a true and copy -- and true and correct copy of that patent?

A.  It does.

MR. RUIZ:  Your Honor, we offer DX-252.

MR. RECKERS:  I'm sorry.  Which?

MR. RUIZ:  My apologies, your Honor.  We're trying to talk about Signature's patent.  That's 252.

It's the one you showed during opening.  Yeah.

THE COURT:  252.  I assume there is no objection?

MR. RECKERS:  No, your Honor.

THE COURT:  Okay.  It will be admitted.

MR. RUIZ:  All right.  If we could show the jury

now 252, please.

BY MR. RUIZ:

Q.  Dr. Howard, you just told us that you took -- you have reviewed Signature's patent in this case.

What is the title of this patent?

A.  The title of this patent is "System for Molding Plastic Materials."

Q.  Now, does anything in this patent disclose something related to the mold that we've been discussing?

A.  There is a little related to the mold, but you can see it in the figure in the screen right here.  It's also -- this is, I think, Figure 2 to the patent.

Q.  Well, if it discloses a system for molding plastic materials, isn't that what we're talking about today?

A.  Well, yeah.  I mean, this is a very generic system. This is basically the idea of compression molding itself.

That would be a mold.  There is not much more than that, but there is a mold there.

Q.  So you kind of hit on that, but I want to talk a little bit more about that.  You said that it's a generic patent.

Does it disclose any of the specific mats that we have talked about in this court at all today?

A.  It does not.

Q.  In fact, what does it say in this patent specifically about a trackout mat?

A.   Well, this patent doesn't use the word "mat" anywhere. This is for a plastic part, but it doesn't say what part it is.

Q.   ///////////////////////////////////////////////////////////////// ///////////////////////////////////////////////////// ///. ///////////////////////////////////////////////////////////// ///////////////////////////////////////////////////////////////// ///////////////////////////////////////////////////////////// /////////////////////////////////////////////////////////////

Q.   Does this talk about anything related to whether a mat can be manufactured as a single piece or whether it needs to be welded or mechanically fastened together?

A.   So the part that would come out of this could be part of a single piece, it could be part of a two-piece part, it could be part of a four-piece part, or almost anything.

There is nothing in there that says a final part out of this very generic mold that we look at is a single-piece mat or a single-piece part.

MR. RUIZ:  Mr. Smoot, can we zoom in on the bottom image there.

BY MR. RUIZ:

Q.   Dr. Howard, does this image tell us what the specific shape of the cavity or the core is?

A.   No.  This talks about -- well, the point of this mold was the idea that you would want to fill the deeper areas

with more plastic and you'd want to fill the shallower areas with less plastic.

So what you see is 105 on the left side being a thin line and that's going into the area that's fairly shallow.

If you look at 105 three over, going into the deepest area, that's a much thicker line.

So what the patent is talking about is the way you fill the bottom cavity, whatever that is, with plastic because you're going to fill it, according to this patent, with more product faster in the areas that are deeper and with less product in the areas that are not as deep.

Q. So, Dr. Howard, did you hear opposing counsel during opening statement talk about how the DiamondTrack was actually made using this -- the information that was disclosed in this patent?

A. I heard that, yeah.

Q. Do you agree with that statement?

A. The 3-D CAD drawings that I looked at, I don't see how you get those 3-D CAD models that were used by Signature to make the DiamondTrack. I don't see any of the features that we talked about in this patent, none at all.

Q. Let's take a look at I think what you just talked about.

MR. RUIZ: Mr. Smoot, if we could take this down

and bring back up the PowerPoint.

BY MR. RUIZ:

Q.  Now, Dr. Howard, what was more likely in this case: The DiamondTrack mat molds on the right side came from the FODS mat mold or from the image there at the bottom?

A.  So I went through the parts very carefully because I wanted to really look at this and really know for sure. And I took a lot of time and went through all of the 3-D files to look real carefully at it.

I believe that the Signature mold was taken from the FODS mold.  And I don't believe that the Signature mold was independently developed using the patent that we see there.

Q.  Thank you, Dr. Howard.

Now, earlier you told us that you were going to talk about the concept of interlockability.  Do you remember that?

A.  I do.

Q.  Now, just -- can you just remind the members of the jury, what exactly is interlockability?

A.  So it's important the way that these are used that the mats be able to interlock with each other because when you take a truck and you drive it over, especially as it first enters onto the mat, it can push the mat and then the mats can get pushed out of order or not be where they're

supposed to.

So interlocking them allows the various mats in the patterns that we saw all to be a unified product.  And so that when the truck drives over it, it drives over all of them, and they're all in the right position.

Q.  Did you look at the FODS mat here today and what it can interlock with?

A.  I have, yes.

Q.  And what did you find regarding FODS's interlocking ability -- the FODS mat's interlocking ability?

A.  I found that the FODS mat is capable of being interlocked with the DiamondTrack mat.

Q.  And so earlier Chris Hefner testified.  You were here for that?

A.  I was.

Q.  Did you hear him say that he's seen the two interlock with one another?

A.  I did hear him say that.

Q.  From an engineering standpoint, can the FODS mat and the DiamondTrack interlock with one another?

A.  Yes, they can.

Q.  All right.  Now, I anticipate that the jury is going to get a chance to see these mats next to each other, and so let me -- when they do, I kind of want to talk about some things that I want for you -- I want to talk about some

things that they can look at related to interlockability.

So how would the jury be able to tell that these two mats are interlockable with one other?

A. So if you look at the hole patterns and you knew where the holes are, you will see that they're -- both have -- well, A, it helps that the mats are the same size because it becomes a lot harder to mat interlock a 4 by 8 with a 5 by 7. They just don't fit up. You can never get about more than one hole to line up.

So the two mats are the same size. That's a big deal because that means you could replace one with the other.

And then that allows -- you look at the holes and the placement of the holes, whether those holes are placed such that you could put brackets -- I thought it was here. I may have lost it -- but you could put those brackets between it and interlock the two mats.

Q. Now, when the two mats are interlocked with each other, are they pressed right next to each other?

A. They're close. Sometimes there's a little bit of gap. But, yeah, I mean, they're basically adjoining. There might be an inch or two gap, which doesn't matter, but they are next to each other.

Q. And does that 1- or 2-inch gap change anything about the effectiveness of a trackout mat?

A.  Nothing at all.  I mean, the trackout mat is typically about 50 feet as you go in, having 1 inch, even if it's 1 inch over a couple, it's 3 inches over 50 feet, it really has no effect.

Q.  And earlier you told us -- or I apologize.

And if we're looking at the FODS mat and the DiamondTrack mat next to one another, how can you tell the difference between the two mats?

A.  There's a color difference.

Q.  And is there a shape difference?

A.  Yeah.  So there is a shape -- the DiamondTrack uses pyramids, but they rotate on 45 degrees and change the square just a little bit into sort of a diamond and call it a DiamondTrack.

But it's basically the same pyramidal shape with just a little bit of differences.

Q.  And then just to be clear, when the jury gets to take a look at that orange mat, is it going to be the same mat that uses the manufacturing process that we've discussed here today?

A.  It is, yes.

Q.  Is it the same mat that was used -- that used the mold that we looked at earlier?

A.  It is, yes.

Q.  All right.

MR. RUIZ:  And, your Honor, if we could approach at this time?

THE COURT:  Yes.

(The following proceedings were conducted at sidebar with all parties represented.)

MR. RUIZ:  Yeah, so really we put the other side on notice that at this point we wanted to give the jury a chance to take a look at the mats through the back windows. When we told the other side, they told us that they would rather us to force the jury to go downstairs and take a look at the mats.

The problem with that is we don't want that to go into our time, so we would just rather give the jury five or so minutes if they could look at the mats through the windows.

THE COURT:  Well, I think it's probably more appropriate for them to actually see the mats up close. But I will just split the time equally between both sides because your mat is down there too.

MR. RECKERS:  We don't really care if they see our mat, but -- I mean -- yeah.  I mean, I think they look at -- they're the same size, so you don't really get anything from that by just looking at it through a window. If anything, the differences, you have to be closer to see them.

MR. RUIZ:  But, your Honor, specifically one of the claims that we have today is whether the two mats are interlockable --

THE REPORTER:  I'm sorry, Mr. Ruiz.  Could you please slow down and restate that.

MR. RUIZ:  Sorry.

One of the claims that we have is whether the two mats are interlockable with one another.  So, again, we want the jury to be able to take a look at that and see the mats and where the holes are placed specifically.

MR. RECKERS:  There is holes in the corner of these mats, and I don't think we need to spend 20 minutes going down to see mats the same size with holes on them.

THE COURT:  Well, I will just split the time.

The way we'll do this is we'll just go up now and -- I'll take them downstairs to see it, and we can have one counsel from each side.  There will be no questions. I'll just let them look at it and tell them they can look at both -- I'll point out which one is which.  I think they can figure that out, but still.  Otherwise, I won't say anything.

And then we'll just go right into our break.  So I don't think it will take very long.  And then we'll take a break for -- the court reporter has, you know -- well, my staff can have a chance and we'll come back.

MR. RECKERS:  Will that be the end of your examination?

MR. RUIZ:  Yes, that's the end of my examination.

THE COURT:  Okay.  Well, why don't I -- how long is your cross going to be?

MR. RECKERS:  Probably close to an hour.

THE COURT:  So do you want to go ahead and do the demonstration now before that?

MR. RUIZ:  That was our hope.

THE COURT:  Then we'll go on the break, and then we'll come back and start your cross.

(Sidebar conference concluded.)

THE COURT:  Okay.  So -- well, other than the demonstration, you pass the witness, correct?

MR. RUIZ:  Yes, your Honor.

THE COURT:  Okay.  So, ladies and gentlemen, what we're going to do is -- I don't know if you've seen them, but the mats are downstairs.  And so we're going to let you do a little kind of show-and-tell.

And I'm going to go with you with one counsel for each side to go down, have you -- let you just look at them for five minutes.  There's both the plaintiffs' mat as well as the defense.

And the lawyers aren't going to question anything. Just we'll just let you look at them.  Then we'll come up

and we'll take our -- we'll go straight into our break.

So when we're done with that, you'll go upstairs to the jury room until we're ready to go ahead and proceed, and then we'll come back with cross-examination.

So if you can -- okay.  So at this time, I'm going to have -- if our court security officers can help escort you downstairs, and I'll have one attorney from each side come with me so --

(The jury exits the courtroom with the Court, Mr. Ruiz and Mr. Reckers, 3:42 p.m.)

(3:48 p.m., Open court, all parties present, jury not present.)

THE COURT:  So we're going to go into our break now.

Just to describe what happened, I took the jury down with our court security officers and one representative from each side.

I just pointed out which mat was each one and told them as much time as they needed.

They inspected it, and there was no interaction by counsel.

And then the jurors, they were just observing. And the jurors didn't ask any questions.

And then we dismissed them for their 15-minute break.

I think -- is that a fair representation of what happened?

MR. RECKERS:  Yes, your Honor.

MR. RUIZ:  Yes, your Honor.

THE COURT:  Okay.  We'll take 15 minutes, and we'll come back and begin cross.

(Recess, 3:48 p.m. to 4:02 p.m.)

(Open court, all parties present, jury present.)

THE COURT:  Please be seated.

Cross-examination.

CROSS-EXAMINATION OF WILLIAM S. HOWARD

BY MR. RECKERS:

Q.  Good afternoon, Dr. Howard.

A.  Good afternoon.

Q.  Let me start with just a little bit of housekeeping before I get into some of your opinions.

One of the things that you said early on in your testimony is that you have no relationship with either party.

Do you remember that?

A.  I do, yes.

Q.  And that's not quite true, is it?  That you've been retained by plaintiffs' counsel and you're being compensated for your hourly time in this case, right?

A.  That is correct, yes.

Q. And that's going to be true for all the experts that appear in this case, to your knowledge, right?

A. To my knowledge, I would expect that, yes.

Q. And you were also asked about some of your professional experiences, and you explained you're an engineer and that you work with companies.

But isn't it true that most of your time, even approaching 75 percent of your time, is spent today on litigation matters like this?

A. No.

I -- the goal has always been, since I started the firm, to try to make it a relatively even balance. I'm not always able to do so. There have been years where it's not a 50/50; it's a 60/40. It's approached more than that, but I don't believe it's ever really gone much beyond the 60-ish percent range.

Q. And that would be 60-ish percent for litigation?

A. Yeah. And, I mean, we're talking fine numbers, which is hard to say.

The key there is I'm really trying to make sure that I don't just do litigation. I want to keep it -- and last week, for instance, I was working in a factory in South Carolina doing testing of machinery that's being shipped out next year.

So I try very hard to make sure that I always keep

a solid percentage of my work away from just pure litigation.

Q.  Yeah.  But it's beyond 50 percent is in litigation?

A.  Yeah, yeah.  No, I -- it's not unusual for it to be above 60 percent, too.

Q.  Okay.  Let's talk a little bit about the trade secret analysis that you did and just in general about sort of your view on what's a trade secret.

Now, independent development of technology is not a trade secret violation, correct?

A.  Correct.  If you were to independently develop a technology, it would not be a trade secret.

Q.  Reverse engineering --

A.  Excuse me.  It would not be using somebody else's trade secret.

Q.  Sorry.

Reverse engineering, that's not a trade secret violation either, is it?

A.  Okay.  It is the word "violation" I missed.

Yes.  You are perfectly allowed to reverse engineer a product.  Like I showed this cup right here, you could reverse engineer that.  That would be fine.

Q.  And you can purchase a product on the market and use reverse engineering to figure out how to make that product without violating any trade secret law, right?

A.  Yeah.  I mean, that's perfectly acceptable.  You are allowed to reverse engineer a product.

Q.  And it's not unusual to use a competitor's product to get a fair understanding of how it's made, right?

A.  No.  I mean, that's not unusual at all.

Q.  I'm sorry.  What was that?

A.  It is not unusual at all.

Q.  Okay.  And the FODS product is, as we've heard in this case, is freely available for consumers to purchase, right?

A.  I believe so.  I believe it's sold to a lot of distributors, and I believe those distributors sell it. And I don't know of any restrictions that would prevent, say, Signature from buying it.  I think they would be allowed to.

Q.  Right.  And other disclosures that are public, in the public domain, are patents, correct?

A.  Patents are in the public domain, and those are public knowledge.

Q.  Yeah.  And so if something is disclosed in a patent, it's not a trade secret, right?

A.  Yes.  That would be correct.

Q.  And FODS, as we've heard, holds their product, their mat out as patented, right?

A.  FODS holds the mat itself as patented.  That's correct.

        MR. RECKERS:  Now, let's pull up a slide from the

plaintiffs' opening, Slide 57.

BY MR. RECKERS:

Q.  I think this might have been the slide that opposing counsel was trying to show you.

So these are -- this is the list from opening of the four alleged trade secrets in this case.

A.  I think this was the one that I mentioned in my answer and that counsel tried to find and we struggled to find, but yes, I think that's it.

Q.  We had a little more time.

A.  Yes.

Q.  So -- and you understand that to prevail in this case that FODS has to prove that these items --

And we'll focus on the first two, right, because those are the two that you opined on?

A.  Correct.

Q.  -- that FODS is a -- as a preliminary matter, a threshold matter, they have to prove that they qualify for trade secret protection to begin with, right?

A.  That would be my understanding, yes.

Q.  And then there is a question of misappropriation and what Signature may or may not have done if those things actually are proven to be trade secrets, right?

A.  That is my understanding, yes.

Q.  Okay.  And so we'll talk about both, but you -- just

again, to be clear, you opined [REDACTED], number one, and the second one, which is the single-mat issue with the FODS-like design, right?

A.  The second issue would be related to the mold that is used to make the single piece.  So I was opining on the mold itself and how that is used to make a single-piece mat.

Q.  Okay.  So let's go through each, one by one.

So the idea of [REDACTED]

A.  So, yeah.  I mean, the question there is what are the possibilities in this case, and there is really just two.

Q.  Right.

A.  You can mold it [REDACTED].  Those are the only real possibilities.

Q.  You have a 50/50 chance on that one, right?

A.  There's a real close to 50/50 chance.

Q.  Now, you -- as you mentioned, you've done some work in industry, right?

A.  I have.

Q.  And from your experience, probably either half or maybe even a little more than half of the products that you've worked on have been [REDACTED],

correct?

A.  I would think that's right, yeah.

Q.  Okay.  So, again, your personal experience is that ///////////////////, is at least 50 percent of the time, right?

A.  Yeah.  I would agree with that.

Q.  Now, you know that Signature's been making mats since 2007, right?

A.  Yeah, I believe in 2007 is my understanding of when they started making the Dura- --

Q.  DuraDeck, sir?

A.  DuraDeck, thank you.

Q.  Right.  And you know that the Signature DuraDeck is manufactured /////////////////////////////, right?

A.  It's my understanding that that's what you guys assert, yes.

Q.  Well, you've done a little bit more than just take our word for it.  You've actually seen a video of it, right?

A.  I've seen a very short video of it.

Q.  And from that video, you were able to tell that the mat was /////////////////////////////////.

A.  From viewing that video, it did appear that way, yes.

Q.  Okay.  So just so we have a clean record, your investigation, including watching a video of the DuraDeck mat, shows that it was /////////////////////////////////// ///////////////, correct?

A.   When I viewed the video, it looked like that might be the case.

Q.   At least as you sit here today, it's your understanding that that mat is made ///////////////////////////////////////, fair?

A.   Well, there was extra information that came in that indicated that the DuraTrack (*sic*) is actually usable either side, which I wasn't aware at the time.  So I'm a little bit unsure of how to answer that.

///////////////////////////////////////////////////////////////// ///////////////////////////////////////////////////////////////, and that is something that I saw.

Q.   And that's what you saw yourself?

A.   That's what I saw on the very short video that I -- that I reviewed, which is the only thing I reviewed related to videos or pictures of the DuraDeck mold.

Q.   And if we -- again, we're going to dig in a little bit more on these, but just as a principle matter, if we look at the summary that we have on Number 2, the second trade secret, a "FODS-like trackout mat designed to be manufactured as a single-mat" -- let me ask you about that, your opinions on that.

     So the first part of this is, of course, the FODS-like trackout mat design, right?

A.   Correct.

Q.   And that would be things like the size and the shape

and the compositions and the structures that we see on the surface, right?

A.   Correct.

Q.   Okay.  Now, you agree with me that there are not any aspects of that actual mat that are trade secrets, right?

A.   No.  I think I was quite clear, and I'll stand by that, that the mat itself is not a trade secret.  It's the molds and ///////////////////////// that I found to be trade secrets. The molds are what are used to produce the mat in a single piece.

Q.   Right.  The jury has already heard, so we don't need to go over it again, that FODS has put out some technical information about their mats.  They sell them publicly. The mats are out there, right?

A.   Yeah.  I completely agree.  There's one outside.

Q.   Right.

And as to the composition of the mat, you understand that the DiamondTrack and the FODS mat have a different recipe, they have a different plastic composition?

A.   If you're referring to the plastic composition, I believe that they are different.  But I think -- and I could be wrong, but I believe that the plastic mat on the FODS is an HDPE, a high-density polyethylene, and I believe -- again, could be wrong, but I believe it's a

linear low density polyethylene on the Signature mat, which is way more information than you need.  I get it.

But the point is that there's a slight difference in the plastic itself.  They're not the same plastic. They're a different color.

They're not the same plastic, not exactly.

Q.  Right.  And there's also differences in the shapes that we see on the surface of the mats, correct?

A.  Yes.  There's two sort of key -- well, there are several, but, I mean, they're both pyramidal structures. But on the DiamondTrack, it's clearly rotated 95, and the base is not exactly square.  The base is more of a diamond shape.

So the pyramid is formed from a diamond-shaped base, so that being a difference as well.

Q.  Right.

And if we go to the second part of this alleged trade secret, that has to do with the single-piece manufacturing, correct?

A.  Well, you're shortening it from my original answer, but yes.  I mean, if you want to say number two is the second part, I agree with that.

Q.  Well, again, trying to talk about the components that you're putting together in your combination here, right?

A.  I understand.

I'm trying to avoid saying that it's just the single piece as opposed to saying it's the molds that allow the single piece to be made that is their trade secret because single piece is a part of it, but it's really that mold that is allowing that to happen.

That's a big mold.  It's got a lot of features to it.  It's got a lot of important features that allow that to be manufactured.  And that's what the trade secret is.

Q.  Yeah.  So let's talk about Signature's history.

Signature has been making a mat as a single piece since around 2007, correct?

A.  Yes.  The DuraDeck is a single-piece mat.

Q.  And to make that as a single piece, you're going to need a mold that's designed to make it as a single piece, right?

A.  Correct.  I mean, that mold would presumably, for the DuraDeck, be designed to make it as a single piece.  That would be my assumption.

Q.  Right.  So the DiamondTrack mold is not the first mold at Signature that can make a one-piece mat, right?

A.  No, it's not.  I agree.

Q.  And we're talking about -- now, you mentioned the size, the size of the trackout mats in this case, which, by the way, these mats are 12 by 7, right?

A.  If you're referring to the DiamondTrack, it is 12 by 7.

If you're referring to FODS, it's 12 by 7.  If you're referring to the DuraDeck, it's much smaller.  It's 4 by 8.

Q.  Thank you.  Yes, I was referring to the trackout mats.

A.  The two trackout mats in this case, the two that are outside, are both 12 feet by 7 feet.

Q.  All right.  And to make a mold -- that's 12 feet by 7 -- you need a press that can accommodate that size, correct?

A.  Yeah.  It's also a lot of plastic.  So the presses that are used have a capacity of about 8,000 pounds -- 8,000 tons, excuse me, 8,000 tons being a lot more.  And you need a big press in order to make a part that's that big.

Q.  Right.  And the press has to have a bed with sufficient area to handle a mold for a 12-by-7 mat, right?

A.  Yeah.  I mean, at a minimum, the press would have to have a 12-by-7 bed so it could -- it could be larger, but you really need something at least a certain size and certain tonnage in order to make that type of mat.

Q.  Signature already owned a press of that size before it introduced the DiamondTrack, correct?

A.  Right.  Yeah.  So the Signature at the time owned a Hulk 5 press, and the Hulk 5 press is what they ultimately put the DiamondTrack molds on; and that is a press that is big enough for, honestly, either of the molds.

Q.  Right.  And it's big enough for Signature's MegaDeck pieces as well, right?

A.  I probably -- I won't state that for certain because I'm not sure.  I know it's big enough for the DiamondTrack. And I understand that they worked out what would have been big enough for the FODS mat.

Q.  And the Hulk 5 is a mold -- I'm sorry -- is a press that Signature purchased that's a commercially available product that companies like Spartan and Signature can go out and buy, correct?

A.  Yeah.  You can buy presses from a lot of places. There's a ton of manufacturing companies that have -- produce presses.  And there's a ton of manufacturing companies like Signature and FODS that employ presses for various aspects of their business.

Q.  And so D&D, and later Spartan, they have a facility with one of these big presses as well, right?

A.  Their facility has at least two presses as well, yes.

Q.  And so you agree with me that FODS didn't invent making plastic mats as one piece?

A.  No.  I don't believe I said I did, and I do agree with you.

Q.  Okay.  And if you examine the FODS mat, the publicly available mat, there's no evidence that it's been fused together or that it's two parts that have been welded in

some way, right?

A.  If you look at it, there's no obvious evidence that it's been fused together.  It's hard to tell for sure just on a cursory inspection, but there's no obvious evidence.

Q.  Right.  We're not talking about a cursory inspection.

You can look very closely and you would see no evidence of that, right?

A.  It would be possible to look very carefully, yes.

Q.  Well, it's -- as we know for a fact that it's -- that there's -- there was no welding for that particular product, true?

A.  Sure.  So I think back to my inspection.  And I got hired for this case and then there was about a month of time before I went down and actually saw the process being made.  And in that month of time, I came across a FODS mat in a construction entrance and I looked at it pretty carefully.

But when I looked at it, I couldn't tell it was a single-piece mat nor could I tell, for that matter, ////////// //////////////////.

So my inspection of it wasn't allowing me to tell.

Is it possible you could tell if you spent more time?  Maybe.  But I couldn't tell.

Q.  Well, we -- there's no lines, there's no seams on it, right?

A.  There are no seams.

Q.  Right.  And when you look at some of the other mats that you've opined upon, you can tell the seams, right?

A.  You can often see the seams.  That's correct.

Q.  Why would you want to hide a seam on a construction mat?

A.  I mean, I've seen pieces joined together that you can't tell they weren't made as one.  I mean, it's definitely doable.

        You're asking me would you.  I don't know.

Q.  Well, right.  But we know there's commercially available presses that can make these things as one piece, right?

A.  We do.

Q.  And we know that's an option.  It's an option for a mat manufacturer to make a big mat as one piece, right?

A.  Well, if you know how.  If you know how to make a mold to do so, that would be an option, yes.

Q.  Yeah.  If you have a big enough mold and a big enough press, you can make any big part you want, right?

A.  There's a big leap there when you said if you have a big enough mold.

        I mean, that's why you hire engineers.  Molds take time and effort to do right.  It's very easy to do a mold wrong.

Q.  Well, the molds here in this case are not made by the parties here, right?

A.  That is correct.  I believe the molds for FODS were made by Linear.  And I believe the molds for Signature were made by RPS.

Q.  Some of the Signature molds were made by RPS, and some were made by Linear as well, right?

A.  That may be true.  I'm not sure one way or another.

Q.  And you understand that Signature contends that it created a DiamondTrack without reliance on the two alleged trade secrets that you've opined upon, right?

A.  I heard that in the opening statements, yes.

Q.  But you've also been involved in this case for a little bit, right?

A.  Yeah.  I mean -- yes.  Yes.

Q.  Okay.

A.  I'm certainly not arguing that point.

Q.  Okay.  And so you -- as part of your investigation in this case, you looked at Signature's manufacturing process, right?

A.  I did.  I've looked at their molds very carefully.

Q.  Okay.  And we -- well, we've discussed also the Hulk 5 press in addition to that mold, right?

A.  I looked into the mold -- the presses that they had available.

Q.  Okay.  And you also looked at the patent that you spoke with Mr. Ruiz about, the Signature patent, which is Defendant's Exhibit 252, right?

A.  I looked at several patents, in fact, more than several patents, but those are ones that I looked at, yes.

MR. RECKERS:  Okay.  Well, let's just pull up 252.

BY MR. RECKERS:

Q.  And so this is one of the patents that was addressed in your direct examination, right?

A.  That is correct, yes.

Q.  Okay.  And so this is a Signature patent filed in 2012, right?

A.  It was filed in 2012.  That's correct.

Q.  Okay.  And you understand that Signature claims that this patent covers some of the mat manufacturing processes, right?

A.  I do, yes.

Q.  And you don't challenge as part of your engagement in this case the fact that Signature uses the processes in this patent to manufacture its mats, right?

A.  I'm not challenging that one way or another.

MR. RECKERS:  Okay.  And so let's zoom in on Figure 2A, which is also the cover photo, cover image.

BY MR. RECKERS:

Q.  I think you covered this on your direct, but this

patent teaches a way to make a one-piece plastic part, right?

A.  Right.

Q.  Okay.  And so this mold, as we see, has a top and a bottom, right?

A.  The mold has two halves, and one is above the other. If that's what your question is, yes.

Q.  It is.

And then in the middle we have what's representing the plastic, right?

A.  So, yeah, those arrows are meant to show the flow of plastic coming down from the manifold.

In fairness, and I'm being a little bit -- part 85 in this particular patent is not the upper half of the mold.  This is actually the manifold in the station before it gets moved underneath.

I feel like I might be confusing things to the jury, and I apologize, but I also want to be clear about what it is.

85 is the manifold that is laying the plastic into the lower half of the mold.

Q.  And there's still going to be a top on this one, right?

A.  There will still be a top on it.  I believe it's 100 prime or 100 is the top, or 110.  I don't remember the number, but there is a different number that is the top of

the mold.

Q.  Okay.  And we're going to focus on the bottom anyways.

A.  Okay.

Q.  And so we see the items that are labeled 110.

         Do you see those?

A.  Yeah.  So 110 is the different heights of the part, and there are surface features on 110a, 110b, 110c, and 110d. They're surface features.

Q.  Right.  So the patent calls ///////////////////////////, the 110s, the surface features, right?

A.  It does.

Q.  And the surface features are, of course, ///////////// //////////?

A.  There are surface features /////////////////.

         It doesn't say much about what the surface features are.  ///////////////////////////////////////////////////////// //////////, but it does say surface features.

Q.  Yeah.  Well, this is an example of a stairstep, right?

A.  Excuse me?

Q.  This is a stairstep.  This surface is like a stairstep, right?

A.  If you're saying is it sort of stairstepped, yes.  I think, as I understood the patent -- and I read it -- the point there was they were trying to show that some areas are deeper and some areas are shallower.

And for efficiency's sake and to do it, you would want to put plastic faster into the deeper areas than the shallow areas because that makes the whole process more efficient.

So you have deeper areas like 110c and less deep areas in other places.

Q. //////////////////////////////////////////////////////////////////
//////////////////////////////////////////////////////////////////
//////////.

///. //////////////////////////////////////////////////////////////////
//////////////////////////////////////////////////.

Q.  Right.

A.  It's not exactly the same.

Q.  It's not exactly the same.  But this is a patent, and the patent is broad enough to cover surface features of different depths, correct?

A.  On almost any part that you were to make using compression molding, yeah.

Q.  So we have in this patent this compression molding, right?

A.  It is compression molding.

Q.  It makes a one-piece product, right?

A.  I mean, almost all compression molds make one piece, so yeah.

Q.  Okay.

A.  I mean, but that doesn't imply that the one piece that comes out of it is not used for a multipiece part joined together.

Q.  Right.  Anyone can do anything after you take the product out of the mold.

A.  After you take it out, you can do anything, including joining it with another piece to make a two-piece part.

Q.  Right.  But what this makes in particular is a one-piece plastic product, correct?

A.  As do almost all compression molds, yes.

Q.  All right.  That's the simplest way to make something, right, is one piece?

A.  Some things are made one piece.  Sometimes it's easier to make it two pieces.

        To call it the simplest is a little bit oversimplifying.  Oftentimes, it is, but certainly not always.

Q.  But, again, the patent is compression molding and a one-piece piece of plastic comes out of this process, right?

A.  As with all compression molds, a single piece will come out of it, that is correct.

Q.  Right.  And then the surface of the product is defined by //////////////////////////, the 110s, correct?

A.  Right.  And that surface could be almost anything, but

yes.

Q. [REDACTED]

Q. All right. So at this point, Dr. Howard, I'd like to go through some of your slides. We'll pull those up.

So one of the things that you did in this case and that you talked with opposing counsel is that you took some drawings, some computer-aided drawings of the DiamondTrack mold and the FODS mold, right?

A. Right. I looked at the CAD drawings, 3-D models, of the two molds.

Q. Okay. And what you've done -- and we'll talk about some of the specifics, but you pointed out similarities between the two, right?

A.   That is correct.

Q.   Okay.  And you understand, as we just talked about, that a company called RPS is the one who actually made the DiamondTrack mold, right?

A.   The documents I showed -- saw that Signature hired them and then worked with them to make the mold, yes.

Q.   Right.  And you don't know exactly what was told to RPS about sort of what the details of the ultimate mold would have had, right?

A.   I had no information on the contents of the exact conversations between Signature and RPS, so the answer is correct.  I don't know exactly what Signature told RPS.

Q.   Right.  And so you agree with me if Signature didn't ///////////////////////////////////////////," that that couldn't be traced back to any alleged trade secret misappropriation, right?

A.   It's a hard question to answer.

I would agree that if it were independently developed -- like if RPS had done this entirely independently developed, it would not be a trade secret.

But when I look at the two, I don't see independent development.  I see one being developed from the other.

Q.   Well, we could play this same game of taking two similar pieces of machinery and say, "This is common to

this common."

If I opened the hood of two cars and said, "Look, they are both spark plugs, there's both hoses, there's both belts," we would be able to -- you'd be able to do the same thing and say there is a lot of common components, right?

A.  Yeah.  That is true.  It's not a great analogy because in those cases, the cars that go out into the marketplace are seen by everybody.  I can open up the trunk of my Ford and I can see that there's four spark plugs.  I can open up the trunk of my Toyota and see there's four spark plugs.

In the case of the molds, those are something that FODS wouldn't allow other people to see, so those are not the same thing.

Q.  Well, but there are mold manufacturers who, you know, over time have developed in the industry with common component parts, right?

A.  There are certainly commonalities there.  I mean, it's absolutely the case that, for instance, ejector pins are common.  I mean, those are used.

There are the case that there's different styles.

If we had looked at it and I had seen less commonalities, I wouldn't have came to the conclusions that I came to.  But I saw commonalities well in extent of anything I would have expected for independent development.

Q.  Okay.  Well, let me pull up some of these and maybe I

can help you with the lack of commonalities.

MR. RECKERS:  So let's go to -- let's go to just the first slide that you have on the mold similarities, Slide 3.

BY MR. RECKERS:

Q.  And so here we have -- this is the overview slide, right?

A.  It is.

Q.  Okay.  And we see here -- so the number one thing that I see is we have different alignment blocks.

So the FODS mold has alignment blocks ////////// //////, right?

A.  Correct.

Q.  And the DiamondTrack doesn't.

A.  That is correct as well.

Q.  So that's a difference.

And actually the alignment blocks that are used have a ////////////////////// that's different than the ////////////// ////////////// on the FODS mat, right?

A.  Correct.  Yes.

Q.  And the ////////////////// the spacer bars, ////////////////// //////////////////////////////////////////////, those are different //////////////////, right?

A.  I believe that the -- if you mean the support plate underneath -- you said spacer bar.  If you mean the support

plate underneath --

Q.  Yes.

A.  -- I believe they have a different ///////////////////////////// ////////////////////////////////////////// ////. ////////////// I think is correct.  I think that's --

A.  I think it's a slightly different /////////////.

Q.  Right.  And if we count the numbers, I think these are the support structures, ////////////////////////////////////// ///////////////////////////////////////////////////////////// //////////.

A.  You're referring to the pillar supports?

Q.  Right, the little circles that we see all on these.

A.  I realize you're not an engineer, and I obviously realize that the jury is not an engineer, so I'm going to try to explain.

But, correct, there are a different array pattern. //////////////////////////////////////////////////////////.  I agree with that.  You are exactly right.

What I was pointing out is the pillar supports themselves //////////////////////////////////////////.

Q.  Yeah.  And that's a common ////// for that, right?

A.  It's //////////////////////////////////////.

Q.  All right.  So there's ///////////////////////////////// difference in the number of those, right?

A.  If you're asking me the numbers, that's correct.

MR. RECKERS:  Okay.  If we go to page 5, and we see how the plastic is ▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦.

BY MR. RECKERS:

Q.  In the FODS example, it's these logs, right?

A.  That is correct, yeah.  ▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦ ▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦.

Q.  And in -- at Signature, ▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦ ▦▦▦▦▦▦▦▦

A.  Correct.  ▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦ ▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦▦.  But it is a little different.  I agree.

Q.  Yeah.  And then we see the shape.  We can see -- on this -- this image, we can see the shape is different in that the Signature mold has diamonds that are sort of at angles at -- you know, diagonally, where we see on the FODS we have squares that are more lined up, correct?

A.  Correct.

So the pyramidal features in both are a little bit different.  They are -- on the Signature trackout mat, they are rotated 45 degrees, and then the actual shape is moved a little bit from an actual square to kind of a diamond shape.

So you take a square and you compress it to make it a diamond.  So it is a little bit different.

Q.  Thank you.

And then if we go to Number 7, again, we see ▨▨▨ ▨▨▨▨▨ alignment blocks --

A.  Correct.

Q.  -- on the DiamondTrack in a different style of alignment blocks --

A.  I agree.

Q.  -- right?

And then on Slide 8, ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨?

A.  Right, because that's something that you can measure very easily at an inspection.

Q.  All right.  And isn't it true that the MegaDeck, the other large-scale Signature mat, that they ▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨.

A.  I don't know the answer one way or another.

Q.  Would it surprise you that for the other large mold, it ▨▨▨▨▨▨▨▨▨▨▨▨▨?

A.  I simply don't know.

Q.  Okay.  Then go to the next page.  You point out the -- you point out the logos in the middle, right?

A.  So ▨▨▨▨▨▨▨▨▨ is -- of the 20 or 25 similarities I pointed out, that's one of those that would be more common. I certainly agree with that.

Q.  And not just more common, though.  You can tell when you look at the product that it has a logo there, right?

A.   You can tell it has a logo there.  Whether it's a ////////////////// is not always as obvious.

       But if you ask me have I seen other molds with //////////////////, yeah.  It's not uncommon.

       MR. RECKERS:  Okay.  Well, let's go to the next page.

BY MR. RECKERS:

Q.   Okay.  This -- these are the leader pins, right?  ///////////////////////////

A.   So leader pins sort of have to be there.  You have to use something.

       The question is do you need to use exactly /////////////, and that's a surprisingly exact similarity between the two molds.

Q.   Do you know whether the Signature molds use ///// leader pins?

A.   I don't.

Q.   I mean, you'll agree with me that's a standard //////, right?

A.   It's one of various standard //////, yes.

Q.   Okay.  And FODS uses /////////////////////////////////?

A.   So that is a difference.  //////////////////////////////// //////////////////////////////////////////////////////////////////// ///////////////////////////////////////// ///. ////////////////////////////////////////////////////

A. ///////

///. /////////////////////////////////////////

///. /////////////////////////////////////////////////////////.

/////////////////////////////////////////////////////////////.

/////////////,

///. ///////////////////////.

///. ///////////////////////.

///. /////////////////////////////////////.

///. /////////////////////////.

Q.   Great.

Okay.  So let's go up to -- let's go to page 13.

And so these are the /////////////////////// right?

A.   Correct.

On the left side you see the FODS mat///////////////////

/////////////////////////////////////.

On the right side you see the Signature

DiamondTrack, and you see ////////////////////////////////////////.

Q.   Right.

And the shapes of these mold parts ///////////////////

////////////////////////////////////////////////////////////////

/////////.

///. /////////////////////////////////////////////////////////.

/////////////////////////////////////////////.

Q.   So if you see the final plastic product, you have a

pretty good idea what the mold would look like beforehand

as far as the shapes that you're showing here on Slide 13, right?

A.  To be clear, by seeing the final product, you would have an idea of some of the things.  As an example, you would be able to tell the size and width.  I mean, those are things you'd be able to get.

You'd be able to understand the height of the pyramids because that's something you can look at the mat and get.

But there are differences and I point out a lot of things that are not apparent from looking at the mat.

Q.  Right.  And a lot of the things you pointed out are things -- choices that the mat -- the mold manufacturer is going to make, right?

A.  They are choices that would be made by whoever was designing it.  Correct.

Q.  Well, in this case, we know that Signature paid RPS something like $285,000 to make this mold, right?

A.  I do understand that Signature paid RPS 285.  I also understand that Signature had numerous meetings with RPS to discuss it.

Q.  But you looked into that, right?

A.  I did.

Q.  And you understand that Signature paid -- or showed -- or gave RPS a CAD drawing of the mat itself, right?

A.  They gave them a CAD drawing of the mat itself.  That's correct.

Q.  And these other details that we're talking about, you didn't find evidence of Signature providing that to RPS, right?

A.  So I don't know what was said in the conversations.

Q.  All right.  You don't know what was in those conversations, but we have the written record, right?

A.  Well, I have the emails that were produced, but what I don't have is when they held a meeting, what was said in the meetings.  That, I don't have.

Q.  Okay.  Let's continue with some of the more differences.

On page 15, again, this is on the [REDACTED] and the alignment blocks.  [REDACTED]

A.  Correct.

Q.  These are different styles of alignment blocks?

A.  There are differences in the alignment blocks themselves.  There are similarities, but there are also differences.

Q.  Okay.  And if we look at the [REDACTED], you point out some common dimensions, but you -- but there's also different dimensions.  You have more of a [REDACTED]

A.  That is correct.  What would be the lateral dimension on the two in this is a different dimension.  That's true.

Q.  Okay.  And if we go to the ejector pin system, again there is --

MR. RECKERS:  If we go to 22 -- well, let's go forward to 24.

BY MR. RECKERS:

Q.  So let's talk about these pillar supports again.

This is what we were talking about on the first slide, right?

A.  Those were the pillar supports.

And as you pointed out, it's a ////////////////////////// //////////////////////////////////////////////////////////////  So that is a difference.

Q.  //////////////////

A.  I -- probably, yeah.  I think you're probably right.

Q.  Don't mean to test your math, sir.

MR. RECKERS:  Now, if we go to the ejector pins itself, that is 30, Slide 30.

BY MR. RECKERS:

Q.  Now, I think you mentioned the ejector pins ////////// ////// is a common -- that's a common ///////////////////////?

A.  That is one of the -- like we talked earlier about the support -- excuse me -- the //////////////////////////.  That use of ejector pins is common.  They're used on a lot of molds,

so I am not implying that they're not.

Q.  Okay.  And in this case, we have -- if you look at the main ejector pins line, ////////////////////////////////////////////// //////////////////////////////////////

A.  If you're asking me is the array a little bit different, they are, but they -- that's not surprising, but yes.

Q.  But that wasn't important to you?

A.  Everything is important to me.  I looked at the whole thing.  I looked at all of the issues.

I looked at the similarities and I looked at the differences, because in order to give an opinion that is fair and accurate, I wanted to make sure I took everything into account.

Q.  Okay.  Let's talk about that.

So there are ///////////////////////////////////////////// ///////////////////////////////////// //// ////////////////////////////////////////////////// /////////////////////////////////////////////.  That is a correct statement.

I -- yes.

Q.  Okay.  ///////////////////////////////////////////// /////////////////////

A.  Probably.  I -- if you're asking me is there a different number on the other, I'll say yes.

Q.  Yeah, I mean, I think there is a pretty substantial difference in having ///////////////////////////////////////////////////// ///////, right?

A.  I'm agreeing there's a difference.

Q.  Okay.  If we go to your next slide, again, here you're comparing the finished public products, right?

A.  Correct.

Q.  Okay.  And, again, we talked about the mold is going to have some relation to -- the public product is going to have some correspondence with the mold, right?

A.  There's absolutely things you can tell.  You can tell that it's going to be a ///////////////////////////////////////////////////// ///////////////////////////////////////////////////////////////// ///////////////////////////////////////////////////////////////// ///////////////////.

     Some of that is determined from the mat itself.

Q.  And all of those are public features that are going to inform the mold designer?

A.  Those are public features that inform the mold designer.  That's correct.

Q.  Okay.  So one of the things that you talked about on your direct examination was some of the benefits that someone -- when there is actual trade secret misappropriation, some of the benefits to the party that, you know, in your hypothetical took something, right?

A.   There are absolutely benefits to someone to use someone else's trade secrets, yes.

Q.   And specifically you -- you've opined in this case that Signature got a head start, got some head start in its development of the DiamondTrack, right?

A.   I did.

Q.   And you've suggested that there might be some cost savings associated with that, right?

A.   I absolutely believe there would be cost savings.

Q.   And, again, we talked about the -- this mold was actually purchased for $285,000 from RPS, right?

A.   Correct.

Q.   Okay.  And you've not tried to quantify or assign a dollar amount to the cost savings, right?

A.   I have not tried to do that, no.

Q.   So, you know, we obviously heard about your extensive experience with related manufacture, but you weren't able to come up with an opinion in this case as to what the value might be of cost savings, right?

A.   I wasn't asked to do that.

Q.   Okay.  And the same -- similar question, for the amount of time of the head start -- again, you've been working in related fields for a while -- you weren't able to estimate the time savings or the head start that Signature would have enjoyed for -- under your allegations or -- sorry --

Spartan's allegations of the alleged trade secret misappropriation?

A.   Yeah, not -- that's not my role in this case to figure out how much time it would have been.

Q.   Well, you've opined that they saved these things, right?

A.   And I stand by that a hundred percent.  I believe that they saved significant amounts of time and significant amounts of dollars.

        But then you asked me how many, and that's -- I'm an engineer.

Q.   Well, you have experience in this field, right?

A.   I do have experience in the field.

Q.   Okay.  And by the way, FODS was a novice back in 2016, '17, '18 when they were putting out their first mat, right?  This was their first -- this was their first work that they did in compression molding, right?

A.   Right.  And I think we heard testimony that they started in 2010 and spent the better part of six or seven years designing and developing it.  So, yeah, they were a novice.

Q.   Right.  And Signature -- I mean, they were a novice, but that was back in Ninety -- or in 2007, right?

A.   Signature's first mold was in 2007.  Correct.

Q.   All right.  And so when Signature developed the

DiamondTrack starting, as you heard, in the 2018-2020 time frame, right?  You heard that testimony today?

A.  So Signature did testing on parts that were somewhat similar to the DiamondTrack in 2020.

Q.  Right.

A.  I did see evidence of that.

Q.  Right.  And by that point, they had already been making mats for 13 years, right?

A.  They had been making mats, at least the DuraDeck, since 2007.

Q.  So Signature, at that point -- again, in 2020 through '23 -- had a lot more experience in the mat manufacturing business than, say, the original development at FODS in the early 2010s, right?

A.  Yeah.  I mean, I think that that's fair.  I don't think that any of the witnesses would tell you that they were super experienced in molds when they started out.

Q.  Okay.  Now, I want to turn to the issue of interconnectability.

Now, you alluded to some of this or you asked about some of this, about what it means to connect two mats, right?

A.  Correct.

Q.  And you understand that both FODS and Signature sell some hardware to connect mats, right?

A.  They do.  They both sell hardware to connect the mats.

MR. RECKERS:  Judge, with your permission, I'd like to pick up -- and with plaintiffs' permission -- one of their physical exhibits.

THE COURT:  Yes, that's fine.

BY MR. RECKERS:

Q.  So I have here -- this is the FODS connection system, right?

A.  It's a part of it, yeah.  They use two of those and then bolts in between it.

Q.  And so just to be -- you know, this is a -- so it's part of the system, but there are some bolts and there are some holes in the mats.  And you basically stake them together, right?

A.  Correct.

Q.  Okay.  This is, what, I think about 13 inches?

A.  I believe it's 13 inches.  I think that's correct.

Q.  Now, Signature has a different connection system called DuraLink, right?

A.  They do.

Q.  DuraLink's quite a bit shorter than this, right?

A.  It's quite what?

Q.  Quite a bit shorter.

A.  It's shorter.  It's -- there are two styles.  One is a square style and one is a two-pin style.  But it's

definitely shorter than 13 inches.

Q.  Right.  And DuraLink, that's been sold by Signature for a long time, right?

A.  I believe the DuraLink has been sold for a long time, yes.

Q.  And DuraLink connects DuraDeck mats, right?

A.  They do.

Q.  And really when we're talking about connecting, again, it's holes in the corners of the mats and plates and screws, right?

A.  I'm not sure I understood your question.  I think that that's correct.  Maybe -- I mean, it's a -- there are two styles, one of which has plates with bolts coming up.

        The other is -- comes down.  It's also kind of square.

        Both of them are smaller than the FODS.

        Is that what you're asking?

Q.  Yes.

A.  Yes.

Q.  Okay.  And, well, cut to the chase, as you just said, the DuraLink mat -- the DuraLink connection system doesn't work with FODS, does it?

A.  It's my understanding that it doesn't work with the current design of FODS.

Q.  The current version, right?

A.   Yes.

Q.   Because FODS changed from its previous design, right?

A.   That's what was testified in court earlier today.

Q.   Okay.  So FODS -- so just to be clear, since at least 2021, the DuraLink will not connect any Signature mat to a FODS, right?

A.   I believe that that's accurate.

Q.   Okay.  So the only way to connect a FODS mat, in your opinion, a FODS and a Signature mat, is using the FODS connection, right?

A.   With the current version of the FODS mat and the currently sold connection systems, you would use the FODS interlocking system, the one that you're holding in your hand, to interlock the two mats.

          MR. RECKERS:  So let's go to plaintiffs' opening, page 40.

          Actually, let's go to Mr. Howard's slide deck at page 40.  There we go.

BY MR. RECKERS:

Q.   All right.  So this is one of the slides that you saw yesterday during openings, right?

A.   Correct.

Q.   And it's suggested by plaintiffs' counsel that there was this identical interlockability between these two mats, right?

A.   Can you define "identical"?

Q.   Well, that's my problem with this.

This image isn't actually accurate, is it?

A.   No.   There really should be a space.   There should have been a space.

The pictures that came out demonstrate it, and that shows it.   This probably should have had about a 1- or 2-inch gap between because 13 inches causes them to be a little bit apart.   But I did talk about that earlier.

Q.   It's not 1 or 2 inches.   It's 3 or 4 inches, sir.

A.   Oh, okay.   3 or 4.

Q.   That's what you put in your report, right?

A.   Let's see.

Yeah.   It's probably right in that area.

Q.   Okay.

A.   You are correct.

Q.   So they're not made to be directly connect to each other, right?   They don't -- they aren't so identical like we have here in the exhibit that plaintiffs showed in the opening, right?

A.   Right.   They are not -- if you did it, there would be a 3- to 4-inch gap in between them.   You could still interlock them, but there would be a gap between the two mats.

Q.   And the holes don't really match up either that

exactly, do they?

A.  What do you mean by that?

Q.  They don't match up like you have in this picture here, do they?

A.  I -- there's probably some differences in the way the holes match because I think you end up with a slight, like --

Q.  Yeah.

A.  -- in or out of it.

I mean, the idea is shown on this, but you are correct that it's not as precisely correct as it should be because there is a little bit of a not straight, either an inward or outward, due to the slight difference in the hole locations.

Q.  Right.  It's not like LEGOs that have to be identically put together, right, to actually interlock?

A.  I struggle to say "like LEGOs" because I'm not really sure what you mean by that.

Q.  Let me help you.

So -- so you're familiar with the mats that are sitting outside the courtroom?

A.  Yes, absolutely.

Q.  Okay.  So I'm going to show you -- before showing the jury, I'm going to show you a picture that I took out there when -- just when the jury was out there.

I'll show it to opposing counsel.

Does that appear to be a picture of the mats that are outside?

I'm sorry, is --

A.  There's nothing on my screen.

MR. RECKERS:  Oh, can you pull up that picture?  There we go.  Just to him.

Can we give the witness, only the witness, the ability to see the exhibit before it's been...

THE COURTROOM DEPUTY CLERK:  We can't do that.

THE COURT:  You can approach with a copy.

MR. RECKERS:  I just took it when we were out there.  I can show it on -- I can show it on my phone.

THE COURT:  Well, if you want to do that, that's fine.

MR. RECKERS:  All right.  I'll turn my phone back on.

THE COURT:  This will be treated as a demonstrative, not evidence, but go ahead.

BY MR. RECKERS:

Q.  All right, sir.  Does this appear to be the mats that are sitting outside?

A.  I believe that's a photo of the mats that are sitting outside, yes.

Q.  Okay.

MR. RECKERS:  With your Honor's permission, I'd like to put the picture on the screen.

MR. RUIZ:  Your Honor, we have no objection as long as it's being used for demonstrative purposes and not offering it as a substantive exhibit.

MR. RECKERS:  I think I can lay a foundation as an exhibit, sir -- or Judge.

THE COURT:  Well, probably not on your phone, but I'm sure no one is going to object if you want to take pictures of what was downstairs and put it in evidence, so -- but you're not putting your phone in evidence, so...

MR. RECKERS:  It's going to be --

THE COURT:  I understand you can substitute a picture.  I'm sure there's not going to be a problem with that, to print it off.

MR. RUIZ:  Yes, your Honor.  It's my understanding, I think, that after the trial we will substitute the pictures of the mats.

THE COURT:  Exactly.  We're not taking the mats into evidence.

MR. RUIZ:  Yes, your Honor.

THE COURT:  Okay.

MR. RECKERS:  So can we put up the -- and we'll put it up, the mat.

And what number would this be?  321.

So, your Honor, at this time I would ask for admission of Exhibit 321, the image that I have on the screen.

THE COURT:  Yes.  Go ahead.

MR. RUIZ:  Sorry, your Honor, just to clarify, the pictures that are going to be replaced of the mats will be of the two mats.  This is a -- is this -- this picture is not going to be offered as a substantive exhibit, is it?

THE COURT:  I think he is, but, I mean, if you want to take a picture and submit it, too, I don't think anybody objects to what the jury has already went and visited.

So you may not like the way it is viewed, but if you want to take another picture of that, I think both sides can submit their own picture of that.  I am not worried about that.

MR. RUIZ:  Yes, your Honor.

THE COURT:  So what is the number for this one?

MR. RECKERS:  Defendant's Exhibit 321, please.

THE COURT:  And I will admit that, but I will admit it once you submit the paper copy of it.  So...

MR. RECKERS:  Thank you, your Honor.

And I want to zoom in on just the hole placement. So if we can just zoom in.

                              *

BY MR. RECKERS:

Q.  And I noticed this when we were out there, but these holes don't match up, do they?

A.  So there is a couple things.  If you look at the drawing -- or, excuse me -- the photo that was shown before, the mats are actually oriented separate.  In this case is they are oriented short end to short end versus long end to long end.  And what the connection looks like varies a little bit depending on how you orient it.

But, yes, as I was talking about, there is a -- if you wanted to use the connection system, you would have to go at kind of an angle as opposed to straight.

Q.  These mats aren't made to interlock directly.  Yeah, they just have holes on the edges, right?

A.  The mats are capable of being interlocked.

Q.  Because they have holes in them and you've got this just generic metal bar right, sir?

A.  They don't have to have holes in them.  They don't have to be capable.  They are capable of it.

MR. RECKERS:  Okay.  I'll pass the witness.

THE COURT:  Additional questions?

MR. RUIZ:  Your Honor, just a brief moment to confer?

THE COURT:  I'm sorry?

MR. RUIZ:  Just a brief moment to confer?

THE COURT:  Yes, of course.

MR. RUIZ:  Yes, your Honor, a brief redirect.

THE COURT:  Go ahead.

REDIRECT EXAMINATION OF WILLIAM S. HOWARD

BY MR. RUIZ:

Q.  Dr. Howard, you were just asked some questions about the mold CAD files that you looked at between the two products.

Are those two molds exactly the same?

A.  The molds are definitely not exactly the same.  I am not saying that the molds are the same.

What I am saying is that I'm looking at one set of molds and having done as much design and development as I have done, I know what a separate mold -- the amount of differences I would expect on something that was independently developed.

And what I am stating is that there are far too many similarities -- far, far too many similarities in the molds for the DiamondTrack mold to have been developed independently from the FODS mold.

Q.  And so would any of the similarities that opposing counsel pointed out change that conclusion?

A.  He pointed out differences, and none of those differences change my opinions.

Q.  Differences.  I apologize.

Now, also, opposing counsel looked at the patent that Signature had.

MR. RUIZ:  So if we could pull up DTX-252, please.

And if we could zoom in to the Figure 2A at the bottom.

BY MR. RUIZ:

Q.  Now, Dr. Howard, you were shown this picture.  And right after, you were shown the picture of the DiamondTrack /////////////////////////////////////////.

Is what we're looking at the /////////////////////////////// ////////////////.

A.  I -- what we are looking at, it's hard to tell because it just has /////////////////////////.

There is a ////////. there, but we don't know if the ///////////////////////////////////////////////////////////////////// ///////////////////////////////////////.

Q.  All right.

MR. RUIZ:  And we can take that down.

BY MR. RUIZ:

Q.  And, lastly, you were asked about the DuraDeck, and so I want to just make some -- have some clarification about the DuraDeck.

How big is the DuraDeck mat?

A.  The DuraDeck is a small mat.  It's a 4-by-8 mat, and it's only 1/2 inch thick.

Q.  And so how is that compared to the FODS trackout mat or the DiamondTrack mat?

A.  Well, it's very different.  The DuraDeck doesn't rely on sharp edges to break pieces off.  It is for ground protection.  So whether it's ////////// or not, whether it has sharp edges, wouldn't matter.

That's quite in contrast to the FODS mat where it's very important that you have //////////////////////// //////////////////////// because that's used for the purpose that it's doing, which is to knock the dirt and sediments off of the trucks that pass over the top.

Q.  And I'm glad you mentioned the ////////// process because I believe you told opposing counsel that some new information came up about the DuraDeck?

A.  So when I had my deposition, I was unaware that the DuraDeck was capable of //////////////////////////////// //// ////////////////////////////////////////////////// ////////////////////////////////////////////////// //////////////////////////////. //// ////////////////////////////////////////////// //////////////////////////////////////////////// //////////////////////////////////////////////// //////////////////////////////////////////////// //////////////////////////////////////////////// //////.

Q.  Thank you, Dr. Howard.

MR. RUIZ:  Your Honor, we pass the witness.

THE COURT:  Anything else?

MR. RECKERS:  Just really briefly.

THE COURT:  I know it's past 5:00.  I thought I'd just finish -- we'd just finish -- are y'all okay going a few minutes so we can get the witness finished?  Go ahead.

MR. RECKERS:  Two -- really just one question, or two questions.

RECROSS-EXAMINATION OF WILLIAM S. HOWARD

BY MR. RECKERS:

Q.  Sir, you saw a video of the DuraDeck being made, right?

A.  I did see a very brief video of the DuraDeck.

Q.  And you made clear in your deposition that it was //////////////////////////////////////, right, sir?

A.  I'm sorry.  Can you say that again?

Q.  You -- after seeing that video, you've testified that it was ////////////////////////////////////, right?

A.  So I was unaware of the DuraDeck's features, but at the time I thought it was /////////////.

Q.  And it wouldn't surprise you because half of the products that you've made in your life have been /////////////, right?

A.  Correct, yes.  That's true.

Q.  Thank you.

THE COURT:  Anything else, Mr. Ruiz?

MR. RUIZ:  Nothing further, your Honor.

THE COURT:  Okay.  Let me just see if they have questions.

Whether you have a question or not, please fold a piece of paper and pass it over to the court security officer.

Okay.  There are no questions from the jury.

Can this witness be fully excused?

MR. RUIZ:  From the plaintiff, yes, your Honor.

MR. RECKERS:  Yes, your Honor.

THE COURT:  Okay.  Sir, you are free to leave.

Okay.  Ladies and gentlemen, we're going to go ahead and stop for the day.  Again, please don't discuss the case among yourselves or do any outside research.

And then tomorrow we are going to start at 8:30. I think we've -- I had my staff talk to you about that.

And I will bake you something tonight, probably homemade brownies from scratch.  So I will do that -- since I've said it, I have to do it tonight.

So have a good drive home and see you tomorrow morning at 8:30.  Thank you.

(The jury exits the courtroom, 5:04 p.m.)

THE COURT:  Okay.  Anything further from the plaintiff?

MR. SCHWEGMANN:  No, your Honor.

THE COURT:  Anything else from defendants?

MR. RECKERS:  No, Judge.

THE COURT:  And then we're working on the charge, and I just did have a question regarding -- so what are your defenses you're asserting as to breach of contract?

MR. RECKERS:  What are the breach of contract affirmative defenses?

THE COURT:  Yes.

Yeah, just turn your mic on, please.

MR. RECKERS:  Judge, I have to admit that I don't have that on top of mind at the moment.  Could we email it to you and include the opposing counsel?

THE COURT:  Yeah, just email the other side and email my lawyer.

What about for the trade secrets?  What is your affirmative defenses you're asserting as to the trade secrets claims?

MR. RECKERS:  I don't believe there are any affirmative defenses, but I can confirm.

THE COURT:  So where does unclean hands fit into this?

MR. RECKERS:  Oh, sorry.  That is an affirmative defense.

THE COURT:  And what is the factual basis for that defense that you're asserting?

MR. RECKERS:  For that defense?

THE COURT:  Yes.

MR. RECKERS:  Is the inspection, the --

THE COURT:  But how does that support that the plaintiffs have unclean hands as to it relates to their trade secrets?  I understand it's --

MR. RECKERS:  Yeah.

THE COURT:  Factually the evidence has come in, but I don't see how that is a defense to trade secret misappropriation when that event happened and has nothing -- has no connection to some equitable thing that they've done wrong in procuring --

MR. RECKERS:  Right.

THE COURT:  Oh.

MS. JOHNSON:  Your Honor, if I may.

THE COURT:  Yes.

MS. JOHNSON:  I think this --

THE REPORTER:  Could you just use the microphone, please.

THE COURT:  It's not that we can't -- I can't hear you, but it's just easier in the sound system for the court reporter.

MS. JOHNSON:  I think this issue also goes to an objection that was raised earlier today related to sort of a -- frankly, our unclean hands defense, which is while I

understand that plaintiffs' counsel hasn't yet used the actual word "breach" of the NDA in that, you know, there's information that was kept that was subject to the NDA, that is a primary part of their case in alleging that we have their trade secrets and that we used their trade secrets.

And that is why all along we've insisted that we should be able to show that they also kept information under the NDA, not because there's any specific claim of breach of the NDA, but it goes to multiple issues, one being a trade secret defense.

I mean, we have multiple.

Number one, we don't think these things are trade secrets.

But in addition, just maintaining information that was subject to an NDA in and of itself does not -- they're trying to sort of imply that by keeping information that was subject to a contract that we shouldn't have kept, we therefore kept their trade secrets and used their trade secrets.

THE COURT:  But they haven't made that argument yet.  I mean --

MS. JOHNSON:  They've been making --

THE COURT:  -- they've carved around it in the MIL.

But can you answer the question regarding, you

know, why unclean hands is a defense to the trade secret misappropriation based upon this inspection that happened? Which, you know, we've dealt with that in a discovery issue, but I'm having a hard time really seeing how that is a defense of them going in and secretly taping when they didn't use that information as part of their trade secrets.

Because I think the unclean hands is going to -- factually what they have indicated is just -- and I let the evidence in. The evidence is in about them going into the plant.

But I don't see how that's tied to the claims for trade secret that are asserted.

MS. JOHNSON: Right. Well, the evidence is in about them going to the plant after the fact, but the evidence -- you've not allowed the evidence to be admitted that they did the very same conduct under the NDA in keeping information that was subject to the NDA of my clients, which I think is relevant to exemplary damages, the breach of contract claim, as well as their trade secret claim.

I can tell you that we're in the process of working on a brief that we intended to submit to the Court by end of day today because that was my understanding from your law clerk that you were asking for, that hopefully will articulate more clearly our basis.

THE COURT:  Okay.  And we have a basis of the charge -- we have a draft of the charge, but the defenses are a little -- are murky, so -- and if you'll send something else tonight so -- because we'll plan on having a charge conference tomorrow after court.

I did have an injunction hearing tomorrow, but it's gone away for the 5:15.  They settled, so -- or they resolved the -- I don't have to have an injunction hearing tomorrow.  I do have one today at 5:15, but --

MS. JOHNSON:  And, your Honor?

THE COURT:  Yes.

MS. JOHNSON:  About the charge conference, do you anticipate having an informal charge conference prior to a formal conference?

THE COURT:  Yes.  So my typical practice, I think, as you know, is just to do it informally in chambers.  And then before it goes to the jury at some point, I'll let everyone make their record to object.

MS. JOHNSON:  Thank you, your Honor.

THE COURT:  Okay.

MS. COX:  Your Honor, the only question I have is -- I have some responses, but I know that you have a hearing at 5:15.  If we need to discuss this --

THE COURT:  I don't think everyone is here yet, so...

MS. COX:  Oh, it's okay.  It sounds like there's a brief coming anyway, so if we need to discuss this further, does the Court have availability before we start at 8:30 tomorrow?

THE COURT:  So I think -- well, I do, but I think at 8:15 I'm swearing in the new U.S. Attorney who just got appointed.

MS. COX:  We don't want to interrupt that.

THE COURT:  So I'm swearing him in at 8:15, so -- that won't take very long, but we could take up things at 8:00.  We open the building at 8:00.  We'll all be here at 8:00.

Or we can do it right after the swearing in.  But we're starting at 8:30.  I've been building extra time just -- I want to make sure we get done, with the holidays approaching, so...

MS. COX:  Understood.

THE COURT:  Okay.  Anything else from the plaintiffs, then?

MS. COX:  Nothing else, your Honor.

THE COURT:  Anything else from defendants?

MR. RECKERS:  No, your Honor.

THE COURT:  Okay.  Well, then I'll see you back tomorrow morning at 8:30.

If another issue comes up that I need to resolve,

just be here before then.

And I'm going to stay on the bench since we have this other hearing.

(Proceedings adjourned, 5:37 p.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, NOVEMBER 18, 2025, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.


        /s/_____
        CHRISTINA L. BICKHAM, CRR, RDR