# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| SPARTAN COMPOSITES, LLC, d/b/a FODS, and SPARTAN MAT, LLC, | § § § | |
| *Plaintiffs,* | § § | Civil Action No. 4:24-cv-609 |
| v. | § § | Judge Mazzant |
| SIGNATURE SYSTEMS GROUP, LLC, | § § | |
| *Defendant.* | § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is one post-trial filing: Plaintiffs Spartan Composites, LLC, d/b/a FODS, and Spartan Mat, LLC's Post-Trial Brief (the "Motion") (Dkt. #241). Having considered the Motion and the relevant pleadings, the Court finds that the Motion should be **GRANTED in part** and **DENIED in part**.

## BACKGROUND

Before the Court is a trade secret and breach of contract dispute. The facts of this case are more fully discussed in this Court's prior Memorandum Opinion and Order (Dkt. #156). Accordingly, the Court only recounts the relevant facts that occurred during and after this case was brought to trial.

On November 17, 2025, this action came for trial before a jury. Plaintiffs appeared in person and through their attorneys of record and announced ready for trial. Defendant similarly appeared through its attorneys of record and announced ready for trial. Having determined that it has jurisdiction over the subject matter and the parties in the case, the Court then empaneled and swore in the jury, which heard evidence and arguments of counsel. On November 17, 2025, through November 20, 2025, Plaintiffs tried their trade secret and breach of contract case to a jury. For their

trade secret claims, Plaintiffs sought recovery under both the Federal Defend Trade Secret Act ("DTSA"), and the Texas Uniform Trade Secrets Act ("TUTSA"), which are often considered "together because they will likely require proof of the same elements." *StoneCoat of Tex., LLC v. Procal Stone Design, LLC*, 426 F. Supp. 3d 311, 339 (E.D. Tex. 2019); *Lifesize, Inc. v. Chimene*, No. 1:16-CV-1109-RP, 2017 WL 1532609, at *8 n.4 (W.D. Tex. Apr. 26, 2017).

On November 20, 2025, following four days of trial, the jury returned a verdict in favor of Plaintiffs on all but two questions (Dkt. #211 at pp. 2–3). The Court received, filed, and entered record of the jury's findings. The jury found that Plaintiffs owned three trade secrets related to their trackout construction mat (the "FODS trackout mat"), that Defendant willfully and maliciously misappropriated those trade secrets by designing and selling its "DiamondTrack" mat at market, and that Plaintiffs suffered harm as a result.

Almost one month later, on December 19, 2025, Plaintiffs filed the present Motion, requesting that the Court enter final judgment on a variety of relief, including a proposed permanent injunction (Dkt. #241 at p. 6). Defendant filed its response on January 9, 2026 (Dkt. #251). Plaintiffs' reply (Dkt. #254) and Defendant's sur-reply (Dkt. #257) followed closely thereafter. The Court is now tasked with determining the legal viability of Plaintiffs' monetary elections and proposed permanent injunction under the circumstances presented.

## LEGAL STANDARD

"A party having several remedies must elect." *United States v. Dashiel*, 70 U.S. (3 Wal.) 688, 695 (1865). Federal Rule of Civil Procedure 58 governs the entry of final judgment. While Rule 58(b)(1) details the circumstances under which the clerk of the court must enter judgment "without awaiting the court's direction," Rule 58(b)(2) outlines those circumstances under which

the Court must approve final judgment before it can be entered by the clerk. Specifically, Rule 58(b)(2) provides that "the court must promptly approve the form of the judgment, which the clerk must promptly enter, when: (A) the jury returns a special verdict or a general verdict with answers to written questions; or (B) the court grants other relief not described in this subdivision (b)." FED. R. CIV. P. 58(b)(2).

The party seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 478 n.39 (5th Cir. 2020) (reminding the parties and the district court that a plaintiff must satisfy "the traditional four-factor test" before "permanent injunctive relief can be awarded").

**ANALYSIS**

This Memorandum Opinion and Order will not substitute or otherwise replace the Court's entry of final judgment, which is still forthcoming. Rather, it will remain restricted to a broad analysis of Plaintiffs' election of remedies. It is in this context that the Court narrows Plaintiffs' proposed monetary recovery and further finds Plaintiffs entitled to permanent injunctive relief.

I.      **Objections to Exhibits**

Plaintiffs first request that the Court strike or disregard certain documents attached to Defendant's post-trial brief (Dkt. #254 at pp. 1–2). The Court sees fit to deny Plaintiffs' request insofar as it will determine whether equitable injunctive relief is warranted by considering all available evidence. *See Bright Data Ltd. v. Teso LT, UAB*, 584 F. Supp. 3d 193, 197 (E.D. Tex. 2022)

(analyzing the necessity of a permanent injunction in light of an expert report). However, monetary damages, including profit disgorgement, will be awarded "within the range of evidence presented at trial." *Nova Consulting Group, Inc. v. Eng'g Consulting Servs., Ltd.*, 290 F. App'x 727, 740 (5th Cir. 2008) (quoting *Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 108 (Tex. App.—Houston [14th Dist.] 1996, writ denied)).

## II.    Plaintiffs' Monetary Recovery

Alternate theories of recovery, together with a favorable finding on two or more theories, enables a plaintiff to elect the theory under which it wishes to recover. *See 5G Studio Collaborative, LLC v. Dall. Uptown Hosp., LLC*, No. 3:15-CV-2719-L, 2017 WL 4750697, at *1 (N.D. Tex. Oct. 20, 2017). "While the Court may combine 'equitable and legal remedies,'" plaintiffs are not allowed to obtain "double recovery for the same injury." *In re Lager*, No. 22-30072-MVL-11, 2023 WL 4676067, at *17 (Bankr. N.D. Tex. July 20, 2023) (citation modified) (quoting *F.T.C. v. Leshin*, 719 F.3d 1227, 1232 (11th Cir. 2013)); *Matter of 3 Star Props., L.L.C.*, 6 F.4th 595, 612 (5th Cir. 2021) ("A party is not entitled to a double recovery." (citation modified) (quoting *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998))). "A double recovery exists when a plaintiff obtains more than one recovery for the same injury." *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998).

Following a trial on the merits, the jury found in favor of Plaintiffs on multiple damages questions. As relevant to this Memorandum Opinion and Order, the jury found that $2,300,000 represented a fair disgorgement of Defendant's past profits; $570,000 represented the development costs Defendant avoided due to misappropriation; and $5,500,000 represented a reasonable royalty recoverable by Plaintiffs (Dkt. #211 at p. 5). As a result, the jury left Plaintiffs with multiple avenues of recovery under their breach of contract, DTSA, and TUTSA causes of

action. In the days that followed, Plaintiffs parsed the jury verdict for a permissible recovery for their past harm (*See* Dkt. #241 at p. 4). At the end of their assessment, they elected to recover strictly under DTSA and TUTSA and requested the following monetary relief: "$2,300,000 as a disgorgement of [Defendant's] past profits and $570,000 for the development costs that [Defendant] avoided incurring" along with "exemplary damages subject to the statutory cap" (Dkt. #241 at p. 4). Plaintiffs are also seeking post-judgment interest, pre-judgment interest, and attorneys' fees (Dkt. #241). The Court will now determine the validity of each aspect of their elected recovery.

### A.    Double Recovery

Plaintiffs do not seek to recover their own actual losses alongside the monetary value of Defendant's unjust enrichment, which is expressly permitted under either statute. *See* 18 U.S.C. § 1836(b)(3)(B) (providing for "damages for actual loss caused by the misappropriation of the trade secret; and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss"); TEX. CIV. PRAC. & REM. CODE § 134A.004(a) ("Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."). Instead, Plaintiffs elect to receive Defendant's ill-gotten profits alongside Defendant's saved research and development costs, which is permissible where each cost can combine to constitute the relevant "unjust enrichment" associated with the trade secret misappropriation. *See ResMan, LLC v. Karya Prop. Mgmt., LLC*, No. 4:19-CV-00402, 2021 WL 3403935, at *12 (E.D. Tex. Aug. 4, 2021) ("Because the Fifth Circuit has taken a flexible approach to damages in a trade secret misappropriation claim, the Court finds that unjust enrichment is not limited to net profits.").

5

Naturally, the proposed combination of both sources of unjust enrichment implicates the issue of double recovery.

Defendant's post-trial brief only ever implicitly argues that Defendant is opposed to Plaintiffs' elected monetary recovery on the basis of double recovery: "[b]oth Mr. Jaquess's cost-savings and lump-sum royalty theories quantify any and all damages to Plaintiffs" (Dkt. #251 at p. 9).[1] Plaintiffs, on the other hand, addressed the issue head-on in their reply (Dkt. #254 at pp. 2–5 ("Plaintiffs' elections do not create a double recovery issue")), which finally prompted the Court to answer the question: does Plaintiff's elected monetary recovery constitute a prohibited double recovery? In answering that query, the Court finds it necessary to individually examine both aspects of Defendant's unjust enrichment. First, Plaintiffs' damages expert indicated that the $570,000 awarded to Plaintiffs for development costs constitutes the amount of money Defendant saved by not purchasing multiple mat molds on account of its trade secret misappropriation (Dkt. #219 at pp. 189–91, 193). This sum of money pertains to the period of time that the DiamondTrack mat was in development. Plaintiffs argue that the $570,000 award for development costs therefore cannot compensate Plaintiffs for events that occurred after November 2023, which was the month that the DiamondTrack mat emerged from development and hit the market (Dkt. #254 at p. 3). Second, the $2,300,000 disgorgement award figure pertains to Defendant's past profits on the DiamondTrack mat, which is based on gross revenue minus expenses generated by the product from November 2023 up until the date of trial (Dkt. #219 at p. 168). Plaintiffs posit

---

[1]  Elsewhere, Defendant appears to agree with Plaintiffs' monetary election, stating that "Plaintiffs' elected monetary damages require Signature to disgorge its profits from the DiamondTrack mat and to further pay Plaintiffs the saved development costs Signature allegedly avoided. *Through its elections of these economic damages, Plaintiffs will be fully compensated for the alleged harm in this case*" (Dkt. #251 at p. 5 (emphasis added)).

that, because each avenue of recovery addresses a distinct temporal injury, Plaintiffs' election cannot constitute an impermissible double recovery.

But even if the Court credits Plaintiffs' argument and grants that the two sources of recovery are *temporally* distinct from one another, the question remains—are they *functionally* distinct? That is to say, does the calculation of Defendant's disgorged profits itself account for the avoided cost of research and development? If the proposed $2,300,000 in disgorged profits already takes into account the saved $570,000 in avoided development costs (the cost that Defendant would have incurred had Defendant actually undertook to create the DiamondTrack mat without misappropriation), then Plaintiffs could not recover an additional $570,000 without receiving an impermissible double recovery. This is because Defendant's profits would not have been as high as $2,300,000 if Defendant was first forced to expend at least $570,000 on research and development to generate the profits in the first place.

In *Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 908 F.2d 706 (11th Cir. 1990), the Eleventh Circuit applied Texas law to a trade secret misappropriation dispute and analyzed a district court's interpretation of this very question. It found that the district court erred in granting a plaintiff $52,000 for disgorged profits *on top of* $1,000,000 for avoided research and development costs. *Id.* at 714–15. The Eleventh Circuit centered its decision on the notion that "if [the defendant] had been required to spend the amount [the plaintiff] expended, [the defendant] would not have made the $52,000 profit the court required [the defendant] to disgorge." *Id.* at 714.

A different yet similar question was addressed by the Seventh Circuit in *Motorola Sols., Inc. v. Hytera Communications Corp. Ltd.*, 108 F.4th 458 (7th Cir. 2024), *reh'g and reh'g in banc dismissed*, No. 22-2370, 2024 WL 4416886 (7th Cir. Oct. 4, 2024), *cert. denied*, 145 S. Ct. 1182 (2025). There,

the Seventh Circuit held that a district court "correctly found that the avoided [development] costs should be subtracted from [a defendant's] profits to avoid double-counting." *Id.* at 492. In its opinion, the district court cited *Salsbury* to explain that "because the defendant's profits were inflated by the avoided costs—as profits are revenue minus costs—it was improper to award both." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 495 F. Supp. 3d 687, 710 (N.D. Ill. 2020).

In this case, Plaintiff's $2,300,000 profit estimation is similarly inflated by the costs Defendant avoided through its misappropriation. At trial, Plaintiff's damages expert opined that Defendant gained $3,500,000 in gross revenue from its sale of the DiamondTrack mat (Dkt. #219 at p. 192). The expert claimed that the $2,300,000 profit estimation was created by accounting for "the variable costs associated with that revenue" along with the "costs necessary to make those products or sell those products," including "resin . . . certain manufacturing costs, material costs, [and] other available selling costs" (Dkt. #219 at pp. 192–93). From the face of the record, there is no indication that the $2,300,000 figure, which is based upon "updated . . . financials that went through September [2025]," fails to account for the avoided hypothetical research and development costs Defendant saved through misappropriation (Dkt. #219 at p. 191).

Furthermore, as related to the definition of the disgorgement of Defendant's past profits, the Court instructed the jury:

> "Disgorgement" is the act of giving up something that was unjustly obtained. If you find that Defendant benefitted from a trade secret belonging to Plaintiffs, then you may award the monetary value that you attribute to those benefits as a measure of Plaintiffs' damages. The "unjust enrichment" subject to disgorgement is not the whole of the gain realized by Defendant but only the amount of the gain that is attributable to misappropriation. When a benefit or advantage has been realized in part as a result of misconduct and in part as a result of legitimate business activities, you may award as disgorgement only that portion of the gain that is attributable to the misconduct.

(Dkt. #205 at p. 16).

The broad language of this instruction indicates that Defendant's "past profits" includes additional benefits or advantages received by Defendant. Neither the Court's instructions nor the evidence introduced at trial supports a finding that a combination of $2,300,000 and $570,000 represents the proper amount of unjust enrichment gained by Defendant. Thus, the Court adopts the reasoning behind the Eleventh Circuit's decision in *Salsbury* and finds that Plaintiffs may elect to receive either $2,300,000 in disgorged profits or $570,000 in avoided development costs. *See* 908 F.2d at 714.

This finding is consistent with the Fifth Circuit's opinion in *Comput. Scis. Corp. v. Tata Consultancy Servs. Ltd.*, 159 F.4th 429 (5th Cir. 2025). In that case, the Fifth Circuit was tasked with describing an unjust enrichment damages award for trade secret misappropriation. *Id.* at 450–451. It determined that the award could consist of either "an estimation of the costs that [the defendant] would have incurred had it developed [a product] . . . without the benefit of [any] trade secrets" or "the *alternate* 'income approach' measure . . . which estimates [the defendant's] profits from misappropriating [the] trade secrets." *Id.* (emphasis added). The Fifth Circuit further approved of the district court's finding that "[a]t trial, [the plaintiff] proved $56,151,583 in damages from [the defendant's] misappropriation under the cost approach, and it also proved $55,448,165 in damages under the income approach. [The plaintiff] is entitled to the higher level of damages it proved at trial, $56,151,583." *See id.* at 455; *Comput. Scis. Corp. v. Tata Consultancy Servs. Ltd.*, No. 3:19-CV-0970-X, 2024 WL 6909861, at *33 (N.D. Tex. June 13, 2024).

Thus, Plaintiffs must elect one recovery under their unjust enrichment theory. The Court finds that Plaintiffs are not entitled to a double recovery consisting of an additional $570,000 to

account for avoided development costs which already work to enable the original $2,300,000 profit estimation.

## B.   Disgorgement of Profits

Plaintiffs anticipated the Court's finding on the issue of double recovery, and included the following request in their reply: "[t]o the extent the Court concludes that awarding Plaintiffs these two amounts [profit disgorgement and avoided development costs] would be a double recovery, Plaintiffs elect to recover disgorgement" (Dkt. #254 at p. 3). Plaintiffs also requested the entire disgorgement award offered by the jury's advisory opinion—$2,300,000—which represents, in the words of Plaintiffs' defense expert, all "the profits [Defendant] earned through the sale of its DiamondTrack mat all the way through trial" (Dkt. #219 at pp. 168, 192). Plaintiffs' receipt of the full amount of Defendant's profits is anything but automatic, as "monetary relief in the form of disgorgement is equitable and, as a result, the court, not the jury, must decide whether to award it and how much to award," *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1319 (Fed. Cir. 2018); *Burkhart Grob Luft & Raumfahrt GmbH & Co. KG v. E-Systems, Inc.*, 257 F.3d 461, 469 (5th Cir. 2001) (noting that the Court's decision on profit disgorgement is reviewed "only for an abuse of discretion").

To recover disgorgement of defendant's profits, a "plaintiff is not required to prove lost profits; rather it need only prove misappropriation of its valuable trade secret and prove that it was put to some commercial use." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 540 (5th Cir. 1974). The appropriate "measure should correspond to the nature of the use"; for example, in cases "where the trade secret was used to improve manufacturing, and subsequently manufactured items were sold at a profit," it is "natural and equitable to measure damages based on those sales." *Id.* "If the defendant enjoyed actual profits," the plaintiff is afforded a

"restitutionary remedy" of "either recovering the full total of defendant's profits or some apportioned amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success." *Id.* at 539. "[O]nce the plaintiff . . . prove[s] profits were made," the defendant bears the "burden of proving factors other than the [trade secret] caused the profits." *Id.* at 536 n.28; RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. f ("[T]he defendant has the burden of establishing any portion of the sales not attributable to the trade secret . . . .").

If the Court finds it appropriate to award Plaintiffs with a disgorgement of Defendant's profits, it must identify a remedy that both "remove[s] the advantage created by the misappropriation" and "protect[s] . . . the plaintiff's recognized legal rights." *Halliburton Energy Servs., Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 257 (Tex. App.—Dallas 2014, no pet.). "[C]ourts adjust the measure of damages to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use the defendant put the trade secret to after misappropriation." *Univ. Computing*, 504 F.2d at 538.

Plaintiffs established at trial that Defendant misappropriated their trade secrets. For such misappropriation, Plaintiffs sought unjust enrichment of Defendant's profits made on those trade secrets. Given Plaintiffs' success at trial and the availability of unjust enrichment as a remedy provided for by both the DTSA and TUTSA, the Court finds Plaintiffs entitled to unjust enrichment damages as an initial matter. 18 U.S.C. § 1836(b)(3)(B); TEX. CIV. PRAC. & REM. CODE § 134A.004(a).

Having found Plaintiffs entitled to unjust enrichment damages, "the Court must now determine the appropriate amount." *ResMan, LLC v. Karya Prop. Mgmt., LLC*, No. 4:19-CV-00402,

11

2021 WL 3423345, at *7 (E.D. Tex. Aug. 5, 2021). This determination asks the Court to consider whether Plaintiffs are entitled to recover "either . . . the full total of defendant's profits or some apportioned amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success." *Univ. Computing*, 504 F.2d at 539.

At trial, Plaintiffs' damages expert opined that "if the jury determines that the DiamondTrack product . . . is the result of a trade secret misappropriation . . . I wanted to calculate the total profit that Signature earned from selling that product," which amounted to $2,300,000 (Dkt. #219 at p. 191). Following deliberations, the "[t]he advisory jury awarded the disgorgement figure proposed" by Plaintiffs' expert. *AMS Sensors USA Inc. v. Renesas Elecs. Am. Inc.*, No. 4:08-CV-00451, 2021 WL 12234726, at *18 (E.D. Tex. Dec. 14, 2021), *aff'd sub nom.*, *ams-OSRAM USA Inc. v. Renesas Elecs. Am., Inc.*, 133 F.4th 1337 (Fed. Cir. 2025). By awarding Plaintiffs the full amount of Defendant's profits on the DiamondTrack mat, the advisory jury implicitly found against Defendant on any apportionment or head start issue.

In fashioning Plaintiffs' disgorgement remedy in equity and in accordance with the evidence presented at trial, the Court finds it appropriate to favor the "advisory jury's implied rejection of Defendant's . . . arguments." *Id.* at 16. Turning to the evidence presented at trial, the Court must determine whether $2,300,000 represents a fair measurement of Defendant's "actual profits resulting from the use or disclosure of the trade secret (unjust enrichment)." *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 723 (5th Cir. 2006) (citing *Elcor Chem. Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204, 214 (Tex. App.—Dallas 1973, writ ref'd n.r.e.)). Two lines of reasoning support a finding that it does.

12

First, Plaintiffs presented sufficient evidence of Defendant's misappropriation and the value it provided to Defendant's endeavors in the trackout mat business. For instance, Plaintiffs' expert witness noted that a failure to utilize Plaintiffs' manufacturing trade secret leads to the creation of trackout mats with less "sharp angles," mats that are inferior in "function," and mats that are plainly "not as effective" (Dkt. #218 at pp. 6, 63). Plaintiffs also proved at trial that Defendant inappropriately accessed Plaintiffs' information pertaining to the types of customers to target and sell to, what trade shows to attend to reach potential new customers, sales forecasts for trackout mats, and other factors related to the pricing of trackout mats (*See* Dkt. #241 at p. 10). Plaintiffs further explained to the jury that Defendant gained insider knowledge regarding how to effectively sell products to Plaintiffs' biggest customer prior to the launch of its DiamondTrack product (Dkt. #217 at pp. 85–87). Plaintiffs also indicated that they lost a customer who Defendant identified as a "convert from an exclusive FODS distributor over to DiamondTrack" (Dkt. #220 at p. 77). Plaintiffs' trade secrets directly contributed to Defendant's financial success in what it described as a market "adjacent" to its primary market, and this contribution must be accounted for in the Court's equitable recovery analysis (Dkt. #251 at p. 23).

Second, the record supports the advisory jury's implicit finding that any relevant head start period stretched up to the date of trial. Defendant introduced evidence at trial that it began utilizing Plaintiffs' "proprietary [manufacturing] process" in December 2022, when it sent a mat mold plan with the design off to a third party (*See* Dkt. #251 at p. 13). As this Court indicated earlier, DiamondTrack officially hit the market in November 2023 (*See* Dkt. #254 at p. 3). Approximately 24 months later, Defendant found itself faced with a negative jury verdict. While Defendant introduced evidence at trial that it took around nine months to develop the DiamondTrack mat

mold containing Plaintiffs' trade secrets and two months to prepare for its market launch, Plaintiffs introduced evidence that Defendant actually started working on DiamondTrack in "June 2022," and that Defendant was expecting to purchase and test at least three independent mat molds in the absence of any misappropriation (Dkt. #219 at pp. 190, 292). The increased time and effort needed to design and test a trackout product at scale supports a finding that any head start received by Defendant ended after the close of evidence (*See* Dkt. #219 at p. 292). Not only that, but the jury also found that Defendant misappropriated two trade secrets relating to market information and customer lists—two unique items which do not lend themselves to reverse-engineering and instead naturally lose significance slowly over time.

To rectify past damages regarding the advantage created by the misappropriation of Plaintiffs' manufacturing and market-related trade secrets, and to protect Plaintiffs' recognized legal rights, the Court finds that "equitable considerations support a longer head-start period under the circumstances of this case." *AMS Sensors*, 2021 WL 12234726, at *15. The Court makes this determination in consideration of the notion that "[t]he head-start period must correct more than just the lead time gained through misappropriation because it is intended to prevent a party from unfairly profiting from another's expense of time and resources—an objective that a head-start limitation in many cases will not achieve." *Id.* at *13 (citation modified) (quoting *Halliburton*, 444 S.W.3d at 259)); *accord Elcor*, 494 S.W.2d at 212 ("The equitable cloak of protection must, of necessity, be full and complete so that those who have acted wrongfully . . . will be effectively denied the benefits and profits flowing from the wrongdoing."). As indicated above, the Court

14

ultimately adopts the advisory jury's implicit finding on this issue and holds that the appropriate head start in this case concluded in November 2025, and no sooner.[2]

Given the facts listed above and the "high degree of judicial discretion" associated with equitable relief, the Court finds it appropriate to follow the advisory jury's opinion and award Plaintiffs with $2,300,000, representing a proper disgorgement of all Defendant's profits from sales of the DiamondTrack mat through November 2025. DAN. B. DOBBS, LAW OF REMEDIES § 2.1 at 47 (3d ed. 2018).

### C.      Exemplary Damages

The jury awarded Plaintiffs $8,000,000 in exemplary damages (Dkt. #211 at p. 7). Plaintiffs have asked to receive the maximum amount of exemplary damages permitted by law. Defendant does not contest Plaintiffs' election of exemplary damages. Both DTSA and TUTSA cap exemplary damages at two times the amount of actual damages. 18 U.S.C. § 1836(b)(3)(C); TEX. CIV. PRAC. & REM. CODE § 134A.004(b). Thus, Plaintiffs will be entitled to recover a total of $4,600,000 (two times $2,300,000) in exemplary damages. *See ams-OSRAM USA*, 133 F.4th at 1352; *Curtis v. Loether*, 415 U.S. 189, 197–98 (1974) (characterizing exemplary damages as a legal remedy).

---

[2] The Court makes this determination only to the extent necessary to secure a final judgment, as the jury prompted the Court to ask a witness at trial if their opinion would "change if [Defendant] didn't have the *head start* of the FODS information," (Dkt. #220 at p. 88 (emphasis added)), and because Plaintiffs' expert witness presented evidence of an unknown head start period to the jury: "Q: '[a]nd specifically you—you've opined in this case that [Defendant] got a *head start* . . . in it's development of the DiamondTrack, right?' A: 'I did.'" (Dkt. #217 at p. 221 (emphasis added)). In making its determination as to an appropriate "head start" period, the Court considers the fact that "at trial [Defendant] did not present evidence regarding that theory. Nor did it ask for a jury instruction embodying that theory. Instead, [Defendant's] principal argument at trial was that there was no misappropriation at all. The jury, however, rejected the 'no misappropriation' argument." *Bianco v. Globus Med., Inc.*, 53 F. Supp. 3d 929, 935 (E.D. Tex. 2014).

**D.    Interest and Attorneys' Fees**

Defendant does not dispute Plaintiffs' election of pre- or post-judgment interest, or attorneys' fees. Furthermore, Plaintiffs have indicated their intent to file a fee application after the Court's entry of final judgment (Dkt. #241 at p. 3 n.1). Under these circumstances, the Court sees fit to address the issue of fees and taxable costs following the entry of final judgment.

## III.    Plaintiffs' Injunctive Relief

In addition to monetary damages, Plaintiffs urge the Court to permanently enjoin Defendant in a manner:

> (1) permanently prohibiting the use, access, or disclosure of Plaintiffs' trade secrets;
> (2) permanently prohibiting the possession or retention of Plaintiffs' trade secrets;
> (3) permanently prohibiting the design, manufacture, sale (which includes both renting and leasing), and marketing of any products that are based on and/or derived from Plaintiffs' trade secrets, including the DiamondTrack; (4) permanently prohibiting any Signature employees who had access to Plaintiffs' trade secrets from working on or assisting with the design, manufacture, sale, or marketing of the DiamondTrack and for 18 months on any composite trackout products; and (5) prohibiting the manufacture, marketing, advertising, or sale (including renting or leasing) of any mat that is interlockable or interoperable with a mat that is manufactured by Plaintiffs for a period of 3 years.

(Dkt. #241 at pp. 18–19).

While both DTSA and TUTSA authorize injunctive relief in addition to compensatory and exemplary damages, injunctions remain "an extraordinary and drastic remedy," only to be granted "when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)); 18 U.S.C. § 1836(b)(3)(A)(i); TEX. CIV. PRAC. & REM. CODE § 134A.003(a). Nevertheless, this Court and others have previously recognized that "[t]he Fifth Circuit favors permanent injunctions for most misappropriation of trade secrets cases." *BarZ Adventures Inc. v. Patrick*, No. 4:20-CV-299, 2022 WL 4082464, at *5 (E.D. Tex. Sept. 6, 2022) (citing *Metallurgical Indus. Inc. v.*

16

*Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986)). And, "[a]s the Supreme Court of the United States has recognized, the standards applicable to requests for preliminary and permanent injunctions are 'essentially the same . . . with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success' when pursuing a preliminary injunction." *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008)).

To carry its burden of persuasion, a party seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Trinseo Europe GmbH v. Kellogg Brown & Root, L.L.C.*, 165 F.4th 399, 423 (5th Cir. 2026) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## A.    Irreparable Injury

"[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982). Irreparable harm generally exists "if the injury cannot be undone through monetary relief." *ADT, LLC v. Cap. Connect, Inc.*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015). Ultimately, the Court must determine the presence of irreparable injury according to the evidence in the record and articulate whether "the facts and circumstances of [this] particular case . . . show that certain injuries resulting from misappropriation of trade secrets are either compensable by monetary damages or purely speculative." *Heil*, 542 F. App'x at 336.

17

Plaintiffs argue that "there is both reason for the Court to presume that irreparable injury will occur absent injunctive relief as well as evidence showing a reasonable likelihood that [Defendant] will continue to use Plaintiffs' trade secrets" (Dkt. #241 at p. 8). They support their perspective with citations to the record indicating that Defendant obtained Plaintiffs' trade secrets through attempted acquisitions and subsequently retained the information despite multiple requests to delete it (Dkt. #241 at p. 9).

Defendant disagrees, arguing that Plaintiffs have not sufficiently identified any proof of lost sales, goodwill, or market value to warrant injunctive relief, and claiming instead that the "jury's verdict quantifies the value of the time and money [Defendant] allegedly saved as a result of Plaintiffs' alleged trade secrets, and that monetary sum fully compensates Plaintiffs" (Dkt. #251 at p. 12). Defendant further relies upon its opinion that "it is undisputed that [it] would have entered the trackout mat market on its own merit" to argue that any harm Plaintiffs suffered was covered by the jury verdict (Dkt. #251 at p. 12).

Prior to conducting a thorough analysis of either perspective, the Court must first highlight a topic introduced in each supplemental brief: the fact that this Court has previously addressed whether it is obligated to simply presume that irreparable harm exists under the facts of this specific case. *Spartan Composites, LLC v. Signature Sys. Grp., LLC*, No. 4:24-CV-609, 2026 WL 25449, at *3–4 (E.D. Tex. Jan. 5, 2026). In that decision, the Court determined that Plaintiffs were entitled to a limited preliminary injunction prohibiting Defendant from manufacturing, selling, renting or marketing the DiamondTrack mat only prior to and "pending this Court's final judgment in the imminent future." *Id.* at *7. In making its decision, this Court emphasized the actions of the parties following the four-day jury trial and ultimately determined that Plaintiffs had successfully carried

18

their burden of persuasion as to irreparable harm regardless of the operation of any identifiable presumption. *Id.* at *6. The circumstances of this Memorandum Opinion and Order present a different question altogether: whether, in addition to Plaintiffs' election of monetary compensation, Plaintiffs have carried their burden to permanently enjoin Defendant following the Court's entry of final judgment. Thus, the Court's earlier findings (related to a preliminary injunction deemed necessary to defend both a jury verdict and a plaintiff's right to elect remedies prior to the entry of final judgment) do not control the matter presently before the Court, i.e., whether a permanent injunction should issue against Defendant following final judgment. Put another way, the Court sees fit to approach this issue anew.

As with its previous decision, the Court does not here endeavor to lay the irreparable injury presumption question to rest. *See id.* at *3. Nevertheless, the Fifth Circuit issued an opinion adjacent to the irreparable injury presumption approximately sixteen days after this Court granted Plaintiffs' request for a preliminary injunction. *See Trinseo*, 165 F.4th at 399. In its decision, the Fifth Circuit cited *Heil* to support the proposition that a defendant's continued presence in the market, combined with its knowledge of a plaintiff's trade secrets, "constitutes irreparable harm," even when applied exclusively to violations of the DTSA. *Id.* at 423 (citing *Heil*, 542 F. App'x at 336). The Fifth Circuit also found that *Heil* stood for the proposition that "under Texas law, the threat of trade secret disclosure constitutes irreparable injury." *Id.* In light of this recent development, the Court finds that Defendant's knowledge and continued possession of Plaintiffs' trade secrets, together with its intent to continue openly competing in the composite mat market at large, along with the fact that it was found to have willfully and maliciously acted against Plaintiffs' interests, constitutes a threat of disclosure sufficient to satisfy the irreparable harm

19

requirement. Stated differently, Plaintiffs have "demonstrated [they] will suffer harm by the continued use of its trade secrets," which is sufficient to support a finding of irreparable injury. *Id.*

Even without the presumption, however, there are facts to indicate that Plaintiffs' proposed future injuries are not entirely compensable by monetary damages nor purely speculative. *See Heil*, 542 F. App'x at 336 (indicating that the presumption of irreparable harm can be defeated under certain circumstances); *see also Direct Biologics, L.L.C. v. McQueen*, 63 F.4th 1015, 1022 (5th Cir. 2023) (finding that a district court did not abuse its discretion by declining to presume the existence of an irreparable injury in a covenant non-compete context).

The jury found that Defendant maliciously and willfully misappropriated Plaintiffs' trade secrets concerning the marketing strategies and customer lists associated with the FODS trackout mat. It further found that Defendant benefitted from the receipt of such information—information that is still currently in Defendant's possession, and information that could be used to further assist Defendant in the future sale of products in the trackout mat market.[3] Following a thorough review of the record, the Court is confident that Plaintiffs have satisfied their burden of persuasion regarding irreparable injury, through application of the legal presumption or otherwise. *See Cajun Servs. Unlimited, LLC v. Benton Energy Serv. Co.*, No. CV 17-491, 2020 WL 375594, at *7 (E.D. La. Jan. 23, 2020) ("Based on the jury's finding that Besco willfully and maliciously misappropriated

---

[3]   The Court finds that neither the nature behind Defendant's retention of such information nor the mode in which it is currently stored is sufficient to negate the consequences of its retention altogether (Dkt. #251 at p. 21). *See Calsep A/S v. Intelligent Petroleum Software Sols., LLC*, No. 4:19-CV-1118, 2022 WL 2813069, at *7 (S.D. Tex. June 10, 2022) ("As Defendants possess misappropriated trade secrets, they could still develop a competing product in the future using Plaintiffs' software. Plaintiffs' feared harm is neither speculative nor imagined . . . ." (internal citations omitted)), *report and recommendation adopted*, No. 4:19-CV-01118, 2022 WL 2806538 (S.D. Tex. July 18, 2022), *aff'd sub nom.*, *Calsep A/S v. Dabral*, 84 F.4th 304 (5th Cir. 2023).

Plaintiffs' trade secret, the Court holds that an injunction preventing any further use of the misappropriated trade secret is warranted.").

### B.     Inadequate Remedy at Law

"[A]n adequate remedy at law exists when the situation sought to be enjoined is capable of being remedied by legally measurable damages." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 848 (5th Cir. 2004). Plaintiffs aver that the consequences of Defendant's misappropriation of its trade secrets are beyond the reach of monetary relief, as they represent a "head start and embedded knowledge" which together create "ongoing harm to market position, goodwill, and customer relationships" (Dkt. #241 at p. 10).

In response, Defendant points to Plaintiffs' favorable jury verdict regarding a reasonable royalty and argues that Plaintiffs' nonelection of that remedy precludes them from claiming that their harm has no adequate remedy at law, as such harm has already been measured and accounted for by the jury (Dkt. #251 at p. 15). Additionally, Defendant argues that the evidence presented at trial indicates that it would have eventually created a construction mat like the DiamondTrack mat regardless of any misappropriation of Plaintiffs' trade secrets related to their FODS trackout mat (Dkt. #251 at p. 12). Finally, Defendant contends that any injunctive relief would be duplicative of a monetary damages award, because monetary damages "forces [Defendant] to pay Plaintiffs a sum certain that represents the cost to independently develop DiamondTrack" (Dkt. #251 at p. 18). The Court will address the arguments presented by both parties to support its conclusion that Plaintiffs have carried their burden of proof where an inadequate remedy at law is concerned.

Defendant's first argument necessitates a review of the proposed lump sum royalty and permanent injunction. Because Plaintiffs have elected to recover Defendant's profits rather than a lump sum royalty, the issue raised by the royalty is relatively narrow: does the royalty compensate

21

Plaintiffs for future damages addressed by the proposed permanent injunction and thus prove that Plaintiffs have an adequate remedy at law? As the Fifth Circuit has cautioned that "every case requires a flexible and imaginative approach to the problem of damages," and that "each case is controlled by its own peculiar facts and circumstances," the Court addresses the royalty question in the unique context presented by this case. *Univ. Computing*, 504 F.2d at 538 (quoting *Enter. Mfg. Co. v. Shakespeare Co.*, 141 F.2d 916, 920 (6th Cir. 1944)).

Where a lump sum royalty award adequately addresses future damages in their entirety, it would stand to reason that the jury, in such a circumstance, has successfully prescribed an "adequate remedy at law" such that a plaintiff cannot prevail on the second *eBay* factor. Support for this concept can be gleaned from *Netlist, Inc. v. Samsung Elecs. Co, Ltd.*, No. 2:22-CV-00293-JRG, 2025 WL 364074, at *2 (E.D. Tex. Jan. 31, 2025), which stands for the proposition that a jury may effectively preclude a plaintiff from electing a permanent injunction if the jury finds that a "lump sum award adequately compensates [a] [p]laintiff." In *Netlist*, the district court found that when a jury returns a verdict offering a plaintiff a lump sum royalty under an express instruction that such royalty would compensate the plaintiff "for damages for both past infringement and for future infringement throughout the life of the patent," the plaintiff is prevented from complaining "that it will be irreparably harmed by future sales." *Id.* (quoting *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1380 (Fed. Cir. 2008)).

However, by that same token, if the royalty award does not cover the same future damages as the proposed permanent injunction, it cannot constitute proof of an "adequate remedy at law" sufficient to preclude injunctive relief. To highlight this fact, the Court turns to *Texas Advanced Optoelectronic*, 895 F.3d at 1304. There, the Federal Circuit analyzed a district court's decision to

22

deny injunctive relief to a plaintiff seeking recovery for patent infringement on the grounds that the plaintiff "had requested a reasonable royalty as compensation for past infringement." *Id.* at 1331. In that decision, the Federal Circuit found that a lump sum award addressing *past* infringement did not preclude a plaintiff's election of a permanent injunction addressing *future* "hard-to-measure harms . . . to prevent them before they occur." *Id.* Just as "a patent owner's request for relief in the form of a reasonable royalty may be relevant" to the issue of an inadequate remedy at law yet remains "not conclusive without further analysis," so too does a trade secret owner's request for a reasonable royalty fail to immediately divest him of the right to elect his remedy after trial. *Id.*; *see also StoneCoat*, 426 F. Supp. 3d at 347 ("Once a jury determines that a trade secret exists and was wrongfully misappropriated, the Fifth Circuit has noted that it is generally accepted that the measure of damages may be calculated by reference to patent cases." (citing *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 962 (S.D. Tex. 2013))).

Therefore, the Court must conduct further analysis to determine whether the relevant jury verdict in this case either limits or completely divests Plaintiffs of the prospect of injunctive relief. In this case, the jury found that Defendant unjustly benefitted from its exposure to Plaintiffs' trade secrets during multiple failed business acquisitions (*See* Dkt. #211 at pp. 3–4). Plaintiffs' damages expert opined that anywhere from $549,995 to $7,556,672 constituted a reasonable royalty representing "how much [Plaintiffs] would have been paid for the use of its trade secrets" for up to six years (Dkt. #219 at pp. 166, 188–89). Furthermore, the Court instructed the jury that "[a] 'reasonable royalty' is what the parties would have agreed to as a fair price for licensing Defendant to put the . . . trade secrets to the use that Defendant intended at the time the misappropriation took place" (Dkt. #205 at p. 17). Given that Plaintiffs presented evidence at trial that Defendant

began to work on its DiamondTrack mat in June 2022 after receiving Plaintiffs' trade secrets, it stands to reason that the $5,500,000 reasonable royalty award accounts for some future damages, or damages that the jury believed would occur after the November 2025 trial (Dkt. #219 at p. 292). In fact, Plaintiffs' expert stated as much, claiming that "[i]f the jury were to decide that it [is] most appropriate for [Defendant] to pay a royalty just through trial, that would be $2,100,000" (Dkt. #219 at p. 188 (modified for readability)). By increasing Plaintiffs' award by over $3,000,000 from that number, the jury necessarily awarded Plaintiffs millions of dollars in future damages. This finding appears to beg the question: does the $3,000,000 in excess recovery adequately measure and represent all the future damages Plaintiff might endure? The Court finds that it does not.

At the conclusion of trial, the jury was informed that a reasonable royalty consists of a "fair price for Defendant's use of Plaintiffs' trade secrets," including "the resulting and foreseeable changes in the parties' competitive positions" (Dkt. #205 at p. 17). Thus, under a fair review of the record, there is at least some evidence that the reasonable royalty award is partially "based on actual future use of the trade secret[s]." *TMRJ Holdings, Inc. v. Inhance Techs., LLC*, 540 S.W.3d 202, 210 (Tex. App.—Houston [1st Dist.] 2018, no pet.). However, while the jury found it appropriate to award Plaintiffs compensation for some future use of its trade secrets, there is nothing indicating that the jury determined the fair monetary compensation for all future damages suffered by Plaintiffs "without restraint [to] either time or circumstance." *Cf. Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16CV545, 2018 WL 6272893, at *5 (E.D. Va. Nov. 30, 2018) (holding that an expert's trial testimony that "a lump sum royalty 'would allow [the defendant] to use the trade secrets as long as those are valuable—or the alleged trade secrets as long as they are valuable to [the defendant]'" precluded any issuance of a permanent injunction). Instead, Plaintiffs' damages

24

expert capped the reasonable royalty damages by centering his calculation on the number of DiamondTrack units sold by Defendant and by restricting the available time frame to a maximum of six years (*See* Dkt. #219 at pp. 187–88). Neither the Court's instructions nor the evidence introduced at trial asked the jury to take into consideration the potential future "loss of market share, goodwill, and business advantages associated with the [t]rade [s]ecrets" at issue in this case. *Computer Scis.*, 2024 WL 6909861, at *37. Therefore, the Court finds that the reasonable royalty award, standing alone, does not conclusively preclude injunctive relief because it does not provide Plaintiffs with an "adequate remedy at law" for all future misuse of Plaintiffs' trade secrets.

Nor does the fact that Plaintiffs prevailed on the reasonable royalty question automatically preclude Plaintiffs from receiving injunctive relief. The Fifth Circuit has previously held that "[d]amages in trade secret misappropriation cases are typically a royalty paid to the trade secret owner." *Cudd Pressure Control Inc. v. Roles*, 328 F. App'x 961, 964 (5th Cir. 2009). To broadly hold that the "typical" recovery for trade secret cases precludes any issuance of permanent injunctions would contravene the fact that "[t]he Fifth Circuit favors permanent injunctions for most misappropriation of trade secrets cases." *BarZ*, 2022 WL 4082464, at *5.

Having determined that the lump sum remedy does not conclusively prove that Plaintiffs have an adequate remedy at law regarding future misappropriation of their trade secrets, the Court next analyzes Defendant's arguments pertaining to the inevitability of its competing product and the potential duplicity that could accompany the issuance of any permanent injunction.

Defendant's "inevitability" argument fails to account for the consequences of its misappropriation of Plaintiffs' business information and customer list trade secrets. The jury found that Defendant willfully and maliciously used these two trade secrets to sell and market

Defendant's DiamondTrack mat in the past. If Defendant's knowledge of Plaintiffs' market strategies and customer lists are not quashed by a permanent injunction, they will likely be used to support the sale of Defendant's products following this Court's final judgment, resulting in ongoing irreparable harm to Plaintiff's market share and goodwill. *See AHS Staffing, LLC v. Quest Staffing Grp., Inc.*, 335 F. Supp. 3d 856, 873 (E.D. Tex. 2018) ("Any calculation of monetary damages would fail to fully appreciate the harm done by Defendant . . . skipping the necessary research and development undertaken by every other competitor."); *Comput. Scis.*, 2024 WL 6909861, at *37 ("[M]onetary damages would fail to compensate CSC for the future harm resulting from TCS's misappropriation of the Trade Secrets, including CSC's loss of market share, goodwill, and business advantages associated with the Trade Secrets.").[4]

Finally, the notion of double recovery does not preclude Plaintiffs from receiving both a disgorgement of Defendant's profits and a permanent injunction. Both the DTSA and TUTSA plainly permit courts to award damages *and* to enjoin defendants who are found liable for misappropriating trade secrets. *See* 18 U.S.C. § 1836(b)(3)(A)–(B); TEX. CIV. PRAC. & REM. CODE § 134A.004(a). Although a party may not receive "more than one recovery for the same injury," this concern is not implicated when a party receives a disgorgement of profits related to past infringement and a permanent injunction related to future infringement. *TMRJ*, 540 S.W.3d at 207; *see also* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:1 ("An injunction looks to the future, while money damages look to compensation for past injuries.").

---

[4] The Court makes this determination over Defendant's argument that the $570,000 in saved development costs represents the full amount of Defendant's improper head start, which is "based on the faulty premise that head start damages and saved development costs are the same thing." *Sabre GLBL, Inc v. Shan*, 779 F. App'x 843, 851 (3d Cir. 2019) (citation modified).

### C.     Balance of Hardships

"The movant must also show that the threatened injury to the movant outweighs the harm that the injunction may cause the nonmovant." *Centurum Info. Tech. Inc. v. Geocent, LLC*, No. CV 21-0082, 2021 WL 533707, at *15 (E.D. La. Feb. 12, 2021). When this Court originally granted Plaintiffs' request for a preliminary injunction, it did so while noting that "Defendant is no longer manufacturing or producing their DiamondTrack model, and is actively selling four industrial matting products." *Spartan*, 2026 WL 25449, at *6. Given this fact, a hypothetical permanent injunction targeting the DiamondTrack model and/or the misappropriated marketing strategies and customer list would not cause undue harm to Defendant's business (Dkt. #251 at p. 23). "Courts have found that the balance of hardships tips in favor of a plaintiff seeking an injunction which would 'merely prohibit the defendants from misappropriating the trade secrets of the plaintiff.'" *Chevron U.S.A., Inc. v. Guajardo*, No. CV H-17-1549, 2017 WL 2265694, at *3 (S.D. Tex. May 24, 2017) (quoting *Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*, 2013 WL 2151553, at *14 (E.D. Cal. May 16, 2013)). Because "a permanent injunction reduces the need for multiple lawsuits and prevents future infringement," the Court finds that a permanent injunction, narrowly tailored to address specific portions of the trade secret misappropriation recognized by the jury, would not cause harm to Defendant sufficient to defeat or undermine the injunction's operative purpose. *Gibson, Inc. v. Armadillo Distrib. Enters., Inc.*, No. 4:19-CV-358, 2025 WL 2698115, at *5 (E.D. Tex. Sept. 22, 2025).

### D.     Public Interest

Defendant argues that this Court's previous finding, that "Plaintiffs seek the ability to compete in the market without suffering the negative consequences of any misappropriation of their trade secrets" is inapplicable in a permanent injunction context. *Spartan*, 2026 WL 25449, at

27

*7. Defendant repeats its belief that Plaintiffs' elected monetary recovery adequately compensates them for the "head start" Defendant received by misappropriating Plaintiffs' trade secrets (Dkt. #251 at p. 24). However, as this Court has already explained, the misappropriation of Plaintiffs' trade secrets has resulted in lasting and hard-to-measure damages to Plaintiffs which customarily warrants the application of injunctive relief. *See supra* Section III A–B. Because "protection against the misappropriation of trade secrets serves the public interest," the Court finds that a permanent injunction defending Plaintiffs' right to be free from the future negative consequences of trade secret misappropriation would serve the public interest. *Trinseo*, 165 F.4th at 423.

### E.    Narrowly Tailored

A district court abuses its discretion if it issues an injunction that is not "narrowly tailored to remedy the specific action which gives rise to the order as determined by the substantive law at issue." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (per curiam) (citation modified) (quoting *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)). To prevent such an occurrence, a district court may "reduce the scope of [an] injunction to eliminate [issues such as] overlap." *Comput. Scis.*, 159 F.4th at 451.

This Court previously favored Plaintiffs' proposed preliminary injunction because it found that the request was not merely a "thinly veiled request for an exclusionary right to sell their FODS trackout mat without competition." *Spartan*, 2026 WL 25449, at *7. That finding does not apply in equal measure to the proposed permanent injunction currently before the Court. Indeed, Plaintiffs ask the Court to do much more than address and prevent future misappropriation of their trade secrets—among other things, Plaintiffs seek to: (a) prohibit any employees of Defendant who either had or have access to Plaintiffs' trade secrets from participating in the production or sale of

28

"any composite trackout product" for 18 months; (b) effectively prevent Defendant from "[d]esigning, developing, or manufacturing any products that are based on, embody, use, and/or are derived from Plaintiffs' Trade Secrets"; and (c) enjoin Defendant from manufacturing or selling any mat that is interlockable with any mat manufactured by Plaintiffs for over three years (Dkt. #241-1 at pp. 3–4).[5]

In determining an appropriate post-trial injunctive remedy for any particular case, a district court must consider all aspects of the jury verdict. That is, it must weigh in equal measure the jury's findings for either party. In this case, the jury found three trade secret questions for the Plaintiffs, and one trade secret question for the Defendant (Dkt. #211 at p. 3). When asked whether the combination of manufacturing traits held by the FODS trackout mat constituted a trade secret, the jury answered with a resounding "no." Defendant's success on this question leads the Court to believe that any injunctive relief granted to Plaintiffs should not be as expansive as they request. A variety of other factors support this particular interpretation. First, Defendant introduced evidence at trial that it has been utilizing a method similar to Plaintiffs' proprietary production process to create multiple other products for almost 20 years (Dkt. #219 at p. 214). Second, Plaintiffs' own damages expert held that a reasonable royalty would only account for a maximum of six years of trade secret "use," which the jury ultimately did not find (Dkt. #219 at p. 189).[6] That expert further opined that "access to these trade secrets . . . save[d] [Defendant] time and money," which is necessarily different than providing Defendant with something it would not have

---

[5]  To the extent that Plaintiffs seek a permanent injunction based on its breach of contract cause of action, the Court finds that the balance of hardships precludes of any such injunctive relief. Indeed, Plaintiffs admitted they are in active breach of the very contract they argue was breached by Defendant (Dkt. #215 at p. 193 ("Q: 'So [Plaintiff] is actively breaching this Settlement Agreement, right?' A: 'Yes.'")).

[6]  Plaintiffs' damages expert based his proposed six-year maximum on a previous settlement agreement regarding different composite mats and Defendant's own proposed calculation (Dkt. #219 at p. 168).

eventually obtained (Dkt. #219 at p. 189). Finally, Plaintiffs admitted at trial that Defendant would eventually create a composite trackout mat and repeatedly emphasized the term "head start" to describe Defendant's unlawful gain (Dkt. #217 at p. 221; Dkt. #219 at p. 168).

Plaintiffs argue that a broad and sweeping injunction against Defendant is warranted notwithstanding the facts listed above. The Court disagrees, and tailors the injunction by limiting it primarily to the trade secrets related to Plaintiffs' marketing strategies and customer lists as reflected in the Court's imminent final judgment.[7]

## CONCLUSION

It is therefore **ORDERED** that Plaintiffs Spartan Composites, LLC, d/b/a FODS, and Spartan Mat, LLC's Post-Trial Brief (Dkt. #241) are hereby **GRANTED in part** and **DENIED in part**. The Court will enter Final Judgment on the issues of profit disgorgement and permanent injunctive relief in accordance with this Order.

**IT IS SO ORDERED.**

**SIGNED this 30th day of April, 2026.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

---

[7] The proposed permanent injunction at issue in this Memorandum Opinion and Order, like the rest of the Court's upcoming Final Judgment, may be altered by the Court in response to subsequent motions filed by either party. This Memorandum Opinion and Order does not prevent the Court from subsequently ruling on issues related to the foundation of the proposed permanent injunction. Nor does it prevent the Court from ruling against the necessity of injunctive relief by any future motion. *See, e.g.*, *Aspen Tech., Inc. v. Kunt*, No. CV H-10-1127, 2013 WL 12090343, at *4 (S.D. Tex. Feb. 4, 2013) ("The motion to amend the judgment is granted as set out herein, and an Amended Final Judgment and Permanent Injunction shall issue contemporaneously.").